

AlaFile E-Notice

50-CV-2024-900163.00

Judge: CHRISTOPHER F ABEL

To:   JACKSON KEITH
      kj@rileyjacksonlaw.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA

MICHAEL MASHKEVICH V. OLIVIA AVA ET AL
50-CV-2024-900163.00

The following matter was FILED on 1/20/2025 1:57:19 PM

**ZO   UAB QBIT FINANCIAL SERVICE**
MOTION TO VACATE OR MODIFY
[Filer: BUCK THOMAS WINCHESTER HE]

Notice Date:    1/20/2025 1:57:19 PM

ANGIE JOHNSON
CIRCUIT COURT CLERK
MARSHALL COUNTY, ALABAMA
424 BLOUNT AVE.
SUITE 201
GUNTERSVILLE, AL, 35976

256-571-7785
angie.johnson@alacourt.gov

Case 5:25-cv-02565-PCP    Document 1-10    Filed 03/14/25    Page 2 of 34

ELECTRONICALLY FILED
1/20/2025 1:57 PM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

# STATE OF ALABAMA

**Revised 3/5/08**

**Unified Judicial System**

50-MARSHALL

☐ District Court    ☑ Circuit Court    CV2...

## CIVIL MOTION COVER SHEET

MICHAEL MASHKEVICH V. OLIVIA AVA ET AL

*Name of Filing Party:* ZO - UAB Qbit Financial Service

---

*Name, Address, and Telephone No. of Attorney or Party. If Not Represented.*

THOMAS WINCHESTER HENDRICK BUCK

1901 6TH AVENUE NORTH

BIRMINGHAM, AL 35203

*Attorney Bar No.:* BUC036

☑ Oral Arguments Requested

---

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative Summary Judgment ($50.00) | ☐ Continue |
| | ☐ Deposition |
| | ☐ Designate a Mediator |
| ☐ Renewed Dispositive Motion (Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Judgment as a Matter of Law (during Trial) |
| | ☐ Disburse Funds |
| ☐ Summary Judgment pursuant to Rule 56 ($50.00) | ☐ Extension of Time |
| ☐ Motion to Intervene ($297.00) | ☐ In Limine |
| ☐ Other _____ | ☐ Joinder |
| pursuant to Rule _____ ($50.00) | ☐ More Definite Statement |
| | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| | ☐ Pendente Lite |
| ☐ Local Court Costs $ 0 | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☑ Vacate or Modify |
| | ☐ Withdraw |
| | ☐ Other _____ |
| | pursuant to Rule _____ (Subject to Filing Fee) |

---

Check here if you have filed or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) ☐

Date:
1/20/2025 1:54:33 PM

Signature of Attorney or Party
/s/ THOMAS WINCHESTER HENDRICK BUCK

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

DOCUMENT 40

Case 5:25-cv-02565-PCP    Document 1-10    Filed 03/14/25    Page 3 of 34

ELECTRONICALLY FILED
1/20/2025 1:57 PM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

# IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>OLIVIA AVA, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE NUMBER: CV-2024-900163 |

## NONPARTY UAB QBIT FINANCIAL SERVICE'S MOTION TO DISSOLVE OR, IN THE ALTERNATIVE, MODIFY PRELIMINARY INJUNCTION ORDER

On June 14, 2024, this Court issued a preliminary injunction order (Doc. 17, the "Injunction Order") that, among other things, ordered nonparty OKX Hong Kong FinTech Company Limited ("OKX"), a Honk Kong-based cryptocurrency exchange, to freeze nine of its customers' cryptocurrency accounts. One of those accounts belonged to nonparty UAB Qbit Financial Service ("Qbit"),[1] a Lithuanian financial technology company specializing in cross-border payment and banking solutions for global businesses. The frozen account contains funds belonging to these businesses, which are Qbit customers. To pay back its customers' funds from the frozen account, Qbit has been borrowing money at high interest rates and, as a result, is losing about $6,000 each day. The Injunction Order directly and adversely affects Qbit, and Qbit now moves for its dissolution.

This Court should dissolve the Injunction Order for several reasons. Perhaps the most glaring reason is the fact that Plaintiff Michael Mashkevich brought this case against fictitious parties only. Such actions are void *ab initio*, and courts lack authority to take any action upon them

---

[1] "UAB" stands for "Uzdaroji Akcine Bendrove," which is Lithuania's designation for a Lithuanian Private Limited Company. Translated literally, "Uzdaroji Akcine Bendrove" means "Closed Joint Stock Company."

except to dismiss them. The Injunction Order, like this lawsuit, is therefore void.

The Injunction Order is also void because this Court issued it before obtaining personal jurisdiction over any defendant. Courts cannot obtain personal jurisdiction over a defendant until that defendant is served with process. Mashkevich cannot serve process, however, because his lawsuit does not identify a defendant.

Jurisdictional issues aside, the Injunction Order violates Rule 65 in several respects. First, it violates Rule 65(a)(1)'s requirement that notice be provided to "the adverse party." Obviously, Mashkevich could not have provided notice to an "adverse party" because he has not identified an "adverse party." Even if it was possible to provide notice to fictitious parties, the "notice" purportedly provided by Mashkevich was provided not to any fictitious parties, but to cryptocurrency exchanges who all agree are *nonparties*. Furthermore, such "notice"—delivered by what this Court described as "Service Tokens" airdropped into digital wallets—does not constitute a valid form of notice under Rule 5. And even if it did, Mashkevich deprived any notice recipients of due process by failing to deliver those "Service Tokens" until three days *after* this Court's deadline for filing opposition to his preliminary injunction request.

Second, the Injunction Order violates Rule 65(b)(2) because it does not bind any parties to this case. Courts may enjoin certain nonparties, such as persons acting in concert with enjoined defendants, only when doing so is necessary to give effect to an injunction against a *party*. The Injunction Order does not bind any identifiable party. Indeed, the harm Qbit is suffering results directly from the Injunction Order's enjoinment of *nonparty* OKX.

Third, even if the Injunction Order actually bound parties, it would still violate Rule 65(c)'s security requirement. This Court did not require Mashkevich to post security because, in its view, his private conversion claim presented an issue of "overriding public concern." Although the

Alabama Supreme Court has recognized that an "overriding public concern" may warrant an exception to the bond requirement in an appropriate case, it appears that no Alabama appellate court has ever affirmed a trial court's decision to make such an exception. Indeed, the Alabama Supreme Court recently held that the "overriding public concern" exception did not apply to an injunction order that opened a roadway to the public. *Milton v. Haywood*, 393 So. 3d 1156 (Ala. 2023). If public access to a roadway does not present an issue of "overriding public concern," Mashkevich's private conversion claim certainly does not.

In addition to its other legal defects, the Injunction Order creates an unlawful remedy by freezing assets before judgment. Alabama has long recognized that, absent an equitable interest asserted by the plaintiff, courts lack the authority to freeze a defendant's assets before judgment. *See Norman v. Occupational Safety Ass'n of Ala. Workmen's Comp. Fund*, 811 So. 2d 492 (Ala. 2001). This rule should apply with extra force when, as here, the frozen assets do not even belong to a defendant, but rather to nonparties.

Notwithstanding these numerous legal deficiencies, the evidence supports, at the very least, a modification of the Injunction Order to unfreeze Qbit's account. Unfreezing Qbit's account will not cause Mashkevich to suffer any irremediable harm before judgment. Mashkevich's conversion claim for money damages provides him an adequate remedy at law. Furthermore, Mashkevich cannot show a likelihood of success on the merits because he cannot even identify who is supposedly responsible for his loss. And because Mashkevich cannot identify a defendant, there is neither evidence to warrant an injunction against nonparties for acting in concert with a defendant nor evidence from which this Court could assess the hardship against any particular defendant.

The hardships to nonparty Qbit, however, are undeniable. Without being provided notice, process, or any opportunity to defend itself, Qbit lost access to millions of dollars in its customer's

funds. Not only is the Injunction Order causing Qbit to lose $6,000 per day, but it is has also empowered Mashkevich to demand exorbitant sums of money from Qbit without ever naming Qbit as a party. After becoming aware of the Injunction Order, Qbit contacted Mashkevich's counsel. Taking advantage of Qbit's precarious position as a nonparty, Mashkevich's counsel offered to unfreeze Qbit's account in exchange for a ransom payment of more than 30 times what Mashkevich claims to have lost.[2] By leveraging the *ultra vires* Injunction Order, Mashkevich has effectively drawn Qbit into this litigation without having to worry about due process or rules of procedure. Such concerns, of course, go to the very heart of why injunctions like the one imposed by the Injunction Order are invalid. The Injunction Order is unlawful and this Court should dissolve it.

<u>**BACKGROUND AND PROCEDURAL HISTORY**</u>

**A.    Qbit**

Qbit is a financial technology company headquartered in Lithuania. Declaration of Yujun Wu ("Ex. A") at ¶ 2. It specializes in cross-border payment and banking solutions for global businesses. *Id.* Qbit offers its customers, among other things, multi-currency business accounts, global payment processing, and supply chain financing. *Id.* at ¶ 3. Qbit's customers may fund their accounts by transferring cryptocurrency, and they may direct Qbit to use the deposited funds for payment purposes. *Id.*

Qbit services cryptocurrency accounts on a platform called "Interlace," which is only open to registered businesses and may be used for business purposes only. *Id.* at ¶ 4. To register an Interlace account, customers must provide various certifications and business documents,

---

[2] To the extent Mashkevich's ransom demand can be characterized as a settlement offer, it does not fall within the protections of Alabama Rule of Evidence 408. That Rule prohibits "any party" from offering settlement offers into evidence. Qbit is not a "party" to this action.

including certificates of incorporation, business licenses, governing documents, registries of directors and shares, ownership charts, and, for certain directors and account owners, personal identification documents. *Id.*

Qbit uses OKX to provide trading services related to it virtual assets. *Id.* at ¶ 5. OKX takes these virtual assets into its custody, but Qbit is the legal and beneficial owner of these assets and, until the events giving rise to this motion, was the only entity that could access them. *Id.* One of these virtual assets, and the asset at issue here, is a cryptocurrency "wallet" identified as "THGTenLmvqWycGLGtgRvX4wURiHQeDvNps" (the "Qbit Wallet"). *Id.*.

## B.    Procedural Background

### 1.    Mashkevich files a complaint naming only fictitious parties as defendants

Mashkevich filed this putative class action on June 4, 2024. Doc. 2 ("Compl."). The Complaint does not identify a single defendant, but instead names 26 Fictitious Defendants. *Id.* at ¶ 13. According to the Complaint, Fictitious Defendants used fake work platforms to convince Mashkevich and putative class members to transfer funds from cryptocurrency wallets into wallets that Fictitious Defendants control. *See id.* at ¶¶ 2–5.

The Complaint gives fictitious names to Fictitious Defendants A-C. *See id.* at ¶¶ 12–13. The Complaint identifies Fictitious Defendant A as "Olivia Ava," Fictitious Defendant B as "Emma Miller," and Fictitious Defendant C as "F.B. Lee." Mashkevich acknowledges that the "true identities" of these individuals "are currently unknown. *Id.* at ¶ 12.

According to the Complaint, between March 20, 2024 and April 6, 2024, "Lee," at "Ava's" behest, and "Miller" contacted Mashkevich via WhatsApp under the auspices of offering remote online employment opportunities.  *See id.* at ¶¶ 20–27. "Lee" and "Miller" directed Mashkevich to fake web sites that they created, and they "trained" Mashkevich to perform "work" for which

they told him he would receive commissions. *Id.* at ¶¶ 20–30. "Lee" and "Miller" instructed Mashkevich to create cryptocurrency accounts on these fake work platforms. *Id.* at ¶¶ 21–23. They led Mashkevich to believe that he would be able to withdraw his commissions from these accounts. *Id.* Through various deceptions and schemes, "Lee" and "Miller" convinced Mashkevich that he needed to deposit more and more of his own cryptocurrency into these accounts so that he could access the commissions he thought he was earning. *See id.* at ¶¶ 22, 31–37. Ultimately, Mashkevich transferred approximately $90,000 to these accounts. *Id.* at ¶ 24.

When Mashkevich learned that he could not access the cryptocurrency that he had transferred, he contacted Inca Digital ("Inca"), a cryptocurrency investigation firm. *Id.* at ¶ 8. Inca conducted an investigation that allegedly revealed that Fictitious Defendants converted Mashkevich's assets and sent them through a web of transactions designed to "hide their trail." *Id.* at ¶ 40. Inca ultimately traced Mashkevich's cryptocurrency to 36 cryptocurrency wallets (the "Crypto Wallets") held by 5 cryptocurrency exchanges (the "Exchanges"), including OKX. *Id.* at ¶ 41, Ex. A. OKX has custody of nine of the Crypto Wallets. *Id.* at Ex. A. The Complaint identifies one of the nine Crypto Wallets maintained by OKX as the Qbit Wallet. *Id.*

Maskevich also brings class allegations. *See id.* at ¶¶ 44–53. He alleges that once Inca identified the 36 Crypto Wallets, it "reversed traced" the funds contained in the Crypto Wallets and determined through the "flow of funds" that Fictitious Defendants used the same scheme used against Mashkevich to convert the cryptocurrency of other putative class members and that the Crytpo Wallets also hold putative class members' funds. *Id.* at ¶¶ 42–43, Ex. A.

Based on these allegations, Mashkevich brings only one substantive count: conversion. *Id.* at ¶¶ 54–57.[3] According to the Complaint, the cryptocurrency allegedly converted by Fictitious

---

[3] The Complaint purports to list two "causes of action": "conversion" and "request for injunctive relief." Compl. ¶¶ 54–59. But an "injunction is a remedy, not a cause of action." *Davis v. Bank of Am., N.A.*, No. 2:12-CV-01632, 2014

Defendants is "specifically identifiable." *Id.* at ¶ 56. Despite this allegation—and despite Mashkevich's assertion that Inca traced his specific cryptocurrency to the Crypto Wallets— the Complaint does not identify the specific cryptocurrency that Fictitious Defendants supposedly converted. Nor does Mashkevich allege that the Crypto Wallets hold *only* stolen cryptocurrency. Indeed, Mashkevich does not allege how much cryptocurrency each of the Crypto Wallets holds. Nevertheless, as part of his remedy, Mashkevich requested injunctive relief freezing all cryptocurrency—not just his own—held in the Crypto Wallets.  *Id.* at ¶¶ 58–59.

### 2.    Mashkevich requests injunctive relief and this Court issues a TRO

On the same day he filed the Complaint, Mashkevich moved for a temporary restraining order and an order to show cause why a preliminary injunction should not issue. Doc. 5. Among other things, Mashkevich requested that this Court enjoin the movement of any funds contained in the Crypto Wallets. *Id.* at 2. In support of his motion, Mashkevich presented affidavit testimony describing the WhatsApp conversations he had with "Lee" and "Miller" and attesting that he lost $90,000 to their scheme. *See generally* Doc. 8 at ¶¶ 5–20.

Mashkevich also submitted the Declaration of Inca employee Charles Zach, executed in Croatia. Doc. 7. According to Zach, Inca traced Mashkevich's cryptocurrency by first using Mashkevich's screenshots to identify the addresses to which Mashkevich sent his cryptocurrency. *Id.* at ¶ 8. Next, Inca "analyzed transfers from these addresses" and found that Fictitious Defendants (whom Zach did not identify) combined funds from these addresses with other funds and converted them to different cryptocurrencies. *Id.* at ¶ 9. According to Zach, these combined funds were transferred yet again "through a series of wallet addresses, commingled, and then

---

WL 5090692, at *14 (N.D. Ala. Oct. 9, 2014). Therefore, "[i]njunctive relief is not properly pled as a separate cause of action, but is available only as part of the relief granted if plaintiff prevails on a substantive cause of action." *Id.* (citing *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004)).

deposited" in the Crypto Wallets. *Id.* at ¶ 10. Finally, Inca "reversed traced" from the Crypto Wallets to identify a "common pattern of transactions." *Id.* at ¶ 11. Based only on this "reverse trace," Inca concluded that the Crypto Wallets contained "a minimum of $3.5 million" of funds stolen from "more than 125" putative class members. *Id.* Although Zach claimed he had identified the location of Mashkevich's cryptocurrency, he did not state, as the Complaint alleges, that such cryptocurrency is specifically identifiable. Nor did he attempt to identify the cryptocurrency taken from Mashkevich or any putative class member.

Finally, in a proposed order submitted with his motion, Mashkevich proposed that "actual notice" of the TRO could be effected on the nonparty Exchanges "via a special-purpose token or equivalent blockchain currency or code," called a "Service Token," "delivered or airdropped into the" Crypto Wallets. Doc. 11 at ¶ 3. He further proposed that that the Service Token would contain a "Service Hyperlink" to a website created by Mashkevich's counsel containing the TRO "and all papers upon which it is based" and that the Service Hyperlink would "include a mechanism to track when a person clicks on" it. *Id.* Mashkevich did not cite to any case law or rule of procedure authorizing notice by his proposed means. Nor did he propose any mechanism for providing notice to the *actual owners* of the Crypto Wallets, such as Qbit.

Shortly afterwards, this Court granted Mashkevich's motion in full, including his proposal for effecting "actual notice" using "Service Tokens." Doc. 13 (the "TRO"). The TRO did not require Mashkevich to provide any notice whatsoever to the actual owners of the Crypto Wallets, such as Qbit. It set a preliminary injunction hearing for June 14, 2024, and it gave Fictitious Defendants, the nonparty Exchanges, and "anyone else wishing to be heard" until June 7, 2024— 3 days from the date of the TRO—to provide responses and evidence in opposition to Mashkevich's preliminary injunction request. *Id.* at ¶¶ 5–6.

**3.     Mashkevich delivers the "Service Tokens" to the Crypto Wallets after the time to respond had elapsed**

On June 12, 2024, Mashkevich submitted the Declaration of Inca contractor Albina Giuttari, executed in Switzerland, to show that he complied with the TRO's service requirements. Doc. 15. Guittari declared that on June 10, 2024, just four days before the scheduled preliminary-injunction hearing and three days <u>after</u> the response deadline imposed by this Court, Inca delivered Service Tokens to the Crypto Wallets. *Id.* at ¶ 5. Giuttari declared that she subsequently "monitored the address for each [Crypto Wallet] as well as a unique transaction hash associated with the Service Tokens." *Id.* She provided a "spreadsheet listing the addresses that have been served, along with the transaction hashes." *Id.*   Neither Giuttari nor Mashkevich offered any information regarding who, if anyone, actually viewed the TRO.

**4.     This Court grants a preliminary injunction against nonparties and does not require Mashkevich to post security**

On June 14, 2024, this Court held a preliminary injunction hearing, and it issued a preliminary injunction the same day. Injunction Order 1. Not surprisingly—especially since no Defendant had been identified—"no defendants appeared to be heard in person or through counsel." *Id.* Nevertheless, this Court was "satisfied," based on Giuttari's declaration, that Mashkevich's counsel provided Fictitious Defendants and the nonparty Exchanges with appropriate notice. *Id.*

This Court found, based on affidavits and declarations submitted, that Mashkevich satisfied all requirements for a preliminary injunction. *See id.* at 2–3. First, it found that Mashkevich met the "immediate and irreparable loss" requirement because, if the Crypto Wallets were not frozen, Fictitious Defendants would be able to "transfer cryptocurrency to unidentified recipients outside the traditional banking system and effectively place the assets at issue . . . beyond the reach of the

9

Court." *Id.* at 3. This Court did not explain how such transfers would irreparably harm Mashkevich in light of his claim for money damages.

Second—and for essentially the same reasons—this Court found that Mashkevich had no adequate remedy at law. *Id.* at 3. Even though Mashkevich's conversion claims seeks money damages, *see* Compl. 18, this Court determined that a "money judgment" against Fictitious Defendants would be "meaningless" because no one knows who the Fictitious Defendants are and they could be "expected to continue to transfer [Maskevich's] and others' cryptocurrency beyond the reach of discovery and this Court." Injunction Order 3.

Third, even though Mashkevich has not identified a single defendant, this Court found that Mashkevich had "at least a reasonable chance of success" against Fictitious Defendants "on the ultimate merits" of his conversion claim. *Id.* While acknowledging that conversion actions will not generally "lie for the conversion of money," this Court noted that exceptions may be made when the "money at issue is capable of identification." Doc. 17 at 3 (quoting *Greene Cnty. Bd. of Educ. v. Bailey*, 586 So. 2d 893, 898 (Ala. 1991)). This Court, apparently relying only on Mashkevich's allegations, explained that "cryptocurrency is specific, identifiable property subject to conversion" because "[b]y its very nature [it] has a unique and specific identification within the blockchain." *Id.* at 3-4. Despite this explanation, this Court did not limit the Injunction Order to apply only to specific, identifiable cryptocurrency supposedly contained in the Crypto Wallets. Instead, the Injunction Order applies to all currency contained in the Crypto Wallets. Nor did this Court address the fact that Mashkevich's expert did not identify the specific cryptocurrency that he claims Fictitious Defendants converted.

Fourth, this Court found that the hardship imposed on Fictitious Defendants "would not unreasonably outweigh the benefit accruing to" Mashkevich. *Id.* at 4. Even though Mashkevich

has not identified any defendants, this Court nevertheless found sufficient evidence to conclude

that freezing the assets of all Fictitious Defendants would "only minimally prejudice[]" them. *Id.*

This was because, according to this Court, the Injunction's Order freeze of the Crypto Wallets was

only a "temporary inconvenience." *Id.* On the other hand, this Court found that if it did not freeze

the Crypto Wallets, Mashkevich and "other potential victims" would have no "adequate remedy

for their loss" because the specific cryptocurrency at issue—which, again, has not been

identified—would be "forever gone." *Id.* This Court did not address potential hardships that the

Injunction Order would impose upon the nonparty Exchanges it enjoined or any particular Crypto

Wallet owner, such as Qbit.

Finally, while acknowledging that Alabama Rule of Civil Procedure 65(c) generally

prohibits a preliminary injunction order to be issued without a bond, this Court concluded that the

Injunction Order fell within an exception to the bond requirement because "the issue addressed"

was one of "overriding public concern." *Id.* at 6. According to this Court, even though this case is

only a private conversion action, there is an "overriding public concern" to "promote protection of

assets and recovery of stolen assets when they can be readily located and traced to specific

locations." *Id.* By "[f]reezing cryptocurrency accounts," this Court said, it could "reassure[] the

public that even with transactions conducted in the cryptocurrency, there is an adequate remedy to

prevent fraud or theft." *Id.*

## C.    Qbit Learns of the Injunction Order, and Mashkevich Demands a $3 Million Ransom Payment to Unfreeze the Qbit Wallet

On June 20, 2024, OKX informed Qbit that, in compliance with the Injunction Order, it

had frozen the Qbit Wallet. Ex. A at ¶ 6. On July 8, 2024, Qbit's Hong Kong-based counsel

contacted Mashkevich's counsel in an effort to understand the nature of Mashkevich's claim and

the amount of cryptocurrency that had been traced to the Qbit Wallet. To date, Mashkevich has

not provided Qbit with that information. Instead, even though his own expert estimated the amount of funds stolen from the putative class as $3.5 million, *see* Doc. 9 at ¶ 11, Mashkvich's counsel represented to Qbit on October 17, 2024, that the putative class's losses amount to "more than $40 million" and that the Qbit Wallet contains $3 million of stolen funds. Mashkevich's counsel demanded $3 million from Qbit to unfreeze the Qbit Wallet.[4]

The Qbit Wallet contains approximately $7 million worth of cryptocurrency, all deposited by Interlace account holders that have been screened through Interlace's quality assurance procedures. Ex. A at ¶ 7. *See also supra* at 4–5 (describing Interlace verification procedures). Because the Injunction Order froze the Qbit Wallet, Qbit must borrow money at high interest rates to pay back funds to its customers. Ex. A at ¶ 8. As a result, the Injunction Order has caused Qbit to lose about $6,000 each day. *Id.*

## STANDARD OF REVIEW

Whether to dissolve a preliminary injunction "rests within the wide discretion of the circuit court." *Petroleum Equip. Tool Co. v. State Bd. of Health*, 575 So. 2d 587, 589 (Ala. Civ. App. 1991). However, a court "exceeds its discretion when its ruling is based on an erroneous conclusion of law . . . or has so far ignored recognized principles of law or practice as to cause substantial injustice." *Corner Stone Funeral Chapel, Inc. v. MVMG, LLC*, 170 So. 3d 626, 630 (Ala. 2014).

## ARGUMENT

This Court issued the Injunction Order without jurisdiction to do so and in violation of several provisions contained in Rule 65. Qbit, being adversely affected by the Injunction Order, has standing to challenge it. Mashkevich's decision to file a complaint against solely fictitious parties not only failed to trigger this Court's subject-matter jurisdiction, but also made it impossible

---

[4] *See supra* note 2.

for this Court to obtain the personal jurisdiction necessary to enter an injunction. The Injunction Order violates Rule 65(a)(1)'s notice requirements because no notice was provided to an adverse party, and, even it had been, such notice did not comply with Rule 5 and was, regardless, untimely. It violates Rule 65(b) because it binds nonparties only. And even if the Injunction Order *did* bind identifiable parties, it would still violate Rule 65(c) because it unlawfully excused Mashkevich from posting a bond.

The remedy fashioned by the Injunction Order is also unlawful. Absent a lien or equitable claim to funds, Alabama law prohibits freezing assets to preserve funds for a money judgment that has yet to be obtained. And it certainly prohibits such relief when, as here, the enjoined entities are not even parties to the case.

Finally, even if Mashkevich could overcome all of these legal deficiencies, the evidence does not support the continued freeze of the Qbit Wallet. Unfreezing the Qbit Wallet will neither irreparably harm Mashkevich nor leave him without an adequate remedy at law. If Mashkevich ever identifies a defendant who has stolen his funds and placed them in the Qbit Wallet, he may pursue a conversion claim for money damages against such a defendant. For all these reasons, this Court should dissolve the Injunction Order or, in the alternative, modify the Injunction Order to unfreeze the Qbit Wallet.

## I.    Qbit Has Standing to Challenge the Injunction Order

Qbit has standing to challenge the Injunction Order even though it is not a party to this case. This is because "[n]on-parties who are bound by a court's equitable decrees have a right to move to have the order dissolved." *Ex parte State Personnel Board*, 45 So. 3d 751, 754 (Ala. 2010) (citing *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998)). *See also id.* ("A nonparty normally has standing to appeal when it is adversely affected by an injunction." (quoting

*In re Piper Funds, Inc., Institutional Income Portfolio Litig.*, 71 F.3d 298, 301 (8th Cir. 1995)). The Injunction Order adversely affects Qbit because it prevents Qbit from accessing its cryptocurrency account. Ex. A at ¶¶ 5–8. As a result of the Injunction Order, Qbit is losing approximately $6,000 each day and is borrowing money at high interest rates to pay back funds to customers. *Id.* at ¶ 8. Because the Injunction Order directly and adversely prevents Qbit from accessing its cryptocurrency account, Qbit has standing as a nonparty to challenge the Injunction Order.

## II.    This Court Lacked Subject-Matter Jurisdiction to Enter the Injunction Order

A complaint that does not identify any defendants "fail[s] to commence a valid action." *Ex parte Bd. of Trustees of Univ. of Ala.*, -- So. 3d --, No. SC-2024-0210, 2024 WL 3997908, at *4 (Ala. Aug. 30, 2024). Because Mashkevich brought his Complaint against fictitious parties only, this Court lacked jurisdiction to enter the Injunction Order. Indeed, the "only action" this Court was permitted to take was "to dismiss" the Complaint. *Id.*

In *Board of Trustees*, a University of Alabama-Birmingham ("UAB") professor brought negligence and breach-of-contract claims against UAB and eight fictitious defendants. *Id.* at *1. He twice amended his complaint to add new claims and new parties, including substituting several UAB employees for fictitious defendants. *Id.* UAB's board and the individual defendants moved to dismiss on absolute-immunity grounds. *Id.* After the trial court denied their motion, the defendants petitioned the Alabama Supreme Court for a writ of mandamus. *Id.* A unanimous Supreme Court held that the original complaint "was both void ab initio and failed to trigger the subject-matter jurisdiction of the trial court." *Id.* at *3. This was because the original complaint named only UAB and fictitious parties as defendants. UAB, as a State institution of higher learning, enjoyed absolute immunity under the Alabama Constitution and was "not subject to suit

under any theory." *Id.* (internal quotations omitted). Because UAB—the only named defendant—was immune from suit, the Court reasoned that "essentially, what occurred in [the] case" was that the plaintiff had filed "an unservable complaint with <u>only</u> fictitiously named defendants" and thus had not "commence[d] an action." *Id.* at *4 (quoting *Weaver v. Firestone*, 155 So. 3d 952, 963 (Ala. 2013) (emphasis in original)). Because the plaintiff's original complaint was "a nullity under Alabama law" and "failed to commence a valid action," the trial court "lacked jurisdiction to allow [the plaintiff] to later substitute named defendants for fictitiously named defendants identified in the original complaint." *Id.* Under these circumstances, "the only action the trial court could have taken was to dismiss it." *Id.*

Under *Board of Trustees*, Mashkevich's Complaint is a nullity warranting dismissal. Indeed, whereas the *Board of Trustees* plaintiff at least *identified* one defendant—albeit one that was immune from suit—Mashkevich has identified none. In other words, Mashkevich *unequivocally* did what the Supreme Court found the *Board of Trustees* plaintiff "essentially" did. *Id.* He filed an "unservable complaint with <u>only</u> fictitiously named defendants." *Id.* at *4 (quoting *Weaver*, 155 So. 3d at 963 (emphasis in original)). *See also Johnson v. Reddoch*, 198 So. 3d 497, 505 (Ala. 2015) (plurality) (describing *Weaver* as "expressly reject[ing] the arguments that" Rule 9 permits a plaintiff to file "a complaint naming as defendants *only* fictitious parties" and "that a complaint naming only fictitious part[i]es" could "commence an action against the alleged tortfeasors" (internal quotation marks omitted)). Mashkevich has therefore failed to "commence an action," and "the only action" this Court was permitted to take under Alabama law was to dismiss Mashkevich's Complaint. *Id.* This Court therefore lacked jurisdiction to issue the Injunction Order.

III.    **The Injunction Order is Void Because this Court Has Not Obtained Jurisdiction Over Any Defendant**

The Injunction Order should also be dissolved because this Court has not and cannot obtain personal jurisdiction over any Defendant in this case. When a court enters a preliminary injunction against a defendant over which it has not yet obtained personal jurisdiction, that injunction is void. *Facebook, Inc. v. K.G.S.*, 294 So. 3d 122, 141 (Ala. 2019). And it is well-settled that a court cannot obtain personal jurisdiction over a defendant until that defendant is served with process. *See Crowder v. Blevins*, -- So.3d --, No. SC-2023-0445, 2024 WL 1223798, at *8 (Ala. Mar. 22, 2024) ("[F]ailure of proper service under Rule 4[, Ala. R. Civ. P.,] deprives a court of jurisdiction and renders its judgment void." (quoting *Ex parte Pate*, 673 So. 2d 427, 428–29 (Ala. 1995)); *Ex parte Sawyer*, 984 So. 2d 1100, 1111 (Ala. 2007) (noting that the trial court did not "obtain[] personal jurisdiction over" a defendant until "process was properly served").

Mashkevich has not and cannot serve process upon any Defendant to this case. A complaint brought against fictitious parties only is "unservable." *Board of Trustees*, 2024 WL 3997908, at *4 (internal quotations omitted). Because Mashkevich has not and cannot serve process upon any Defendant in this case, this Court, accordingly, has not and cannot obtain personal jurisdiction over any Defendant in this case. And because a court must obtain personal jurisdiction over a defendant prior to entering a preliminary injunction, the Injunction Order is void.

IV.    **The Injunction Order Violates Rule 65**

The Injunction Order is also due to be dissolved because it violates Alabama Rule of Civil Procedure 65 in several respects. Specifically, this Court issued the Injunction Order in violation of Rule 65's notice requirement, and the Injunction Order unlawfully binds nonparties only. And even if it were otherwise lawful, the Injunction Order violates Rule 65's security requirement.

### A.        The Injunction Order violates Rule 65(a)(1)

The Injunction Order violates Rule 65(a)(1)'s notice requirement because it was issued without notice to an adverse party, and the notice purportedly provided neither comported with Rule 5 nor afforded due process to those affected by the injunction.

### 1.  No notice was provided to an adverse party

Alabama Rule of Civil Procedure 65(a)(1) prohibits courts from issuing preliminary injunctions "without notice to the adverse party." *See also Ingenuity Int'l, LLC v. Smith*, 386 So. 3d 450, 457 (Ala. 2023) ("[N]otice to the adverse party before a preliminary injunction is issued is mandatory." (internal quotations omitted)). In this case, Mashkevich has not identified an "adverse party." Instead, he has named only fictitious parties as defendants. Obviously, Mashkevich cannot give notice to an adverse party if he does not know the adverse party's identity. This Court's Injunction Order therefore violates Rule 65(a)(1)'s threshold requirement.

This Court misconstrued Rule 65(a)(1)'s notice requirements when it required Mashkevich to provide notice of the preliminary injunction hearing to nonparties only. The TRO ordered Mashkevich's attorneys to serve notice via "Service Tokens" upon five <u>nonparty</u> Exchanges, including OKX, the custodian of the Qbit Wallet. *See* Doc. 13 at ¶ 3. *See also id.* at ¶ 2 (expressly identifying the Exchanges as "non-parties"). Even assuming that these "Service Tokens" otherwise constitute sufficient notice, notice to *nonparties* does not satisfy Rule 65(a)(1)'s requirement that notice be given to adverse *parties*.

Even if it were possible to provide notice to a fictitious party, Mashkevich has not done so. This Court did not order Mashkevich to provide notice to "Ava," "Miller," "Lee," or any of the 23 other Fictitious Defendants. Instead, prior to holding its preliminary injunction hearing, this Court required Mashkevich to give notice to the *non-party Exchanges only*. *See id.* at ¶¶ 3–4. This Court

based its finding that Mashkevich satisfied service requirements entirely on Guittari's declaration that Inca delivered Service Tokens into the Crypto Wallets controlled by the nonparty Exchanges. *See* Doc. 15 at ¶ 5; Injunction Order 1. There is no evidence that Mashkevich provided notice to any party to this case. Because no adverse party was provided notice, the Injunction Order is due to be dissolved.

### 2.    The "Service Tokens" issued by Mashkevish did not provide sufficient notice

Even if the "Service Tokens" had been served upon an "adverse party," they did not constitute a valid method of service under Rule 5. Under Rule 5,  "every order required by its terms to be served" must be served "by delivering a copy to the attorney or the party or by mailing it to the attorney or party at the attorney's or party's last known address, or, if no address is known, by leaving it with the clerk of the court." Ala. R. Civ. P. 5(a)-(b). "Delivery of a copy" means

> handing it to the attorney or party; or leaving it at the attorney's or party's office with a clerk or other person in charge thereof; or, if no one is in charge, leaving it in a conspicuous place therein; or, if the office is closed or the person to be served has no office, leaving it at the person's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein.

Ala. R. Civ. P. 5(b). Here, this Court directed Mashkevich to serve the TRO by delivering "Service Tokens" containing "hyperlink[s]" into the Crypto Wallets. Rule 5 does not permit service of court orders via "Service Tokens."

Furthermore, the record does not establish who, if anyone, actually received notice of this Court's order. Although Giuttari stated in her declaration that Inca delivered "Service Tokens" into the Crypto Wallets and "monitored the address for each wallet as well as a unique transaction hash associated with the Service Token," Doc. 15 at ¶ 5, she does not purport to have any knowledge concerning *who*, if anyone, actually accessed and viewed the TRO.

18

3.    **Even if "Service Tokens" provided to unknown individuals constitute a valid method of service, the timing of such service failed to comport with due process**

Notwithstanding other defects discussed herein, the notice purportedly provided by Mashkevich did not provide any potential recipient a meaningful opportunity to be heard. Notice of a preliminary injunction hearing does not comport with due process unless it provides a defendant with "a fair opportunity to oppose the [injunction] application and to prepare for such opposition." *Southern Homes, AL, Inc. v. Bermuda Lakes, LLC*, 57 So. 3d 100, 104 (Ala. 2010) (quoting *Granny Goose Foods, Inc. v. B'hood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 434 n.7 (1974)). The TRO set a preliminary injunction hearing for June 14, 2024, and required anyone wishing to file an opposition to do so by June 7, 2024. Doc. 13 at ¶¶ 5–6.  Guittari stated that the "service process . . . was completed for all the [Cyber Wallets] as of 4:45pm Eastern Daylight Time on Monday, June 10, 2024." Doc. 15 at ¶ 5.  Thus, to extent the "Service Tokens" constituted valid notice, no one received such notice until *after* the time to file an opposition and, at the earliest, less than four days before the hearing. This did not give the purported notice recipients a fair opportunity to oppose the injunction or prepare for the preliminary injunction hearing. The Injunction Order therefore violated the due process rights of every entity or person it was entered against.

B.    **The Injunction Order violates Rule 65(d)(2)**

The Injunction Order is also void because it does not bind any parties. Indeed, it binds nonparties only. Under Alabama Rule of Civil Procedure 65(d)(2), an injunction "is binding only upon the parties to the action; the "officers, agents, servants, employees, and attorneys" of those bound parties; and "persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Thus, although Rule 65(d)(2) contemplates that the

enjoinment of certain nonparties may be necessary to give effect to the injunction *against a party*, the enjoinment of a *party* is a prerequisite—and indeed the reason for—any such nonparty being enjoined. *See Chunchula Energy Corp. v. Ciba-Geigy Corp.*, 503 So. 2d 1211, 1216 (Ala. 1987) (holding that injunction could not bind stockholders and purported alter egos of defendant corporation when those stockholders and purported alter egos were not named as parties to the action).

Rule 65(c) underscores this limitation on a court's injunction power. With exceptions not applicable here, it prohibits courts from issuing a preliminary injunction "except upon the giving of security by the applicant . . . for the payment of such costs, damages, and reasonable attorney fees as may be incurred or suffered by *any party* who is found to have been wrongfully enjoined or restrained" (emphasis added). Rule 65(c) makes no mention of damages incurred by *nonparties* because nonparties cannot be preliminary enjoined unless they are in "active concert or participation" with a bound defendant.

Because Mashkevich has brought this action against fictitious parties only, the Injunction Order does not identify any party that it binds. Although it purports to bind "Defendants," those "Defendants"—"Ava," "Miller," and "Lee"——are fictitious and therefore not identifiable. Furthermore, Qbit's interest in this case arose not out of any injunction against these "Defendants," but rather out of this Court's injunction against *nonparty* OKX. Finally, even if an injunction could be properly issued against a fictitious party such as "Ava," "Miller," or "Lee," no injunction could be issued against Qbit until this Court "determined" that Qbit was "shown to be in concert or participation" with the enjoined party. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969). No such showing has been made. For all these reasons, the Injunction Order violates Rule 65(b)(2) and should be dissolved.

C.      **The Injunction Order violates Rule 65(c)**

Even if the Injunction Order was otherwise lawful, its failure to require security violates Rule 65(c). As discussed above, Rule 65(c) generally prohibits courts from issuing a preliminary injunction "except upon the giving of security by the applicant . . . for the payment of such costs, damages, and reasonable attorney fees as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." It expressly recognizes only two exceptions. First, courts may not require the State of Alabama and its "officers and agents" to provide security. Second, courts may not require security in "domestic relations cases." Unless a court makes a "specific finding" that "one or more of the[se] exceptions" exist, "[i]t is mandatory that security be given under Rule 65(c)." *Milton v. Haywood*, 393 So. 3d 1156, 1157–58 (Ala. 2023). Neither of these exceptions applies here, and this Court did not determine otherwise.

Instead, relying on dicta from *Spinks v. Automation Personnel Services*, this Court excused the bond requirement because the "issue addressed by the preliminary injunction 'is one of overriding public concern.'" Injunction Order 6 (quoting 49 So. 3d 186, 190 (Ala. 2010)). Notably, although *Spinks* recognized that an "overriding public concern" may excuse Rule 65(c)'s bond requirement, it did not apply that exception. Neither did the two cases that *Spinks* cited for that proposition: *Anders v. Fowler*, 423 So. 2d 838 (Ala. 1982) and *Lightsey v. Kensington Mortgage and Finance Corp.*, 315 So. 2d 431, 434 (Ala. 1975). Indeed, it appears that no appellate court in this State has ever approved a trial court's decision to forego the bond requirement based on an "overriding public concern."

The Supreme Court, however, recently reverse a preliminary injunction order that used the "overriding public concern" exception to excuse the bond requirement. In *Milton*, the trial court entered a preliminary injunction requiring defendant landowners to open gates erected by the

landowners that the plaintiffs claimed were blocking public access to a county road and trails in Talladega National Forest. 393 So. 3d at 1157. The trial court did not require the plaintiffs to post security because it determined that the "case [was] of great public concern." *Id.* at 1158 (internal quotations omitted). On appeal, the Supreme Court recognized that "members of the public" may have "used the disputed portions of the road," but nevertheless concluded that the public's "inability to access" those portions did not "constitute[] an issue of overriding public concern." *Id.* at 1158. It therefore reversed the preliminary injunction. *Id.*

*Milton* is instructive because even though the Court recognized that the dispute at issue could directly affect members of the public, it still concluded that the public's "inability to access the disputed portion of" the road presented no "overriding public concern" that would warrant an exception from Rule 65(c)'s security requirement. Here, *nothing* about Maskevich's private conversion claim affects the general public, and this Court did not find otherwise.

Rather than focus on whether Mashkevich's conversion claim presented an "overriding public concern," this Court instead focused on how the public would perceive its *treatment* of Mashkevich's injunction request. By "[f]reezing cryptocurrency accounts," this Court said, it could "reassure[] the public that even with transactions conducted in the cryptocurrency space, there is an adequate remedy to prevent fraud or theft." Injunction Order 6. In other words, this Court determined that its ability to fashion an adequate equitable remedy in the purported absence of an adequate legal remedy was an "overriding public concern."

Applying this Court's rationale, Rule 65(c) would be a dead letter because *every* preliminary injunction attempts to preserve an adequate remedy in equity when an adequate remedy at law does not exist. *See Stephens v. Colley*, 160 So. 3d 278, 282 (Ala. 2014) (requiring a plaintiff seeking a preliminary injunction to show, among other things, that it "has no adequate

remedy at law" (internal quotations omitted)). Thus, under this Court's reasoning, a plaintiff who meets the requirements for preliminary injunctive relief *necessarily* makes a showing that the "issue addressed by the preliminary injunction is one of overriding public concern" because the mere issuance of the injunction "reassures the public" that an adequate remedy exists to address any injuries they may someday incur. *Milton*, 393 So. 3d at 1158 (internal quotations omitted); Injunction Order 6.

In any event, the "issue" that must constitute an "overriding public concern" must be tied to the plaintiff's claims, not a court's *treatment* of those claims. In *Milton*, the Court identified the pertinent "issue" as the public's "inability to access the disputed portion of" the road, and determined that this was not an issue of "overriding public concern." 393 So. 3d at 1158. The only "issue" addressed by the Injunction Order is whether Mashkevich (and perhaps unidentified putative class members) may recover cryptocurrency. If the general public's inability to access a road did not qualify as an issue of "overriding public concern," certainly Maskevich's loss of his own cryptocurrency does not qualify either. Therefore, even if the Injunction Order was otherwise properly entered (it was not), the failure of this Court to require security requires its dissolution.

## IV.    The Injunction Order's Freezing of Assets is Improper

Besides exceeding the jurisdiction of this Court and not comporting with Rule 65, the Injunction Order should also be dissolved because the remedy it provides—the freezing of assets to secure the satisfaction of a future money judgment—is unlawful. In *Norman v. Occupational Safety Association of Alabama Workmen's Compensation Fund*, a workers' compensation fund sued an owner of the fund's administrator alleging that he breached his fiduciary duties to the fund by recommending that the fund transfer its insurance contracts to an insurance company with which the owner was in merger negotiations. 811 So. 2d 492, 493–94 (Ala. 2001). At the fund's

request, the trial court entered a preliminary injunction enjoining the insurance company from disbursing payments to the owner related to the merger transaction, enjoining the owner from making any effort to obtain such funds from the insurance company, and requiring the insurance company to pay into the court all proceeds due as a result of the merger transactions. *Id.* at 496, 499. The plaintiff fund argued that any money obtained by the defendant owner as a result of the owner's breach of fiduciary duty rightfully belonged to the fund, and it "fear[ed] that if [the owner] obtain[ed] cash from [the insurance company], there [was] a risk that [the owner would] conceal, transfer, spend or otherwise dispose of this money and that the [f]und [would] not be able to get it from [him] at the conclusion of [the] case." *Id.* at 499 (internal quotation marks omitted).

The Alabama Supreme Court rejected the fund's position and reversed the preliminary injunction. It found persuasive and "consistent with Alabama law" the U.S. Supreme Court's holding that "in cases where a creditor plaintiff has no lien or equitable interest in a debtor defendant's assets, a federal district court has no authority to issue a preliminary injunction preventing the defendant from transferring its assets." *Id.* at 500–01 (citing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)). The Court explained that the "common-law rule in Alabama has long been that, '[o]rdinarily, the property of the defendant, in an action at law, is not subjected to the payment of the demand against him, until that demand is sanctioned and established by the verdict of a jury, and the judgment of a court.'" *Id.* at 501 (quoting *Millard's Adm'rs v. Hall*, 24 Ala. 209, 226–27 (Ala. 1854) (emphasis omitted)). Because the fund's action sought "money damages rather than equitable relief," the court "lacked the authority . . . to enjoin [the insurance company] from disbursing the proceeds or to enjoin [the owner] from making efforts to obtain the proceeds." *Id.*

Like the trial court in *Norman*, this Court issued the Injunction Order out of concern that

someone may transfer or dispose of the funds at issue before final judgment. *See* Injunction Order 3–4. And like the plaintiff in *Norman*, Mashkevich has brought a claim for money damages. The Complaint's only substantive count is an action at law for conversion, and he seeks "damages in the amount of the value of" his assets and "proceeds derived from the same." Compl. 18. Although Maskevich nominally requests "the return of any remaining stolen assets" and asserts that his "cryptocurrency is specific [and] identifiable," he has not provided this Court with any information by which it could specifically identify the cryptocurrency that belongs to him. *Id.*; Doc. 7 at 14. Indeed, his expert admits that Mashkevich's funds have been commingled with other funds. Doc. 9 at ¶¶ 9–10.

Furthermore, the assets frozen by the Injunction Order far exceed the assets that Mashkevich claims were stolen. Mashkevich presented affidavit testimony that he lost $90,000 to Fictitious Defendants' scheme. Doc. 8 at ¶ 20. He also submitted testimony from his expert that all 36 Crypto Wallets combined contain "a minimum of $3.5 million" taken from putative class members. Doc. 9 at ¶ 11. This Court received no evidence concerning the amount of cryptocurrency held in each of the frozen Crypto Wallets. With this motion, Qbit now presents affidavit testimony that the Qbit Wallet alone holds approximately $7 million worth of cryptocurrency. Ex. A at ¶ 7. Even if this Court could excuse Mashkevich's failure to specifically identify the cryptocurrency that he claims is specifically identifiable, it would still have no evidentiary basis to freeze more than the amount of cryptocurrency that Mashkevich claims was stolen.

Regardless, absent a claim for the return of specific, identifiable cryptocurrency, Mashkevich's action is one for money damages. This Court lacks the authority to freeze accounts on the chance that one day Mashkevich will obtain a money judgment. This is especially true

when, as here, Mashkevich has not even brought a claim against any of the account owners. Because it orders an unlawful remedy, the Injunction Order should be dissolved.

## V.    There is no Evidentiary Basis to Freeze the Qbit Wallet

Even if this Court determines that the Injunction Order survives the several legal challenges posed by this motion, the evidence before this Court supports modifying the Injunction Order to unfreeze the Qbit Wallet.

*First,* neither Mashkevich nor any putative class member would be likely to suffer immediate and irreparable harm if the Qbit Wallet is unfrozen. In its Injunction Order, this Court reasoned that Mashkevich would suffer immediate and irreparable injury absent a freeze because it "would be a simple matter for [Fictitious] Defendants to transfer cryptocurrency to unidentified recipients outside the banking system and effectively place the assets at issue in this matter beyond the reach of the Court." Doc. 17 at 3. Such reasoning makes sense, however, only if the source of the irreparable harm is the loss of *specific, identifiable* cryptocurrency. This is because, regardless of whether Fictitious Defendants "transfer cryptocurrency to unidentified recipients," they will still be obligated to make Mashkevich whole with money damages if they are ultimately found liable. But Mashkevich has not presented any evidence that he will suffer irreparable harm if the specific cryptocurrency he lost is not returned. Indeed, Mashkevich has not even identified the specific cryptocurrency at issue.

*Second,* Mashkevich has an adequate remedy for any harm he suffers: money damages. Indeed, "an action for conversion"—the only substantive cause of action brought by Mashkevich[5]—"is a suit for *money damages* for the personal property converted." *Taylor v. Powertel, Inc.*, 551 S.E.2d 765, 769 (Ga. Ct. App. 2001) (emphasis added). This Court nevertheless

---

[5] *See* supra note 3.

found that, for two reasons, a "money judgment" would be an "inadequate legal remedy." Injunction Order 3. This Court first determined that the "anonymity of the Defendants at the heart of the scheme" made a "money judgment against them . . . meaningless." *Id.* But the absence of a defendant makes *any* judgment —not just a "money judgment"—meaningless, because it cannot be enforced against anyone. The absence of *any* meaningful remedy does not give this Court authority to fashion a remedy against entities that are not parties to this case. Next, this Court determined that "the difficulty in having to trace the cryptocurrency" also rendered any money judgment "inadequate." *Id.* Whether Mashkevich locates his specific, identifiable cryptocurrency, however, does not affect his legal remedy for conversion. If Mashkevich can prove that Fictitious Defendants converted his property, he will have a legal remedy against them for conversion even if the specific converted property is never located.

**Third,** Mashkevich has not established a reasonable chance of success on the merits of his case because he has not identified a defendant. As discussed earlier, *supra* at 13–14, this lawsuit is a nullity under Alabama law because Mashkevich instituted it by filing an unservable complaint against only fictitious parties. This defect alone prevents him from prevailing. But regardless of whether this Court has subject-matter jurisdiction, Mashkevich cannot prevail on his conversion claim without identifying a defendant. To prove conversion, a plaintiff must establish, among other things, "that *the defendant* destroyed or exercised dominion over [his] property." *Schaeffer v. Poellnitz*, 154 So. 3d 979, 988 (Ala. 2014) (emphasis added). Mashkevich cannot establish a likelihood of success on the merits if he has not even identified who is allegedly responsible for converting his property.

**Finally,** because Mashkevich has not identified any defendants, this Court did not—and does not currently have—have any evidence before it to weigh the hardship that the Injunction

Order would have on Fictitious Defendants. For reasons discussed herein, however, the hardship

the Injunction Order has placed on nonparty Qbit is substantial. *See supra* at 3–4.

## **CONCLUSION**

For the foregoing reasons, this Court should dissolve the Injunction Order. In the

alternative, this Court should modify the Injunction Order to unfreeze the Qbit Wallet.

Respectfully submitted,

*/s/ Thomas W.H. Buck, Jr.*
Thomas W.H. Buck, Jr.
*One of the Attorneys for Nonparty UAB Qbit*
*Financial Service*

OF COUNSEL:

John A. Smyth, III
Helen Kathryn Downs
Thomas W.H. Buck, Jr.
MAYNARD NEXSEN PC
1901 6th Avenue North
Suite 1700
Birmingham, Alabama 35203
(205) 254-1000
jsmyth@maynardnexsen.com
hkdowns@maynardnexsen.com
tbuck@maynardnexsen.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court via Alafile, which will send notification of such filing to all counsel of record on this the 20th day of January, 2025**.**

/s/ *Thomas W. H. Buck, Jr.*
Of Counsel

ELECTRONICALLY FILED
1/20/2025 1:57 PM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

# EXHIBIT A

**IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA**

| | |
|---|---|
| **MICHAEL MASHKEVICH, on behalf** ) | |
| **of himself and all others similarly** ) | |
| **situated** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NUMBER: CV-2024-900163** |
| ) | |
| **OLIVIA AVA, et al.** ) | |
| ) | |
| **Defendants.** ) | |

<u>**DECLARATION OF YUJUN WU**</u>

I, Yujun Wu, declare under penalty of perjury as follows:

1.      My name is Yujun Wu. I am the chief executive officer for UAB Qbit Financial Service ("Qbit"). I am over 19 years of age, of sound mind, and am competent to testify to the matters herein. The evidence set forth in the foregoing declaration is based on my personal knowledge.

2.      Qbit is a financial technology company headquartered in Lithuania. It specializes in cross-border payment and banking solutions for global businesses.

3.      Qbit offers its customers, among other things, multi-currency business accounts, global payment processing, and supply chain financing. Qbit's customers may fund their accounts by transferring cryptocurrency, and they may direct Qbit to use the deposited funds for payment purposes.

4.      Qbit services cryptocurrency accounts on a platform called "Interlace," which is only open to registered businesses and may be used for business purposes only. To register an Interlace account, customers must provide various certifications and business documents, including certificates of incorporation, business licenses, governing documents, registries of

directors and shares, ownership charts, and, for certain directors and account owners, personal identification documents.

5.       Qbit uses OKX Hong Kong FinTech Company Limited ("OKX") to provide trading services related to it virtual assets. OKX takes these virtual assets into its custody, but Qbit is the legal and beneficial owner of these assets and, until an injunction was issued in this case, was the only entity that could access them. One of these virtual assets is a cryptocurrency "wallet" identified as "THGTenLmvqWycGLGtgRvX4wURiHQeDvNps" (the "Qbit Wallet").

6.       On June 20, 2024, OKX informed Qbit that, in compliance with this Court's order, it had frozen the Qbit Wallet.

7.       The Qbit Wallet contains approximately $7 million worth of cryptocurrency, all deposited by Interlace account holders that have been screened through Interlace's quality assurance procedures.

8.       Because this Court ordered OKX to freeze the Qbit Wallet, Qbit must borrow money at high interest rates to pay back funds to its customers. As a result, the injunction has caused Qbit to lose about $6,000 each day.

9.       I declare under penalty of perjury under the law of the State of Alabama that the foregoing is true and correct, and that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States.

_____
Yujun Wu

Executed on the _15_ day of _Jan_, at

Hong Kong          China
_____
City and Country