

AlaFile E-Notice

50-CV-2024-900163.00

Judge: CHRISTOPHER F ABEL

To:   BRIAN KEITH JACKSON
      kj@rileyjacksonlaw.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA

MICHAEL MASHKEVICH V. OLIVIA AVA ET AL
50-CV-2024-900163.00

The following matter was FILED on 2/4/2025 3:36:11 PM

**C001 MASHKEVICH MICHAEL**

RESPONSE TO MOTION TO VACATE OR MODIFY

[Filer: JACKSON KEITH]

Notice Date:     2/4/2025 3:36:11 PM

ANGIE JOHNSON
CIRCUIT COURT CLERK
MARSHALL COUNTY, ALABAMA
424 BLOUNT AVE.
SUITE 201
GUNTERSVILLE, AL, 35976

256-571-7785
angie.johnson@alacourt.gov

ELECTRONICALLY FILED
2/4/2025 3:36 PM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

**IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA**

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated, ) | |
| ) | Civil Action No. 2024-900163 |
| Plaintiff, ) | |
| ) | **CLASS ACTION** |
| V. ) | |
| ) | |
| OLIVIA AVA, EMMA MILLER, and F.B. LEE, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' OMNIBUS MOTION TO STRIKE DECLARATION OF YUJUN WU AND RESPONSE TO UAB QBIT FINANCIAL SERVICES' MOTION TO DISSOLVE OR, IN THE ALTERNATIVE, MODIFY PRELIMINARY INJUNCTION ORDER**

Robert R. Riley, Jr
rob@rileyjacksonlaw.com
Keith Jackson
kj@rileyjacksonlaw.com
James E. Murrill
jay@rileyjacksonlaw.com

**RILEY & JACKSON, P.C.
3530 INDEPENDENCE DRIVE
BIRMINGHAM, AL 35209
TELEPHONE: (205) 879-5000**

## Table of Contents

**THRESHOLD ISSUES** .................................................................................................... 1

**THE INTERNATIONAL PIG BUTCHERING CRISIS (a Brief Overview)** ......................... 4

  A.  How Pig Butchering Works .................................................................................... 4

  B.  The Second Layer of Pig Butchering Victims ...................................................... 5

  C.  The Criminal Masterminds Behind Pig Butchering .............................................. 6

  D.  Off-Ramping – From Stolen Cryptocurrency to Fiat Currency ............................ 9

**QBIT, YUJUN WU, INTERLACE, AND THE INTERSECTION OF CRIMINAL
CONDUCT, FINTECH, AND BaaS** ................................................................................. 10

  A.  Qbit – Scope of Business ..................................................................................... 10

  B.  Qbit's CEO, Yujun (Michael) Wu ...................................................................... 11

  C.  Interlace's CEO, Yujun (Michael) Wu................................................................ 14

  D.  Qbit's Functional Alter Ego Bytechip, LLC ....................................................... 15

  E.  Bytechip/Qbit Cryptocurrency Laundering ........................................................ 16

          *USA v. All Funds Deposited* ............................................................................. 16

  F.  Qbit's/Yujun Wu's Connections to Interlace ..................................................... 17

  G.  Blockchain Analysis of Qbit's Wallet ................................................................ 22

         1.  *Qbit's THGTen Wallet* ........................................................................... 22

**PLAINTIFF'S MOTION TO STRIKE DECLARATION OF YUJUN WU** ......................... 24

  A.  Paragraph 2 of Mr. Wu's Declaration is Unsupported and Lacks Specificity ..................... 26

  B.  Paragraph 3 of Mr. Wu's Declaration Contains Only Non-Specific Generalizations.......... 30

  C.  Paragraph 4 of Mr. Wu's Declaration is Vague, Lacks Specificity, and Illustrates Qbit's
      Attempts to Mislead the Court ............................................................................ 31

  D.  Paragraph 5 of Mr. Wu's Declaration is Conclusory and Contradictory ............................ 32

  E.  Paragraph 7 of Mr. Wu's Declaration is Vague, Conclusory, and Contradictory............... 33

  F.  Paragraph 8 of Mr. Wu's Declaration is Vague and Conclusory........................ 34

**PLAINTIFF'S RESPONSE TO UAB QBIT FINANCIAL SERVICES' MOTION TO
DISSOLVE OR, IN THE ALTERNATIVE, MODIFY PRELIMINARY INJUNCTION** ... 35

**THE COURT HAD JURISDICTION TO ENTER THE PRELIMINARY INJUNCTION ORDER** ..................................................................................................36

**THE PRELIMINARY INJUNCTION ORDER SATISFIED RULE 65** ..............................37

    A. Notice was provided to the adverse parties ........................................................38

    B. The "Service Tokens" provided sufficient notice .............................................39

    C. The timing of service comported with due process............................................40

    D. The Preliminary Injunction Order bound adverse parties ...................................41

    E. Mashkevich did not have to provide security because the "overriding public concern exception" applies .........................................................................................41

    F. Freezing the Digital Assets is Proper ................................................................42

**IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA**

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated, ) | |
| ) | Civil Action No. 2024-900163 |
| Plaintiff, ) | |
| ) | **CLASS ACTION** |
| V. ) | |
| ) | |
| OLIVIA AVA, EMMA MILLER, and F.B. LEE, ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' OMNIBUS MOTION TO STRIKE DECLARATION OF YUJUN WU AND RESPONSE TO UAB QBIT FINANCIAL SERVICES' MOTION TO DISSOLVE OR, IN THE ALTERNATIVE, MODIFY PRELIMINARY INJUNCTION ORDER

For his omnibus Motion and Response, Plaintiff Mr. Mashkevich:

- Explains the mechanics of pig butchering scams, including roles played by scammers, the international crime syndicates that traffic the scammers, and crypto launderers;

- summarizes the corporate history and laundering efforts of UAB Qbit Financial Services ("Qbit") and its beneficial owner Yujun Wu, including Qbit's and Mr. Wu's interrelationship with Interlace, the company Qbit contends vets its cryptocurrency customers;

- moves this Court to strike the unsworn Declaration of Yujun Wu (Doc. 41) for lack of specificity; and

- responds to Qbit's Motion to Dissolve (Doc. 40).

## THRESHOLD ISSUES

Five threshold issues merit a brief initial discussion. First, Qbit does not argue it is holding only legitimately obtained cryptocurrency, nor does it seek to disprove that it is laundering stolen cryptocurrency. Rather, Qbit vaguely refers the Court to a company called Interlace, which Qbit maintains subjects all of Qbit's clients to a process of vetting their legitimacy. Qbit simultaneously conceals from this Court that Qbit owner and CEO Yujun Wu is also Interlace's owner and CEO.

Second, Qbit wrongly contends this Court ventured into uncharted territory by issuing a Preliminary Injunction in a case involving only fictitious parties at the time the injunction was entered. Qbit is incorrect. Specifically in pig butchering cases, Preliminary Injunctions are commonly entered when only fictitious parties are named. Alabama Rule of Civil Procedure 65(a) and Fed. R. Civ. P. 65(a) are substantively identical. "The rule is similar to federal Rule 65." Ala. R. Civ. P. 65, Committee Comments. Thus, this Court may find guidance from federal courts' issuance of Preliminary Injunctions when only fictitious defendants are before the court, particularly when those injunctions are entered in pig butchering cryptocurrency scam cases like the present case. Mr. Mashkevich has attached hereto as Exhibits "A" – "F" Preliminary Injunction orders from various federal court cases entered when the courts had only fictitious defendants before them.[1]

Third, Qbit argues this Court's Order authorizing service of process by service tokens in accordance with Ala. R. Civ. P. 4.4 is without precedent. Qbit is wrong again. Service on foreign individuals is authorized in Alabama under Ala. R. Civ. P. 4.4(3) and in federal court under Fed. R. Civ. P. 4(f)(3). Both rules authorize service "by other means not prohibited by international agreement." Alabama's "Rule 4.4 as amended is taken almost verbatim from Rule 4(f), Fed.R.Civ.P., as amended effective December 1, 1993." Ala. R. Civ. P. 4.4, Committee Comments. Thus, this Court may find guidance from federal courts' authorization of service by service tokens when only fictitious defendants are before the court, particularly when those injunctions are entered in pig butchering cryptocurrency scam cases like the present case. Mr. Mashkevich has

---

[1] The courts include the Eastern District of Louisiana (2), Northern District of Illinois, Eastern District of Michigan, Northern District of Florida, and Southern District of Florida.

attached hereto as Exhibits "G" – "K" orders authorizing service by service tokens entered by various federal court cases when the courts had only fictitious defendants before them.[2]

Fourth, Qbit is the only objector to the Preliminary Injunction in this case. Qbit has only identified one cyberwallet frozen by the Preliminary Injunction in which it claims an ownership interest. Qbit claims no interest in any other cyberwallet covered by the Preliminary Injunction and thus lacks standing to seek a complete dissolution of the injunction. The only issue Qbit has properly placed before this Court is the question of whether the injunction should be modified to remove the Qbit wallet from its scope.

Fifth, Qbit's claim of hardship or pecuniary loss because of the injunction lacks credibility. Qbit knew about the injunction for over seven months without seeking a dissolution of the injunction. During that 7-month interval, Qbit hired Hong Kong counsel with whom Mr. Mashkevich's counsel communicated several times. Qbit then hired Florida counsel. Qbit's communications with Mr. Mashkevich's counsel continued and involved both Qbit's Hong Kong and Florida counsel. As part of those communications, and at the request of Qbit's counsel, Mr. Mashkevich's counsel made one of their experts available during a Zoom meeting with Qbit's counsel. The expert shared certain findings from his blockchain analysis and demonstrated how Plaintiff knows Qbit is holding Mr. Mashkevich's and the putative class members' stolen cryptocurrency. Qbit's counsel asked for a settlement demand, which Mr. Mashkevich's counsel relayed. Qbit then hired fa third law firm, Maynard Nexsen, which contacted Mr. Mashkevich's counsel on December 2, 2024. This law firm did not file the pending motion until January 20,

---

[2]The Southern District of Florida case attached as Exhibit G cites two additional cases not attached hereto in which service by NFTs, or "service tokens", was authorized by the court. The Northern District of Ilinois case attached as Exhibit "J" cites five additional cases not attached hereto in which service by NFTs, or "service tokens", was authorized by the court

2025. If Qbit were suffering a financial hardship, it would not have waited approximately seven months after having notice of the wallet freeze to file the pending motion.

**THE INTERNATIONAL PIG BUTCHERING CRISIS**
**(a Brief Overview)**

Mr. Mashkevich and the putative class members had their cryptocurrency stolen as part of elaborate pig butchering scams, which are primarily perpetrated by Chinese and Taiwanese international crime syndicates operating out of Southeast Asia. According to the FBI, pig butchering scams cost Americans $5.3 billion in 2023 alone, with 40,000 U.S. victims reporting the scams to law enforcement. Various sources estimate that only 15% - 25% of U.S. pig butchering victims report the crimes, meaning the U.S. likely had a minimum of 160,000 pig butchering victims in 2024.

A. **How Pig Butchering Works**

Pig butchering scammers conduct an elaborate, long-term psychological attack on their victims with the intent of stealing victims' cryptocurrency through deception. The scammers contact potential victims through social media, dating apps, direct messaging platforms, or text. As just one initial contact example, the potential victims may receive a text from an unknown number that simply says "hello." The scammers are seeking any response, such as the potential victims replying to ask who sent the text because their number is not saved in the target's contacts. From there, the scammers seek to build personal relationships with the targets, manipulating the targets into believing the scammers are potential romantic interests or trusted friends.

After the scammers establish trust, they introduce the victim to the idea of investing in or with cryptocurrency or, as in the present case, by earning cryptocurrency doing online work from home. The scammers guide the victims to a fake cryptocurrency trading platform. These websites look legitimate, with polished interfaces and simulated trading data. The scammers never ask the

4

victims to send cryptocurrency to the scammers. Rather, the scammers convince the victims that the victims are controlling their own invested cryptocurrency. The scammers' goals are (a) convince the victims their work from home profits or investments are legitimate, and (b) foster in the victims a "fear of missing out" mindset so the victims continue participating in the scam.

After the victims have invested a large sum, the scammers make it impossible for the victims to withdraw their funds. If the scammers believe the victims can be tricked further, explanations may follow to convince the victims to invest even more crypto. For example:

- The scammers may tell the victims their accounts have been so profitable that the IRS requires the victims to pay capital gains tax in advance.

- As was the case with Mr. Mashkevich, the scammers identify alleged technical issues or processing fees the victims need to pay before the victims' accounts will be unfrozen. At some point, the platform itself will disappear, or the scammer will block the victim.

The victims then realize they have been scammed, but their cryptocurrency is gone. The cryptocurrency can then only be retrieved with blockchain analysis and court-ordered wallet freezes to stop the process of cryptocurrency laundering before the cryptocurrency is taken off the blockchain and converted to fiat currency such as Chinese Yen, at which point it cannot be retrieved. Fortunately in the present case, this Court entered a Temporary Restraining Order freezing various amounts of stolen cryptocurrency in several cyberwallets, including the one claimed by Qbit, before the stolen cryptocurrency could be moved off chain, at which point it would disappear forever.

## B.  <u>The Second Layer of Pig Butchering Victims</u>

Pig butchering scams create financial tragedy for the scam victims, but the international criminal operation is fueled by a second layer of tragedy - the scammers are human trafficking victims. Trafficking victims are lured with promises of legitimate jobs, such as customer service or IT work, often in countries like Cambodia, Laos, or Myanmar. During their recruitment, the

traffickers target vulnerable populations, particularly in Southeast Asia, China, and Africa. The victims do not realize they have been trafficked until they arrive at the scam compounds. Their passports and phones are confiscated, and they are forced to work in scam operations.

For example, a Vietnamese teenager named Nguyen Thien Kai moved to Cambodia after she was promised a high salary for teaching people how to play online games. But once she crossed the border, she was sent into a basement and instructed to scam people. The 19-year-old realized she had been tricked. "I had hidden my phone and managed to text my family to let them know what happened. But then the boss saw my phone and took it," she said. "He read the texts to my family telling them to call the police, and he beat me and sold me to another organization."[3]

The trafficked workers must meet high financial quotas by deceiving victims online. If they fail, they face severe punishments, such as beatings or the risk of being sold to other, potentially more brutal, scam syndicates. Trafficked individuals are confined to compounds, often surrounded by armed guards.

Former prosecutor Erin West summarized the human trafficking tragedy fueling pig butchering scams during an interview with Ali Rogan of PBS News:

> We have literally never seen a world crisis like this. We've got Americans and people all over the world who've lost all their money. . . . [W]e have human trafficked victims that are forced to do this dirty work . . . . And when they get there, their passports are seized, they're put in buses and they are moved to these compounds where they are surrounded with men with AK47s . . . . The NGOs that I spoke with on the ground in Southeast Asia told me 7 out of 10 women are coming out of there saying that they were sexually assaulted . . . . 300,000 [people] estimated by the United States Institute of Peace are behind held against their will.[4]

## C.  The Criminal Masterminds Behind Pig Butchering

---

[3] https://www.abc.net.au/news/2022-09-16/cambodia-human-trafficking-online-scam-pig-butchering/101407862
[4] https://www.pbs.org/newshour/show/how-human-trafficking-victims-are-forced-to-run-pig-butchering-investment-scams

The international crime syndicates operating these scams include but are not limited to the Chinese 14K Triad and the Karen Border Guard Force. Wan Kuok-Koi a/k/a "Broken Tooth" is a reputed Chinese mafia boss who has been sanctioned by the U.S. Government. He is the former head of the Chinese 14K Triad.[5] The 14K Triad is a criminal operation based in Hong Kong with ties to various scam compounds, such as KK Park, an online scam factory on Myanmar's border with Thailand.[6]



KK Park, a scam factory on Myanmar's border with Thailand, where several of the human trafficking victims repatriated on February 29, 2024 were held captiveImage: Stefan Czimmek/DW

In 2018, "Broken Tooth" established the World Hongmen History and Culture Association in Cambodia, which reflects a criminal co-opting of the name of a centuries old Chinese fraternal organization first established in the mid-1600s. Broken Tooth also heads the Dongmei Group based in Hong Kong, which invests in the Saixigang Industrial Zone in Burma (Myanmar).[7] The Saixigang Zone, along with Myanmar's KK Park (pictured above) and other scam compounds, houses industrial-scale cyberfraud operations, engages in human trafficking, and has "clear links

to organize crime figureheads Wan (Broken Tooth) Kuok Koi and She Zhijiang."[8] Notably, Myanmar is one of only three countries on the FATF money laundering and terrorist financing black list, along with North Korea and Iran.[9],[10]

The Karen Border Guard Force (KBGF) is a violent militia that controls much of Myanmar's border areas with China, Laos, and Thailand. The KBGF operates in Myanmar's Karen State and is headed by Colonel San Myint a/k/a Saw Chit Thu. The KBGF has overseen the development of numerous illegal casino operations, which are used as pig butchering scam compounds. The KGBF changed its name in 2024 to the Karen National Army (KNA). The KBGF/KNA is considered a "major node in a network of cyber scam centers . . . in Southeast Asia in which criminal groups are earning billions of dollars."[11]

The KGBF/KNA partnered with the Hong-Kong registered Yatai International Holdings Group  to generate revenue through companies forced to leave China because of that country's crackdown on illegal casino operations.[12] "Myanmar has become the prime destination for criminal groups", where money laundering and online scam operations relocated after several governments in southeast Asia cracked down on criminal gangs.[13] While an exhaustive discussion of the international criminal gangs perpetrating pig butchering scams is beyond the scope of this filing, the Court's awareness of the global criminal enterprises perpetrating the scam at issue in this case is important for the Court's determination as to appropriate next steps in this litigation.

---

[8] https://www.unodc.org/roseap/uploads/documents/Publications/2024/Casino_Underground_Banking_Report_2024.pdf

[9] https://www.fatf-gafi.org/en/countries/black-and-grey-lists.html.

[10] The FATF is the Financial Action Task Force, an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering and terrorist financing. The FATF black list identifies high-risk jurisdictions subject to a call for action because of their known close association with money laundering and terrorist financing. *See* FN7, *supra*

[11] https://www.justiceformyanmar.org/stories/the-karen-border-guard-force-karen-national-army-criminal-business-network-exposed

[12] https://www.usip.org/publications/2020/04/chinese-crime-networks-partner-myanmar-armed-groups

[13] https://www.usip.org/publications/2025/01/how-crime-southeast-asia-fits-chinas-global-security-initiative

### D.  **Off-Ramping – From Stolen Cryptocurrency to Fiat Currency**

The goal of the international crime syndicates perpetrating pig butchering cryptocurrency scams is to off-ramp the crypto by moving assets on a blockchain such as Tether or Tron and ultimately off chain to fiat currency such as US dollars or Chinese Yen. If the stolen crypto is anywhere on the blockchain, it can be tracked and frozen. Once the crypto is off-ramped - for example if the stolen cryptocurrency frozen in the Qbit cyberwallet is released so that it can be off-ramped and converted to fiat currency - pig butchering victims have no realistic path to recovery. To accomplish the off-ramping, criminals will send crypto to a digital wallet and instruct the wallet owner to move the crypto to other wallets as part of the laundering process or ultimately to a spot-market trading account, where the crypto can be converted into fiat currency.

Laundering large amounts of cryptocurrency requires sophisticated techniques. Money laundering traditionally involves three stages – placement, layering, and integration. Placement is the process of moving the funds away from a direct association with the crime. With cryptocurrency, placement is the movement of crypto out of the "scam wallets" into which the victims unwittingly transferred their crypto. Layering seeks to move the funds in a complex pattern to disguise the trail of funds and frustrate attempts to track the stolen funds. With cryptocurrency, layering involves numerous transactions along the blockchain to disguise where the funds went. Integration is the process of making the stolen funds available to the criminals who stole the funds after the funds have been "washed".[14]

As part of the laundering process, cyber criminals deploy various techniques. such as:

- Smurfing - splitting large sums into smaller amounts that are transferred through multiple transactions

- Exchange hopping - using multiple crypto exchanges to transfer funds across different platforms

---

[14] https://www.unodc.org/unodc/en/money-laundering/overview.html

- Mixing - blending crypto from multiple sources to obscure the transaction history. Digital banks that offer banking-as-a-service (BaaS) in jurisdictions deficient in their anti-money laundering systems afford criminals the opportunity to "cloak" the stolen crypto by mixing it with legitimate funds

The financial technology (FinTech) and cryptocurrency industries pose a significant risk of criminal fraud as there is no comprehensive regulatory framework governing their banking activities. FinTech and BaaS can offer legitimate business services, but only when they employ robust know your customer (KYC) and anti-money laundering (AML) compliance solutions. The goal of KYC and AML compliance is to identify suspicious behavior such as money laundering and financial terrorism before it occurs. When FinTech and BaaS companies operate without adequate KYC and AML compliance, they are knowingly making themselves available to launder stolen cryptocurrency by mixing and cloaking the stolen funds.

In the present case, Qbit has submitted to this Court the unsworn declaration of Yujun Wu, who refers this Court to a company called "Interlace" as supposed proof of Qbit's KYC and AML safeguards. As detailed below, however, Mr. Wu concealed from this Court the fact that Interlace is his company, not an independent third party. This is perhaps why Qbit offered no proof that Interlace provides any KYC or AML compliance solutions beyond Mr. Wu's vague, self-serving, and misleading assertion.

## QBIT, YUJUN WU, INTERLACE, AND THE INTERSECTION OF CRIMINAL CONDUCT, FINTECH, AND BaaS

A. Qbit – Scope of Business

Qbit's company records list Yujun Wu as its executive officer.[15] Qbit operates primarily out of China and has offices in the cities of Hangzhou and Shenzhen and in the special

---

[15] See, e.g, https://rekvizitai.vz.lt/en/company/qbit_financial_service/, a site that aggregates publicly available company information. Inca has submitted requests for copies of official registration documents from the Lithuanian State Enterprise Centre of Registers.

administrative region of Hong Kong.[16] Its website, which was provided by Qbit's counsel in their November 7, 2024 letter, also lists a United States office at "Zanker Rd, Ste 110, San Jose, CA 95131." (Pl. Evid. Submission, Tab A).

Qbit holds itself out as a legitimate BaaS company and claims ownership of the cryptocurrency wallet at OKX address THGTenLmvqWycGLGtgRvX4wURiHQeDvNps ("THGTen"). Qbit contends its services include "multi-currency business accounts, global payment processing, and supply chain financing." Its customers "may fund their accounts by transferring cryptocurrency, after which they can direct Qbit to use the deposited funds for payment purposes." (Pl. Evid. Submission, Tab B).

### B. Qbit's CEO, Yujun (Michael) Wu

In his declaration, Yujun Wu identified himself as the "chief executive officer for UAB Qbit Financial Service." (Doc. 41, ¶ 1). Yujun Wu also goes by "Michael Wu." He uses these two names interchangeably, professionally and personally. For example, as a speaker at ZhenFund's "Looking Up | ZhenCraft·Overseas Adventurers" event, Wu was listed as "Wu Yujun" and introduced himself as "Michael Wu".[17]

---

[16] The primary location listed on Qbit's LinkedIn is: No.998 Canton Road,No.998 Canton Road, Kowloon Unit A2, 5/F, OfficePlus @Mong Kok, Kowloon, HK. https://www.LinkedIn.com/company/qbitneobank, last accessed Jan. 27, 2024.
[17] https://en.zhenfund.com/News/51 (last visited Jan 23, 2025).



On his Facebook profile page, Yujun Wu lists himself as "Yujun Wu (Michael)."[18] On his LinkedIn Account, Yujun Wu lists himself as "Michael Wu."[19]



*Facebook Profile Page*

---

[18] https://www.facebook.com/yujun.wu.98, last accessed Jan. 22, 2023.
[19] https://www.LinkedIn.com/in/michael-wu-278a0a21/, last accessed Jan 22, 2023



*LinkedIn Account*

These social media accounts are easily connected to Yujun Wu. According to a profile listed on Qbit Funder ZhenFund's website, Yujun Wu holds bachelor's degrees from Shanghai Jiao Tong University and Purdue University, holds a master's degree from Stanford University, and previously worked as a Google software engineer. The same credentials are listed on both the LinkedIn and Facebook Pages. The Facebook and LinkedIn Accounts use the same profile picture.



Yujun Wu and Michael Wu are also clearly the same person. Yujun Wu has the exact same credentials and dates of school as Michael Wu.



## C. Interlace's CEO, Yujun (Michael) Wu

According to Wu's LinkedIn, he is also the CEO at interlace.money. Although he does not list Qbit as part of his experience, Wu has only two posts on his LinkedIn. In one, he shares Qbit's LinkedIn four-year anniversary announcement.[20]

Mr. Mashkevich has addressed in his Motion to Strike, *infra*, the fact that Yujun Wu filed in this Court a declaration that referenced Interlace to establish that Qbit ensures its customers have provided "various certifications and business documents, including certificates of incorporation, business license, governing documents, registries of directors and shares, ownership charts", etc. (Doc. 41, ¶ 4). Qbit referenced Interlace eight times in its Motion. (Doc. 40). Qbit represented to this Court in its Motion that Qbit's wallet holds cryptocurrency "all deposited by Interlace account holders that have been screened through Interlace's quality assurance

---

[20] Michael Wu, LinkedIn Post, https://www.LinkedIn.com/posts/michael-wu-278a0a21_go-qbit-team-activity-7101712717509509120-0Duh (last accessed Jan. 23, 2025).

procedures." (Doc. 40, p. 12; Doc. 41, ¶ 7). At no point did Mr. Wu or Qbit's attorneys acknowledge to this Court that Interlace is Yujun Wu's company, just as Qbit is.

### D. Qbit's Functional Alter Ego Bytechip, LLC

Bytechip LLC ("Bytechip") is a limited liability company registered in both Delaware and California. It is registered as Delaware file number 736317 and California file number 202021210840. (Pl. Evid. Submission, Tabs C and D). On July 30, 2020, Yujun Wu filed an "Application to Register a Foreign Limited Liability Company" with the California Secretary of State to register Bytechip LLC in California. (Pl. Evid. Submission, Tab E).

Qbit formerly operated as Bytechip. Bytechip did business as Qbit, was owned by Qbit's executive officer, Yujun Wu[21], and had an office at the same address as Qbit: 2381 Zanker Rd, Ste 110, San Jose CA 95131. Bytechip's operation under the name Qbit is identified in two different federal court cases. In *Bytechip, LLC v. Solid Financial Technologies, Inc. et al*, Bytechip identifies itself in the caption as "Bytechip, LLC d/b/a Qbit." (Pl. Evid. Submission, Tab F). In *United States of America v. All Funds Deposited, Credited, or held up to up to $2,029,765.39 in Solidfi vAccount # XXXXXXXXXXXXXXX in the name of Gatcha Pictures LLC, beneficial owner Xuan Du; and, All funds deposited, credited, or held up to $2,979,690.04 in Solidfi v Account # XXXXXXXXXXXXXXX in the name of Bytechip LLC, beneficial owner Yujun Wu, defendants,* Bytechip established a bank account as "Bytechip dba QbitPay." (Pl. Evid. Submission, Tab G).

Both Qbit and Bytechip are owned and operated by the same person, Yujun Wu. In its 2020 California Statement of Information, Bytechip lists Yujun Wu as its Chief Executive Officer ("CEO") and its only manager and member. This same filing lists the address 20 Barneson Ave, Unit D, San Mateo CA 94402 as both Bytechip's and Yujun Wu's address. (Pl. Evid. Submission,

---

[21] See, e.g., *United States of America v. All funds up to $2,979,690.04 in Solidf vAccount in the name of **Bytechip LLC, beneficial owner Yujun Wu** et al*, No. 2:24CV02036 (W.D. Tenn. Jan. 1, 2024) (emphasis added).

Tab D). Yujun Wu is also listed as the CEO and the only member and manager in Bytechip's 2024 Statement of Information. This filing lists the address 620 Willowgate St., Apartment 2, Mountain View, CA 94043 as both Bytechip's and Yujun Wu's address. Yujun Wu electronically signed the document on July 24, 2024. (Pl. Evid. Submission, Tab H).

Bytechip dba QbitPay listed Yujun Wu as the beneficial owner of a bank account opened in its name.[22] Qbit and Bytechip have also had offices registered at the same California address. According to the Global LEI Index, Bytechip (Delaware file number 7363157) has a headquarters at 2381 Zanker Rd., Ste 110, Unit D, 95131, San Jose, CA.[23] On their contact page, Qbit lists one of their "Company Address[es]" as "Zanker Rd, Ste 110, San Jose, CA 95131."[24]

E. Bytechip/Qbit Cryptocurrency Laundering

*USA v. All Funds Deposited*

While doing business under its Bytechip name, Qbit settled a forfeiture case with the United States after the US Attorney's Office seized Bytechip/Qbit controlled funds for suspected involvement in fraudulent activity and pig butchering. (Pl. Evid. Submission, Tab G). The U.S. Department of Justice initiated a civil forfeiture action on January 22, 2024 to seize around $2.98 million held in an account owned by Bytechip and linked to fraudulent cryptocurrency transactions. The lawsuit, filed in the Western District of Tennessee, revealed that these funds were held in accounts at Evolve Bank and Trust ("EB&T"). EB&T offers banking as a service (BaaS) to different platforms, including Solid Financial Technologies ("Solidifi"). Solidifi in turn offered Virtual accounts (vAccounts) to its customers, including Bytechip.

---

[22] *USA v. All Funds Deposited,* Complaint for Forfeiture *In Rem* at paragraph 35.
[23] *See Global Legal Entity Identifier Foundation (GLEIF), Record for LEI 254900VKX1GAIRTC3F69,*
*https://search.gleif.org/#/record/254900VKX1GAIRTC3F69 (last accessed Jan. 27, 2025).* The Global LEI Index is a central repository of active and historical Legal Entity Identifier (LEI) records maintained by the non-profit organization GLEIF.
[24] https://qbitnetwork.com/contact-us (Last accessed Jan. 23, 2025)

Evidence collected in preparation for the lawsuit strongly implicates Yujun Wu and his company doing business as Qbit in wire fraud and money laundering across the U.S. and Canada. In his Complaint for forfeiture, U.S. Attorney Ritz wrote of Bytechip:

> Based on my training and experience, I know . . . Bytechip['s] Solidfi vAccount **1162 **[is] used to provide money laundering infrastructure to a large wire fraud scheme perpetrated against numerous individuals.** Bytechip LLC, Gatcha Pictures, and Paralel Design are entities interconnected through IP addresses, outgoing debit transfers, and intrabank transfers of funds, **each performing an important function in a large fraud conspiracy ring.** None of these entities bears any indicia of legitimacy in its operations. . . . **I have demonstrated that wire fraud proceeds from pig butchering victims are frozen in . . . Bytechip Solidfi vAccount **1162**, and that these accounts are used to launder the proceeds of wire fraud.[25]

On August 1, 2024, the United States of America and Bytechip filed a stipulated settlement agreement. The Court issued a Consent Order on August 22, 2024, accepting the terms of the stipulated settlement. (Pl. Evid. Submission, Tab I). Under the terms, Bytechip forfeited $542,728.30 previously held in its Solidfi vAccount. It also waived all ownership and relinquished all rights to an additional $672,493.69 held in a different Solidfi vAccount in the name of another defendant, for a total forfeiture of $1,215,221.99.

### F.  Qbit's/Yujun Wu's Connections to Interlace

Interlace was founded as iPeakoin in 2019 and is based in Singapore. On August 20, 2024, iPeakoin rebranded to Interlace, announcing the change on LinkedIn.[26] Interlace's LinkedIn lists Michael Wu as its CEO.[27] Mr. Mashkevich established, *supra*, that Michael Wu is the same person as Yujun Wu. In a recent LinkedIn post, Interlace also referred to Michael Wu as its founder.[28]

---

[25] (Pl. Evid. Submission, Tab G).
[26] Interlace, LinkedIn Post, https://www.LinkedIn.com/posts/interlace-money_money-management-unified-interlace-activity-723193997338862 7970-aaRl/ (last accessed Jan. 27, 2025).
[27] Interlace, LinkedIn Profile, https://sg.LinkedIn.com/company/interlace-money?trk=public_post_feed-actor-name (last accessed Jan. 27, 2025).
[28] Interlace, LinkedIn Post, https://www.LinkedIn.com/posts/interlace-money_weareinterlace-interlace-interlacemoney-activity-7265659464840 560640-



Wu similarly lists himself as Interlace's CEO on LinkedIn.[29] Interlace lists its website as

https://interlace.money.[30]

---

MPsu?utm_source=li_share&utm_content=feedcontent&utm_medium=g_dt_web&utm_campaign=copy (las accessed Jan. 27, 2025)

[29] Michael Wu, LinkedIn Profile, https://www.LinkedIn.com/in/michael-wu-278a0a21/ (last accessed Jan. 27, 2025).

[30] Interlace, LinkedIn About Page, https://www.LinkedIn.com/company/interlace-money/about/ (last accessed Jan. 27, 2025).

In addition to their common CEO, Yujun (Michael) Wu, Qbit and Interlace share common digital infrastructure, suggesting closely tied ownership.[31] The computer infrastructure at IP address 47.89.250.82 has domain name resolutions to qbitnetwork.com, ipeakoin.com, and interlace.money. Domain names conventionally resolve to IP addresses, which represent computer network infrastructure that serve websites and applications. A domain name can be thought of as a shortcut directly from your browser to the proper server, represented by the IP address. "Passive DNS" is a collection method of identifying resolutions between domain names and IP addresses, and when those resolutions were active.

- VirusTotal's passive DNS report observed the IP address 47.89.250.82 resolve to the domain hostname **app.qbitnetwork.com** as recently as November 16, 2021.[32,33]

- VirusTotal's passive DNS report observed the IP address 47.89.250.82 resolve to the domain hostname **ipeakoin.com** as early as February 26, 2024.[34]

- VirusTotal's passive DNS report observed the IP address 47.89.250.82 resolve to the domain hostname **interlace.money** as early as November 22, 2024.[35]

---

[31] Mr. Mashkevich's experts will testify as to the information discussed in this subsection at a future ore tenus hearing.

[32] VirusTotal is a cybersecurity service that analyzes files, URLs, IP addresses, and domains for malware, phishing, and other security threats. It aggregates results from dozens of antivirus engines, website scanners, and threat intelligence sources to provide a comprehensive security assessment.

[33] *VirusTotal, IP Address Report for 47.89.250.82,* https://www.virustotal.com/gui/ip-address/47.89.250.82/relations (last accessed Jan. 23, 2025).

[34] *Id.*

[35] *VirusTotal, IP Address Report for 47.89.250.82,* https://www.virustotal.com/gui/ip-address/47.89.250.82/relations (last accessed Jan. 23, 2025).

Both qbitnetwork.com and interlace.money use a website analytics library called NPSMeter, and their integrations use the same account identifier. Companies typically include website analytics libraries to track visits to their website and users' experience when browsing the site. To differentiate between different customers' data, a website analytics library like Google Analytics or NPS Meter will give each customer a unique identifier to compartmentalize customer integrations. These customers typically will view the data tied to their account via an application made available to them from the web analytics service provider. Based on the HTML source code visible at https://qbitnetwork.com/app/#/app/dahsboard/ and https://www.interlacemoney/app/#/app/dashboard/, the NPS Meter integration on these sites use the same identifier "9698c2ea853caafe."



*HTML source code for website https://qbitnetwork.com/app/#/app/dashboard/*

HTML source code for website *https://www.interlace.money/app/#/app/dashboard/*

The fact that Interlace and Qbit use the same website analytics library tied to the same user account for managing the website analytics strongly indicates shared operational ownership between the two services. Additionally, notices on the interlace.money website make reference to Qbit and Qbit infrastructure. As recently as October, 20, 2024, the HTML source code on Interlace's website (interlace.money) includes a warning in the event that a visitor to the webpage does not have JavaScript enabled in their browser: "We're sorry but QbitPay doesn't work properly without JavaScript enabled. Please enable it to continue." (Pl. Evid. Submission, Tab J). The same notice appears on qbitnetwork.com. (Pl. Evid. Submission, Tab K).

When visiting the Interlace website at interlace.money, the site connects to https://qbitpay-3-0.us-west-1.log.aliyuncs.com/logstores/web-merchant/track, which appears to send tracking information to a resource ostensibly related to Qbit. Qbitnetwork.com connects to the same tracker.

The Qbit entity currently before this Court shares ownership and other commonalities with the Qbit entity formerly known as Bytechip, which was party to a civil forfeiture action for

laundering stolen cryptocurrency. Yujun Wu and Michael Wu are the same person, such that Qbit and Interlace have the same owner and significant operational overlap. Given the foregoing, this Court may fairly view Qbit, Bytechip, and Interlace interchangeably as all three entities are owned and controlled by Yujun Wu. Yujun Wu's previous Qbit entity was a cryptocurrency launderer, according to the U.S. government in its forfeiture action, *supra*. Mr. Wu's Qbit name change dance should not distract the Court from these facts. Every assertion from Qbit should be viewed with healthy skepticism, at least until discovery of Qbit's claims may occur.

G.  Blockchain Analysis of Qbit's Wallet

Qbit claims ownership of the THGTen wallet.[36] From March 5 to June 6, 2024, $251 million flowed into Qbit's THGTen wallet. Nearly all incoming deposits came from one wallet address.[37] In their November 7, 2024 letter, Qbit counsel claimed Qbit also owns this wallet, referring to it as the "Master Cregis Account" (the "Cregis wallet"). (Pl. Evid. Submission, Tab B). Mr. Mashkevich's experts will testify at a future ore tenus hearing that the blockchain addresses attributed to both the THGTen and Cregis wallets exhibit patterns typical of scam addresses, including because of their multiple interactions with addresses reported in connection with various scam and fraud operations, as discussed *infra*.

1.  *Qbit's THGTen Wallet*

Mr. Mashkevich's experts have traced cryptocurrency worth 7-figures in U.S. Dollar value to Qbit's THGTen wallet. Based on Blockchain Analysis of THGTen and related wallets, it is highly likely that the wallet is used for illegitimate purposes, such as the provision of

---

[36] Qbit has not proven ownership of the wallet and has only submitted vague and unsupported assertions of Yujun Wu, who declaration should be stricken for the reasons discussed below. But taking Qbit's wallet ownership assertion at face value, the results of blockchain analysis have established well beyond Mr. Mashkevich's and the putative class members' burden of proof that Qbit is laundering stolen cryptocurrency.

[37] TYdJv19WaC992rhseXA4j27R5FM2dKVDqk

money laundering and other banking services to scams. As a final deposit address, Mr. Mashkevich's experts will testify that THGTen likely serves a vital function as an off-ramp to turn stolen assets into usable crypto- or fiat currency.

The graph below reflects a sample of QBIT's THGTen wallet's connections to seven different known or reported scams within seven hops of THGTen. In total, there are 28 reported scam address interactions within seven hops of THGTen. THGTen is also within 3 hops of two entities sanctioned by the US Treasury Department's Office of Foreign Assets Control (OFAC). Overall, the THGTen Wallet has exposure to 53 different reported scam addresses and 10 different reported fraud shops. (Pl. Evid. Submission, Tab L, divided as Tables 1 and 2).



*Qbit's Cregis Wallet (YdJv19WaC992rhseXA4j27R5FM2dKVDqk)*

Qbit's Cregis wallet has received over 600 million USDT[38] from a cluster of approximately 350 wallet addresses. Every wallet address that sent more than 1 million USDT to the Cregis Wallet received TRX for gas (transaction) fees from the same address: TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW ("TGN4LV"). Chainalysis Reactor[39] tagged TGn4LV as a scam wallet. It has similarly been tagged by two Open Source Intelligence (OSINT) Comments for receiving funds from scams.

The absence of the information discussed above from Qbit's motion is striking. Mr. Mashkevich submits that the efforts to which Qbit and its legal team have gone to mislead this Court into believing Qbit is a diligent digital bank with third party regulatory compliance should alarm the Court and potentially result in a show cause hearing as to why Qbit should not be sanctioned for failing to disclose its connections with Interlace, its prior civil forfeiture action for cryptocurrency laundering, and the other details addressed above. While Mr. Mashkevich is not presently requesting a show cause hearing, Mr. Mashkevich maintains that Qbit and Yujun Wu should be required to respond to third party discovery and to sit for depositions before this Court rules on Qbit's Motion.

Against the backdrop of extremely strong indicators that Qbit's THGTen wallet is a laundering wallet used for mixing and cloaking stolen cryptocurrency, Mr. Mashkevich moves to strike the declaration of Yujun Wu and then responds to the misguided legal arguments Qbit asserted in its Motion.

## PLAINTIFF'S MOTION TO STRIKE
## DECLARATION OF YUJUN WU

---

[38] USDT is a cryptocurrency with a value that largely mirrors the U.S. dollar.
[39] Chainalysis Reactor is blockchain investigation software considered by many digital forensic experts to be the gold standard in software-aided blockchain analysis to detect illicit cryptocurrency transactions.

Plaintiff Michael Mashkevich, on behalf of himself and all others similarly situated, and for his Motion to Strike Affidavit of Yujun Wu shows the Court as follows:

Alabama adopted the Uniform Unsworn Declarations Act. Ala. Code § 12-21-80, *et seq.* A declarant who satisfies the statutory requirements of the Act may file an unsworn declaration. Such unsworn declaration has the same force and effect as a sworn pleading, e.g., an affidavit in the present context. *See, e.g.*, *Hoff v. Estate of Kidd*, 382 So. 3d 569 (Ala. 2022) (ruling "under [the Alabama Uniform Unsworn Declarations Act], an unsworn declaration will have the same effect as a sworn declaration if the unsworn declaration" satisfies the requirements of the Act).

Mr. Wu's declaration in the present case facially satisfies the Act's requirement. Thus, Mr. Wu's declaration is treated the same as an affidavit. However, Mr. Wu's declaration must comply with Alabama's specificity requirements for an affidavit. Mr. Wu's declaration does not comply with these requirements. Instead, Mr. Wu's declaration improperly contains vague and conclusory statements lacking in specificity and should therefore be stricken.

Generally, affidavits must "present facts which would be admissible into evidence." *See, e.g.*, *Whatley v. Cardinal Pest Control*, 388 So. 22 529 (Ala. 1980). Mr. Wu's declaration is subject to the same Rules of Evidence that govern live witness testimony. Affidavits are often submitted in support of or in response to a motion for summary judgment. Thus, much of Alabama's case law regarding affidavits has developed in the Rule 56 context. Such was the case in *Whatley*, *supra*, which was decided under Alabama's old scintilla rule. Despite the heavy Rule 56(e) context for affidavits, Alabama law requiring affidavits to aver specific facts rather than vague or conclusory assertions remains consistent irrespective of the context in which the affidavit is submitted. The following cases illustrate this consistency:

- *Cochran v. Engelland*, 298 So. 3d 1071, 1075 (Ala. 2020). Alabama Rule of Civil Procedure 4.3 allows service of process by publication when a defendant avoids service.

Rule 4.3(d)(1) requires the plaintiff seeking to obtain service by publication to submit an affidavit averring facts showing the defendant's avoidance of service. The affidavit "must aver specific facts of avoidance." *Id.* A conclusory assertion that the defendant has avoided service will not suffice.

- *Ex parte Parker*, 858 So. 2d 941, 945 (Ala. 2003). An affidavit submitted in support of a requested search warrant "must state specific facts or circumstances which support a finding of probable cause; otherwise the affidavit is faulty . . . ."

- Alabama Rule of Procedure 65. The Rule directly before the Court in the instant case requires a plaintiff's affidavit to set forth "specific facts" regarding the immediate and irreparable injury that will result.

Alabama law does not afford a lower or special standard of review for Mr. Wu's unsworn declaration simply because the document is not a sworn pleading. Rather, Mr. Wu must detail in his declaration specific facts otherwise admissible in evidence. He failed to do so.

Addressing the substantive paragraphs of Mr. Wu's declaration in turn, paragraphs 2-5 and 7-8 constitute nothing more than vague, conclusory, or otherwise unsupported assertions and should be stricken from the record.

A.  Paragraph 2 of Mr. Wu's Declaration is Unsupported and Lacks Specificity

Mr. Wu identifies Qbit as a financial technology company headquartered in Lithuania that specializes in cross-border payment and banking solutions for global businesses, but he offered no evidentiary support for those statements. Mr. Wu failed to submit any documents with his declaration. He failed to document that Qbit constitutes a legal entity separate and apart from Mr. Wu as an individual. He failed to document that Qbit is headquartered in Lithuania.

In contrast, both Plaintiff and the United States Government know that Mr. Wu conducts his offshore businesses under various "Qbit" designations. In the *in rem* forfeiture action against Bytechip LLC d/b/a Qbitpay Solidfi vAccount discussed *supra*, the government identified Yujun Wu as the beneficial owner of this Qbit entity. *U.S. v. All Funds Deposited . . . in the name of Bytechip LLC, beneficial owner Yujun Wu*, 2024 WL 3935989 (W.D. Tenn. 2024). In this forfeiture

action, the government sought forfeiture of up to $2,979,690.04 because the funds were "proceeds of wire fraud and wire fraud conspiracy." *Id.*

During the investigation that led up to the forfeiture action, the government identified twenty-six Chinese nationals who were conspiring together "to orchestrate fraud scams which are targeting businesses and consumers residing in the United States and Canada." The scammers were perpetrating their fraud by establishing shell corporations, using virtual accounts, and maintaining contractual agreements through an aggregator. (Pl. Evid. Submission, Tab G). The conduct at issue in the forfeiture constituted an elaborate pig butchering scam. While the pig butchering scam at issue in the forfeiture action was structurally different than the scam that ensnared Mr. Mashkevich and the putative class members, the result is the same – theft of cryptocurrency.

In its forfeiture action, the government identified "Bytechip dba QbitPay Solidifi vAccount **1162" as a recipient account for cryptocurrency stolen from four individuals who were victimized by the pig butchering cryptocurrency investment scam. In paragraph 35 of its action, the government detailed the following results of its investigation:

> On or around October 2022, Bytechip LLC, a purported information technology entity, established Bytechip dba QbitPay Solidfi vAccount **1162 listing **Yujun Wu** as the BO. Wu provided a California driver's license, F3248032[40], and China Passport EF0115532 to establish the vAccount. Bytechip Solidfi vAccount **1162 currently has $2,979,690.04 frozen by EB&T for suspicious activity **without objection from the BO**.

The government detailed intrabank transfers between the Bytechip dba Qbit account and a virtual account owned by other co-conspirators that participated in the pig butchering scam. The

---

[40] Although Mr. Mashkevich cannot establish Mr. Wu was on United States soil when he signed his unsworn declaration, it would be fair for the Court to question why Mr. Wu is unable to sign a sworn affidavit if he holds a California driver's license. Mr. Mashkevich also maintains Mr. Wu will not be unreasonably inconvenienced by sitting for a Zoom deposition given that he maintains a presence within the United States, as evidenced by his California driver's license.

government further detailed Mr. Wu's alleged criminal activity in this pig butchering scam, while

operating under a Qbit d/b/a, as follows:

> The amount of fraud loss claimed by the four victims in the specified wires totaled $64,200. The same amount, less transaction expenses, was transferred in its entirety in multiple steps all within a two-week period through the described route to **Bytechip [dba Qbitpay] Solidfi vAccount \*\*1162. These transactions demonstrate the money laundering technique known as "layering,"** a method by which fraud proceeds are broken down and distributed through various transactions and multiple bank accounts to obfuscate their fraudulent origin and conceal their destination.

The layering technique the government identified as being perpetrated by one of Mr. Wu's

Qbit entities is an established cryptocurrency laundering technique criminals utilize when

conducting pig butchering scams. The stolen cryptocurrency is initially transferred to a cyberwallet

and is then divided and sent to various other cyberwallets. Because all cryptocurrency transactions

are recorded using blockchain technology, the transactions become part of an immutable ledger

that can be traced in both real time and historically. Criminals will "wash" the cryptocurrency

through these transactions, but they are unable to conceal the resulting series of transaction fees

(or "gas" fees) incurred as part of the series of transactions. Blockchain forensics allows trained

individuals such as Plaintiff's experts in the present case to follow the pattern of transactions. The

stolen cryptocurrency, which is initially divided and distributed among cyberwallets, will often

return temporarily to a single wallet known as a "pivot" wallet. In a further laundering method, the

stolen cryptocurrency may also be transferred into a "bridge" wallet, which allows a transfer of

cryptocurrency between different exchanges or blockchain networks. When this occurs, the money

launderers have the ability to exchange the stolen cryptocurrency for another form of

cryptocurrency that is traded on a different exchange.

The government did not mince words in its forfeiture action against Mr. Wu's company. To

the contrary, the government detailed:

**Gatcha Solidfi vAccount \*\*6272** and **Bytechip [dba Qbitpay] Solidfi vAccount \*\*1162** are used to provide **money laundering infrastructure** to a large wire fraud scheme perpetrated against numerous individuals. Bytechip LLC, Gatcha Pictures, and Paralel Design are entities interconnected through IP addresses, outgoing debit transfers, and intrabank transfers of funds, **each performing an important function in a large fraud conspiracy ring**. None of these entities bears any indicia of legitimacy in its operations.

Plaintiff submits the lack of specificity in paragraph 2 of Mr. Wu's unsworn declaration should be weighed against the fact that another Qbit entity for which Mr. Wu was the Beneficial Owner stood accused of laundering cryptocurrency stolen in a pig butchering scheme. Qbit ultimately resolved that case by forfeiting a 7-figure value in cryptocurrency.

Mr. Wu's name and the Qbit name also appear in Bytechip's California filing of a civil complaint in the Superior Court of San Mateo County on February 29, 2024, discussed *supra*.[41] Exhibit 1 to Qbit's Complaint in that case is a Banking and Card Services Fee Scheduled signed on behalf of Bytechip LLC d/b/a Qbit by "Yujun Wu CEO". Bytechip LLC d/b/a Qbit identified its business as "providing cash management services to businesses through digital finance", including global pay-in and pay-out and banking as a service. This description is strikingly similar to Mr. Wu's description of the Qbit entity he identifies in the present case as a Lithuanian company.

The exhibits to the Qbit Plaintiff's Complaint in California also contain email addresses using the domain "qbitnetwork.com". Within Exhibit 3 to the Qbit Plantiff's Complaint , two Qbit email addresses received an email stating "[o]ur risk and compliance team has noticed unusual ACH activity in the Qbit Solid program." An email string is also attached as Exhibit 4 to the Qbit Plaintiff's Complaint in California. The email string contains four email addresses using the same domain "qbitnetwork.com". At the top of the email string, evidently identifying the email address from which the string was printed, appears "Yujun Wu wyj0912@gmail.com".

---

[41] Bytechip, LLC d/b/a Qbit, a Delaware Limited Liability Company, v. Solid Financial Technologies, a Delaware Corporation, et al., Superior Court for San Mateo County, California, 24-CIV-00307.

A name of interest can be found behind Exhibit 4 in the emails the Qbit d/b/a submitted in its California case. An email dated March 15, 2023 is signed by Michael Wu. The email was sent from the address michael@qbitnetwork.com. The signature block identifies Michael Wu as the "Qbit CEO". As established above, Michael Wu and Yujun Wu are the same person.

In his unsworn declaration, Yujun Wu makes a vague reference to Interlace as being suggestive of legitimacy for Qbit's operations. But Yujun Wu never disclosed to the Court that he is also Michael Wu, CEO and beneficial owner of Interlace. Michael Wu, as Qbit CEO, also has in his signature block a link to the website www.qbitnetwork.com.

Mr. Mashkevich included the detail above regarding the various Qbit entities, the "Qbit Network", the civil and criminal allegations against Qbit operating under various names, and Yujun Wu's failure to disclose to the Court he also goes by the name Michael Wu to illustrate why vague and conclusory allegations are stricken as a rule. In the present case, Qbit's documented history of allegedly laundering cryptocurrency stolen in a pig butchering scam further emphasizes why the Court should strike Mr. Wu's declaration as lacking specificity, beginning with his assertion as to where Qbit is headquartered and what its business includes.

B.  Paragraph 3 of Mr. Wu's Declaration Contains Only Non-Specific Generalizations

Mr. Wu submits to this Court a declaration purporting to explain Qbit's business as offering customers multi-currency business accounts, global payment processing, and supply chain financing. Mr. Wu includes one additional sentence regarding what Qbit's customers can do on the platform, i.e., fund their accounts and make payments from their accounts. Mr. Wu could have saved himself some space by simply declaring "Qbit is a digital bank." That is the only substance paragraph 3 includes.

Mr. Wu failed to make any attempt to explain Qbit as a legitimate business enterprise. By limiting his declaration to describing Qbit as a digital bank[42], Mr. Wu in no way refuted the evidence Mr. Mashkevich will present at trial demonstrating that Qbit is an online digital bank functioning as a key component of an international cybertheft and money laundering scheme. Qbit is holding stolen cryptocurrency, which is blended with other cryptocurrency in a well-known laundering technique. Mr. Mashkevich has already demonstrated as much with the filings in this case to date. Mr. Wu made no effort in paragraph 3 of his Declaration to refute that evidence. Rather, he simply stated that Qbit offers accounts for its customers.

Under the troubling facts of the present case, the Court could fairly question why Mr. Wu would not detail in paragraph 3 of his Declaration the nature, manner, and scope of Qbit's business. The answer likely lies in plain sight, as detailed in the federal government's forfeiture proceedings – Qbit is not a legitimate business, or at the very least Qbit commingles money laundering with otherwise legitimate business.

C.  <u>Paragraph 4 of Mr. Wu's Declaration is Vague, Lacks Specificity, and Illustrates Qbit's Attempts to Mislead the Court</u>

Mr. Wu references a platform called Interlace on which Qbit services cryptocurrency accounts. Mr. Wu makes no attempt to explain the Interlace platform and offers no specificity regarding what the platform does, how it works, or what assurances it provides to Qbit that Qbit's customers are operating legitimate businesses. Rather, Mr. Wu summarily asserts that Qbit's customers must provide various certifications and business documents to register an Interlace account. None of the documents Mr. Wu identifies as the "business documents" customers must provide would establish that the customer is conducting legitimate business rather than

---

[42] Mr. Mashkevich uses the word bank as a factual descriptor only. The reality is that the two overarching benefits companies such as Qbit offers to criminal organizations are (a) a lack of traditional bank fees, and (b) limited to no regulatory oversight.

cryptocurrency theft. Mr. Wu's assertion seems to be that the Interlace platform operates as a "Know Your Customer" type of service, through which Qbit can maintain some level of oversight regarding its customers.

Mr. Wu's vagueness is even more concerning based upon what Mr. Wu did not tell this Court. Mr. Wu is the CEO and owner of Interlace, just as he is the CEO and owner of Qbit. As detailed above, the Interlace CEO Michael Wu and this Court's Declarant Yujun Wu are the same person. On his LinkedIn page, Mr. Wu claims to have been the Interlace CEO since 2021. But in his Declaration, Mr. Wu does not acknowledge for this Court that he is the CEO of Interlace. Instead, he uses vague assertions regarding Qbit's use of the Interlace platform at a transparent attempt at subterfuge – he wants this Court to believe that Qbit's use of Interlace offers some level of legitimacy while concealing from this Court that Mr. Wu is both Qbit and Interlace. Mr. Wu's vague reference to Interlace without full disclosure that he is Interlace justifies striking Mr. Wu's declaration in its entirety and at a minimum striking paragraph 4.

     D.  Paragraph 5 of Mr. Wu's Declaration is Conclusory and Contradictory

Mr. Wu's assertions in paragraph 5 initially address OKX, which is a cryptocurrency exchange. In its simplest terms, a cryptocurrency exchange is a digital platform that hosts cryptocurrency wallets and allows customers to trade cryptocurrencies for other types of cryptocurrencies or fiat currency, such as U.S. dollars. OKX is a "FinTech" platform, with the word FinTech representing a combination of financial and technology. FinTech refers to any technology that allows people to access or manage digital assets and to make financial transactions, including exchanging or purchasing cryptocurrencies.

After noting that Obit uses the OKX exchange for cryptocurrency trading, Mr. Wu summarily asserts that Qbit is the legal and beneficial owner of the virtual assets, including the

frozen OKX wallet, which Mr. Wu contends only Qbit can access. Mr. Wu's conclusory statement contradicts Qbit's assertions that Qbit's customers are the owners of the cryptocurrency in the Qbit wallet, which Qbit represented to this Court in its Motion to Vacate. (Doc. 40, p. 1). Maintaining his patterns of offering only vague statements, Mr. Wu fails to identify any of the sources of the cryptocurrency held in the OKX wallet, presumably because Mr. Wu cannot contradict the findings of Mr. Mashkevich's expert, who conducted blockchain analysis, transaction analysis, and wallet analysis to determine the OKX wallet identified by Qbit is holding stolen cryptocurrency.

Additionally, Mr. Wu offered no proof supporting his conclusion that Qbit is either the legal or beneficial owner of the wallet. In fact, if Qbit is truly a digital bank holding cryptocurrency that belongs to its customers, as Qbit stated in its Motion to Vacate, then Qbit is neither the legal nor the beneficial owner of the cryptocurrency in the wallet.

E.  Paragraph 7 of Mr. Wu's Declaration is Vague, Conclusory, and Contradictory

Mr. Wu asserts the Qbit wallet contains "approximately $7 million worth of cryptocurrency, all deposited by Interlace account holders that have been screened through Interlace's quality assurance procedures." (Doc. 41, ¶ 7). Mr. Wu offers no proof of his assertion that approximately $7 million worth of cryptocurrency is in the account. Mr. Wu could have selected any number for that statement without fear of being challenged if such conclusory statements were accepted by courts. Mr. Wu also seeks to shield Qbit's activities from this Court by withholding any detail regarding the depositors and true owners of the cryptocurrency. Mr. Mashkevich's experts have already proven that the Qbit wallet holds stolen cryptocurrency. Plaintiff understands it would be uncomfortable for Qbit to identify that the depositors to the account and true owners of the cryptocurrency include, for example, members of the Chinese 14K

Triad, members of the Karen Border Guard Force, or other known pig butchering masterminds, but that is the level of specificity that is required for a declaration.

Mr. Wu again references Interlace in paragraph 7 of his Declaration, with an additional reference to undefined "quality assurance procedures." Mr. Wu clearly implies that Interlace's "quality assurance procedures" somehow establish the stolen cryptocurrency was obtained by honest means. Because Mr. Wu is the owner of both Qbit and Interlace, his reference to Interlace's "quality assurance procedures" is nothing more than a circular diversion intended to distract the Court from the evidence the Court has already reviewed. This evidence establishes that Qbit is laundering stolen cryptocurrency, either directly or by intentionally ignoring the criminal nature of the cryptocurrency transactions within the frozen Qbit wallet. Either way, Mr. Wu's vague, conclusory, and contradictory statements should be stricken.

F.  Paragraph 8 of Mr. Wu's Declaration is Vague and Conclusory

Mr. Wu again offers no proof other than vague and conclusory statements regarding money Qbit allegedly had to borrow to repay funds to its customers. Mr. Wu did not identify the lenders, the amounts, the fiat currency, the dates, the interest rates, or the amortization schedules for the alleged loans. Mr. Wu also did not identify any Qbit customers that Qbit allegedly must pay back, likely because these assertions are just another step to conceal Qbit's ongoing scam and its laundering of stolen cryptocurrency.

Mr. Wu also exceeds the outermost bounds of believability with his assertion that Qbit is incurring losses of $6,000 per day because of money it had to borrow for two reasons. First, Mr. Wu declared that the frozen wallet is holding approximately $7 million worth of cryptocurrency. One must question what sort of loan Mr. Wu would have this Court believe produces $2,190,000

in annual interest ($6,000 daily x 365 days) on a $7 million loan. Such loan service would require a loan at an interest rate of 31.29%.

Second, Mr. Wu asks this Court to believe that Qbit is incurring $6,000 daily in losses but also waited over seven months through various attorney conversations, Zoom meetings, letters, and a settlement demand request and receipt before filing its pending Motion to Vacate. Such an assertion is absurd on its face.

During the seven months between notice of wallet freeze and late January 2025, Qbit hired a minimum of three different law firms. Mr. Mashkevich's counsel communicated with all of Qbit's counsel. Attorneys with Qbit's first two law firms met several times by Zoom with Mr. Mashkevich's counsel. During one of these meetings, Mr. Mashkevich's counsel allowed Qbit's counsel to speak directly with one of Mr. Mashkevich's experts. This expert discussed his findings and showed some of the tracings of the expert's blockchain analysis that revealed Qbit's wallet is laundering stolen cryptocurrency. Qbit's counsel then asked Mr. Mashkevich's counsel for a demand to resolve this case, which Mr. Mashkevich's counsel sent. None of this conduct suggests that Qbit (a) truly believes the cryptocurrency in the frozen wallet was legally obtained, or (b) Qbit is suffering from financial losses from the freeze.

Given the lack of specificity in Mr. Wu's Declaration, his repeatedly conclusory and vague assertions, and Mr. Wu's self-contradictory assertions, Mr. Mashkevich respectfully requests the Court to strike Mr. Wu's unsworn Declaration in its entirety.

## PLAINTIFF'S RESPONSE TO UAB QBIT FINANCIAL SERVICES' MOTION TO DISSOLVE OR, IN THE ALTERNATIVE, MODIFY PRELIMINARY INJUNCTION

Plaintiff Michael Mashkevich, on behalf of himself and all others similarly situated, responds to Qbit's Motion to Dissolve or, In the Alternative, Modify Preliminary Injunction as follows:

## THE COURT HAD JURISDICTION TO ENTER
## THE PRELIMINARY INJUNCTION ORDER

Mr. Mashkevich named three individuals as defendants in his Complaint but acknowledged these individuals likely provided fake names to Mr. Mashkevich. Under the circumstances, it was impossible for Mr. Mashkevich to name an individual defendant without such acknowledgement. Generally, scammers do not use their real names when stealing cryptocurrency. Qbit's argument if accepted would restrict pig butchering victims from seeking a freeze of stolen cryptocurrency until they are able to identify the scammers. All the while, the scammers and the international criminals controlling the scammers would be off-ramping the stolen crypto so that the victims would have no possibility of recovery. This is not what the law requires. This Court had jurisdiction to enter the injunction, just as the federal courts that issued the injunctions in pig butchering cases had jurisdiction to do so.

To support its argument that the Court lacked jurisdiction to enter the Preliminary Injunction Order [Doc. 17] because the Complaint only named fictitious parties, Qbit cites *Ex parte Board of Trustees of Univ. of Ala.*, -- So.3d --, 2024 Ala. LEXIS 150 (Ala. Aug. 30, 2024). That case does make such a blanket holding. There, the original complaint only named a state institution as a defendant. *Id.* at *7. Because the state institution was entitled to absolute immunity, the trial court lacked jurisdiction and the complaint was a nullity. *Id.* The plaintiff could not avoid dismissal by naming fictitious parties because the fatal defect in the complaint – the effect of the state institution's absolute immunity – meant no amendment could save it. *Id.* at *7-*8. The case

did not hold, or even contemplate, that a complaint cannot name only fictitious parties under any set of circumstances.

To the contrary, naming only fictitious parties is appropriate in situations like the one Mr. Mashkevich faced. *See Eason v. Middleton*, 398 So. 2d 245, 248 (Ala. 1980) ("The fictitious party rule is intended to operate in emergency situations in which neither the name nor the identity of the defendant is known, as in the situation when the cause of action is known, but not the liable party, and when there is an urgent need to seize property or to attain service."); *see also McKelvey-Coats Furniture Co. v. Doe*, 198 So. 128, 129 (Ala. 1940) ("In any event a complaint is sufficient which follows the terms of [the statute on fictitious party pleading]; avers that the name of defendant is to plaintiff unknown, and his true name will be disclosed by amendment, when ascertained").

Mr. Mashkevich knows that the fictitious defendants own the cyberwallets to which the criminals moved the stolen cryptocurrency and thus knows the wallet owners are participants in the scam that stole the putative class members' crypto. Cyberwallet owners possess a private digital key, which is like an account password. Cyberwallets may only be accessed with this private key. If someone accesses a cyberwallet, they hold the private key and thus are the wallet owner.

Additionally, fictitious party pleading is specifically allowed in Alabama under Ala. R. Civ. P. 9(h). The federal rules contain no provisions for fictitious party pleadings. Generally, fictitious party pleading is not allowed in federal court. *See, e.g.*, *Estate of West v. Smith*, 9 F.4th 1361, 1363 (11th Cir. 2021). Nonetheless, the federal courts that entered the injunctions in the attached orders realized they have jurisdiction over the disputes even when the plaintiff does not know the name of the scammers and wallet owners.

**THE PRELIMINARY INJUNCTION ORDER SATISFIED RULE 65**

The Preliminary Injunction Order [Doc. 17] complied with Ala. R. Civ. P. 65 and it should not be vacated or modified. "Preliminary injunctions are designed 'to preserve the status quo in aid of the ultimate equitable relief claimed.'" *Ingenuity Int'l v. Smith*, 386 So. 3d 450, 455 (Ala. 2023) (quoting *Tilley's Alabama Equity* § 3:1(b) (5th ed. 2012)). "A trial court has wide discretion in determining whether to grant a preliminary injunction, and its decree will not be disturbed on appeal unless an abuse of that discretion is shown." *Chunchula Energy Corp. v. Ciba-Geigy Corp.*, 503 So. 2d 1211, 1216 (Ala. 1987).

### A.    Notice was provided to the adverse parties.

Qbit first alleges the Preliminary Injunction Order [Doc. 17] was issued without notice to an adverse party. Qbit either ignores or mischaracterizes who received notice and what those people and entities were alleged to have done. The people and entities who received notice **were the adverse parties** because they were the ones that Mashekivich alleged had stolen his funds.

"No preliminary injunction shall be issued without notice to the adverse party." Ala. R. Civ. P. 65(a)(1). Here, the adverse parties were the **wallet owners**. Mashekivich clearly alleged that the Defendants controlled the wallets and had transferred his and the Class's stolen cryptocurrency into those wallets. *See* Complaint at ¶ 4 ("The Class in this matter is defined as all persons and entities whose funds were unlawfully taken by Defendants through the date of this Complaint, and whose stolen cryptocurrency is contained in the wallets set forth in Appendix A, or in other cryptocurrency accounts controlled by Defendants as set forth in Appendix A."); *id.* at ¶ 5 ("After Defendants persuaded Class Members to deposit additional funds, they stole the money and transferred it to wallets they control."); *id.* at ¶ 10 ("To date, the investigation initiated by Plaintiff has identified the wallet addresses set forth in Appendix A, categorized by cryptocurrency exchange, as part of the common allegations centered around the fake work platforms."); *id.* at ¶ 40

("Inca traced and connected Defendants' transactions, found and followed a trail of transactions, and identified the cryptocurrency wallets that held Class Members' funds."); *id.* at ¶ 42 ("Through this tracing, Inca was able to confirm the identity of wallets involved in cryptocurrency transactions that were part of the common scheme, including the identity of Defendants' wallets that received Class Member funds and accordingly should be frozen. Those wallets are set forth in Appendix A, categorized by exchange."); *id.* at ¶ 43 ("The bottom line of Inca's analysis is that Class Members' funds converted by Defendants were sent to the cryptocurrency wallets listed in Appendix A. It is these wallets that Plaintiff seeks to freeze."); *id.* at ¶ 53 ("Plaintiff and Class Members have suffered or are at imminent, severe, and unacceptably high risk of suffering, irreparable harm because of Defendants' ability to move funds at any time, without notice. If Defendants withdraw funds from the wallets set forth in Appendix A, Plaintiff and Class Members will not be able to recover their funds, and will lose their property forever.").

The wallet owners are neither non-parties nor random bystanders. Instead, they are the people and entities that stole Mashkevich and the Class's funds and that held those funds in wallets they controlled. Thus, giving notice to a wallet owner gave notice to "an adverse party" in compliance with Ala. R. Civ. P. 65(a)(1).

### B.      The "Service Tokens" provided sufficient notice.

The service tokens dropped into the wallets provided sufficient notice of what the wallet owners were alleged to have done and of the impending preliminary injunction hearing. The TRO required Mashkevich to serve "this [TRO], together with a copy of the papers upon which it is based, . . . upon the person or persons controlling the wallets identified in Appendix A[.]" TRO [Doc. 13] at ¶ 3. The Complaint [Doc. 1] was one of the "papers" upon which the TRO was based and was included in the documents made part of the Court-ordered hyperlink.

"Pig butchering" scams are most often perpetrated and orchestrated by foreign individuals and entities, as explained above. The Alabama Rules of Civil Procedure allow service of process on foreign individuals or entities "by other means not prohibited by international agreement as may be directed by the court." Ala. R. Civ. P. 4.4(3). "[T]he method of service of process ordered must be reasonably calculated to give notice to the defendant." *Snead v. Snead*, 874 So. 2d 568, 574 (Ala. Civ. App. 2003).

Here, service through the service tokens is not prohibited by international agreement. The service tokens provide a means of depositing information into Defendants' digital wallets and notifying them of Mashkevich's allegations. Those service tokens are an appropriate method of service in a case involving digital wallets where "pig butchering" and cryptocurrency theft has occurred. *See Lcx Ag v. 1.274m United States Dollar Coin*, 2022 NYLJ LEXIS 961, *10-*12 (N.Y. Sup. Ct. N.Y. County August 21, 2022). That is because the wallet owners (i.e., the adverse parties) are the only ones who have access to their wallets and are the ones who receive the service tokens. Thus, the service token was what it claims to be: a method of service reasonably calculated to give notice to the Defendants.

### C.    The timing of service comported with due process.

The adverse parties were provided with sufficient notice before the preliminary injunction hearing. "Rule 65(a)(1) does not specify how much notice must be given to the adverse party before a preliminary injunction can be issued." *Southern Homes, AL, Inc. v. Bermuda Lakes, LLC*, 57 So. 3d 100, 104 (Ala. 2010) (going on to find that less than two hours advanced notice was insufficient).

Here, Mashkevich completed delivering the service tokens into the wallets by Monday, June 10, 2024. The preliminary injunction hearing was scheduled for Friday, June 14, 2024, four

days later.  As the Court may recall, several purported wallet owners communicated with the Court in the days leading up to the preliminary injunction hearing.  Those wallet owners had ample opportunity to state their positions and most claimed to have not played a role in the pig butchering scam.

Here, Qbit received notice of this lawsuit through the service token process.  Qbit's argument that the notice was insufficient or that it was not given enough time rings hollow considering the nearly seven months Qbit has waited between finding out about this lawsuit and filing its Motion to Strike.

> **D.**    **The Preliminary Injunction Order bound adverse parties.**

The Preliminary Injunction Order [Doc. 17] bound wallet owners who, as explained above, were the adverse parties because they were the ones who Mashkevich alleged had stolen his funds and put them in the wallets that Mashkevich sought to freeze.  The wallet owners were ***not*** unaffiliated with the scam: they participated in it and perpetuated it.

> **E.**    **Mashkevich did not have to provide security because the "overriding public concern exception" applies.**

 "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs, damages, and reasonable attorney fees as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained[.]"  Ala. R. Civ. P. 65(c).  The Rule goes on to provide exceptions for the State of Alabama and for domestic relations cases.  *Id.*  But, the Alabama Supreme Court "has acknowledged that there may be additional exceptions to the security requirement that are not spelled out in Rule 65(c)."  *Milton v. Haywood*, 393 So.3d 1156, 1158 (Ala. 2023).  Those "[other] necessary exceptions to such an absolute holding in all cases under Rule 65(c) . . . [include] requiring only a nominal security, or where the litigant is

impecunious or the issue is one of overriding public concern.'" *Spinks v. Automation Pers. Servs.*, 49 So. 3d 186, 190 (Ala. 2010) (internal citations omitted).

This is not a case involving prohibited road access where other, albeit less convenient, access was available. *See Milton*, 393 So.3d at 1158 (deciding not to apply the "overriding public concern" in a case involving the closure of a public road where other access roads were still open and available to the plaintiffs). Instead, "pig butchering" cases involve the theft of cryptocurrency as the result of fraudulent criminal activity. The scammers committing the crimes are human trafficking victims, who are held by international criminal gangs. The Defendants here, as is typical in "pig butchering" cases, go to great lengths to scam their victims and then hide their trails in order to keep their stolen assets. Those are exactly the type of cases for which the "overriding public concern" exception is applicable. *See Jacobo v. Doe*, 2022 U.S. Dist. LEXIS 101504, *18 (E.D. Cal. June 7, 2022) ("[T]he public interest is properly served by promoting the objectives of . . . FinCEN and providing assurance to the public that courts will take action to promote protection of assets and recovery of stolen assets when they can be readily located and traced to specific locations."); *see also Blum v. Defendant*, 2023 U.S. Dist. LEXIS 235592, *5 (N.D. Fla. Dec. 13, 2023); *Hikmatullaev v. Marco Alessandro Villa*, 2023 U.S. Dist. LEXIS 111619, *8 (S.D. Fla. June 28, 2023); *Heissenberg v. Doe*, 2021 U.S. Dist. LEXIS 257218, *2 (S.D. Fla. Apr. 23, 2021).

## F. Freezing the Digital Assets is Proper

Qbit claims that freezing assets before a judgment is improper, but freezing the wallets is appropriate because Mashkevich has an equitable interest in their contents. Normally, a plaintiff cannot obtain injunctive relief against a defendant's assets before a judgment. *Norman v. Occupational Safety Ass'n*, 811 So.2d 492, 500-501 (Ala. 2001). There is an important exception to that rule that Qbit fails to mention: where the plaintiff claims a lien or equitable interest in the

asset sought to be enjoined. *Id.* at 500.  Here, Mashkevich and the Class claim an equitable interest in their stolen cryptocurrency that Defendants placed into the now-frozen wallets.

This not a case where Mashkevich is trying to enjoin the wallet owners (i.e., the adverse parties) from accessing and moving ***their*** assets.  The assets at issue do not belong – and have never belonged – to the wallet owners.  Instead, those assets were stolen from Mashkevich and the Class, who have consistently maintained their equitable interest in those assets.  Thus, freezing those assets is proper.

Respectfully submitted,

*/s/ Keith Jackson*
Robert R. Riley, Jr. (ASB-8310-Y75R)
Keith Jackson (ASB-7519-J66B)
James E. Murrill (ASB-4329-A57M)
Attorneys for Plaintiff

**OF COUNSEL:**

RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Telephone: (205) 879-5000
rob@rileyjacksonlaw.com
kj@rileyjacksonlaw.com
jay@rileyjacksonlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2025, a copy of the foregoing was electronically filed with the Clerk of the Court using the AlaFile system.

*/s/ Keith Jackson*
OF COUNSEL

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JEYSEN ZIVAN YOGARATNAM                          CIVIL ACTION

VERSUS                                           NO. 24-393

JOHN DOES et al.                                 SECTION: "G"(4)

## ORDER

Considering the Preliminary Injunction hearing held on this date, and for the reasons more fully explained by the Court in its Order and Reasons issuing the Temporary Restraining Order,[1] the Court finds that Plaintiff has met the requirements for a Preliminary Injunction in the above-captioned matter. Accordingly,

**IT IS HEREBY ORDERED** that a Preliminary Injunction is entered as follows:

1. Defendants and their agents, servants, employees, attorneys, partners, successors, assigns, and all other persons or entities through which they act or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, are hereby temporarily restrained from withdrawing, transferring, or encumbering any assets currently held in the following cryptocurrency wallet addresses:

---

[1] Rec. Doc. 8.

1

| No. | Bitkub Destination Address | Funds Traced (USDT) |
|-----|---------------------------|---------------------|
| 1 | 0x7b7b86bfe06929a7a32aaf9c7bb87c27a816cc7b | (See total below) |
| 2 | 0x3d1d8a1d418220fd53c18744d44c182c46f47468 | (See total below) |
| | | Total: 153,900 USDT |

| No. | Blofin Destination Address | Funds Traced (USDT) |
|-----|---------------------------|---------------------|
| 1 | 0xc383e037ab6872adae3ec35714b8d8cc46bea867 | (See total below) |
| 2 | 0x0e747eb2ff0f26fb77c3a1ea67ee07fac2dbb783 | (See total below) |
| | | Total: 1,063,609 |

| No. | Binance Destination Address | Funds Traced (BTC) |
|-----|----------------------------|--------------------|
| 1 | 0x376795c8b53b69a712f1024cf8537f980eb3bcbf | 77,763.16356 USDT |
| | | Total: 77,763.16356 USDT |

| No. | Tokenlon Destination Address | Funds Traced (BTC) |
|-----|-----------------------------|--------------------|
| 1 | 3JA4StsiJwsgMvnxj8JgchmBEZMTH9mUWm | 3.28654 BTC |
| 2 | 3JMjHDTJjKPnrvS7DycPAgYcA6HrHRk8UG | 3.63019 BTC |
| | | Total: 6.91673 BTC |

2. In the Court's Order and Reasons granting the Temporary Restraining Order, the Court determined that security in the amount of $100 is adequate.[2] The record does not reflect that this has been deposited with the Court. Therefore, Plaintiff is directed to post security of $100 with the Clerk of Court.

3. This Preliminary Injunction shall remain in effect until the Court's entry of a final judgment on the merits of Plaintiff's claims in this action unless otherwise ordered by the Court.

**NEW ORLEANS, LOUISIANA**, this ___8th___ day of March, 2024.

*Nannette Jolivette Brown*

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[2] Rec. Doc. 8 at 3.

2

# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| VIRGINIA CHOW | CIVIL ACTION NO: 24-CV-480 |
|---|---|
| VERSUS | JUDGE DARREL JAMES PAPILLION |
| "DEFENDANT 1" | MAGISTRATE JUDGE DONNA PHILLIPS CURRAULT |

## ORDER AND REASONS

Having held a preliminary injunction hearing, and for the reasons explained by the Court in its Order and Reasons issuing the temporary restraining order, the Court holds that Plaintiff Virginia Chow has met the requirements for a preliminary injunction in this matter. *See* FED. R. CIV. P. 65. Accordingly,

**IT IS ORDERED** that a preliminary injunction is issued as follows:

1. Defendant and his agents, servants, employees, attorneys, partners, successors, assigns, and all other persons or entities through which he acts or who acts in active concert or participation with Defendant, who receive actual notice of this Order and Reasons by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, are hereby temporarily restrained from withdrawing, transferring, or encumbering any assets currently held in the following cryptocurrency wallet addresses:

| No. | Binance Destination Address | Funds Traced (BTC) |
|---|---|---|
| 1. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 7.3995 |
| 2. | 33S4UAjvEUDJkiP1f9TC8p9AX6pdVbWC5o | 3.8956 |
| 3. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 15.8995 |
| 4. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 4.9995 |
| 5. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 5.7995 |

| 6. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 3.7995 |
| 7. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 11.8995 |
| 8. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 3.4995 |
| 9. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 5.4995 |
| 10. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 8.5995 |
| 11. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 18.9995 |
| 12. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 23.9995 |
| 13. | 1HUVBcpHxnQcEVquhpNkT1RTEMWwp4BM5L | 21.9995 |
| TOTAL | | 136.2896 BTC |

| No. | **Bitfinex Destination Address** | **Funds Traced (BTC)** |
|---|---|---|
| 1. | 33S4UAjvEUDJkiP1f9TC8p9AX6pdVbWC5o | 5.9935 |
| TOTAL | | 5.9935 BTC |

2. In the Court's Order and Reasons granting the temporary restraining order, the Court determined that security in the amount of $100 is appropriate. The record does not reflect that this sum has been deposited with the Court. Therefore, Ms. Chow is directed to post security of $100 with the Clerk of Court. No additional security shall be required. *See Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 612 (5th Cir. 1985).

3. This preliminary injunction shall remain in effect until the Court's entry of a final judgment on the merits of Ms. Chow's claims in this action unless otherwise ordered by the Court.

New Orleans, Louisiana, this 1st day of May 2024.

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**

2

# Exhibit C

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROMES H. PHILLIPS<br><br>    Plaintiff,<br><br>v.<br><br>DEFENDANT "1" a/k/a "Barry Knapps", DEFENDANT "2" a/k/a "Colin Gordon", DEFENDANT "3" a/k/a "Mary", DEFENDANT "4" a/k/a "Linda", DEFENDANT "5" a/k/a "Mia", DEFENDANT "6" a/k/a "Eric Gordon", DEFENDANT "7" a/k/a Mr. Shah who is the owner of the following cryptocurrency address,<br>Robinhood:<br>0xa26e73c8e9507d50bf808b7a2ca9d5de4fcc4a04, and<br>JOHN DOE Defendants 1-6 who are the cohorts of DEFENDANTS "1" – "7" and are the owners of the following cryptocurrency deposit wallets where Plaintiff's stolen cryptocurrency assets were transferred:<br>Binance:<br>0x28c6c06298d514db089934071355e5743bf21d60 and<br>0xa67766248d9b3c6399c55292cf72be270c92d29a,<br>Coinbase:<br>0xa9d1e08c7793af67e9d92fe308d5697fb81d3e43,<br>BTSE:<br>0x5a99839e9e90e64ab2606a556165b64d208d0eef,<br>OKX:<br>0x68841a1806ff291314946eebd0cda8b348e73d6d,<br>HTX:<br>0xa03400e098f4421b34a3a44a1b4e571419517687,<br><br>    Defendants. | Case No. 1:24-cv-07511<br><br>Honorable Jorge L. Alonso |

## PRELIMINARY INJUNCTION

THIS CAUSE comes before the Court on Plaintiff's Motion for Entry of a Preliminary Injunction against DEFENDANT "1" a/k/a "Barry Knapps", DEFENDANT "2" a/k/a "Colin Gordon", DEFENDANT "3" a/k/a "Mary", DEFENDANT "4" a/k/a "Linda", DEFENDANT "5" a/k/a "Mia", DEFENDANT "6" a/k/a "Eric Gordon", DEFENDANT "7" a/k/a "Mr. Shah", and JOHN DOE Defendants 1-6.

As explained below, after careful review of the Motion and Plaintiff's supporting memorandum, Plaintiff's Motion for Preliminary Injunction is GRANTED.

## BACKGROUND

Plaintiff ROMES H. PHILLIPS ("Plaintiff") brings the present action against the Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act (Count I), Conversion (Count II), Unjust Enrichment (Count III), Imposition of Constructive Trust and Disgorgement of Funds (Count IV), and Conspiracy (Count V). [ECF 1].

As alleged in Plaintiff's Complaint, Plaintiff is a victim of not only a nationwide but also a worldwide RICO conspiracy known as "pig butchering." Pig butchering scams are fraudulent crypto investment schemes directed from Asia, which are now a billion-dollar industry. Pig butchering scams run and perpetrated by organized criminal groups in Southeast Asia, are called such because the victims are likened to hogs fattened up for slaughter. *See* Compl. at ¶¶ 20-22. Through Defendants, Plaintiff discovered the online purported trading platforms EN HASH Exchange, WE OWN COIN, and Sigma, which, unbeknownst to Plaintiff, were fraudulent "copycat" exchanges. Defendants misrepresented that EN HASH Exchange, WE OWN COIN, and Sigma would allow Plaintiff to earn high rates of return within a short period of time on all trades. Defendants represented to Plaintiff that EN HASH Exchange, WE OWN COIN, and Sigma were

trusted websites used for cryptocurrency trading. Relying on Defendants' misrepresentations, Plaintiff ROMES H. PHILLIPS accessed what he believed were websites owned and operated by legitimate exchanges. Instead, however, Plaintiff ROMES H. PHILLIPS accessed fraudulent websites created to deceive individuals, including Plaintiff, into believing they were investing on a legitimate cryptocurrency exchange. *See* Compl. at ¶ 30.

Plaintiff started to transfer cryptocurrency from his Crypto.com account— a legitimate third-party online platform for buying, selling, transferring, and storing cryptocurrency—to the fraudulent platforms (EN HASH Exchange, WE OWN COIN, and Sigma). The fraudulent exchanges served as an engine of theft for Defendants, giving them a mechanism to provide Plaintiff with false account statements that masked the fraudulent scheme Defendants were perpetrating. In essence, the "EN HASH", "WE OWN COIN", and "Sigma" exchanges to which Plaintiff was sending his cryptocurrency holdings was actually – unbeknownst to Plaintiff – Defendants' own private cryptocurrency wallet addresses. *See* Compl. at ¶¶ 31-33.

Plaintiff's stolen assets have been traced through his first tracing report of blockchain analytics to the following cryptocurrency wallet addresses held at the Robinhood, Binance, Coinbase, BTSE, OKX, and HTX cryptocurrency exchanges —wallet addresses believed to be owned or controlled by Defendants.

**TRACED TRANSACTIONS TO EXCHANGES AND DEFENDANT WALLETS[1]:**

| Exchange | Wallet Address |
|----------|----------------|
| Robinhood | 0xa26e73c8e9507d50bf808b7a2ca9d5de4fcc4a04 |
| Binance | 0x28c6c06298d514db089934071355e5743bf21d60 |
| | 0xa67766248d9b3c6399c55292cf72be270c92d29a |
| Coinbase | 0xa9d1e08c7793af67e9d92fe308d5697fb81d3e43 |
| BTSE | 0x5a99839e9e90e64ab2606a556165b64d208d0eef |

---

[1] *See* ECF No. 1-1.

| OKX | 0x68841a1806ff291314946eebd0cda8b348e73d6d |
|-----|--------------------------------------------|
| HTX | 0xa03400e098f4421b34a3a44a1b4e571419517687 |

## I.    STATEMENT OF FACTS

On October 2, 2024, this Court granted Plaintiff's *Ex Parte* Motion for Entry of a Temporary Restraining Order ("the TRO"), as well as Plaintiff's Motion for Alternate Service. [ECF 10, 11]. Plaintiff was authorized to provide notice of these proceedings, including notice of the preliminary injunction hearing, summons, Complaint, and any future pleadings, via NFT, WhatsApp, as well as through publication to Plaintiff's Service Website. Plaintiff successfully served all active WhatsApp accounts and destination wallets located on the Robinhood, Binance, BTSE, OKX, and HTX cryptocurrency exchanges with a copy of the Complaint, summons, notice of the preliminary injunction hearing, all other relevant documents, as well as Plaintiff's service website address. The Coinbase wallet is armed with a smart contract and Plaintiff's cryptocurrency expert is diligently working on a solution and alternative coding with which to serve the Coinbase wallet address.

During the October 30, 2024, status conference and hearing on Plaintiff's Motion for Preliminary Injunction, Plaintiff's counsel informed this Court that updated tracing conducted by Plaintiff's blockchain experts had identified several bridges and swaps that Defendants used in efforts to obfuscate the flow of funds. These bridges and swaps had not been apparent in Plaintiff's earlier tracing. The updated tracing shows that Plaintiff's funds now sit in wallets at four of the five exchanges identified in Plaintiff's earlier report: Robinhood, OKX, HTX, and Coinbase. Accordingly, counsel requested that the injunctive relief requested in Plaintiff's Motion be narrowed in scope to reflect the updated addresses as set forth below:

| Exchange | Wallet Address |
|----------|----------------|
| Robinhood | 0xa26e73c8e9507d50bf808b7a2ca9d5de4fcc4a04 |
| Coinbase | 0xa9d1e08c7793af67e9d92fe308d5697fb81d3e43 |
| OKX | 0x68841a1806ff291314946eebd0cda8b348e73d6d |
| HTX | 0xa03400e098f4421b34a3a44a1b4e571419517687 |

After reviewing the Motion and the accompanying record, this Court **GRANTS** Plaintiff's

Motion, so narrowed in scope, as follows.

## II.    ANALYSIS

### A. A Preliminary Injunction Extending Relief Already Granted in the TRO is Appropriate

A preliminary injunction is necessary to prevent further unlawful conduct by Defendants.

Courts addressing similar allegations of cryptocurrency theft have also issued preliminary

injunctions following a temporary restraining order. *See, e.g.*, See *Fitzgerald v. Defendant "1" a/k/a*

*"Lisa", et al., Case No. 1:24-cv-21925 (S.D. Fla. June 12, 2024)*, *Chow v. Defendant "1" a/k/a*

*"Kai Xuan Wang", et al., Case No. 2:24-cv-00480 (E.D. La. April 16, 2024)*, *Salem v. Defendant*

*"1" a/k/a "Anna Asfahany", et al., Case No. 3:24-cv-00093 (N.D. Fla. April 8, 2024)*,

*Jambulingam v. Defendant "1" a/k/a "Amead", et al., Case No. 3:24-cv-00116 (N.D. Fla. April 8,*

*2024)*, *Yogaratnam v. Defendant "1" a/k/a "Darina Dubois", et al.*, Case No. 2:24-cv-00393 (E.D.

La. February 23, 2024), *Blum v. Defendant "1" a/k/a "Mia Tara", et al.*, Case No. 3:23-cv-24734

(N.D. Fla. December 13, 2023), *Lin v. Defendant "1" a/k/a "Fanxin Lin", et al.*, Case No. 2:23-

cv-05878 (E.D. La. December 5, 2023), *Ohlin et al. v. Defendant 1 a/k/a Selina, et al.*, Case No.

3:23- cv-08856 (N.D. Fla. May 26, 2023); *Astrove v. John Doe*, Case No. 9:22-cv-80614, 2022

WL 2805315 (S.D. Fla. Apr. 21, 2022).

### i. This Court Has Already Found that the Requirements for a Preliminary Injunction Have Been Satisfied

Since the standard for granting a TRO and the standard for granting a preliminary injunction are identical in this Circuit, the requirements for entry of a preliminary injunction extending the TRO have been satisfied. *See, e.g., Charter Nat'l Bank & Trust v. Charter One Fin., Inc.,* No. 1:01-cv-00905, 2001 WL 527404, at *1 (N.D. Ill. May 15, 2001) (citations omitted). A temporary restraining order or preliminary injunction may be issued upon a showing that: "(1) there is a reasonable likelihood that Plaintiff will succeed on the merits; (2) Plaintiff will suffer irreparable injury if the order is not granted because there is no adequate remedy at law; (3) the balance of hardships tips in Plaintiff's favor; and (4) the public interest will not be disserved by the injunction." *Columbia Pictures Indus., Inc. v. Jasso,* 927 F. Supp. 1075, 1076 (N.D. Ill. 1996). By virtue of this Court's entry of the TRO, it has already found that the above requirements have been satisfied.

### ii. The Equitable Relief Sought Remains Appropriate

This Court also finds that the injunctive relief previously granted in the TRO should remain in place through the pendency of this litigation and that issuing this Preliminary Injunction is warranted under Federal Rule of Civil Procedure 65. Evidence submitted in support of this Motion and in support of Plaintiff's previously granted Motion for Entry of a TRO establishes that Plaintiff has demonstrated a likelihood of success on the merits; that no remedy at law exists; and that Plaintiff will suffer irreparable harm if the injunction is not granted.

Here, a Preliminary Injunction is warranted to prevent Defendants from withdrawing, transferring, alienating, or encumbering any of Plaintiff's assets contained in Defendants subject

wallets during the pendency of this litigation. In the absence of a Preliminary Injunction, Defendants may attempt to transfer Plaintiff's assets or convert Plaintiff's cryptocurrency into fiat currency, forever precluding Plaintiff's recovery.

This Court also finds Plaintiff has provided notice to Defendants in accordance with the Temporary Restraining Order entered October 2, 2024, [ECF 11] ("TRO"), and Federal Rule of Civil Procedure 65(a)(1). This Court also finds, in the absence of adversarial presentation, that it has personal jurisdiction over Defendants because Defendants directly target their business activities toward consumers in the United States, including Illinois. Specifically, Plaintiff has provided a basis to conclude that Defendants have targeted Illinois residents by setting up and operating a scam cryptocurrency exchange that targets United States consumers, including and specifically Plaintiff in Illinois, using one or more aliases.

## III.    CONCLUSION

In view of the foregoing, Plaintiff's Motion for Preliminary Injunction is **GRANTED**. A Preliminary Injunction is entered as follows:

1.  Defendants and their agents, servants, employees, attorneys, partners, successors, assigns, and all other persons or entities through which she/they act or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, are hereby restrained from withdrawing, transferring, or encumbering any assets currently held by, for, or on behalf of Defendants or any business entity through which she/they act or which act in active concert or participation with them; including but not limited to those assets currently held in: (1) the above and below listed

Destination Addresses at the Robinhood, Coinbase, OKX, and HTX exchanges where Plaintiff's stolen funds were transferred; or (2) any account at any other financial institution, bank, trading exchange, or investment firm, or any cryptocurrency wallet or cryptocurrency trading account they maintain or control anywhere other than in the Destination Addresses, if such account contains assets that are reasonably traceable to the assets allegedly taken from Plaintiff.

> 0xa26e73c8e9507d50bf808b7a2ca9d5de4fcc4a04
> 0xa9d1e08c7793af67e9d92fe308d5697fb81d3e43
> 0x68841a1806ff291314946eebd0cda8b348e73d6d
> 0xa03400e098f4421b34a3a44a1b4e571419517687

2. The $1,000 bond posted by Plaintiff shall remain in the registry of the Court until a final disposition of this case or until the Preliminary Injunction is terminated.

**DONE AND ORDERED** this 30th day of October, 2024.


**SO ORDERED.**

# Exhibit D

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

STEPHEN B. SHAYA, on behalf of
Himself and all others similarly situated,

                            Case No. 24-cv-10670

         Plaintiff,

                            Hon. Mark A. Goldsmith

v.

KYLIE NOFS, ZHU SHICAI, LUO
YANBING, LIN YIN, YANG ZHENLIN,
and JOHN DOE NOS. 1-25,

         Defendants.

---

**ORDER FOR PRELIMINARY INJUNCTION**

      This matter is before the Court in accordance with its March 18, 2024 Order

to Show Cause and Granting Motion for Temporary Restraining Order (ECF No. 4).

On April 1, 2024, this Court conducted a hearing for the Defendants, Enjoined

Parties and anyone else wishing to be heard to show good cause for why this Court

should not enter a preliminary injunction further enjoining the withdraw, transfer,

sale, encumbrance, or alteration of the cryptocurrency or assets held in the wallet

addresses listed in Appendix A of the March 18, 2024 Order to Show Cause and

Granting Motion for Temporary Restraining Order during the pendency of this

action.  The Court being satisfied that Plaintiff's counsel satisfied the requirements

of providing actual notice of the Order to Show Cause and Granting Motion for

Temporary Restraining Order, as set forth in that order.  None of the Defendants,

Enjoined Parties, or anyone else wishing to be heard filed a response or appeared at the April 1, 2024 show cause hearing to oppose the granting of a preliminary injunction concerning the cryptocurrency or assets held in the wallet addresses listed in Appendix A to this Order maintained by Binance Holdings Ltd., WhiteBIT, MaskEX, and BTSE. Counsel for Alt 5 Sigma Canada, Inc. appeared at the April 1, 2024 hearing, however, based on the stipulations of counsel the cryptocurrency and assets held in the wallet addresses maintained by B2C2 to which Alt 5 Sigma Canada, Inc. claims an interest are subject to a separate stipulated order extending the temporary restraining order over those assets. The Court has reviewed Plaintiff's Emergency Motion for Temporary Restraining Order and for Order to Show Cause Why a Preliminary Injunction Should Not Issue and Brief in Support of the same (ECF No. 3), as well as the Declaration of Stephen Shaya, the Declaration of Charles Zach, and the Declaration of Kenneth F. Neuman, and heard oral argument on that motion. The Court is satisfied that pursuant to Federal Rule of Civil Procedure 65, the preliminary injunctive relief set forth in this Order is warranted based on the likelihood of immediate and irreparable injury to Plaintiff and those similarly situated if the cryptocurrency and assets held in the wallet addresses listed in Appendix A of this Order were not restrained from being withdrawn, transferred, sold, encumbered, or otherwise altered prior to a final disposition of this action.

Based on the foregoing, and for the reasons stated on the record, it is hereby **ORDERED THAT:**

2

1.      Plaintiff's motion for a preliminary injunction is GRANTED as set forth in this Order.

2.      Defendants KYLIE NOFS, ZHU SHICAI, LUO YANBING, LIN YIN, YANG ZHENLIN, JOHN DOES NOS. 1-25, Binance Holdings Ltd., WhiteBIT, MaskEX, and BTSE and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any other persons through which they act, or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, (collectively, the "Enjoined Parties") are hereby preliminarily enjoined from withdrawing, transferring, selling, encumbering, or otherwise altering any of the cryptocurrency or assets held in the wallet addresses listed in Appendix A of this Order, whether such property is located inside or outside of the United States of America.

3.      Pursuant to FED. R. CIV. P. 65(c), the Court in its discretion determines that no bond is required.

      SO ORDERED.

Dated:  April 2, 2024                                  s/Mark A. Goldsmith
        Detroit, Michigan                             MARK A. GOLDSMITH
                                                      United States District Judge

3

## APPENDIX A

### Cryptocurrency Addresses (categorized by exchange)

Binance

- 1MiobFphxPJu4WiKahfBo2MaZQEvfpnzHp
- 0x3e771B4Aae63A8Ff4D6e748b217a478C9e3fD0Fc
- 0xbDB99397306D5Ed439A866a1196C2878fFD30af0
- 0x00adC74eca60bc8570fBfbf2Ae0001bdBA9987d1
- 0xa3e7232f754c25dB48E7B1e45935830c987E81B0
- 0xBddd281A443980a4711442a43c846604F0174e9B
- 0x1b014AbF59be85aa1A9abc16766873239637F4d6
- 0x9D6D61B5b466F870E809659B6c0EFE0cc9B06BA4
- 0xcd269B39EA2855242258F90089cc76e6f10504Ab
- 0x4f9C4ac9107A3Aec6b09Db004810Db0A6c65eD44
- 1MJeD1xARua9y9EzusBXeZwmcZftgZ48kn
- 15coUULzLprp1fQvirgRPxJKF4LaTiVMPW
- 15szMaFnEgsfYAKuVKjafPyeV7kdkKx1LV
- 15UmREUGRssw42ptnC4ie7xK1u5nhXrfi7
- 15yoLFniWtKSt8YTdBCR3YdmnX2DNk3SHM
- 16cX4spbtNpGhqzTpBhedop7EBHPS3tgrk
- 16paf23pp94feCF2YVceDDhTk36FHACihT
- 16vzwevyUmE52U4bsPAHM6cCK9sK31Rjo3
- 1725hUxmFvtaLbdC1SEyHD6ocGTC55eexx
- 1DnVrd1hDjXQz83p3Mh4tf3cFqjsGfvmMv
- 1Ec83cfjkwjSQyafJ9oFXTPgpKmgwjvo2d
- 1EesTgoexyPsPMsRTXtc2R2NVPcYYHbGP8
- 1EJQnosfynok4LZRqcMqTCfDdZMS2Xz9Pb
- 1EWgCTg17DaCHGGQf5ZZ3BV52CFKkF4vE9
- 1EYQ9uvqeGmRg41Yea42yigWoAKqftB9ik
- 1F73oPbsSb2sShxQQbbXY6F1vEQWMfYAwY
- 1FfjgorWHSPc4jgK2HKKHXmNCQHGMRwMYZ
- 1MNMBRsVK2oLzQ2TsTwQHm4uHwz6JyxQLx
- 1MUQ7KWARGTTtysgxjxgiL1vk7r3RgYDjY
- 1MVSf7yLxBNJTHqRJxkMj3UscSpVsBW8fJ
- 1N1DEHgk5nVV2smaeu2RPPKJ671EE7CE7d

4

- 12397TpnaobznX1Tgmbf7LyWtttUj2ts1g
- 125VuPdt4yxZquEqaDPf4Rb6A7btNmMaCp
- 128wXsuiKxQ9DzQ5xmCXztPvUbdogPUW95
- 18ywsJ3ivFG1QxvRjgyAZ18yzAxLSTbhwb
- 1936HAeaa6mE95dqPKkrbMTzBkAZxepJkE
- 19PZrNm7CucpCZdT39bf9p5ac1Cg1Mh5CS
- 19VVjDPkPnbYUBAep7VCL6MoEKzKPYF4pp
- 1mVKxYij5rozc5a1dtFo2oYpdnHEoDhWc
- 1MXwe75LVDGLWVPQ6PDEkJmCSxEZ6BzU7P
- 1N4mszL8HsBpNwiZzxgdS1eMamtYcdEasp
- 1N9o6a29DNdf6C7VnL5gN2esER79QajSa3
- 1NA9BGRQt7rwYHgfZg4tErBzSeBTgJUALS
- 1NrbPSCbcvKBi8nENgB38vRvnPijewJMwX
- 1NSDjjzCcJGkbBedGioCbFuWqyZvtbxDuZ
- 1NshiPK15HwV2kXB5tMu49URpk8FkdWfo7
- 1NsNQ4QKYCLS1xs5fkzLcVmNyXj69w8jq7
- 1NsPUH3pp6u8W1LHkeDRAW1F9z272g9e9F
- 169w1UwZemYjXWDXkFs1TMxd1828chZpgw
- 16FcFMemjpEzFUrN1D5to8yj6e1mDwkuSE
- 1HA3FT21oJDtmE643hoiKfTN7R6mSZF38p
- 1HDZFkDE2MNdrakAEUtxNFVJSHLDTAYoJG
- 1Hiui2uvD6NtpNoSH2NS9JL526DgXh8BHg
- 1HKi6Z5f6D7dhYomM2JDQXk9kefxr46YP7
- 1MquibWP1iU5ea9g4LQVSwNkLhyF7dCC8q
- 1MSWpiNSHs4rTEBoKXZBEc9LvWmDRKZphA
- 14Jc8uZYw4xcgUBpWtZUT2YqaFuc5ZQ79k
- 14nx4kPz3jrru15NwA6bxyjoCfN39B6Hxd
- 19KjbadinBFiFqqfRWJqpGU9cMG2pbYkbz
- 19UZo6BKzWXMj1mufPaCYqMRpBFvEnSGcM
- 1AmK9LabYF6xdUPmawJ4w7kiydUc6xUh1p
- 1ASuucPKYgCs3zVStcCqhWbC9Ngh4tCAsn
- 1FVk38iEdd5KZGYR8DS6cXCdRiLNRmD4U7
- 1G5iM759XrbpGdSugAE64T3NgQ1LFKTqat
- 1GTVTLWNfYGrS5TMMg6jg9bTVV3JsyEjbS
- 1H3VMz3TSTjAWAriL1ne2fnhhmSYvZrdM7

- 14qCkB9mJhw11y9cz5j5Xr9bZwi2bm1sm5
- 14TZhP7mz81ZUQzrs1972j634EDh1GXLWT
- 15MeVNmbBKVGmXNtkfynxSGzn6nRCLtD8p
- 15yBbpffvZXsJ41CooazuFhxJy1C5a43Bp
- 1AHS2No53TWCu3MbWMX8ohBwADu8fa2qGS
- 1Ak7DpAZ3eFhwUQn9HL1PbvdgxVDLspqRg
- 1BDfdgoRNxWdpTvzfSePieAwPPofcoPpGT
- 1BLzTUMCZu2tNrttm8sHgxwUXxwCxLLagL
- 1GCncffC1U7UYYckshcLyf4cfhh3tNYS71
- 1GH4CRqr5VQ3fnbAH6QpNT57nmuqqxHXX6
- 1H1nJZzuM5xg48SLddYPMRym6hgRpf3NAU
- 1HHkrX1DRDvbnfYJmmKDd2B2zKQNXwD5GM
- 1LCVhF5anPJS2FASQRUEsVdxq2afPyDTGY
- 1LgbogW6HUP9fJocrAHzZAwME7y4cgY9jo
- 1LtdJGoS5L6ZGzLMcnrLj9g8bqhJFRYZRK
- 1LyhJLGEU7eFpnimki2rfWNWL7xT5V7kPA
- 1Nyyd79kFwpQPoYE5R4dyXzwDS1V4UZMhq
- 1NZ9yWWHXcjAfKoFwKipdB9kJXTris5ZnD
- 1PFXMFbxGq79hR1v7BZa5UrfHAqEKXKon3
- 1PGDztMH8VhdCnw4A2U5oVzjKWWqn3p7PK
- 1D87Vs9PUHR2ijJtVYqmanaiaEj4hWfkjS
- 1DDhqCLVhaoFpGzqWv5RgSvDtKdTiJ4LiU
- 1DdEktRXYmccUbcgsU3eisKYPEsTmhd1gQ
- 1DF8jgMcBmrV8FQG5N7rVZRvgXt48hP2VD
- 15SdZTiwcRc51kiTexNUJv2NXvw4q3QUuU
- 16pRfRQ5xCfbd9YtnwD79dDRLFgJHZhtUC
- 17WJuMFLEKnaJrVBe4fRP1sw8byoUT4X98
- 1Azx8GBjDcQwjQXi6Xc5FH4sPPcudZaqGZ
- 1BRQ6LgAdpajteWJKbHJAmGG3j5t4tULVH
- 1FXXGzqEkJ6NzWQMtaAPw2qhctFoVnVR8Y
- 1JwGFMTraBSEAvXiHo72DaMHsbEs4Mtv9W
- 1JXisr7TWLtcM5Usd3b9DJgksfW1p8RPAD
- 14FekUrC7731cZJT7esWU3k2pdTNRPWFiB
- 14kfqCgPycuaUirxExdJB7HQz2sEaphzVb
- 156Q1uyp9PDA8Mr3y3WjzXydi9EriJUpwZ

- 15CuHWUhTzXaauGUQCQsZya3xPKYne3GB4
- 16WkEnmZnymXeCLQx4qsaoGT8YJk2F54tr
- 174PwTD1XrhTHu4fwPHaco1136E92sFoMH
- 1D3FupnMmDkQVeFLYoFkBy4mhB8bpK5jW9
- 1DbpS8YzMFmKHP1q2kkLJjWJbtBVNp6vby
- 1FkTLS92MNLNXjCDECtLWiWC7JvpY9RDBM
- 1FMrc2A5o6jWZTAqzA3bpDMzX8PX2rpUdD
- 1HRczVBeYGxUWUqFoUTrGmbJPe84S5aNWe
- 143tHbjpcX86LrL1RGj2ZBUxocpspgwwmv
- 14hc6zc1ccc9gBUQ5DkucefBTpUiAezhxm
- 19nKmdnCfoce4feqNovS58BQgJJ6WY2ipx
- 19Vh8o2Au5jnSv7a7eccs2s2tep3Noragj
- 1AEQoCh8MpwnawnQ9KJEbmuypcTZKo6WGM
- 1Am9jAyKHEhA5DzXBUhsNEvEkbk4peaVU3
- 1FW4P7BQyAr4NBpKo6em4xPHMSxufLryoW
- 1G5DAgZL3TZtkbHsMKHXEHeE6Yv7VCmMcK
- 1GVAdXwrcTQyrYHQVtpjPxcQBQqecyHU3Y
- 1H5zSDEmuVXBReJkZ7HAbKSd2BnzphUaqL
- 14RFvtJvh5W8erSrWeyrQKzC2qkWRQURda
- 14vocoFAARZnsVT2q4sYxnZ3NoQTrr5UZD
- 15mZWe6535nCj5yFg1PaTMmM5HKwTUSeqL
- 15xwAKxfe7chKomG7BLXarU1L3XDRYoMvC
- 1aGeJGokd128aWy8QKaNYKqKMP4yhf7pb
- 1AMHyhnEZyrGCafFuGrMyz3HWC1vuDQfQs
- 1BCfNqLspBXLzoVQoVbCjGk1u39JQmCtTj
- 1BiFQbqF9hpYsoPPQkofB7GVX7pkmGT1w2
- 1GbgkLfJB7fhwM4KhPsNYjv5MuBDyeG6SL
- 1GHG8Ayj88DXjZw782vrsjDbE6aszEkzhF
- 1H2x67nzqLYzNtSKq5ZLMAmn66sGF75uFy
- 1HhqJoMjS99byZ6LsSXXGyftcpfHz7sqWw
- 1LaudpkfDuwRghXNC1ku32rMhbWKrNCqaN
- 1LG9yHdB7xWDTv5gRd5paxz6YDqGkzo98T
- 1LsGct4neXRPnAigRUvXEAhQ7eXhrq6Hkh
- 1LzKstp1uQsxX58ZBFCgFZcdqWDrELCobZ
- 1NYsJU4ZPPmGxDUz5vmSxfMUYfN4cofupP

7

- 1NZ8baQep6p18hC44bbVn7zfRCLAwCjwYh
- 1PG4NXEbjc99t99UQHjXkpfL18TEj7gmPp
- 1PgDwv7ctR13kHMd6zjgb7mT8f6goD8pXS
- 13nf6Ywr3WP3xa7LXJQzAaxi7c8bbFMovk
- 13yDqzriRosjp7dSYqewhVT666M2sn7P1R
- 143zMHHAzHQSLJVcR3HcSt3QUPCXi6rVpM
- 1D8PfPDcQdULAerV9H4scG9G56yYkA8HaH
- 1D7BJaU7JV4HsrBDvAdBLmUod2oFrYJKtY
- 1Dd7smpd9fL6uQQDf1roDr9LFihVKnxx1V
- 1DEiAn9Xhx9fr9hmY5DGpwK8FGx5tqRZe4
- 15Tk5DQMD73X16k9JGCaLofuftphJUepCg
- 15UH6YS1MfXmZ8y5jY4iMAEF1wbPbgZQWp
- 166yJrfoqFcs5HzD631Mx7vTJMxYJ8kqZg
- 17vYgtbzkSm3NY4EakEoCWsqu9gVXDCi5s
- 1B1KhZMsmVhkL46Vxa9k1QeV8rRQQR58eG
- 1BPiftyW56wnjzv97c5QMAFwEryNGqLHjm
- 1BUVZSUhCVWf2mPRoPw7P2f5xrWbFErEak
- 1JwMx3PUT4j2vuNFBbyTLC41pEE5JeWiKg
- 14hFMNwknSJfi358kejXTGHyZiWu4Ke1Tq
- 14KRgxcivg391N68nqNK9iW4y7iqkpjw8X
- 15aKQnkKzfokJy9fnvUxkwyZdXbALisWWv
- 164ABGGG7SpGjbyHuvAZD395DW71W1d9re
- 16WAA7Rno1AynKNo3vKPMW8CHhbsPAHsR
- 1718GhR1vpxHrzoBWTgvcb1zPzMn4Z7D3R
- 1CzzTTVmxJG1UioHL6EnmqeQN6oLiALKi3
- 1DbD8WvUTDZxWCR1PkKvW2sfj92kh2vU7R
- 1Fjr6FMR8hfDn1fLqd8f3vFayFBdVtcgxx
- 1FnyMqtXKUPFLb8ydibvLvq6TYUomawHgd
- 1HkbMbM2K8V6nv929xDib2cLaurRzwmHMK
- 1HSJEevcdx71ZGTrWdnSbq1cww6YWD34BY
- 12EdTtq8ZZeWs2Wdr6bztN7pGDbHJP1ry5
- 12KwfqAr4wCTfPwUCNLbPHtLJ69JesJohE
- 12qGNXVXSvsjZtieDupYqvq2thazyJFr5F
- 12wa8tT8mCqebmkkJvmEfeFr1jd46EDtue
- 12zkVgriHrpTdqM7MMR9Fe6qoUSxS7xW6z

8

- 137fsnp643eUf2XWv4vC82WE2ELDaUPuB7
- 13gAkrPnPMZMDtyTLvZkpkcr9UoJT6WRum
- 13k77pp1z9QhiP7j7bYKwN3fTT6vAPrpCD
- 13RfJ63gLLxAj2YDcknUhu6ucDYTAhdzi1
- 13xWEjxgDjX9k82uJyvZHUFRC7b4opkaQa
- 17Q4Rayqv65sRSkhLRAHMiWxiDK6YzrTS3
- 18asd18XCewna9zBF12GMXVc2Lc4PrzWc
- 19ERtzgKiNMw9noS8qUYaP8AVBJ9fntYM4
- 1CzWyndREVGfGcHHQUfARbhrtJEByUkZCB
- 1D9CeuK4mQqfYmZQgMGqnck1br38JMCKcT
- 1DETqftov8aca9a5x3JKRcVXmfxcUAHRzH
- 1DL17qD7JrsgjnZa5FoFSuh7mqMJwwsPHs
- 1DTXKuJFAXWi9Z73fCKprR8FAfpkC6dwqz
- 1E1dFDRw6Kq56EwLvGPQdTe7MQqN1WWE8f
- 1E3wVz4eCBFWU2CHycVZznDGLrSkgcHfwz
- 1E9oWH8pJ8YmtNJvEV1hxBdEk2DFKJ5hfc
- 1EcpeKZquA6Cnt89aAxKqn9bYUMq3RrNoq
- 1EeF81e5Bzo3K6eiKGhXZsHtpMWTnyqhsV
- 1BxoxcVYWcYcHwVTSLBE6Z6FQ6puJNECZu
- 1FLLCsStZFL6eXqUx5PTXfi6tzAqWS6J8o
- 1FKtoEsRhNAaGMZAehsqS5x4SxebNUGEVN
- 1FyLKjSrNHsnHEX9KLFpBKiLUsixm2LMon
- 1FYzy9HoqPhHi9VtF9XGNXh9LYU6i9RpH5
- 1GbmVc1dErt7WCruXAQ5uk9E4bKVHYdBQQ
- 1JiDvvnZTfqpw9zJEugPFu39SoqqubGBqj
- 1KbMXBddvgsVo7nuiyfnkUk3zrq6FdWKEd
- 1KcUjPbCEX8L5Mf2LwnBLA3Pg7gZMXBh3V
- 1KgNNfbdsGReoB7d1UJNULQ3jVcNnA1cYc
- 1Kkd5nbh2g5tff5gsgEYQRVUfuNJxmvcVK
- 1KMUeSMo9ep4FeSZzqJp2PsUSvEAgPLTjv
- 1KNwR5yrxF2qJHDatsDKdxsYKyLvcwoMp3
- 14X6V5WFgSRA5pEgpeb5e8H3bmdBs5vZpm
- 159uD1UYN45HKMp2nt4KTKTKVjQbMoVUbS
- 15hKD15DbCGiHmodgvsYFbLsjRTrdWzZez
- 15kBWZiYC1CD61obR7wyp6od8rWSR6P7nV

9

- 15n7EfMfwTJu2ANLSbdvtksGTiqGGTz8E2
- 15P7s3YJAhMjGh3u1aZdqk5QNU93wbKWM7
- 1GLnvGR2QcnjSHkNGVJ2Eev85L4mU7jhSA
- 1GMZ5TmNhFbwmXowdJwRH27seuWfa86QJc
- 1GMNLYaHvTrBzWjS5X87bKLBM11ovSvbo9
- 1HcB9Ld2dfpuQfGqpCTxaCRLfeKp31MTo8
- 158ZDCPXopsAo6Ybhawduuq1XPDKR75SqY
- 1DgsexDXnhriRbSZXVHxy1WRDFmBQbDmu2
- 1LBRgXyUKnY5wsj9LMXADTSu87cBD5J2Wk
- 1Ciiza4dVvBEwbdkEQB2MsBxBKBEmsohRo
- 1HgRxi6ZwxNLVjYRUm4aUnPHEygFKN4cQu
- 1Dot7dXt8ynUa16J4Ep5wfae9Pr241TtVk
- 1DrY7D1tjoE4qTqhyb4rqozqeCbx1TyYPz
- 1DuQv2pWkXvpJjUTi492BweiwKYdsjgJji
- 1DTVWgAr5uusEPMgYW6A6vosZ5DK7BrXWe
- 1DW9FNy1RsR2SDgMHAf7yccnYqJVT3iwJX
- 1DZKPqk6awD1ZWMW1aZUXiB1SNpnK46fmU
- 1EehA1pVFkQk3gBTUh5h1a956iGt4NhXnT
- 1ELcug4RecqUsw6DH7tH7pqVbvRDarGwtM
- 1KLvo7yx4LN5gR7oW8eY1EytT5ZWMTQpXR
- 1KwLSR6atAfYsAYBFbBtKeKSN7ZJ6uvQLn
- 12FFq4VURcZjQfvMP2va2t1grjpoQU54kw
- 1MWAeR6FgaacmY4aPqyQkVJZs1WRQxCdgG
- 1MXdDyrt8oTFAi7odqQ9m7tyykhNzZjYAQ
- 1N2szUzBsgWij2ueReFnJVAzwf9ddFxagA
- 1N6k3bryq35e8sAJdxtpaq5AZ67dsXWHQ9
- 1N6oHECud3uYhXwk3gJE5sq1sAq7Cf5m2P
- 1KeKu2XJEgkn1uraCieVCw5dp3xgf8Y7Si
- 1KfRBQS4h2nkVvofkSsG2qoTVYcpfX6UsH
- 1KeUyFmb7h5AuUXuRuA7Tb2EdGVGtYG47y
- 1KTHBVQyvsu1uaJQFnmTVEUTwfb4GZjLfr
- 1KWZDHBZFUDok5PkDGFyPR31nPeEvHmwdw
- 16NXY7qC2Xnz9kJLjdfUKD8G3RybzRtJYU
- 175RZAg8buvQPjqJo9QhN3KmQQGYAprCkW
- 1H2XQSgYBvpUfPsCuwrR2Fykh6WxLoQkDM

- 1HdmbYAQDnN7pK49cgoqrrsNLWwDZmJoYJ
- 1HhD13ffoMVt5ioeEY2oD2HeDp41Tt1FEf
- 1HrV7njhev1UQTTRTXzqLxDG5MKYbwMYf8
- 1MrTUKT5JdGjmA2gg77X2y6F5KQXhysy6y
- 1MseQjHk8efgKtrHgXPfphLBCkcri7J1aZ
- 14iNmRSpXeBgCdMMxeU1yfScDtk3ci63ip
- 14ogaEECDuuXN2rfNdsUsn1oEd6zHMfjrq
- 19N2tN5mo4hRAs9RAsUDLwsfk7pBxSQJsX
- 19rkHRcQzcMJ7V61Tct8B8uH7FeC9BuaC1
- 1AM52X6yKqgQWGppB6RwMq8o14F3bioUYq
- 1Ask5fc3RPKKtxd8uLofzDwsdVqfBpAq3y
- 1FTkTxCJa9coo46bS6hH5TbjQJ37bY7146
- 1G4pCRUiQsxSv5Xd7P3TbGqCH4JbazDfC9
- 1GVJEJHdpSVWxiR26mCtWafUpEsoJPTYQ9
- 1H4cav6ZGbq2xvJHPB4QdwEG6CvkAekoDc
- 14QAHPAX67KrxLqRJDfvVopCbs55nGdXse
- 14VPsVjVqouBTMQenTfuiT9V9ckMGZRfi1
- 15nEeJfBhrq2WSR2kjBCdVGV3sYPYZ2MmX
- 15vpAKUjjRQ9XVijf2AnMhHDCDtH1AxhP4
- 1AgUTiJpnNEM8VHqjrgAJZ3f85SSU24zU6
- 1ACPACfzbWFrN4fMrZjceoyVxH6xEn2udi
- 1BaeLbXaBJFGSgzBc6xvbCvXkP8aio6epS
- 1BL5QE1zKr22Tq9qEnkgU3tMhR9zCwEB9G
- 1Gdv8LwDfLAxG8xVoTG1i4dfgd1wJnFzNy
- 1GG8KacmHAZuqNDPtA7cxr74g7CpR7Gtjw
- 1H5i1iKfpYhK5x51m4jHhV8nJL3a38t9kk
- 1HDEaXVy2DPByVZ4pcmGeEH9gkQLgcLH7n
- 1LcQ1tutGsbLvBMfgpLuAEa3chPpC5axoH
- 1LFRvHnx48vS5jyM5cBD6HCDtgQRbTvxjb
- 1LTQDFfNJwLcCyahMpFWS3pv1fQmKcbEUo
- 1LyuBQ8s8Zz59vbdCSqDHHkjCjKBePbxBv
- 1NywPrkvfRV7wwDcEXCfNcmmLuNGWFt8tG
- 1NZdKKbPBdokgXVfNB5wAXCXrfo2VNbnsR
- 1PFz8rkprQpnRFs9vboR3cvrZnsLDSYwpx
- 1PgeJviuXMChGPsbB1GzqUo3BYA1R2wHcp

- 1D45EvvmMEYFUEt4K27Z4gBvcj4kLBDstD
- 1DaJCDCWMpxMuNADciKHnrmUE8fZkAwE43
- 1DBnQCCNfeeHkyiXdL253yZB3zWPysohWY
- 1DEq9xyaobP5A7RkihSVR1fJftAyMDG89Q
- 15S577eRkxhuLtPBGgy5DWDFoCba9nyXmH
- 16puhJn5DyFU31ZoykhG4JyVADue7WPzyH
- 17vbwJdLMBTiieyqoo7iENkZmoCwHpvQvd
- 1AzxuvtmCaTewtty1VejmMsJabdj4ruLXM
- 1BrnjhdJNHuZAwKvR5ouL4JgT2qKAfvwSf
- 1FvRHcz5udj8hMiNcq4TPus8MPn3v7s3Yv
- 1JWirwX2uvD5w2VxVk2uP5Nsrz7EPSVpHm
- 1JZ5nd4i6AMR4oNDxJrNiwptwRSXXrmCde
- 14frtNUnULbiqZqtpnapUBVkgjATVqtgeg
- 14Hnf5HwW8RTpxkfaLyH3XqpCYKhDXLP9c
- 157diGyebe2NiQB577xcfT9tvj26WcuLCY
- 15EFyTcNxyFquTtngh3Hd558yZs9HtiwyT
- 16WmYHZfhB3zwSpqfpSX1TaDqYUfa6zbcu
- 174GdhvgviWBV8fnw69smJrkbYDkmDsXoy
- 1D14zBoQ6N9RUTecA6UsKfpQNe8xXnAE8c
- 1FL2inyBSyQxZv2nhKBsg3pbXEXn4JqDq9
- 1FrDNEu54dwhyBtwoahxJLcvigT5CbbYzm
- 1FVPV1LYkZt3zuRUTtc7GHB3zRMnLSVyUS
- 1HPZd5ARUsmZXLqzooSAbiT69oka4HVxxh

Whitebit
- 0x12c8aB32bfC3b5da73d987073EB854d212909c85
- 0x50bAa1501fa610d79269c50fBcd52eFE46C80d80

MaskEx
- 15BG9ze2GaB6ZZrHxcsXEWJew9K4bNPE5X
- 16fogJ7eQnSkaB7HXshjgWKG5g2XDYuZWk

BTSE
- 0xDDAad971BE05321FD541372CD710a7f0555972eD (Omnibus
  Account)

12

The above BTSE account is an "omnibus account," meaning that, on information and belief, it contains funds in addition to Defendants' funds.

# Exhibit E

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**MARCO OHLIN and NATASHA**
**PARACHA,**

    **Plaintiffs,**

v.

    **Case No. 3:23cv8856-TKW-HTC**

**DEFENDANT 1 a/k/a SELINA, et al.,**

    **Defendants**.

_____/

## PRELIMINARY INJUNCTION

This case is before the Court based on Plaintiffs' motion for a preliminary injunction (Doc. 5).[1]  The Court held a hearing on the motion on June 22, 2023, at which the Court found based on the evidence submitted by Plaintiffs in support of the motion—*e.g.*, Docs. 5-1, 5-2, 8-1, 10-1—that Plaintiffs are entitled to a preliminary injunction.  This Order memorializes that ruling.

### Facts

Plaintiffs were allegedly deceived by an individual they knew only as "Selina" to transfer approximately $862,318.73 worth of various cryptocurrencies into accounts that Selina misrepresented to be legitimate accounts established for

---

[1]  The motion only requested a temporary restraining order (TRO), but the Court has construed it as a motion for a TRO and/or a preliminary injunction. *See* Doc. 9 at 2 (¶2).

Plaintiffs' benefit but in actuality were controlled by Selina and/or the other "John Doe" defendants.  Once Plaintiffs transferred the cryptocurrency assets into these fraudulent accounts, Defendants allegedly converted them for their own benefit.

Through blockchain analytics tracing, Plaintiffs have identified the following cryptocurrency wallet addresses at the BINANCE, OKX (OKEx), and GEMINI cryptocurrency exchanges that were used to launder the assets stolen from Plaintiffs and are believed to be owned or controlled by Defendants:

| # | EXCHANGE | DESTINATION ADDRESS | ASSET TYPE | ASSETS UNDER CLAIM (confirmed amount with blockchain data analysis, in cryptocurrency unit) |
|---|----------|---------------------|------------|---------|
| 1. | Binance | 1KAr47ZWdEmkLTPDjieF2mqHF7aJUoLEVD | BTC | 18.06583687 |
| | | **TOTAL BTC** | | **18.06583687** |
| 2. | Binance | 0x5a44717f1A7EDe7Ff3C5C6668B7d6cd84323634E | ETH | 19.110906 |
| 3. | Gemini | 0xD620c2Db204247c3C4db370999C90d7b1E5023A2 | ETH | 0.098604 |
| | | **TOTAL ETH** | | **19.20951** |
| 4. | OKX | 0xcA9B4a51C2ee3F65432f41ea71B6C693551B38F4 | USDT | 210000 |
| 5 | OKX | 0x1ce6880Ae94db5FBb5772EdA73A29c101F4D7D0d | USDT | 165025 |
| 6. | OKX | 0xE62462b570A34Cc19C59005289D193fb2fB6E3EA | USDT | 24139 |
| | | **TOTAL USDT** | | **399,164** |

2

Additionally, blockchain analytics have traced Plaintiffs' stolen funds to and/or through the following cryptocurrency wallet addresses, which are believed to be owned or controlled by Defendants and which are believed to still be holding at least some of the assets stolen from Plaintiffs:

| # | DESTINATION ADDRESS | ASSET TYPE | ASSETS UNDER CLAIM (confirmed amount with blockchain data analysis, in cryptocurrency unit) |
|---|---|---|---|
| 1 | 0x389505f098a29a994A3ed0e674f07cd451dde42C | ETH | 0.735681 |
| 2 | 0x000F422887eA7d370FF31173FD3B46c8F66A5B1c | ETH | 0.43432389 |
| | | TOTAL ETH | 1.17000489 |

The cryptocurrency wallet addresses listed above are collectively referred to as the "Destination Addresses."

Plaintiffs have subsequently learned that the GEMINI wallet address listed above is owned by an individual named Azusena Meza.

Plaintiffs do not know the real identity of "Selina" or the other defendants, but they believe that Selina is "of Chinese descent" and currently "located in China" based on IP address information.

**Procedural Background**

In late-April 2023, Plaintiffs filed suit in this Court against Selina and 20 other John Doe defendants based on their alleged theft of Plaintiffs' cryptocurrency assets. The now-operative amended complaint (Doc. 3), filed in mid-May, asserts claims

3

against Defendants for (1) conversion, (2) unjust enrichment, (3) imposition of a constructive trust and disgorgement, (4) and conspiracy related to cryptocurrency fraud.

On May 26, 2023, the Court entered an *ex parte* TRO (Doc. 6) freezing the cryptocurrency asserts in the Destination Addresses. The TRO was set to expire on June 9, but on June 8, the Court extended the TRO for an additional 14 days under Fed. R. Civ. P. 65(b)(2) based on the "good cause" shown by Plaintiffs. *See* Doc. 9.

On June 13 and June 15, Plaintiffs served the amended complaint on Defendants and provided them notice of the preliminary injunction hearing through non-fungible tokens (NFTs) sent to the Destination Addresses, as authorized by the Court under Fed. R. Civ. P. 4(f)(3).

The NFTs contained a link to a website created by Plaintiffs' attorney that contained all of the documents filed in this case.

On June 15, Plaintiffs personally served Ms. Meza with the amended complaint and notice of the preliminary injunction hearing.

Neither Ms. Meza nor any of the other defendants appeared at the preliminary injunction hearing or contacted Plaintiffs' attorney about this case after being served.

## Analysis

The Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a) if the movant provides notice to the adverse party and proves that "(a)

4

there is a substantial likelihood of success on the merits; (b) the ... preliminary

injunction is necessary to prevent irreparable injury; (c) the threatened injury

outweighs the harm that the ... preliminary injunction would cause to the non-

movant; and (d) the ... preliminary injunction would not be averse to the public

interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th

Cir. 2001). The Supreme Court has stated that "the first two factors ... are the most

critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), but the Eleventh Circuit has

suggested that "[t]he first of the four prerequisites to temporary injunctive relief is

generally the most important," *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223,

1232 (11th Cir. 2005).

　　Here, Plaintiffs provided Defendants written notice of its request for a

preliminary injunction and the preliminary injunction hearing through the NFTs and,

as to one of the John Doe defendants (now identified as Ms. Meza), personal service.

This notice was provided a week before the preliminary injunction hearing, and

under the circumstances, the Court finds that notice to be adequate. *See Four

Seasons Hotels and Resorts, B.V. v. Consoricio Barr, S.A.*, 320 F.3d 1205, 1212

(11th Cir. 2003) ("[T]he appropriate amount of notice [for a preliminary injunction

hearing] is properly left to the district court's discretion."); *see also, e.g., United

States v. Alabama*, 791 F.2d 1450, 1458 (11th Cir. 1986) (finding "one to three days'

written notice" of a preliminary injunction hearing to be sufficient); *S.E.C. v. MCC*

*Int'l Corp.* 2022 WL 2760279, at \*3 (S.D. Fla. May 18, 2022) (finding seven days' notice by email to be sufficient in a cryptocurrency fraud case).

On the merits, the Court finds based on the evidence of record that all four of the preliminary injunction factors weigh in Plaintiffs' favor.

With respect to the first factor, Plaintiffs presented evidence showing that Defendants acquired Plaintiffs' cryptocurrency assets fraudulently and that Defendants have no legitimate claim to those assets. Thus, Plaintiffs have a substantial likelihood of success on the merits of their claims against Defendants for conversion, unjust enrichment, and imposition of a constructive trust and disgorgement of funds held by Defendants in the Destination Addresses.

With respect to the second factor, Plaintiffs have also shown that irreparable harm will ensue absent a preliminary injunction. Considering the speed with which cryptocurrency transactions are made as well as the anonymous nature of those transactions, it is necessary to freeze the Destination Addresses to maintain the *status quo* to avoid dissipation of the money illegally taken from Plaintiffs.[2]

With respect to the third factor, the threatened injury to Plaintiffs also outweighs any harm Defendants may suffer by virtue of the preliminary injunction. Indeed, maintaining the assets within the Destination Addresses is perhaps Plaintiffs' only realistic

---

[2] As explained in the TRO, the Court has the authority to freeze the assets in the Destination Addresses prior to trial because Plaintiffs are seeking equitable relief (*e.g.*, constructive trust) in addition to money damages. *See* Doc. 6 at 4-5.

chance at a future recovery in this case, and Defendants will suffer at worst a temporary inability to move assets that it appears they have no right to possess.

With respect to the fourth factor, a preliminary injunction will not be averse to the public interest because it will promote the rule of law and investor confidence in cryptocurrency transactions.

### Bond

Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."

The Court required Plaintiffs to post a $100 bond in conjunction with the TRO, which they did. *See* Doc. 7. No additional bond will be required for the preliminary injunction because the $100 bond is sufficient based on the apparent strength of Plaintiffs' case and the modest amount of cryptocurrency held in the wallet of the only identified defendant, Ms. Meza.

### Conclusion

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' motion for a preliminary injunction (Doc. 5) is **GRANTED**, and a preliminary injunction is entered as follows:

    1.    Defendants and their agents, servants, employees, attorneys, partners,

successors, assigns, and all other persons or entities through which she/they act or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, are hereby enjoined from withdrawing, transferring, or encumbering any assets currently held in the Destination Addresses pending disposition of this case or further Order of the Court.

2.     No additional security beyond the previously posted $100 cash bond is required at this time. The Court will consider increasing the amount of bond upon a showing of good cause by any party-in-interest.

Additionally, on the Court's own motion, it is **FURTHER ORDERED** that:

3.     Plaintiffs shall send a copy of this Order to Ms. Meza at the address they possess for her, and subsequent filings shall include a certificate of service showing that the filing has been sent to her at that address.[3]

4.     Plaintiffs shall file an appropriate pleading or motion substituting Ms. Meza for one of the "John Doe" defendants.

5.     Plaintiffs may commence discovery immediately notwithstanding Fed. R. Civ. P. 26(d)(1).

---

[3] The affidavit of service for Ms. Meza (Doc. 10-1 at 13) includes the street address where she was served, but not the city or state where that street is located. Presumably, Plaintiffs possess a more complete address for Ms. Meza.

6.    An initial scheduling order will be entered if and when an appearance

is made on behalf of one or more defendants.

    **DONE and ORDERED** this 22nd day of June, 2023.

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

# Exhibit F

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-21925-CV-WILLIAMS**

GEORGE FITZGERALD II,

      Plaintiff,

v.

DEFENDANT 1, *et al.*,

      Defendants.

_____/

## PRELIMINARY INJUNCTION

**THIS MATTER** is before the Court on Plaintiff's Memorandum in Support of the

Entry of a Preliminary Injunction (DE 21) and following the July 2, 2024 hearing regarding

whether to convert the temporary restraining order to a preliminary injunction. As

explained below, after careful review of the record and Plaintiff's supporting memorandum

and declarations, Plaintiff has satisfied the requirements for the issuance of a preliminary

injunction.

## FACTUAL BACKGROUND

Plaintiff alleges that he is a victim of a cryptocurrency investment scam in which

Defendant 1, who he also refers to as "Lisa,"[1] deceived him into investing money with

the online purported cryptocurrency trading platform "ETX" which, unbeknownst to

Plaintiff, was a fraudulent "copycat" exchange.     Relying on Defendants'

misrepresentation that ETX was a legitimate trading platform, Plaintiff transferred

---

[1] Plaintiff does not know the identity of Defendant 1 or her alleged co-conspirators, but
Plaintiff believes Defendant 1 "is likely located outside of the United States in Southeast
Asia, specifically, Taiwan." (DE 1 at 2.)

cryptocurrency from his CashApp and Crypto.com accounts—legitimate third-party online platforms for buying, selling, transferring, and storing cryptocurrency—to ETX. Plaintiff alleges that Defendants provided him with false account statements that masked Defendants' fraudulent scheme: instead of investing with a legitimate cryptocurrency platform, Plaintiff alleges that he was sending his cryptocurrency assets to the Defendants' private cryptocurrency wallet addresses.

Through blockchain analytics tracing, Plaintiff has identified the following cryptocurrency wallet addresses held at the Binance cryptocurrency exchange that are believed to be owned or controlled by Defendants and used to hold the assets stolen from Plaintiff:

| Binance Wallet Addresses: |
| --- |
| 1PVZh5tpg1S4wSmbat8wjk9GZHsTuKcTJA |
| 0xab060ac3b57273f171db4e99ac2d785126347a8e |

Plaintiff requests that the Court freeze the assets contained in the cryptocurrency wallet addresses identified above ("***Destination Addresses***"). As set forth in Plaintiff's Verified Complaint, Defendants stole 3.54877 BTC (Bitcoin) and 49,340.45 USDC (USD Coin) from Plaintiff, which at the time of the theft had an approximate value of $180,000.00.

## PROCEDURAL BACKGROUND

On May 17, 2024, Plaintiff filed suit in this Court against Defendants based on their alleged theft of Plaintiff's cryptocurrency assets. The Complaint asserts claims against Defendants for (1) conversion, (2) unjust enrichment, (3) imposition of a constructive trust and disgorgement of funds, and (4) conspiracy related to commit conversion and unjust

enrichment. On June 12, 2024, the Court entered a temporary restraining order (DE 11) freezing the cryptocurrency assets in the Destination Addresses.

On June 25, 2024 and July 1, 2024, Plaintiff filed proofs of service (DE 23; DE 28) demonstrating that Plaintiff had provided Defendants notice of this action through non-fungible tokens ("**NFTs**") sent to the Destination Addresses, as authorized by the Court under Fed. R. Civ. P. 4(f)(3). The NFTs contained a link to a website created by Plaintiff's attorney that contained all of the documents filed in this case. The Defendants did not appear at the preliminary injunction hearing or contact Plaintiff's attorneys about this case after being served.

## LEGAL STANDARD

The Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a) if the movant provides notice to the adverse party and proves that "(a) there is a substantial likelihood of success on the merits; (b) the . . . preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the . . . preliminary injunction would cause to the non-movant; and (d) the . . . preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons & Paroles,* 275 F.3d 1032, 1034–35 (11th Cir. 2001). The Supreme Court has stated that "the first two factors . . . are the most critical," *Nken v. Holder,* 556 U.S. 418, 434 (2009), but the Eleventh Circuit has suggested that "[t]he first of the four prerequisites to temporary injunctive relief is generally the most important," *Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1223, 1232 (11th Cir. 2005).

## ANALYSIS

Here, Plaintiff provided Defendants written notice of this suit, the preliminary injunction hearing, and all other filings through NFTs and Plaintiff's Service Website. This

notice was provided in advance of the preliminary injunction hearing, and under the circumstances, the Court finds that notice to be adequate. *See Four Seasons Hotels and Resorts, B.V. v. Consoricio Barr, S.A.*, 320 F.3d 1205, 1212 (11th Cir. 2003) ("[T]he appropriate amount of notice [for a preliminary injunction hearing] is properly left to the district court's discretion."); see also, e.g., *United States v. Alabama*, 791 F.2d 1450, 1458 (11th Cir. 1986) (finding "one to three days' written notice" of a preliminary injunction hearing to be sufficient); *S.E.C. v. MCC Int'l Corp.*, No. 22-CV-14129, 2022 WL 2760279, at *3 (S.D. Fla. May 18, 2022) (finding seven days' notice by email to be sufficient in a cryptocurrency fraud case), *report and recommendation adopted*, No. 22-CV-14129, 2023 WL 2891235 (S.D. Fla. Mar. 8, 2023), *aff'd*, *S.E.C. v. MCC Int'l Corp.*, No. 22-12281, 2024 WL 1508281 (11th Cir. Apr. 8, 2024).

With respect to the merits, the Court finds based on the record evidence that all four of the preliminary injunction factors weigh in Plaintiff's favor.

With respect to the first factor, Plaintiff presented evidence showing that Defendants acquired Plaintiff's cryptocurrency assets fraudulently and that Defendants have no legitimate claim to those assets. Thus, Plaintiff has a substantial likelihood of success on the merits of their claims against Defendants for conversion, unjust enrichment, and imposition of a constructive trust and disgorgement of funds held by Defendants in the Destination Addresses.

With respect to the second factor, Plaintiff has shown that irreparable harm will ensue absent a preliminary injunction. Considering the speed with which cryptocurrency transactions are made as well as the anonymous nature of those transactions, it is

necessary to freeze the Destination Addresses to maintain the *status quo* to avoid dissipation of the money illegally taken from Plaintiff.

With respect to the third factor, the threatened injury to Plaintiff outweighs any harm Defendants may suffer by virtue of the preliminary injunction. Indeed, maintaining the assets within the Destination Addresses is perhaps Plaintiff's only realistic chance at a future recovery in this case, and Defendants will suffer at worst a temporary inability to move assets that it appears they have no right to possess.

With respect to the fourth factor, a preliminary injunction will not be averse to the public interest because it will promote the rule of law and investor confidence in cryptocurrency transactions.

## BOND

Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."

The Court required Plaintiff to post a $5,000.00 bond in conjunction with the temporary restraining order, which he did. (DE 14.) No additional bond will be required for the preliminary injunction.

## CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** that Plaintiff's request for a preliminary injunction is **GRANTED**, and a preliminary injunction is entered as follows:

1.  Defendants and their agents, servants, employees, attorneys, partners, successors, assigns, and all other persons or entities through which she/they act or who act in active concert or participation with any of them, who receive

actual notice of this Order by personal service or otherwise, whether acting

directly or through any trust, corporation, subsidiary, division or other device,

or any of them, are enjoined from withdrawing, transferring, or encumbering

any assets currently held in the Destination Addresses pending disposition of

this case or further Order of the Court.

2.      No additional security beyond the previously posted $5,000.00 bond is required

at this time.  The Court will consider increasing the amount of bond upon a

showing of good cause by any party-in-interest.

3.      Plaintiff shall send a copy of this Order to Defendants via NFT and at the service

website that Plaintiff has used to serve the Complaint and other filings.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 8th day of July, 2024.


KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 24-21925-CIV-WILLIAMS/GOODMAN

GEORGE EDWARD FITZGERALD, II,

      Plaintiff,

v.

DEFENDANT 1, et al.,

      Defendants.

_____/

### ORDER AUTHORIZING ALTERNATE SERVICE OF PROCESS ON FOREIGN
### DEFENDANTS PURSUANT TO RULE 4(f)(3)

      Plaintiff George Edward Fitzgerald, II filed a Motion for an Order Authorizing

Alternative Service of Process on Foreign Defendants pursuant to Rule 4(f)(3) ("Motion").

[ECF No. 17]. On consideration, the Undersigned **grants** Plaintiff's motion.

### I.    BACKGROUND

      According to the Verified Complaint, Defendants deceived Plaintiff into

transferring approximately $180,000.00 worth of cryptocurrency into Defendants'

private cryptocurrency wallet addresses (collectively "Destination Addresses") after

Defendant 1 fraudulently represented that she was a cryptocurrency investor who would

assist Plaintiff in investing his cryptocurrency. [ECF No. 1, ¶ 20]. Relying on

Defendants' misrepresentations, Plaintiff believed he downloaded a legitimate and

regulated cryptocurrency exchange smartphone application. Instead, Plaintiff downloaded and ultimately transferred his cryptocurrency assets to a smartphone application that facilitated the transfer of those assets into Defendants' Destination Addresses.[1]

While Plaintiff does not know the physical addresses of Defendants, let alone their true identities, based on his conversations with Defendant 1, Plaintiff believes Defendant 1 is likely located outside of the United States. *Id.* at ¶ 7. In light of the above, Plaintiff filed the instant Motion seeking to serve Defendants via NFT electronic transfers and web posting. [ECF No.17].

## II.    Legal Standard

Federal Rule of Civil Procedure 4(f)(3) allows alternative methods for service of process, so long as those methods are not prohibited by international agreement and are directed by the Court. *See Prewitt Enters., Inc. v. The Org. of Petrol. Exporting Countries,* 353 F.3d 916, 923 (11th Cir. 2003); *see also Brookshire Bros., Ltd. v. Chiquita Brands Int'l,* Case No. 05-CIV-21962, 2007 WL 1577771, at *2 (S.D. Fla. May 31, 2007); *Rio Props. Inc. v. Rio*

---

[1]    According to the Verified Complaint, Plaintiff retained CNC Intelligence, Inc. (hereinafter, "CNC"), a forensic cryptocurrency tracing expert, to trace the stolen assets. [ECF No. 1, ¶ 45]. The Destination Addresses are contained in the caption as a named party in the Verified Complaint and Plaintiff has also attached CNC's tracing report containing the Destination Addresses to the Verified Complaint and incorporated it by reference. [ECF No. 1-1].

*Int'l Interlink,* 284 F.3d 1007, 1014 (9th Cir. 2002). "[A]s long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f)(3) may be accomplished in contravention of the laws of the foreign country." *Chanel, Inc. v. Zhixian,* Case No. 10-cv-60585-JIC, 2010 WL 1740695, at *3 (S.D. Fla. April 29, 2010) (quoting *Rio Props., Inc.,* 284 F.3d at 1014) (citing *Mayoral–Amy v. BHI Corp.,* 180 F.R.D. 456, 459 n.4 (S.D. Fla. 1998)).

The plain language of Rule 4(f)(3) reflects that an order allowing an alternate means of service lies within the sole discretion of the District Court. *See Prewitt Enters., Inc.,* 353 F.3d at 921; *Rio Props., Inc.,* 284 F.3d at 1116; *see, e.g., Brookshire Bros., Ltd.,* 2007 WL 1577771, at *2 (noting that "district courts have broad discretion under Rule 4(f)(3) to authorize other methods of service"); *In re Int'l Telemedia Assocs.,* 245 B.R. 713, 720 (N.D. Ga. 2000) (noting that Rule 4(f)(3) is designed to allow courts discretion and broad flexibility to tailor the methods of service for a particular case). Rule 4 does not require a party to attempt service of process by those methods enumerated under subsections (f)(1) and (f)(2), including by diplomatic channels and letters rogatory, before petitioning the court for alternative relief under subsection 4(f)(3). *Rio Props., Inc.,* 284 F.3d at 1114-15; *see also Brookshire Bros., Ltd.,* 2007 WL 1577771, at *1.

In *Brookshire,* the Honorable Judge Marcia G. Cooke allowed substitute service on a party's attorney pursuant to Rule 4(f)(3), holding as follows:

3

> Rule 4(f)(3) is one of three separately numbered subsections in Rule 4(f) and each subsection is separated from the one previous merely by the simple conjunction 'or.' Rule 4(f)(3) is not subsumed within or in any way dominated by Rule 4(f)'s other subsections; it stands independently, on equal footing. Moreover, no language in Rules 4(f)(1) or 4(f)(2) indicates the primacy, and certainly Rule 4(f)(3) indicates no qualifiers or limitations which indicate its availability only after attempting service of process by other means.

*Brookshire Bros., Ltd.*, 2007 WL 1577771, at *1 (quoting *Rio Props., Inc.*, 284 F.3d at 1015);

*Accord TracFone Wireless, Inc. v. Bitton*, 278 F.R.D. 687, 692 (S.D. Fla. Jan. 11, 2012) (noting

that, in regards to Rule 4(f)(3), "there is no indication from the plain language of the Rule

that the three subsections, separated by the disjunctive 'or,' are meant to be read as a

hierarchy."). Judge Cooke further held that, "[t]he invocation of Rule 4(f)(3), therefore,

is neither a last resort nor extraordinary relief." *Brookshire Bros., Ltd.*, 2007 WL 1577771,

at *2.

Additionally, the Constitution itself does not mandate that service be effectuated

in any particular way. Rather, constitutional due process considerations require only that

the method of service selected be "reasonably calculated, under all the circumstances, to

apprise interested parties of the pendency of the action and afford them an opportunity

to present their objections." *Brookshire Bros., Ltd.*, 2007 WL 1577771, at *1 (quoting *Mullane

v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *see also TracFone Wireless, Inc.*,

278 F.R.D. at 692; *Rio Props., Inc.*, 284 F.3d at 1016. Accordingly, federal courts have

allowed a variety of alternative service methods, such as service by e-mail where a

4

plaintiff demonstrates the likelihood that the proposed alternative method of service will notify a defendant of the pendency of the action. *See, e.g., Rio Props., Inc.,* 284 F.3d at 1017 (holding, "without hesitation," that e-mail service of an online business defendant "was constitutionally acceptable"); *In re Int'l Telemedia Assocs.,* 245 B.R. at 721 ("If any methods of communication can be reasonably calculated to provide a defendant with real notice, surely those communication channels utilized and preferred by the defendant himself must be included among them."); *National Ass'n for Stock Car Auto Racing, Inc. v. Does,* 584 F. Supp. 2d 824, 826 (W.D.N.C. 2008) (in "acknowledging the realities of the twenty-first century and the information age, the Court determined that the most appropriate place for publication was [plaintiff's website].").

### III.   Discussion

Plaintiff proposes to serve Defendants via NFT electronic transfer, direct messaging via Telegram, and web postings. [ECF No. 17]. Moreover, Defendants perpetrated their alleged theft electronically, through Telegram and on the blockchain where they transferred Plaintiff's assets to their Destination Wallets. Because Plaintiff has no other means of finding Defendants, the Court finds that service via NFT electronic transfer and web posting are reliable means to provide Defendants notice of this action.

Courts presiding over similar cases have authorized alternate service by similar methods. *See Bowen v. Li,* No. 23-cv-20399, 2023 WL 2346292, at *3 (S. D. Fla. Mar. 3, 2023)

(approving service through NFT under Rule 4(f)(3)); *Bandyopadhyay v. Defendant 1*, No. 22-cv-22907, 2022 WL 17176849 (S.D. Fla. Nov. 23, 2022) (same); *Ohlin v. Defendant "1"*, No. 3:23CV8856-TKW-HTC, 2023 WL 4084523. (N.D. Fla. June 8, 2023) (approving Plaintiffs' oral request under Rule 4(f)(3) for authorization to serve amended complaint through NFT); *Yogaratnam v. Doe, et al., No. 2:24-cv-00393*, 2024 WL 2050608, at *2 (E.D. La. May 8, 2024) (authorizing Plaintiff to serve Defendants via NFT and service website posting in a case involving the theft of various cryptocurrencies).

Finally, Plaintiff believes Defendant 1 is likely located outside of the United States. Service in the manner proposed by Plaintiff is not prohibited by international agreement. The United States is a signatory to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (the "Hague Service Convention"). The Hague Service Convention does not preclude the court from authorizing service of process via electronic means, e.g., via NFT or posting on a designated website. Thus, here, there are no international agreements prohibiting service by blockchain NFT service or posting on a designated website.

As such, I find the service proposed by Plaintiff is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Brookshire Bros., Ltd.*, 2007 WL 1577771, at *1 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *see also TracFone Wireless, Inc.*, 278 F.R.D. at 692; *Rio Props., Inc.*, 284 F.3d at 1016.

Accordingly, the Undersigned **grants** Plaintiff's Motion for an order authorizing alternate service. Plaintiff is authorized to serve Defendants as follows:

1) via blockchain transfer of Plaintiff's NFTs to Defendants' Crypto Wallet addresses (providing Notice, Summons language, and Plaintiff's Website address https://usdccourtservice.com/cv-21925/);

2) via direct message to Defendants' Telegram messaging account; and

3) via website posting by posting a copy of the Summons, Complaint, and all filings in this matter on Plaintiff's Website appearing at the URL https://usdccourtservice.com/cv-21925/.

**DONE AND ORDERED** in Chambers, at Miami, Florida, on June 28, 2024.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Kathleen M. Williams
All Counsel of Record

7

# Exhibit H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

VIRGINIA CHOW                          CIVIL ACTION NO: 24-CV-480

VERSUS                                 JUDGE DARREL JAMES PAPILLION

"DEFENDANT 1"                          MAGISTRATE JUDGE DONNA
                                       PHILLIPS CURRAULT

ORDER AND REASONS

Before the Court is Plaintiff Virginia Chow's Motion for an Order Authorizing Alternative

Service of Process on Foreign Defendant Pursuant to Rule 4(f)(3). R. Doc. 13. Specifically,

Plaintiff seeks to serve Defendant via Non-Fungible Token ("NFT") electronic transfer and via

website posting. Plaintiff argues that this alternative service is necessary and appropriate because

Defendant operates a global internet cryptocurrency fraud and conversion scheme, the subject of

this case, via the internet and cryptocurrency blockchain electronic technology.

LAW AND ANALYSIS

Federal Rule of Civil Procedure 4 allows a district court to order an alternate method for

service to be effected upon foreign defendants, provided it is not prohibited by international

agreement and is reasonably calculated to give notice to the defendants. FED. R. CIV. P.

4(f)(3)(1),(3). Provided these conditions are met, the district court has "considerable discretion"

to authorize alternative service means. *Affinity Labs of Tex., LLC v. Nissan N. Am.*, No. 13-CV-

369, 2014 WL 11342502 (W.D. Tex. July 2, 2014) (internal citation omitted).

Here, Plaintiff has demonstrated that she is entitled to serve Defendant through NFT

electronic transfer and website posting. As a threshold matter, these methods of service are not

precluded by the Hague Convention on the Service Abroad of Judicial and Extra-Judicial

Documents in Civil and Commercial Matters. *See* Hague Convention on the Service Abroad of

Judicial and Extra-Judicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361. Nor has China specifically objected to service via NFT electronic transfer or posting on a website. *See Bandyopadhyay v. Defendant 1*, 2022 WL 17176849, at \*2 (S.D. Fla. Nov. 23, 2022) (citing *Stat Med. Devices, Inc. v. HTL-Strefa, Inc.*, No. 15-CV-20590, 2015 WL 5320947, at \*3 (S.D. Fla. Sept. 14, 2015)). Moreover, service by NFT electronic transfer and website posting is reasonably calculated to give notice to Defendant. In her Amended Complaint, Plaintiff alleges that her communication with Defendant occurred exclusively online and that the cryptocurrency scheme was facilitated online using cryptocurrency blockchain technology. Accordingly,

**IT IS ORDERED** that Plaintiff's motion (Record Document 13) is **GRANTED**, without prejudice to Defendant's opportunity to challenge service and/or personal jurisdiction. Plaintiff is authorized to serve Defendant as follows:

1. Via blockchain transfer of Plaintiff's NFTs to Defendant's crypto wallet addresses (providing Notice, Summons language and Plaintiff's Website address http://usdcourtservice.com/cv-00480); and

2. Via website posting by posting a copy of the Summons, Second Amended Complaint, and all filings in this matter on Plaintiff's service website appearing at the URL https://usdccourtservice.com/cv-00480.

New Orleans, Louisiana, this 19th day of April 2024.

DARREL JAMES PAPILLION
UNITED STATES DISTRICT JUDGE

# Exhibit I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JEYSEN ZIVAN YOGARATNAM** | **CIVIL ACTION** |
| **VERSUS** | **NO. 24-393** |
| **DOE et al.** | **SECTION: "G"(4)** |

## ORDER

Before the Court is Plaintiff Jeysen Zivan Yogaratnam's ("Plaintiff") "Motion for Order Authorizing Alternate Service of Process on Foreign Defendants Pursuant to Rule 4(f)(3)."[1] This litigation arises out of an alleged cryptocurrency scheme where Plaintiff was defrauded of $294,125 by unnamed Defendants.[2] In the motion, Plaintiff seeks an Order authorizing service of process on Defendants via Non-Fungible Token ("NFT") electronic transfer and via website posting.[3] Having considered the motion, the memoranda in support, the record, and the applicable, the Court grants the motion.

## I. Background

According to the Complaint, Defendants deceived Plaintiff into transferring approximately $294,215 worth of cryptocurrency into Defendants' private cryptocurrency wallet addresses (collectively, "Destination Addresses") after Defendant 1 a/k/a "Darina Dubois" fraudulently represented that she was a cryptocurrency investor who would assist Plaintiff in investing his

---

[1] Rec. Doc. 7.

[2] *Id.* at 2 (citing Rec. Doc. 1 at 1).

[3] *Id.*

1

cryptocurrency.[4] Plaintiff allegedly believed that he had downloaded a legitimate and regulated cryptocurrency exchange smartphone application called CTRL-FX, but under the guidance of Defendant 1, Plaintiff instead downloaded an illegitimate application.[5] At the direction of Defendant 1, Plaintiff began transferring cryptocurrency he held on his Coinbase and Kraken accounts to what he believed was the legitimate CTRL-FX exchange.[6] Plaintiff alleges that the app was entirely simulated and served as a vehicle of theft for Defendants, giving them a mechanism to provide Plaintiff with false account statements that masked the fraudulent scheme Defendants were perpetrating.[7] Plaintiff alleges that the "CTRL-FX" exchange to which Plaintiff was sending his cryptocurrency holdings was actually—unbeknownst to Plaintiff—Defendants' own private cryptocurrency wallet addresses.[8]

According to the Complaint, Plaintiff retained CNC Intelligence Inc., a forensic cryptocurrency tracing expert company, which has traced Plaintiff's stolen assets to Destination Addresses believed to be under Defendants' control.[9] On February 15, 2024, Plaintiff filed his Complaint, asserting (1) conversion, (2) unjust enrichment, (3) imposition of constructive trust and disgorgement of funds, and (4) conspiracy claims against Defendants.[10] On February 22, 2024, Plaintiff filed the instant motion for alternate service of process to serve Defendants by NFT

---

[4] Rec. Doc. 1 at 1, 3–4.

[5] *Id.* at 4.

[6] *Id.* at 5–6.

[7] *Id.* at 6–7.

[8] *Id.* at 4.

[9] *Id.* at 8.

[10] Rec. Doc. 1 at 8–11.

electronic transfer and website posting.[11]

## II. Plaintiff's Arguments

### A. *Plaintiff's Arguments in Support of the Motion*

In the motion, Plaintiff contends that alternate service by NFT electronic transfer and by posting on a designated website are appropriate and necessary because Defendants operate their global internet cryptocurrency fraud and conversion scheme through the internet and cryptocurrency blockchain electronic technology.[12] According to Plaintiff, Defendants are likely located in China, as the cryptocurrency funds he transferred were to a Chinese bank.[13] Plaintiff reasons that he has the ability to contact Defendants directly and provide notice of the Complaint by NFT electronic transfer and website posting.[14] Plaintiff suggests that this is the only way to serve Defendants, as he "will be left without the ability to pursue a remedy" if he was unable to serve Defendants through these alternate means.[15]

Plaintiff represents that he has created an NFT ("Plaintiff's NFT") and a service website ("Plaintiff's Website") should the Court grant the motion for alternate service.[16] Plaintiff notes that the concept of a NFT is "essentially a digital certificate of authenticity that cannot be replicated" and this process of authentication "allows a traceability within the ledger as all the transactions are historically registered and stored within the blocks of data."[17] Plaintiff also notes

---

[11] Rec. Doc. 7.

[12] *Id.* at 2.

[13] *Id.* at 1.

[14] *Id.* at 2.

[15] *Id.*

[16] *Id.* at 4.

[17] *Id.* at 3.

3

that his service website will contain the Complaint and hyperlinks to all filings and orders in this

matter.[18] Plaintiff contends that either of these manners of service will allow Defendants to access

all filings and they will be able to view, print, or download any document filed in the case.[19]

    Plaintiff also contends that service via NFT electronic transfer and website posting is not

prohibited by international agreement.[20] Because Defendants are believed to be in China, Plaintiff

notes that the United States and China are signatories to the Hague Convention on the Service

Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (the "Hague

Service Convention").[21] According to Plaintiff, the Hague Service Convention does not preclude

the Court from authorizing service of process via electronic means.[22] Plaintiff further notes that

there are no international agreements prohibiting service by blockchain NFT service, or posting

on a designated website.[23]

### III. Legal Standard

    Federal Rule of Civil Procedure Rule 4(f)(3) permits a district court to "order an alternate

method for service to be effected upon foreign defendants, provided that it [1] is not prohibited by

international agreement and [2] is reasonably calculated to give notice to the defendants."[24] If the

alternate methods of service are not prohibited by international agreement, the district court has

---

[18] *Id.* at 4. Plaintiff's website is located at https://usdccourtservice.com/cv-00393.

[19] *Id.*

[20] *Id.* at 11–13.

[21] *Id.* at 11.

[22] *Id.*

[23] *Id.* at 11–13.

[24] Fed. R. Civ. P. 4(f)(3).

4

"considerable discretion" to authorize those alternate means of service.[25] Any alternative method of service authorized must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford an opportunity to present their objections."[26]

## IV. Analysis

Plaintiff has demonstrated that he is entitled to service by NFT electronic transfer and website posting. First, service by NFT electronic transfer and website posting is "not specifically precluded" by the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters.[27] Although China has objected to the means of service by "postal channels" in Article 10(a) of the Hague Convention, Plaintiff does not request service by postal channels here, as he requests service by NFT electronic transfer and website posting.[28] Because China has not specially objected to service via NFT electronic transfer or posting on a website, the Court may order alternative means of service, as any objections to alternate service must be express.[29]

Second, service by NFT electronic transfer and website posting is reasonably calculated to give notice to Defendants. According to the Complaint, Plaintiff met these Defendants on

---

[25] *Affinity Labs of Tex., LLC v. Nissan N. Am. Inc.*, No. WA:13-CV-369, 2014 WL 11342502 (W.D. Tex. July 2, 2014) (citation omitted). *See also Patel v. "Defendant "1,"* No. 3:23-cv-24651, Rec. Doc. 8 (N.D. Fla. Jan. 16, 2024) (citing *Bandyopadhay v. Defendant "1,"* No. 22-cv-22907, 2022 WL 17176849, at *2 (S.D. Fla. Nov., 23, 2022).

[26] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

[27] Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361.

[28] *Patel*, No. 3:23-cv-24651, Rec. Doc. 8 at 4.

[29] *See Bandyopadhyay*, 2022 Wl 17176849, at *2 (citing *Stat Med Devices, Inc. v. HTL-Strefa, Inc.*, No. 15-20590-CIV, 2015 WL 5320947, at *3 (S.D. Fla. Sept. 14, 2015); *Gurung v. Malhotra*, 279 F.R.D. 215, 219 (S.D.N.Y. 2011)).

LinkedIn, an online social media platform and the cryptocurrency scheme was facilitated online using cryptocurrency blockchain technology.[30] In similar circumstances, district courts have allowed for a variety of alternative service methods, including service by website posting and NFTs.[31]

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Jeysen Zivan Yogaratnam's Motion for Order Authorizing Alternate Service of Process on Foreign Defendants Pursuant to Rule 4(f)(3)[32] is **GRANTED**, without prejudice to Defendants' opportunity to challenge service and/or personal jurisdiction. Plaintiff is authorize to service Defendants as follows:

(1) via blockchain transfer of Plaintiff's NFTs to Defendants' Crypto wallet addresses (providing Notice, Summons language, and Plaintiff's Website address https://usdccourtservice.com/cv-00393); and

(2) via website posting by posting a copy of the Summons, Complaint, and all filings n this matter on Plaintiff's website appearing at the URL https://usdccourtservice.com/cv-00393).

**NEW ORLEANS, LOUISIANA**, this  23rd  day of February, 2024.

*Nannette Jolivette Brown*

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[30] Rec. Doc. 1 at 3–7.

[31] *Lin v. Doe et al.*, No. 23-cv-5878, Rec. Doc. 13 (E.D. La. Dec. 8, 2023) (Guidry, J.) (granting service via NFT and website posting); *Blum v. Defendant "1" et al.*, No. 3:23-cv-24734 (N.D. Fla. Dec. 17, 2023) (granting service via WhatsApp, blockchain transfer of NFT to Crypto Wallet addresses, and website posting; *Ohlin v. Defendant "1,"* No. 3:23-cv-8856, 2023 WL 4084523 (N.D. Fla. June 8, 2023) (granting service via NFT and plaintiff's service website); *Birmingham v. Doe*, 593 F. Supp. 3d 1141, 1162 (S.D. Fla. Mar. 25, 2022).

[32] Rec. Doc. 7.

6

# Exhibit J

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROMES H. PHILLIPS

    Plaintiff,

v.

DEFENDANT "1" a/k/a "Barry Knapps",
DEFENDANT "2" a/k/a "Colin Gordon",
DEFENDANT "3" a/k/a "Mary", DEFENDANT "4"
a/k/a "Linda", DEFENDANT "5" a/k/a "Mia",
DEFENDANT "6" a/k/a "Eric Gordon", DEFENDANT
"7" a/k/a Mr. Shah who is the owner of the following
cryptocurrency address,
Robinhood:
0xa26e73c8e9507d50bf808b7a2ca9d5de4fcc4a04,
and
JOHN DOE Defendants 1-6 who are the cohorts of
DEFENDANTS "1" – "7" and are the owners of the
following cryptocurrency deposit wallets where
Plaintiff's stolen cryptocurrency assets were
transferred:
Binance:
0x28c6c06298d514db089934071355e5743bf21d60
and
0xa67766248d9b3c6399c55292cf72be270c92d29a,
Coinbase:
0xa9d1e08c7793af67e9d92fe308d5697fb81d3e43,
BTSE:
0x5a99839e9e90e64ab2606a556165b64d208d0eef,
OKX:
0x68841a1806ff291314946eebd0cda8b348e73d6d,
HTX:
0xa03400e098f4421b34a3a44a1b4e571419517687,

    Defendants.

Case No. 1:24-cv-07511

Honorable Jorge L. Alonso

## ORDER AUTHORIZING ALTERNATE SERVICE OF PROCESS ON FOREIGN DEFENDANTS PURSUANT TO RULE 4(f)(3)

Plaintiff ROMES H. PHILLIPS, (hereinafter, "Plaintiff") has filed a Motion for Order Authorizing Alternative Service of Process on Foreign Defendants[1] pursuant to Rule 4(f)(3). ECF No. 6 ("Motion"). On consideration, the motion is granted.

### I.    BACKGROUND

According to the Verified Complaint, Defendants deceived Plaintiff into transferring approximately 216,955.28 Tether (USDT) worth of cryptocurrency into Defendants' private cryptocurrency wallet addresses (collectively "Destination Addresses") after Defendants fraudulently represented that they were cryptocurrency investors who would assist Plaintiff in investing his cryptocurrency. ECF No. 1 at ¶ 28 -39. Relying on Defendants' misrepresentations, Plaintiff believed he had downloaded a legitimate and regulated cryptocurrency exchange smartphone application but instead downloaded and ultimately transferred his cryptocurrency assets to a smartphone application that facilitated the transfer of Plaintiff's cryptocurrency assets into Defendants' Destination Addresses.[2]

While Plaintiff does not know the physical addresses of Defendants, let alone their true identities, based on his conversations with Defendant 1, Plaintiff believes Defendant 1 is likely located outside of the United States. ECF No. 1 at 8. In light of the above, Plaintiff filed the instant

---

[1] Plaintiff does not know the true identities of the Defendants but believes they are foreign nationals. ECF No. 1 at 8.

[2] According to the Verified Complaint, Plaintiff retained Coinstructive, Inc. (hereinafter, "Coinstructive"), a forensic cryptocurrency tracing expert, to trace the stolen assets. ECF No. 1 at ¶ 42. The Destination Addresses are contained in the caption as a named party in the Verified Complaint and Plaintiff has also attached Coinstructive's tracing report containing the Destination Addresses to the Verified Complaint and incorporated it by reference. *See* ECF No. 1-1.

Motion seeking to serve Defendants via NFT electronic transfers and web posting. ECF No. 6.

## II.    Legal Standard

Federal Rule of Civil Procedure 4(f)(3) allows alternative methods for service of process, so long as those methods are not prohibited by international agreement and are directed by the Court. *See NBA Properties, Inc. v. Partnerships & Unincorporated Associations Identified in Schedule "A"*, 549 F. Supp. 3d 790, 797–98 (N.D. Ill. 2021)*; Strabala v. Zhang*, 318 F.R.D. 81, 114 (N.D. Ill. 2016) (quoting 4B FED. PRAC. & PROC. CIV. § 1134 (4th ed.); *see also Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 16–18 (D.D.C. 2016)*; Rio Props. Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002); *Brookshire Bros., Ltd. v. Chiquita Brands Int'l*, Case No. 05-CIV-21962, 2007 WL 1577771, at 2 (S.D. Fla. May 31, 2007); *Rio Props. Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002). "[A]s long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f)(3) may be accomplished in contravention of the laws of the foreign country." *Chanel, Inc. v. Zhixian*, Case No. 10-cv-60585-JIC, 2010 WL 1740695, at 3 (S.D. Fla. April 29, 2010) (quoting *Rio Props., Inc.*, 284 F.3d at 1014 and citing *Mayoral–Amy v. BHI Corp.*, 180 F.R.D. 456, 459 n.4 (S.D. Fla. 1998).).

The plain language of Rule 4(f)(3) reflects that an order allowing an alternate means of service lies within the sole discretion of the District Court. *See Prewitt Enters., Inc.*, 353 F.3d at 921; *Rio Props., Inc.*, 284 F.3d at 1116; *see, e.g., Brookshire Bros., Ltd.*, 2007 WL 1577771, at 2 (noting that "district courts have broad discretion under Rule 4(f)(3) to authorize other methods of service"); *In re Int'l Telemedia Assocs.*, 245 B.R. 713, 720 (N.D. Ga. 2000) (noting that Rule 4(f)(3) is designed to allow courts discretion and broad flexibility to tailor the methods of service for a particular case). Rule 4 does not require a party attempt service of process by those

methods enumerated under subsections (f)(1) and (f)(2), including by diplomatic channels and letters rogatory, before petitioning the court for alternative relief under subsection 4(f)(3). *Rio Props., Inc.,* 284 F.3d at 1114-15; *see also Brookshire Bros., Ltd.*, 2007 WL 1577771, at 1.

In *Brookshire,* the Honorable Judge Marcia G. Cooke allowed substitute service on a party's attorney pursuant to Rule 4(f)(3) holding as follows:

> Rule 4(f)(3) is one of three separately numbered subsections in Rule 4(f) and each subsection is separated from the one previous merely by the simple conjunction 'or.' Rule 4(f)(3) is not subsumed within or in any way dominated by Rule 4(f)'s other subsections; it stands independently, on equal footing. Moreover, no language in Rules 4(f)(1) or 4(f)(2) indicates the primacy, and certainly Rule 4(f)(3) indicates no qualifiers or limitations which indicate its availability only after attempting service of process by other means.

*Brookshire Bros., Ltd.,* 2007 WL 1577771, at 1 (quoting *Rio Props., Inc.,* 284 F.3d at 1015).

*Accord TracFone Wireless, Inc. v. Bitton,* 278 F.R.D. 687, 692 (S.D. Fla. Jan. 11, 2012) (noting that, in regards to Rule 4(f)(3), "there is no indication from the plain language of the Rule that the three subsections, separated by the disjunctive "or," are meant to be read as a hierarchy."). Judge Cooke further held: "[t]he invocation of Rule 4(f)(3), therefore, is neither a last resort nor extraordinary relief." *Brookshire Bros., Ltd.,* 2007 WL 1577771, at 2.

Additionally, the Constitution itself does not mandate that service be effectuated in any particular way. Rather, Constitutional due process considerations require only that the method of service selected be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Brookshire Bros., Ltd.,* 2007 WL 1577771, at 1 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)); *see also TracFone Wireless, Inc.,* 278 F.R.D. at 692; *Rio Props., Inc.,* 284 F.3d at 1016. Accordingly, federal courts have allowed a variety of alternative service methods, for example service by e-mail where a plaintiff demonstrates the likelihood that

the proposed alternative method of service will notify a defendant of the pendency of the action. *See, e.g., Rio Props., Inc.,* 284 F.3d at 1017 (holding, "without hesitation," that e-mail service of an online business defendant "was constitutionally acceptable"); *In re Int'l Telemedia Assocs.,* 245 B.R. at 721 ("If any methods of communication can be reasonably calculated to provide a defendant with real notice, surely those communication channels utilized and preferred by the defendant himself must be included among them."); *National Association for Stock Car Auto Racing, Inc. v. Does,* 584 F. Supp. 2d 824, 826 (W.D.N.C. 2008) (in "acknowledging the realities of the twenty-first century and the information age, the Court determined that the most appropriate place for publication was [plaintiff's website].").

## III.   Discussion

Plaintiff proposes to serve Defendants via NFT electronic transfer, direct messaging via WhatsApp, and web postings. ECF No. 6. Moreover, Defendants perpetrated their alleged theft electronically, through WhatsApp and on the blockchain where they transferred Plaintiff's assets to their Destination Wallets. With no other means of finding Defendants, the Court finds that service via NFT electronic transfer and web posting are the reliable means to provide Defendants notice of this action.

Courts presiding over cases with substantially similar facts have authorized alternate service by similar methods. *Yogaratnam v. Doe, et al., No. 2:24-cv-00393 (E.D. La. – Filed February 15, 2024); Yogaratnam* involved the theft of $294,215.00 worth of various cryptocurrencies. U.S. District Court Judge Nannette Jolivette Brown granted Plaintiff's Motion for Alternative Service, authorizing Plaintiff to serve Defendants via NFT and service website posting. *Id. See also Lin v. Defendant "1", et al.,* No. 2:23-cv-05878-GGG-KWR (E.D. La. December 8, 2023); *Lin* involved the theft of $2,592,728.73 worth of various cryptocurrencies.

U.S. District Court Judge Greg Gerard Guidry granted Plaintiff's Motion for Alternative Service, authorizing Plaintiff to serve Defendants via NFT and service website posting. *Id. See also Ohlin v. Defendant "1"*, No. 3:23CV8856-TKW-HTC, 2023 WL 4084523. (N.D. Fla. June 8, 2023); *Ohlin* involved the theft of $862,318.73 worth of various cryptocurrencies. U.S. District Court Judge Wetherell II granted plaintiff's *ore tenus* motion to serve defendants with the summons, amended complaint and notice of the hearing to convert the temporary restraining order to a preliminary injunction via NFT and plaintiff's service website. *Id.* at 1. Other courts have granted similar motions in cases involving facts nearly identical to those in the present matter. *See e.g.*, *Bandyopadhyay v. Defendant "1"*, No. 22-CV-22907, 2022 WL 17176849, at *3 (S.D. Fla. Nov. 23, 2022) (granting service via NFT and website posting); *Bowen v. Li*, No. 23-CV-20399, 2023 WL 2346292, at *3 (S.D. Fla. Mar. 3, 2023) (in a cryptocurrency theft case similar to this case, the court granted plaintiff's motion for alterative service pursuant to Fed.R.Civ.P. 4(f)(3) allowing service of complaint, summons and all other filings via NFT and web posting). *See also LCX AG v. John Doe Nos. 1-25*, No. 154644/2022 (Sup. Ct. N.Y. Co. – Filed 06/27/2022);[3] *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 4594180, at 2 (S.D. Fla. May 31, 2022) (granting motion to serve subpoenas via email on non-party FTX Witnesses).

Finally, Plaintiff believes Defendant 1 is likely located outside of the United States.[4] Service in the manner proposed by Plaintiff is not prohibited by international agreement. The United States is a signatory to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (the "Hague Service Convention"). The

---

[3] *See LCX AG vs. John Doe Nos. 1-25* | Holland & Knight (*https://www.hklaw.com/en/general- pages/lcx-ag-v-doe*). Last accessed: December 7, 2023.

[4] ECF No. 1 [Complaint] at ¶ 8.

Hague Service Convention does not preclude the court from authorizing service of process via electronic means, e.g., via NFT or posting on a designated website. Thus, here, there are no international agreements prohibiting service by blockchain NFT service or posting on a designated website.

As such, I find the service proposed by Plaintiff is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Brookshire Bros., Ltd.,* 2007 WL 1577771, at 1 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)); *see also TracFone Wireless, Inc.,* 278 F.R.D. at 692; *Rio Props., Inc.,* 284 F.3d at 1016.

Accordingly, Plaintiff's Motion for an order authorizing alternate service, ECF No. 6, is GRANTED. Plaintiff is authorized to serve Defendants as follows:

1) via blockchain transfer of Plaintiff's NFTs to Defendants' Crypto Wallet addresses (providing Notice, Summons language, and Plaintiff's Website address https://usdccourtservice.com/cv-07511/);

2) via direct message to Defendant's WhatsApp messaging account; and

3) via website posting by posting a copy of the Summons, Complaint, and all filings in this matter on Plaintiff's Website appearing at the URL https://usdccourtservice.com/cv-07511/.

**DONE AND ORDERED this 2nd day of October 2024.**

**Jorge L. Alonso**
**United States District Judge**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROMES H. PHILLIPS<br><br>    Plaintiff,<br><br>v.<br><br>DEFENDANT "1" a/k/a "Barry Knapps", DEFENDANT "2" a/k/a "Colin Gordon", DEFENDANT "3" a/k/a "Mary", DEFENDANT "4" a/k/a "Linda", DEFENDANT "5" a/k/a "Mia", DEFENDANT "6" a/k/a "Eric Gordon", DEFENDANT "7" a/k/a Mr. Shah who is the owner of the following cryptocurrency address,<br>Robinhood:<br>0xa26e73c8e9507d50bf808b7a2ca9d5de4fcc4a04, and<br>JOHN DOE Defendants 1-6 who are the cohorts of DEFENDANTS "1" – "7" and are the owners of the following cryptocurrency deposit wallets where Plaintiff's stolen cryptocurrency assets were transferred:<br>Binance:<br>0x28c6c06298d514db089934071355e5743bf21d60 and<br>0xa67766248d9b3c6399c55292cf72be270c92d29a,<br>Coinbase:<br>0xa9d1e08c7793af67e9d92fe308d5697fb81d3e43,<br>BTSE:<br>0x5a99839e9e90e64ab2606a556165b64d208d0eef,<br>OKX:<br>0x68841a1806ff291314946eebd0cda8b348e73d6d,<br>HTX:<br>0xa03400e098f4421b34a3a44a1b4e571419517687,<br><br>    Defendants. | Case No. 1:24-cv-07511<br><br>Honorable Jorge L. Alonso |

## ORDER AUTHORIZING ALTERNATE SERVICE OF PROCESS ON FOREIGN DEFENDANTS PURSUANT TO RULE 4(f)(3)

Plaintiff ROMES H. PHILLIPS, (hereinafter, "Plaintiff") has filed a Motion for Order Authorizing Alternative Service of Process on Foreign Defendants[1] pursuant to Rule 4(f)(3). ECF No. 6 ("Motion"). On consideration, the motion is granted.

### I.    BACKGROUND

According to the Verified Complaint, Defendants deceived Plaintiff into transferring approximately 216,955.28 Tether (USDT) worth of cryptocurrency into Defendants' private cryptocurrency wallet addresses (collectively "Destination Addresses") after Defendants fraudulently represented that they were cryptocurrency investors who would assist Plaintiff in investing his cryptocurrency. ECF No. 1 at ¶ 28 -39. Relying on Defendants' misrepresentations, Plaintiff believed he had downloaded a legitimate and regulated cryptocurrency exchange smartphone application but instead downloaded and ultimately transferred his cryptocurrency assets to a smartphone application that facilitated the transfer of Plaintiff's cryptocurrency assets into Defendants' Destination Addresses.[2]

While Plaintiff does not know the physical addresses of Defendants, let alone their true identities, based on his conversations with Defendant 1, Plaintiff believes Defendant 1 is likely located outside of the United States. ECF No. 1 at 8. In light of the above, Plaintiff filed the instant

---

[1] Plaintiff does not know the true identities of the Defendants but believes they are foreign nationals. ECF No. 1 at 8.

[2] According to the Verified Complaint, Plaintiff retained Coinstructive, Inc. (hereinafter, "Coinstructive"), a forensic cryptocurrency tracing expert, to trace the stolen assets. ECF No. 1 at ¶ 42. The Destination Addresses are contained in the caption as a named party in the Verified Complaint and Plaintiff has also attached Coinstructive's tracing report containing the Destination Addresses to the Verified Complaint and incorporated it by reference. *See* ECF No. 1-1.

Motion seeking to serve Defendants via NFT electronic transfers and web posting. ECF No. 6.

## II.    Legal Standard

Federal Rule of Civil Procedure 4(f)(3) allows alternative methods for service of process, so long as those methods are not prohibited by international agreement and are directed by the Court. *See NBA Properties, Inc. v. Partnerships & Unincorporated Associations Identified in Schedule "A",* 549 F. Supp. 3d 790, 797–98 (N.D. Ill. 2021)*; Strabala v. Zhang,* 318 F.R.D. 81, 114 (N.D. Ill. 2016) (quoting 4B FED. PRAC. & PROC. CIV. § 1134 (4th ed.); *see also Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.,* 168 F. Supp. 3d 1, 16–18 (D.D.C. 2016)*; Rio Props. Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1014 (9th Cir. 2002); *Brookshire Bros., Ltd. v. Chiquita Brands Int'l,* Case No. 05-CIV-21962, 2007 WL 1577771, at 2 (S.D. Fla. May 31, 2007); *Rio Props. Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1014 (9th Cir. 2002). "[A]s long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f)(3) may be accomplished in contravention of the laws of the foreign country." *Chanel, Inc. v. Zhixian,* Case No. 10-cv-60585-JIC, 2010 WL 1740695, at 3 (S.D. Fla. April 29, 2010) (quoting *Rio Props., Inc.,* 284 F.3d at 1014 and citing *Mayoral–Amy v. BHI Corp.,* 180 F.R.D. 456, 459 n.4 (S.D. Fla. 1998).).

The plain language of Rule 4(f)(3) reflects that an order allowing an alternate means of service lies within the sole discretion of the District Court. *See Prewitt Enters., Inc.*, 353 F.3d at 921; *Rio Props., Inc.,* 284 F.3d at 1116; *see, e.g.*, *Brookshire Bros., Ltd.,* 2007 WL 1577771, at 2 (noting that "district courts have broad discretion under Rule 4(f)(3) to authorize other methods of service"); *In re Int'l Telemedia Assocs.*, 245 B.R. 713, 720 (N.D. Ga. 2000) (noting that Rule 4(f)(3) is designed to allow courts discretion and broad flexibility to tailor the methods of service for a particular case). Rule 4 does not require a party attempt service of process by those

methods enumerated under subsections (f)(1) and (f)(2), including by diplomatic channels and

letters rogatory, before petitioning the court  for alternative relief under subsection 4(f)(3). *Rio*

*Props., Inc.,* 284 F.3d at 1114-15; *see also Brookshire Bros., Ltd.*, 2007 WL 1577771, at 1.

In *Brookshire,* the Honorable Judge Marcia G. Cooke allowed substitute service on a

party's attorney pursuant to Rule 4(f)(3) holding as follows:

> Rule 4(f)(3) is one of three separately numbered subsections in Rule 4(f) and each
> subsection is separated from the one previous merely by the simple conjunction
> 'or.' Rule 4(f)(3) is not subsumed within or in any way dominated by Rule 4(f)'s
> other subsections; it stands independently, on equal footing. Moreover, no
> language in Rules 4(f)(1) or 4(f)(2) indicates the primacy,  and certainly Rule
> 4(f)(3) indicates no qualifiers or limitations which indicate  its availability only
> after attempting service of process by other means.

*Brookshire Bros., Ltd.,* 2007 WL 1577771, at 1 (quoting *Rio Props., Inc.,* 284 F.3d at 1015).

*Accord TracFone Wireless, Inc. v. Bitton,* 278 F.R.D. 687, 692 (S.D. Fla. Jan. 11, 2012) (noting

that, in regards to Rule 4(f)(3), "there is no indication  from the plain language of the Rule that the

three subsections, separated by the disjunctive "or," are meant to be read as a hierarchy."). Judge

Cooke further held: "[t]he invocation of Rule 4(f)(3), therefore, is neither a last resort nor

extraordinary relief." *Brookshire Bros., Ltd.,* 2007 WL 1577771, at 2.

Additionally, the Constitution itself does not mandate that service be effectuated in any

particular way. Rather, Constitutional due process considerations require only that the method of

service selected be "reasonably calculated, under all the circumstances, to apprise interested

parties of the pendency of the action and afford them an opportunity to present their objections."

*Brookshire Bros., Ltd.,* 2007 WL 1577771, at 1 (quoting *Mullane v. Cent. Hanover Bank & Trust*

*Co.,* 339 U.S. 306, 314 (1950)); *see also TracFone Wireless, Inc.,* 278 F.R.D. at 692; *Rio  Props.,*

*Inc.,* 284 F.3d at 1016. Accordingly, federal courts have allowed a variety of alternative  service

methods, for example service by e-mail where a plaintiff demonstrates the likelihood that

the proposed alternative method of service will notify a defendant of the pendency of the action. *See, e.g., Rio Props., Inc.,* 284 F.3d at 1017 (holding, "without hesitation," that e-mail service of an online business defendant "was constitutionally acceptable"); *In re Int'l Telemedia Assocs.,* 245 B.R. at 721 ("If any methods of communication can be reasonably calculated to provide a defendant with real notice, surely those communication channels utilized and preferred by the defendant himself must be included among them."); *National Association for Stock Car Auto Racing, Inc. v. Does,* 584 F. Supp. 2d 824, 826 (W.D.N.C. 2008) (in "acknowledging the realities of the twenty-first century and the information age, the Court determined that the most appropriate place for publication was [plaintiff's website].").

## III.    Discussion

Plaintiff proposes to serve Defendants via NFT electronic transfer, direct messaging via WhatsApp, and web postings. ECF No. 6. Moreover, Defendants perpetrated their alleged theft electronically, through WhatsApp and on the blockchain where they transferred Plaintiff's assets to their Destination Wallets. With no other means of finding Defendants, the Court finds that service via NFT electronic transfer and web posting are the reliable means to provide Defendants notice of this action.

Courts presiding over cases with substantially similar facts have authorized alternate service by similar methods. *Yogaratnam v. Doe, et al., No. 2:24-cv-00393 (E.D. La. – Filed February 15, 2024); Yogaratnam* involved the theft of $294,215.00 worth of various cryptocurrencies. U.S. District Court Judge Nannette Jolivette Brown granted Plaintiff's Motion for Alternative Service, authorizing Plaintiff to serve Defendants via NFT and service website posting. *Id. See also Lin v. Defendant "1", et al.,* No. 2:23-cv-05878-GGG-KWR (E.D. La. December 8, 2023); *Lin* involved the theft of $2,592,728.73 worth of various cryptocurrencies.

U.S. District Court Judge Greg Gerard Guidry granted Plaintiff's Motion for Alternative Service, authorizing Plaintiff to serve Defendants via NFT and service website posting. *Id. See also Ohlin v. Defendant "1"*, No. 3:23CV8856-TKW-HTC, 2023 WL 4084523. (N.D. Fla. June 8, 2023); *Ohlin* involved the theft of $862,318.73 worth of various cryptocurrencies. U.S. District Court Judge Wetherell II granted plaintiff's *ore tenus* motion to serve defendants with the summons, amended complaint and notice of the hearing to convert the temporary restraining order to a preliminary injunction via NFT and plaintiff's service website. *Id.* at 1. Other courts have granted similar motions in cases involving facts nearly identical to those in the present matter. *See e.g.*, *Bandyopadhyay v. Defendant "1"*, No. 22-CV-22907, 2022 WL 17176849, at *3 (S.D. Fla. Nov. 23, 2022) (granting service via NFT and website posting); *Bowen v. Li*, No. 23-CV-20399, 2023 WL 2346292, at *3 (S.D. Fla. Mar. 3, 2023) (in a cryptocurrency theft case similar to this case, the court granted plaintiff's motion for alterative service pursuant to Fed.R.Civ.P. 4(f)(3) allowing service of complaint, summons and all other filings via NFT and web posting). *See also LCX AG v. John Doe Nos. 1-25*, No. 154644/2022 (Sup. Ct. N.Y. Co. – Filed 06/27/2022);[3] *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 4594180, at 2 (S.D. Fla. May 31, 2022) (granting motion to serve subpoenas via email on non-party FTX Witnesses).

Finally, Plaintiff believes Defendant 1 is likely located outside of the United States.[4] Service in the manner proposed by Plaintiff is not prohibited by international agreement. The United States is a signatory to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (the "Hague Service Convention"). The

---

[3] *See LCX AG vs. John Doe Nos. 1-25* | Holland & Knight (*https://www.hklaw.com/en/general- pages/lcx-ag-v-doe*). Last accessed: December 7, 2023.

[4] ECF No. 1 [Complaint] at ¶ 8.

Hague Service Convention does not preclude the court from authorizing service of process via electronic means, e.g., via NFT or posting on a designated website. Thus, here, there are no international agreements prohibiting service by blockchain NFT service or posting on a designated website.

As such, I find the service proposed by Plaintiff is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Brookshire Bros., Ltd.*, 2007 WL 1577771, at 1 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *see also TracFone Wireless, Inc.*, 278 F.R.D. at 692; *Rio Props., Inc.*, 284 F.3d at 1016.

Accordingly, Plaintiff's Motion for an order authorizing alternate service, ECF No. 6, is GRANTED. Plaintiff is authorized to serve Defendants as follows:

1) via blockchain transfer of Plaintiff's NFTs to Defendants' Crypto Wallet addresses (providing Notice, Summons language, and Plaintiff's Website address https://usdccourtservice.com/cv-07511/);

2) via direct message to Defendant's WhatsApp messaging account; and

3) via website posting by posting a copy of the Summons, Complaint, and all filings in this matter on Plaintiff's Website appearing at the URL https://usdccourtservice.com/cv-07511/.

**DONE AND ORDERED this 2nd day of October 2024.**

**Jorge L. Alonso**
**United States District Judge**

# Exhibit K

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**MARCO OHLIN and NATASHA
PARACHA,**

　　　**Plaintiffs,**

**v.**　　　　　　　　　　　　　　**Case No. 3:23cv8856-TKW-HTC**

**DEFENDANT 1 a/k/a SELINA, et al.,**

　　　**Defendants**.

_____/

## ORDER EXTENDING TEMPORARY RESTRAINING ORDER

This case came before the Court for a hearing on June 8, 2023. The purpose

of the hearing was to determine whether to convert the previously issued temporary

restraining order (TRO) (Doc. 6) into a preliminary injunction (PI).

The Court cannot convert the TRO into a PI at this time because notice has

not yet been provided to the "adverse party" as required by Fed. R. Civ. P.

65(a)(1). However, the Court finds that the arguments and representations made by

Plaintiffs on the record at the hearing constitute "good cause" for extending the TRO

for an additional 14 days from the date it was originally set to expire, as authorized

by Fed. R. Civ. P. 65(b)(2).

Additionally, the Court approved Plaintiffs' ore tenus request under Fed. R.

Civ. P. 4(f)(3) for authorization to serve the amended complaint through a non-

fungible token (NFT). *See Bowen v. Li*, 2023 WL 2346292 (S.D. Fla. Mar. 23, 2023)

(approving service through NFT under Rule 4(f)(3)); *Bandyopadhyay v. Defendant*

*1*, 2022 WL 17176849 (S.D. Fla. Nov. 22, 2022) (same). Notice of the TRO and the

rescheduled PI hearing may be provided to Defendants in the same manner.

Accordingly, for the reasons stated on the record at the hearing, it is

**ORDERED** that:

1.    The TRO is extended on its same terms through June 23, 2023

2.    Plaintiffs' motion for a TRO (Doc. 5) is construed as motion for a

TRO and/or a PI.

3.    A hearing on the motion for a PI is scheduled for June 22, 2023, at

9:00 a.m. (central time) in the United States Courthouse, Courtroom Four North,

1 North Palafox Street, Pensacola, Florida.

4.    Plaintiffs may serve the amended complaint and provide notice of

the TRO and PI hearing through a NFT in the manner described at the hearing.

5.    Plaintiffs shall file an affidavit at or before the PI hearing providing

additional detail about the NFT process and showing proof of service/notice.

2

**DONE and ORDERED** this 8th day of June, 2023.

_____

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

3