Michael Chen, SB# 218863
Michael Chen Law Offices
7330 Edna Ave.
Las Vegas, NV 89117
Telephone: 626-249-2002
Fax: 866-591-3696
Email: michael@michaelchenlaw.com
Attorneys for Plaintiff

**Electronically**
**FILED**
by Superior Court of California, County of San Mateo
ON 1/22/2024
By /s/ Salote Alipate
Deputy Clerk

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
### FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| BYTECHIP, LLC d/b/a Qbit, a Delaware Limited Liability Company,<br><br>        Plaintiff,<br><br>    v.<br>SOLID FINANCIAL TECHNOLOGIES, INC., a Delaware Corporation; EVOLVE BANK & TRUST, an Arkansas Corporation; and Does 1 to 10;<br><br>        Defendants. | CASE NO.  24-CIV-00307<br><br>**COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT**<br>2. **CONVERSION**<br>3. **VIOLATION OF BPC §17200 ET SEQ.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Bytechip, LLC ("Bytechip") hereby complains and alleges against Defendants Solid Financial Technologies, Inc. ("Solid"), Evolve Bank & Trust ("Evolve"), and Does 1 to 10 (collectively referred to as "Defendants") as follows:

-1-
COMPLAINT

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

**PARTIES**

1.  Plaintiff Bytechip, LLC is a Delaware limited liability company with its principal place of business in San Jose, California.

2.  Upon information and belief, Defendant Solid is now, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in the city of San Mateo, California until August 24, 2023, when Solid moved to the city of Palo Alto, California.

3.  Upon information and belief, Defendant Evolve is now, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Arkansas, with its principal place of business located in Memphis, Tennessee.

4.  Upon information and belief, Evolve maintains a branch in San Juan Capistrano, California.

5.  The true names and capacities of Defendants Does 1 – 10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each defendant designated herein as a fictitiously named defendant is in some manner responsible for the events and happenings herein referred to, either contractually or tortiously, and caused the damage to the Plaintiff as herein alleged.  When Plaintiff ascertains the true names and capacities of Does 1 – 10, inclusive, it will ask leave of this Court to amend its Complaint by setting forth the same.

-2-

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

**JURISDICTION AND VENUE**

6.  This Court has personal jurisdiction over Defendants because they are either located and reside in the State of California or have engaged in business activities in this State.

7.  San Mateo County, in which this Court is located, is a proper venue for this action under Cal. Code Civ. Proc. § 395(b) because San Mateo County is where the obligation is to be performed, and where the contract in fact was entered into.

**FACTUAL ALLEGATIONS**

**A. Relationship between Bytechip, Solid, and Evolve**

8.  Bytechip is a leading neobank providing global cash management services to businesses through digital finance. Bytechip's innovative core products include global pay-in and pay-out, virtual credit card, supply chain finance, Banking-as-a-Service (BaaS), and Card-as-a-Service (CaaS).

9.  Bytechip contracted with Solid to provide money services to Bytechip's corporate customers in the United States.

10. On September 12, 2022, Bytechip entered into a Banking and Card Services Fee Schedule (the "**Solid Fee Schedule**," *see* **Exhibit 1**) and Addendum 1 to the Solid Fee Schedule ("Addendum 1," *see* **Exhibit 2**) with Solid (collectively, the "**Solid Contract**").

11. Under the Solid Contract, "Solid will coordinate with Client to establish a program through which Solid or its Affiliate, together with applicable Banks, will provide the

-3-

Banking Services . . . and Card Services . . . to Client Customers who become Accountholders."[1] Solid claims to "be relying on the applicable Banks to enable Solid to provide or make available the Banking Services."[2]

12. The term "Bank" is defined by the Solid Contract as "a financial institution chosen by Solid that will provide Bank Services and Card Services in connection with the Program."[3]

13. Under the Solid Contract, "Solid will be responsible for all aspects of establishing and managing its relationships with the Banks and will enter into agreements with Banks to provide the Services contemplated."[4]

14. The Solid Contract requires its clients to "open and maintain an account at a financial institution designated by Solid in the name of Client" and refers to such account as "Client's Solid Account."[5]

15. The Solid Contract describes the services provided by Solid to Bytechip as follows:

> Solid's partnering Bank ("**SPB**") will enable each Accountholder to (a) create and maintain an account in the Accountholder's name represented by a virtual bank account number that enables that Accountholder to store, spend, and manage money (this account, a "**Financial Account**"); and (b) make electronic payments

---

[1] Ex. 2 at § 2.1.

[2] Ex. 2 at § 5.1.

[3] Ex. 2 at § 1.

[4] Ex. 2 at § 5.1.

[5] Ex. 1 at § 1.

COMPLAINT

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

and funds transfers to and from the Accountholder's Financial Account (the services described in this sentence, the "**Banking Services**"). SPB will act as agent for the Accountholder with respect to the Financial Account.[6]

16.  It is unclear to Plaintiff at this time the exact relationship between client's Solid Account and Financial Account. Plaintiff reserves the right to amend the pleading in this regard when further information becomes available.

17. Bytechip created a virtual bank account no. 9540********1162 (the "1162 account")with Solid and is the Accountholder of the 1162 account.

18. At all times relevant, Bytechip used the 1162 account as a master account to process its clients' funds. The clients' funds, once received, are transferred to the master account before Bytechip made payments through other pay-out channels.

19. Pursuant to Bytechip's agreement with its clients, Bytechip has the right to possess the funds transferred to the 1162 account.

20. Under the Solid Contract, "subject to applicable Network Requirements and the terms of the Accountholder Agreement, Accountholders and their Authorized Clients will be able to: . . . (b) transfer funds from their Financial Accounts to any ACH-enabled account at any other financial institution."[7]

---

[6] Ex. 2 at § 3.1.

[7] Ex. 2 at § 3.4.

-5-

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

21. Upon information and belief, one of Solid's partnering Banks is Evolve.

**B. Suspension and termination of the Solid Contract**

22. As part of the Solid Contract, Addendum 1 provides that "Solid may immediately suspend the provision of all or any part of the Banking Services (a) if Solid reasonably believes that Client presents an unacceptable and material level of financial, reputational, legal, regulatory or security risk to Solid or any applicable Bank; (b) if continued access to or use of all or any part of the Card Services or Banking Services poses a material threat to Solid's systems (e.g., DDOS attack); (c) if Solid suspends the Card Services in accordance with the terms herein; or (d) if a Bank or Network directs Solid to do so."[8]

23. Under the Solid Contract, "[i]f either party materially breaches a material term of [the] Fee Schedule, the non-breaching party may terminate [the] Fee Schedule by giving notice to the breaching party. This notice will: (1) describe the material breach; and (2) state the party's intention to terminate [the] Fee Schedule. If the breaching party does not cure or substantially cure its material breach within twenty (20) business days (or a shorter period if required by applicable law) after receipt of notice as described . . . (the "**Cure Period**"), then the non-breaching party may immediately terminate [the] Fee Schedule by giving notice at any time

---

[8] Ex. 2 at § 13.2.

-6-

COMPLAINT

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

following the end of such Cure Period."[9] "Either party may terminate [the] Fee Schedule in the event the other party, its employees, agents, or representatives commit an act of fraud or willful misconduct that has a material adverse effect on the Program."[10]

24. Under the Solid Contract, Solid may terminate Addendum 1 "immediately upon notice to Client if (a) directed by a Network or Bank; or (b) Client fails to pay any amounts due to Solid timely and does not cure that failure within ten business days after receiving notice of the failure from Solid."[11]

25. On or about January 20, 2023, without any advance notice, Solid advised Bytechip via email that Solid was terminating the Solid Fee Schedule as of January 19, 2023, that the accounts would be closed on February 17, 2023, and that "[f]unds left in accounts past [February 17, 2023] [would] be returned to the approved KYC account holder's address via physical check." (the "Termination Email," *see* **Exhibit 3**).

26. The Termination Email states that "[a] formal notice of termination is forthcoming via DocuSign," but upon information and belief, no such notice was ever received by Bytechip.

27. Neither the Termination Email nor any other correspondence from Solid describes any material breach of any material term of the Solid Contract.

---

[9] Ex.1 at § 10.a.
[10] Ex.1 at § 10.c.
[11] Ex. 2 at § 13.3.

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

28. Upon information and belief, as of January 19, 2023, the 1162 account had a balance of $5,344,624.99.

29. In the Termination Email, Solid directed Bytechip to, among other things, "[e]nsure all accounts have a $0 balance status for your program, including your cardholders/account holders, by February 17th, 2023."

30. However, Bytechip no longer had access to the funds in the 1162 account and cannot transfer the same out of the 1162 account since January 20, 2023.

31. Upon information and belief, Evolve froze or instructed to freeze the funds in the 1162 account, citing an ongoing fraud investigation with the federal government into a high volume of transactions related to certain accounts, including the 1162 account.[12]

32. On or about March 23, 2023, Solid released $1,287,216.81 from the 1162 account and transferred the same through ACH to a non-Evolve bank account that Bytechip specified.

33. On or about June 21, 2023, after Bytechip's repeated requests over an extended period of time, Solid provided Bytechip with a letter from Evolve to Solid ("Evolve Letter," *see* **Exhibit 5**). The Evolve Letter states that Evolve has requested certain accounts, including the 1162 account, "be frozen due to their involvement in unsatisfactory banking practices."

---

[12] Exhibit 4 at 3-4.

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

-8-

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

34. To date, neither Solid nor Evolve has provided any details of the alleged "unsatisfactory banking practices" or the alleged ongoing fraud investigation.

35. Bytechip has never been contacted by Evolve or the federal government regarding the 1162 account, the use of the 1162 account, or the freeze of the 1162 account.

36. To date, the remaining balance of at least $4,336,961.74 in the 1162 account is still frozen and not accessible by Bytechip.

37. Due to the freeze stated above, Bytechip can no longer process its clients' funds or provide payment services for its clients.

38. The freeze stated above has caused Bytechip's failure to meet its obligations under its contract with its clients, loss of business income, loss of reputation as a trusted money service provider, and risk of being sued by its clients.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (Against Solid)

39. Plaintiff repeats and realleges each and every allegation contained in all preceding paragraphs as if fully set forth herein.

40. The Solid Contract is a valid and binding contract.

41. Bytechip has duly performed all, or substantially all of its obligations under the Solid Contract, or excused from performing such obligations.

COMPLAINT

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

42. Solid breached its contractual obligations under the Solid Contract by failing to enable Bytechip as an Accountholder to make electronic payments and funds transfers to and from Bytechip's Financial Account since January 20, 2023.

43. Solid breached its contractual obligations under the Solid Contract by failing to enable Bytechip as an Accountholder to transfer funds from Bytechip's Financial Account to any ACH-enabled account at any other financial institution since January 20, 2023.

44. Solid breached its contractual obligations under the Solid Contract by failing to describe any material breach in the Termination Email or any other correspondence to Bytechip.

45. As a result of these breaches, Bytechip has suffered and will continue to suffer damages in an amount to be determined at trial, but in no event less than $4,336,961.74.

46. As a result of these breaches, Bytechip is entitled to a judgment against Solid, in an amount to be determined at trial, but presently estimated to be no less than $4,336,961.74, together with interests, reasonable attorney's fees, and the costs of the suit.

## SECOND CAUSE OF ACTION
### Conversion
### (Against Solid and Evolve)

47. Bytechip repeats and realleges each and every allegation contained in all preceding paragraphs as if fully set forth herein.

-10-

**MICHAEL CHEN LAW OFFICE**
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

48. Bytechip has the right to immediate possession of the entire balance of $4,336,961.74 in the 1162 account of which Bytechip is the Accountholder.

49. Notwithstanding Bytechip's repeated inquiries and requests, Solid and Evolve by their wrongful acts, continued to knowingly and intentionally take possession of, exercise control over, and withhold access to the entire balance of $4,336,961.74 in the 1162 account of which Bytechip is the Accountholder.

50. Bytechip did not consent to being prevented from having access to the funds within the 1162 account.

51. As a result of these actions, Bytechip has suffered and will continue to suffer damages in an amount to be determined at trial, but in no event less than $4,336,961.74.

52. The actions by the Defendants Solid and Evolve are a substantial factor in causing the harm suffered by Bytechip.

53. As a result of these actions, Bytechip is entitled to a judgment against Solid and Evolve, in an amount to be determined at trial, but presently estimated to be no less than $4,336,961.74, together with interests, reasonable attorney's fees, and the costs of the suit.

## THIRD CAUSE OF ACTION
### Violation of BPC §17200 et esq.
### (Against Defendants Solid and Evolve)

54. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

-11-

55. Defendants have engaged in "unlawful, unfair and/or fraudulent" business acts and/or practices as defined by California Business and Professions Code Section 17200 et seq.:

a. Withholding the deposits made by Plaintiff for a prolonged period of time without justifications; and

b. Preventing Plaintiff from accessing its account without justifications.

56. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer substantial actual damages, including loss of profits, loss of business opportunities, incurred costs beyond what was agreed to and bargained for, and diminution of their good will, together with the costs, interests, and attorney's fees in an amount to be proven at trial.

57. Pursuant to California Business & Professions Code Section 17203, Plaintiff seeks an order from the Court requiring Defendants to provide complete equitable monetary relief so as to prevent Defendants from profiting from the acts and/or practices that are "unlawful, unfair and/or fraudulent," including requiring the payment of restitution of any monies as may be necessary to restore any money or property which may have been acquired by Defendants through such "unlawful, unfair and/or fraudulent" acts and practices.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment against Defendants as follows:

-12-

COMPLAINT

1.  Enter judgment for Bytechip in the amount to be determined at trial, which is estimated to exceed $4,336,961.74, against Defendants, plus interests, attorney's fees, costs and expenses of the suit.

2.  For restitution and disgorgement of all monies that were the result of unlawful, unfair and/or fraudulent business acts and/or practices by the Defendants.

3.  Award Bytechip such other and further relief as the Court may deem proper.

Dated: January 22nd, 2024

Respectfully submitted,

X: /s/ Michael Chen
By: Michael Chen Esq.
Michael Chen Law offices
*Attorney for Plaintiff BYTECHIP, LLC*

MICHAEL CHEN LAW OFFICE
7330 EDNA AVE LAS VEGAS NV 89117
www.michaelchenlaw.com |Call: 626.249.2002

-13-

# EXHIBIT
# 1



# Solid BANKING AND CARD SERVICES FEE SCHEDULE

| Solid | Solid Financial Technologies, Inc. 2955 Campus Dr #110. San Mateo CA 94403 | | |
|---|---|---|---|
| **Client** | Bytechip LLC 8 The Green Suite B Dover, Delaware, 19901 | | |
| **Territory** | United States | | |
| **Effective Date** | Date of final signature | **Initial Period** | 36 months |
| **Signatures** | **Solid** _DocuSigned by:_ *Raghav Lal* FD3E10FC6D90453... By: Raghav Lal President Date: 9/12/2022 | | **Client** _DocuSigned by:_ *Yujun Wu* 5A03598E7347432... By: YUJUN WU CEO Date: 9/12/2022 |

This Solid Banking and Card Services Fee Schedule and Addendum 1 attached hereto (collectively, the "**Fee Schedule**"), effective as of the Effective Date listed above, is entered into between Solid and Client. All capitalized terms used in this Fee Schedule will have the meaning given them in the Banking & Card Services (defined in Addendum 1).

**1. Overview; Applicable Terms.** Prior to Client's receipt of any services provided by or on behalf of Solid under this Agreement (the "Services"), Client must open and maintain an account at a financial institution designated by Solid in the name of Client ("**Client's Solid Account**"). The fees listed in this Fee Schedule apply to the Card Services and Banking Services (as defined in Addendum 1) in the Territory listed above. Beginning on the Effective Date, the terms of the Fee Schedule and the terms of the attached Addendum 1 will apply to Solid's provision and Client's use of the Banking Services and Card Services. Following the Effective Date, the parties will meet in good faith to discuss additional terms and conditions applicable to the Card Services and Banking Services, and, shall enter into any supplemental terms mutually agreed upon prior to offering or marketing the Program (as defined in Addendum 1) to members of the general public (such terms and conditions related to the Card, the "**Spend Card Program Agreement**," such terms and conditions related to the Banking Services, "**Banking Program Agreement**" and the Fee Schedule, Spend Card Program Agreement and Banking Program Agreement, individually and collectively, the "**Program Agreement**").

**2. Fees.** Client will be responsible for the fee set forth below for Bank Services and Card Services (the "Fees"). Solid shall invoice Client for the Fees payable by Client on a monthly basis in arrears, and fees payable by Client will be deducted from the amounts that Solid processes, excluding amounts owned by, or processed for or on behalf of, Accountholders, Authorized Users or Client Customers. If Client fails to pay the Fees in accordance with the preceding sentence, Solid may deduct Fees then due and owing from the Client's Solid Reserve Account or Client's Solid Account. If Client disputes in good faith any invoice, Client shall notify Solid, and Solid and Client shall work in good-faith to resolve the dispute. In the event the parties cannot, after working in good faith to resolve the dispute, resolve the dispute within thirty (30) days of the initial notice of dispute, either party may exercise any remedy available to it under this Agreement or law to resolve the dispute.

# solid.

| Solid Banking Services Fees | |
|---|---|
| **Type** | **Fee** |
| **Solid Implementation Fee** | $15,000 fee charged at the execution of the effective date of the Fee Schedule. This reduced rate is subject to the Client signing this MSA on or before Sep 16, 2022. |
| **Monthly Platform Fee** | Applicable Monthly Platform Fee of $10,000<br><br>Monthly fee charged after sixty (60) days from the Effective Date.<br><br>Month 1 thru 6 = $8,000 per month<br><br>Month 7 thru 36 = $10,000 per month<br><br>There will be a total of 36 monthly platform fee payments for this contract. |
| **Monthly Fee Per Bank (Financial) Account** | $0.10 per active account/per month<br><br>* An user cannot be sub-letting the account. |
| **KYC** | $2.5 per applicant check |
| **KYB** | $2.5 per company check |
| **Identity Verification (IDV)** | $1.0 per applicant check |
| **ACH Transactions** | RDFI: $0 per ACH transfer received<br><br>ODFI: $0.15 per standard<br>ODFI: $0.25 per same day |
| **Domestic Wires** | Incoming: $1.00 per wire transfer received<br><br>Outgoing: $5.00 per wire transfer sent |
| **International Wires** | Incoming: $20.00 per wire transfer received<br><br>Outgoing: $20.00 per wire transfer sent |
| **Remote Check Deposit** | $0.25 per check |



| Check (Digital/Physical) | $1.0 per check |
|---|---|
| ATM Transactions | Withdrawal:$2.00, Deposit:$2.75, Inquiry/Decline:$0.50 |
| Push/Pull via Debit Card | $0.50 per transaction + Network costs pass–thru |
| ACH Returns/NSF/Stop Check | $15 per transaction |
| Return Check | $35 per check |

| Card Services Fees | |
|---|---|
| Solid may assess the Card procurement fees listed below at any time after Client submits its order request to Solid. | |
| **Type** | **Fee** |
| Initial Card Procurement Fee | $5.00 per physical Card with a magnetic stripe and EMV chip and includes USPS 3-5 day postage. Additional service fees may apply for a more expedited type of postage. |
| Replacement Card Procurement Fee | $5.00 per physical Card with a magnetic stripe and EMV chip and includes USPS 3-5 day postage. Additional service fees may apply for a more expedited type of postage. |
| Card Account Monthly Fee | $0.10 per active Card per month |
| Cross-border Fee | 1.00% of the Transaction Amount + $0.30, per cross-border Transaction. Applied where a cardholder makes a purchase in a country other than the United States. |
| Foreign exchange Fee | 1.00% of the Transaction Amount Applied in each instance where network converts funds from one currency to |



| | another. This calculation is made on the converted amount. |
|---|---|
| **Disputes Fee** | $15 per disputed Transaction |

| Client Program Revenues | |
|---|---|
| *Solid will provide the following revenues to the Client.* | |
| **Type** | **Fee** |
| **Cash Incentive** | 0.50% cash incentive for deposits in the Financial Account. Rates are calculated on an APY basis on deposits and paid out monthly. Rates are subject to change and are based on Fed Fund Rates. |
| **Interchange Reimbursement Fee(IRF)** | Pass thru of a % of eligible spend on consumer credit cards or charge cards per following:<br>1.50% on Visa Business Credit or Charge Card<br>1.25% on Visa Business Debit Card<br><br>1.00% on Visa Consumer Credit or Charge Card<br>0.85% on Visa Consumer Debit Card<br>All IRF adjusted for refunds, returns, disputes, and chargebacks. The IRF rate is subject to the Visa IRF fee schedule. |

**3. Balance Cash Incentive.** Beginning Effective Date, Solid will pay Client the Balance Cash Incentive (defined in <u>Section 5</u>) on a monthly basis. The Balance Cash Incentive will be credited to Client's Solid Account.

**4. Revenue Share.** Each month, Solid will pay Client a revenue share ("**Revenue Share**"), calculated as follows.

a. <u>Calculation</u>. The Revenue Share for a given calendar month will be equal to (i) the monthly Transaction Amounts for all Transactions (as defined in the Spend Card Program Agreement) occurring during that calendar month, less (ii) the Transaction Amounts for all Transactions that have been successfully disputed, refunded or reversed during that calendar month (or a prior calendar month, to the extent not previously accounted for in the calculation of the Revenue Share) ("**Monthly Program Volume**"), (iii) multiplied by the percentages corresponding to the applicable volume tier, as provided in the table below.

**Revenue Share Table**

| Volume Tier | Monthly Program Volume | Fee Tier |
|---|---|---|
| Monthly | Minimum of $100 | Pass thru of a % of eligible spend on consumer credit cards or charge cards per following:<br>1.50% on Visa Business Credit or Charge Card<br>1.25% on Visa Business Debit Card<br><br>1.00% on Visa ConsumerCredit or Charge Card<br>0.85% on Visa Consumer Debit Card<br>All IRF adjusted for refunds, returns, disputes, and chargebacks. The IRF rate is subject to the Visa IRF fee schedule. |

b. Payment. Within 30 days after the end of each month with respect to which Solid owes Client any Revenue Share, Solid will pay Client any Revenue Share amounts owing in USD net of any outstanding Fees by Client to Solid under this Agreement. Solid will not have any obligation to make payment to Client in any month in which the Revenue Share is less than $250, which amount will be applied to the next month's Revenue Share calculation. Client is responsible for paying income taxes imposed by governmental authorities in connection with the Revenue Share. Solid will deposit Revenue Share into Client's designated account.

**5. Definitions**. As used in this Fee Schedule, the following terms have the meanings specified below:

"**Balance Cash Incentive**" means a credit, currently equal to 50bps (0.5%) of the funds calculated on an APY basis, using the Average Daily Balance method, paid monthly, that Solid pays Client. The Average Daily Balance method is calculated by adding the ending Financial Account balance for each day of the month and dividing their sum by the number of days in the month, which, in the context of the Balance Cash Incentive, currently[1] results in a calculation equal to:

$$\{[\ \mathbf{S/N}]\ x\ [0.005/12]\}$$

Where    **S** = Sum of All End-of-Day Account Balances for the Month
            **N** = Number of Days in the Month

"**Transaction Amount**" means the total amount processed in connection with a Transaction.

**6. Marketing and Promotional Activities.** Media releases, public announcements and public disclosures by either party or their respective representatives, employees or agents, relating to the Program Agreement or the name or mark of either party, including, without limitation, promotional or marketing material, but not including any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the releasing party, shall be coordinated with and approved by Client or Solid, respectively, in writing prior to the release thereof. For the avoidance of doubt, no press release, media release, public announcement or public disclosure related to a Program or Client may be published by Solid without the written consent of Client.

**7. Reserve Account**.

a. Client Responsibilities. Client is responsible for the following amounts: (i) Client's failure to pay any Fees owed to Solid; (ii) any amount related to chargebacks, returns or provisional credit extension of transactions initiated on Client's Application, via the dashboard or the Client use of the Services; (iii) liabilities arising from a Client Customers or Client Accountholders breach of Accountholder

---

[1] The Balance Cash Incentive is a variable rate and is subject to change.

# EXHIBIT
# 2



Agreement; and (iv) any additional liability for which Client is responsible, as set forth in this Fee Schedule or in the Addendum.

b. <u>Reserve Account</u>. In order to secure Client's liability to Solid over the amounts described above, Client shall establish a reserve account at a financial institution designated by Solid (the "**Reserve Account**"), separate from Client's Solid Account, and fund it in the amount defined in the Program config file executed by Client ("**Reserve Amount**"). Client will maintain funds in an amount at least equal to the Reserve Amount in the Reserve Account during the term of this Agreement and Solid shall debit from Client's Solid Account, in each billing cycle, any existing deficit in the Reserve Amount. If requested by Solid, Client shall grant Solid a security interest in the Reserve Account and provide any other reasonably requested documentation to perfect such security interest. Client shall not at any time grant any security interest in or permit a lien to be placed on the Reserve Account to any person or entity without the prior written consent of Solid. In case of termination of this Agreement, Solid shall return to Client, on or before one hundred (100) days after the effective date of termination, any amount still available in the Reserve Account.

c. <u>Debit to Reserve Account</u>. Client agrees that Solid may debit from the Reserve Account the amounts in section 7.a above. The parties agree that Solid may only debit from the Reserve Account amounts in connection to the list provided in this Section 7. Each time Solid debits the Reserve Account, Client shall receive an electronic notice informing it of such debit.

**8. Confidentiality.**

a. Each party agrees that Confidential Information of the other party shall be used by such party solely in the performance of its obligations and exercise of its rights pursuant to the Program Agreement. Neither party (the "**Restricted Party**") shall disclose Confidential Information of the other party (the "**Disclosing Party**") to third parties or, in the case of Solid, use Client's Confidential Information or information learned in connection to the Program to establish a program or set of services substantially similar to the Program; provided, however, that the Restricted Party may disclose Confidential Information of the Disclosing Party (i) to the Restricted Party's affiliates, agents, representatives or the Restricted Party's subcontractors for the sole purpose of fulfilling the Restricted Party's obligations under this Agreement (as long as the Restricted Party exercises best efforts to prohibit any further disclosure by its affiliates, agents, representatives or the Restricted Party's subcontractors) and only on a "need to know" basis, (ii) to the Restricted Party's auditors, accountants and other professional advisors, and (iii) to any other third party as mutually agreed by the parties, in each case, only if the party to whom Disclosing Party provides Confidential Information is bound to maintain the confidentiality of Confidential Information in accordance with the terms of the Program Agreement. Each Restricted Party may disclose Confidential Information to the extent such Confidential Information is required to be disclosed by applicable law, including in the course of an examination by a regulatory authority; provided that (y) except in connection with disclosure in the ordinary course of an examination by a regulatory authority, the party subject to such applicable law shall notify the Disclosing Party of any such use or requirement prior to disclosure of any Confidential Information obtained from the Disclosing Party in order to afford the Disclosing Party an opportunity to seek a protective order to prevent or limit disclosure of the Confidential Information to third parties; and (z) the party subject to such applicable law shall disclose Confidential Information of the Disclosing Party only to the extent required by such applicable law. "**Confidential Information**" means the terms and conditions of the Program Agreement and any proprietary information or non-public information of a party, including without limitation a party's trade secrets, technical data, pricing, know-how or business information, proprietary marketing plans and objectives, and, with respect to the Confidential Information of a party, any proprietary custom model used by such party in connection with the Program, and all deliverables, materials, software, flowcharts, ideas, concepts, designs, and reports or other analyses which relate thereto, including any modifications, enhancements or derivative works thereof, that is furnished to the other party in connection with the Program Agreement. Each party agrees that the existence of the Program Agreement constitutes Confidential Information of both parties, pricing and other business terms offered to the other party constitutes Confidential Information of both parties, and the parties agree that Account Information constitutes Confidential Information of Client. Except for Account Information, Confidential Information shall not include information which (i) is in or comes into the public domain without breach of this Fee Schedule by the Restricted Party; (ii) was in the possession of the Restricted Party prior to receipt from the Disclosing Party and was not acquired by the Restricted Party from the Disclosing Party under an obligation of confidentiality or nonuse; (iii) is acquired by the Restricted Party from a third party not under an obligation of



confidentiality or nonuse to the Disclosing Party; or (iv) is independently developed by the Restricted Party without use of any Confidential Information of the Disclosing Party.

b.      Restricted Party agrees that any unauthorized use or disclosure of Confidential Information of the Disclosing Party might cause immediate and irreparable harm to the Disclosing Party for which money damages might not constitute an adequate remedy.  In that event, the Restricted Party agrees that injunctive relief may be warranted in addition to any other remedies the Disclosing Party may have.  In addition, the Restricted Party shall promptly (but in no event more than twenty-four (24) hours after discovery of same) advise the Disclosing Party by telephone and in writing via facsimile of any security breach that may have compromised any Confidential Information, and of any unauthorized misappropriation, disclosure or use by any person of the Confidential Information of the Disclosing Party which may come to its attention and shall take all steps at its own expense reasonably requested by the Disclosing Party to limit, stop or otherwise remedy such misappropriation, disclosure or use, including, but not limited to, notification to and cooperation and compliance with any regulatory authority.

c.      Upon written request or upon the termination or expiration of the Program Agreement, each party shall return to the other party all Confidential Information of the other party in its possession or control that is in written form, including by way of example, but not limited to, reports, plans, and manuals, and delete any digitally or optically stored versions of Confidential Information of the other party; provided, however, that each party may maintain and retain in its possession all such Confidential Information in standard archival or computer back-up systems or pursuant to the normal document or e-mail retention practices of the Restricted Party or any of its affiliates, agents, representatives or Restricted Party's subcontractors (so long the retention practices are compliant with applicable law and consistent with the terms of this Fee Schedule) or each party may maintain such Confidential Information in its possession as required to be maintained under applicable law relating to the retention of records for the period of time required thereunder.

d.      Each party shall require its respective subcontractors or services providers having access to Confidential Information to agree in writing to be bound by the provisions of this Section 8 prior to disclosure of any Confidential Information to such party's subcontractors or service providers. Such party shall keep and maintain such protective agreements and shall promptly provide the other party with copies thereof upon request. Such permissible disclosure shall not relieve the Disclosing Party of liability for such disclosure.

e.      Neither Bank nor Solid will use or disclose Confidential Information for solicitation or marketing purposes, including its own marketing purposes and joint marketing with other financial institutions, or for any other reason, except to support the Program offered in connection with Client.

f.      Notwithstanding anything to the contrary, Solid agrees that Client may have developed or will develop certain technology, business plans and strategy, operational plans and other intellectual property relating to the Program and Services provided under this Agreement that it considers valuable and proprietary (the "**Methods**"). Client's Methods shall be considered its Confidential Information. Neither Solid nor Bank shall replicate, describe or distribute to any third party (excluding any regulatory authority) information related to Methods without the written permission of Client.

g.      The parties acknowledge that any breach of the covenants or obligations set forth in this Section may cause the other party irreparable harm for which monetary damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, the non-breaching party is entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available from any court, in addition to any other remedy to which the non-breaching party may be entitled at law or in equity.  Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Fee Schedule to the contrary.

**9. Term.** This Fee Schedule will remain in effect for the Initial Period. Following the expiration of the Initial Period, this Fee Schedule will automatically renew for subsequent 12-month periods, unless either party provides at least 120 days' notice of non-renewal prior to the renewal date.

**10. Termination.**

# solid.

a.　　If either party materially breaches a material term of this Fee Schedule, the non-breaching party may terminate this Fee Schedule by giving notice to the breaching party. This notice will: (1) describe the material breach; and (2) state the party's intention to terminate this Fee Schedule. If the breaching party does not cure or substantially cure its material breach within twenty (20) business days (or a shorter period if required by applicable law) after receipt of notice as described in this Section 10 (the "**Cure Period**"), then the non-breaching party may immediately terminate this Fee Schedule by giving notice at any time following the end of such Cure Period. Neither party will be held in breach for failure to perform under this Fee Schedule if such failure is due to compliance with applicable law.

b.　　Either party may terminate this Fee Schedule if the other party (A) voluntarily or involuntary (and such involuntary petition or proceeding is not dismissed within sixty (60) days) commences (or is the subject of, as the case may be) any proceeding or files any petition seeking relief under Title 11 of the United States Code or any other federal, state or foreign bankruptcy, insolvency, liquidation or similar law, (B) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator or similar official for such other party or for a substantial part of its property or assets, (C) makes a general assignment for the benefit of creditors, (D) commences the winding up or liquidation of its business or affairs, or (E) takes corporate action for the purpose of effecting any of the foregoing.

c.　　Either party may terminate this Fee Schedule in the event the other party, its employees, agents, or representatives commit an act of fraud or willful misconduct that has a material adverse effect on the Program.

**11. General.**  Any modification to this Fee Schedule must be in writing and signed by the parties. Except as modified in this Fee Schedule, all provisions of the Solid Banking and Card Services Addendum ("Addendum 1" or "Addendum")  and existing fee schedules remain in full force and effect.



<u>**Addendum 1**</u>

# Solid Banking and Card Services Addendum

This Addendum 1 is subject to the Fee Schedule to which it is attached ("**Fee Schedule**"), and outlines the Banking Services (defined in <u>Section 3.1 below</u>) and Card Services (defined in <u>Section 4</u> below) that Solid will make available to Client and its Accountholders, as applicable. The Banking Services and Card Services described in this Addendum are payment processing, data, technology and analytics services, and other business services that may be offered by Solid or Bank about Client, all of which constitute **Services**. All capitalized terms used in this Addendum 1 that are not otherwise defined in Addendum 1 will have the meaning given them in the Fee Schedule.

**1.       Definitions.**

The following definitions apply to this Addendum:

"**Account Information**" means information provided by or on behalf of Client, Accountholder, Authorized User or Client Customers or otherwise obtained by Solid or Bank about Client, Accountholder, Authorized User, or Client Customers in connection with the Program, Card Services or Banking Services, including demographic data and Transaction Data. Account Information includes "nonpublic personal information" and "personally identifiable financial information" as defined by the Gramm-Leach-Bliley Act or its promulgating regulation, "personal information" as defined by the California Consumer Privacy Act of 2018 or any similar legislation, information that is defined by applicable law as protected personal information, and Cardholder Data (as defined by PCI-DSS).

"**Financial Account Transaction**" means a deposit, withdrawal, ACH entry, or other transaction made using a Financial Account (defined in <u>Section 3.1</u> below), including a payment on a Card.

"**Accountholder Agreement**" means the then-current version of the "Account Agreement" or "Cardholder Agreement," which governs the Client Customer's use of the Banking Services or Card Services.

"**Authorized User**" means an employee or other person authorized by an Accountholder (defined in <u>Section 2.5</u> below) (a) under the Accountholder Agreement to use the Banking Services; and (b) under the Accountholder Agreement to use a Card Services, including the Card issued in connection thereof, as applicable.

"**Bank**" means a financial institution chosen by Solid that will provide Bank Services and Card Services in connection with the Program.

"**Business Day**" means any day (a) that is not a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required by law to close; and (b) on which the applicable Bank is open to the public for carrying on substantially all of that Bank's banking functions.

"**Card**" is defined in the Accountholder Agreement.

"**Card Account**" is defined in the Accountholder Agreement.

"**Laws**" means all laws, rules, regulations and other binding requirements of any governmental authority with jurisdiction.

"**Network**" means an electronic funds transfer network (including ACH), credit card network, or debit card network used by all or any part of the Card Services or Banking Services.

"**Network Requirements**" means all applicable and then-current (a) operating rules, bylaws, operating regulations, operating guidelines, policies, procedures, and other requirements of any Network; and (b) standards and other requirements of the PCI Security Standards Council (or any successor or replacement entity), including the Payment Card Industry Data Security Standard.

DocuSign Envelope ID: 4E8D23CB-8927-47B9-8040-65EC29C3BBAD



**solid.**

"**Program Data**" means (a) Account Information; (b) Transaction Data; and (c) information related to the Program, Client Customers or Authorized Clients; and (e) information obtained by Solid related to the provisioning of Banking Services and Card Services in connection with the Program.

"**Restricted Business**" means any of the categories of businesses and business practices for which the Banking Services cannot be used and which are identified on the then-current Solid Restricted Business list, which shall be provided to Client at any time Solid Restricted Business list is updated.

"**Solid Privacy Policy**" means the Solid privacy policy found at www.solidfi.com.

"**Territory**" means the United States and its territories and protectorates (excluding the Northern Mariana Islands until Solid is authorized to provide the Card Services and Banking Services in that jurisdiction).

"**Transaction**" means and the purchase of goods or services from a merchant by Accountholder or Authorized User using a Banking Service.

"**Transaction Data**" means information about Transactions and Financial Account Transactions, including transaction date, time, amount, effect and payee (if applicable).

2. **General.**

2.1 <u>Program.</u> Solid will coordinate with Client to establish a program through which Solid or its Affiliate, together with applicable Banks, will provide the Banking Services described in <u>Section 3</u>, and Card Services as described in <u>Section 4</u>, to Client Customers who become Accountholders as described in this Addendum (the "**Program**").

2.2 <u>Spend Card Program Agreement</u>. Solid will provide the Spend Card Program Agreement prior to establishing the Program with Solid.

2.3 <u>Bank and Legal Requirements; Modification; Limitations</u>. Notwithstanding anything to the contrary in the Fee Schedule or this Addendum 1, the components of the Banking Services, including those described in this Addendum, are in all cases subject to the requirements of the applicable Banks, Network Requirements, and applicable Law.

2.4 <u>Territory</u>. Client will not offer, market or otherwise make the Program, including the Banking Services, available to Client Customers located outside of the Territory.

2.5 <u>Program Participation</u>. Client will offer to provide access to the Banking Services to its eligible Customers in accordance with this Addendum. Each Client Customer who wishes to participate in the Program, and use the Banking Services, must successfully complete the onboarding requirements described in <u>Section 7</u>. A Client Customer who successfully completes the onboarding requirements described in <u>Section 7</u> is an "**Accountholder**."

3. **Banking Services**

3.1 <u>Services Description</u>. Solid's partnering Bank ("**SPB**") will enable each Accountholder to (a) create and maintain an account in the Accountholder's name represented by a virtual bank account number that enables that Accountholder to store, spend, and manage money (this account, a "**Financial Account**"); and (b) make electronic payments and funds transfers to and from the Accountholder's Financial Account (the services described in this sentence, the "**Banking Services**"). SPB will act as agent for the Accountholder with respect to the Financial Account.

3.2 <u>Regulated Services.</u> One or more elements of the Banking Services may be or involve money transmission or regulated banking services under applicable Law. To the extent that any element of the Banking Services is or involves money transmission or regulated banking services under applicable Law, SPB will provide that element of the Banking Services, all in compliance with Law.

# solid.

3.3 <u>Account Structure; FDIC Insurance</u>. The funds underlying the Financial Accounts will be held in a For Benefit of Account ("**FBO Account**") established and maintained in the name of SPB at the applicable Bank for the benefit of Accountholders. The FBO Account will be maintained at a Bank that is a member of the Federal Deposit Insurance Corporation ("**FDIC**"). Funds held in the Financial Accounts will be eligible to qualify for pass-through insurance from the FDIC, up to the standard maximum for funds held by the applicable Client Customer at the applicable Bank in the same capacity. Solid shall, at all times, maintain accurate, complete and complete books, records and ledgers related to the Banking Services, and shall such books, records and ledgers are maintained in a manner to ensure FDIC insurance up to the applicable legal limit and in accordance with 12 C.F.R. 330.5 or any subsequent regulation or any guidance issued by the FDIC related to deposit ownership and deposit insurance coverage.

3.4 <u>Account Functionality</u>. As part of the Banking Services, subject to applicable Network Requirements and the terms of the Accountholder Agreement, Accountholders and their Authorized Clients will be able to:

(a) add funds to their Financial Accounts via ACH and any other supported funding methods, which may include wire transfer; and

(b) transfer funds from their Financial Accounts to any ACH-enabled account at any other financial institution.

## 4. Card Services.

Each Accountholder may request and receive Cards issued by the applicable Bank and provide those Cards to its Authorized Users, and each Authorized User may use a Card to initiate Transactions (the services described in this sentence, the "**Card Services**"). This Fee Schedule, including Addendum 1, and the Spend Card Program Agreement governs the Card Services (which are defined as "Program Services" under the Spend Card Program Agreement). Each party will comply with the Spend Card Program Agreement, and Client shall ensure that (a) its Accountholders comply with the Accountholder Agreement; and (b) all Authorized Users comply with the Authorized User Terms.

## 5. Banks.

5.1 <u>Relationships with Banks</u>. As between the parties, Solid will be responsible for all aspects of establishing and managing its relationships with the Banks and will enter into agreements with Banks to provide the Services contemplated herein (the "**Sponsor Bank Agreement**"). Solid shall maintain, with at least one Bank, a Sponsor Bank Agreement and shall comply and remain in compliance with the Sponsor Bank Agreement. Solid will be relying on the applicable Banks to enable Solid to provide or make available the Banking Services. Solid may change Banks or add new Banks from time to time. Solid will notify Client as far in advance as is reasonably practical of a Bank change that will affect the Banking Services; provided, however, Solid will not transfer Financial Accounts to a Bank unless it and Bank comply with Law, including the Bank Merger Act. Solid makes no representations, warranties or guarantees regarding the creditworthiness of any Bank. Solid will also maintain registration with the applicable Network, as required by Network Requirements. Solid agrees to perform or cause to be done all such further acts required by a Bank or Network to maintain the Program.

5.2 <u>Changes to the Program.</u> If a Bank requires a change to all or any part of the Program (including the Banking Services), Solid and Client will implement that change promptly and as directed by that Bank. Solid and Client will comply with, and Client will ensure that each Accountholder implements and complies with, that change upon a mutually agreed upon effective date for such change.

## 6. Compliance and Marketing.

# solid.

6.1     <u>Generally</u>. Client will market the Banking Services to Client Customers in accordance with applicable Law and the Network Requirements. Client will not take or fail to take any action in violation of the terms of this Fee Schedule, including Addendum 1, that could cause Solid or any Bank to violate applicable Law or the Network Requirements.

6.2     <u>Program Guidelines.</u> Client will (a) comply with all product design, marketing, compliance, reporting, and other guidelines and requirements established by Solid and the applicable Bank(s) from time to time in connection with the Program that are provided to Client in writing (collectively, the "**Program Guidelines**"); (b) ensure that Accountholders comply with all Program Guidelines; and (c) establish, maintain, and act in accordance with a compliance program that will enable and ensure Client's compliance with applicable Law, the Network Requirements, the Program Guidelines, and this Addendum. From time to time, Solid or the applicable Banks may change or replace the Program Guidelines (a "**Modification**"); provided, however, Solid provides Client at least 30 days' advance notice of any Modifications; unless a Modification is necessary to comply with applicable Law, the Network Requirements, or any other requirements of a Bank, in which case, Solid may provide less than 30 days' advance notice to Client. In the event Client disagrees with a Modification, it must notify Client and the parties shall meet in good faith to determine the appropriate Modification. If the parties are unable to reach an agreement on the Modification, Client may terminate the Program Agreement.

6.3     <u>Marketing</u>. Solid must preapprove all marketing materials that Client wishes to use in connection with the Banking Services, other than those within a pre-approved framework. Solid will not unreasonably withhold, delay or condition its approval. Client will submit all proposed marketing materials to Solid using a process required by Solid and communicated to Client.

6.4     <u>Press Releases</u>. Each party must obtain the prior written approval of the other party with regard to the content, timing, and distribution of any press releases related to the Program or Banking Services. Neither party will make any public statement that would disparage the other party or its Affiliates.

**7.     Accountholder Onboarding.**

7.1     <u>Onboarding; Responsibility for Accountholders</u>. Client will be responsible for onboarding Client Customers who wish to become Accountholders as described in this <u>Section 7</u>. Each Client Customer (directly or via Client) must submit all Account Information requested by Solid and the applicable Banks to enable Solid to verify and screen the Client Customer's eligibility to access and use the Banking Services, and that the Client Customer is not engaged in a Restricted Business. Solid and the applicable Banks must approve each Client Customer as part of the Program onboarding. Solid shall be responsible for  screening Client Customers and ensuring compliance with anti-money laundering and sanctions laws.

7.2     <u>Contractual Onboarding Requirements</u>. Client will ensure that each Client Customer expressly agrees to the (a) Accountholder Agreement before using the Banking Services; and (b) Accountholder Agreement before using the Card Services as set forth herein. In addition, Client will ensure that each Authorized User of an onboarded Accountholder expressly agrees to the Authorized User Terms as set forth hereinbefore activating and using a Card. Client must ensure that each Accountholder has an opportunity to review the Accountholder Agreement prior to acceptance, that each Accountholder's acceptance is sufficient under Law to create a binding, enforceable contract (including by ensuring that the person agreeing on behalf of the Accountholder is of suitable legal age and is authorized to bind the Accountholder), and that the Accountholder's acceptance is confirmed, recorded, and can be audited. Solid will notify Client of all updates it makes to the Accountholder Agreement, and Client will (a) notify Accountholders of the updated terms as directed by Solid; and (b) ensure that the Accountholders agree to the updated terms. If any Accountholder does not agree to an updated Accountholder Agreement, Client will immediately stop making the Banking Services available to that Accountholder. Client has no



responsibility in connection with the preparation or content of the Accountholder Agreement, which will be provided to Client by the applicable Bank via Solid.

7.3 <u>Accountholders</u>. For all Client Customers who become Accountholders, Solid will provide, or will arrange for the provision of, the Banking Services and Card Services to those Accountholders in accordance with the terms of the applicable Accountholder Agreement and Bank requirements. Client will require that Accountholders and Authorized Users comply with the terms of the Accountholder Agreement, and Client will, in its reasonably discretion or unless otherwise instructed by Solid or Bank, enforce the Accountholder Agreement against Accountholders in accordance with its terms.

## 8. Client Interface with Accountholders.

Client will be responsible for providing the Client Customer-facing interface for onboarding Client Customers, and allowing Accountholders to manage their account, access and use the Banking Services and Card Services (this Client interface, the "**UI**"). Promptly after notice from Solid that Solid-hosted onboarding is available, Client will integrate with the Solid APIs in accordance with the Solid Documentation in a way that allows (a) onboarding to be hosted by Solid; and (b) account management and access to and use of the Banking Services and Card Services to be hosted by either Solid or Client, at Client's option. If Client elects to host account management and Banking Services access and use, then Client will ensure that all information and data that Solid provides or makes available for Client to pass to Accountholders, and all information and data that is passed to Solid by or through Client, is, to its knowledge, accurate and complete, including account balances, transaction history, Transaction requests, and customer service issues.

Solid grants Client a nonexclusive, nontransferable license to use Solid APIs (including underlying patents and other intellectual property rights related thereto) during the term of the Program Agreement solely for purposes of exercising its rights or performing its obligations under the Program Agreement or to otherwise access, support or use the Program or Services under the Program Agreement. There shall be no license or royalty cost to Client beyond Fees.

Client is under no obligation to use Solid APIs and may integrate with any other third party for API provisioning or may establish and maintain its own APIs. The parties agree that the Program Agreement is not intended to create an exclusive relationship of any type between Client and Solid or Client and Bank. Client and Solid may each enter into similar arrangements with one or more third parties.

## 9. Support.

Solid will make support resources related to Client's Solid account & Clients Program accounts and the Banking Services available to Client & their Program through the Solid support pages found at www.solidfi.com, the Solid Documentation, and other pages on the Solid website. If Client continues to have general issues relating to Client's Solid account or the Banking Services, Client may contact Solid through www.solidfi.com. Solid will provide all customer and Accountholder support related to Banking Services and Card Services, including managing dispute resolutions; provided, however, Client will reasonably cooperate with Solid.

## 10. Additional Beta Services Terms

10.1 <u>Beta Services</u>. Solid may indicate that the Card Services and Banking Services as a whole, or with regard to a particular service, release or feature, are classified by Solid as "alpha", "beta", "pilot", "limited availability", "invite only", or "pre-release" ("**Beta**," and the Beta portion(s) of the Card Services and Banking Services, "**Beta Services**"). The Beta Services will continue to be subject to the Beta classification and this <u>Section 10</u> until Solid removes the classification.

10.2 <u>Modification to Beta Functionality; Beta Updates</u>. Without modifying Solid's obligations to comply with Law and to ensure Card Services and Banking Services are provided in accordance with Law, Sponsor Bank Agreement and Network Requirements, Solid has no obligation whatsoever to provide any bug fixes, error corrections, patches, or



service packs for, or any revisions, successors, or updated versions to, the Beta Services, or any part of them, while the Beta classification is in place (all of the foregoing, if made available by Solid, "**Beta Updates**"). However, if Solid provides or makes available any Beta Update, including any Beta Update that is required to be made in connection with Solid removing the Beta classification as it moves to general availability of the applicable Beta Services, Client must fully implement the Beta Update within a reasonable time period specified by Solid.

10.3    <u>Availability</u>. Solid may terminate Client's, its Accountholders', and their Authorized Clients' access to the Beta Services if Solid, in its sole discretion, generally stops offering the Beta Services.

## 11.    Program Data Use.

11.1    <u>Client and Client Customers' Use</u>. Client is responsible for the security of all Program Data in its possession or control, and Solid is responsible for the security of all Program Data in its or Bank's possession or control. No party will not, and will ensure that no third party, accesses, uses, or discloses Program Data except to the extent permitted by the terms of this Addendum and the Accountholder Agreement, as applicable. Client shall own all Program Data and shall use Program Data in compliance with its privacy policy, Law and the Bank's privacy policy; provided, however, Client may collect information, in connection with its services, that overlaps or is identical to Program Data and such information is not subject to Bank's privacy policy. Solid shall ensure the Accountholder Agreement authorizes Bank and Solid to disclose any information related to an Accountholder, Authorized User or Customer, as the case may be, with Client.

11.2    <u>Solid's Use</u>. Without limiting its rights elsewhere in the Agreement, Solid will have the right to access, use, and disclose Program Data to (a) provide the Banking Services to Client and Accountholders; (b) mitigate fraud, financial loss, and other harm to Client, Client Customers, Banks, Networks, Solid and Solid Affiliates; (c) fulfill Solid's obligations to regulators and other governmental authorities, Banks, and Networks; (d) fulfill Solid's obligations under applicable Law, the Network Requirements, and Bank guidelines and requirements; and (e) enable Banks to fulfill their obligations under applicable Law and Network Requirements. Where required by applicable Law or the Network Requirements, Solid may delete or disassociate any Account Data when requested to do so by a natural person. Solid will implement and maintain an information security program designed to protect and safeguard the confidentiality of Account Information with at least the same degree of care as it protects its Confidential Information, but in no event with less than a reasonable degree of care applicable to the banking industry. Solid shall comply with PCI-DSS and to the extent it maintains "cardholder data," as defined by PCI-DSS, it shall comply with PCI-DSS.

11.3    <u>Client Customer Consents</u>. Client must obtain all necessary rights and consents from Client Customers and Authorized Users to provide to Solid, and to allow Solid to collect, use, retain, and disclose, those parties' Account Data to allow Solid to exercise its rights (a) in <u>Section 11.2</u>; and (b) in accordance with the applicable Banks' privacy policies. Additionally, each Client Customer that wishes to use the Banking Services or Bank Services will be required to agree to the privacy policies of the applicable Banks.

## 12.    Feedback

Client may provide Solid with ideas, suggestions, comments, and other input regarding Solid's products and services ("**Feedback**"). If Client provides Feedback to Solid, Client grants to Solid a perpetual, worldwide, non-exclusive, non-transferable, royalty-free license to exploit the Feedback for any purpose, including the development, manufacture, promotion, sale, and maintenance of Solid's products and services.

Solid may provide Client with ideas, suggestions, comments, and other input regarding Client's products and services ("**Client Feedback**"). If Solid provides Client Feedback to Client, Solid grants to Client a perpetual, worldwide, non-exclusive, non-transferable, royalty-free license to exploit the Client



Feedback for any purpose, including the development, manufacture, promotion, sale, and maintenance of Client's products and services.

**13.    Term; Suspension and Termination; Transition and Wind Down.**

13.1    <u>Term</u>. This Addendum will commence on the Effective Date of the Fee Schedule and, unless earlier terminated, expire as defined and described in <u>Section 1</u> of the Fee Schedule.

13.2    <u>Suspension of Banking Services</u>. Solid may immediately suspend the provision of all or any part of the Banking Services (a) if Solid reasonably believes that Client presents an unacceptable and material level of financial, reputational, legal, regulatory or security risk to Solid or any applicable Bank; (b) if continued access to or use of all or any part of the Card Services or Banking Services poses a material threat to Solid's systems (e.g., DDOS attack); (c) if Solid suspends the Card Services in accordance with the terms herein; or (d) if a Bank or Network directs Solid to do so. Client may direct Solid or Bank to suspend any Accountholder's use of Banking Services in accordance with the Accountholder Agreement, and Solid may suspend Accountholder's use of Banking Services if such Accountholder violates the terms of the Accountholder Agreement.

13.3    <u>Termination; Survival</u>. If the Spend Card Program Agreement terminates, this Addendum as it relates to Card Services will automatically terminate on the same date and Client will have no further liability for such termination. Client may terminate this Fee Schedule or the Program Agreement by providing notice to Solid and paying the termination fee set forth in Section 13.4(e) of this Fee Schedule. Solid may terminate this Addendum immediately upon notice to Client if (a) directed by a Network or Bank; or (b) Client fails to pay any amounts due to Solid timely and does not cure that failure within ten business days after receiving notice of the failure from Solid. Terms and conditions giving rise to continued obligations will survive termination of this Fee Schedule and Addendum, including <u>Sections 1, 13, 15, 16, and 17</u> will survive.

13.4    <u>Transition and Wind Down</u>.

(a)    Prior to termination of the Program Agreement or any time 36 months following the Effective Date, Client may elect to transfer one or more Cards, Card Accounts, Financial Accounts or the Program (each, a "**Transfer**") to an alternative depository institution designated by Client ("**Successor Bank**") or wind down the Program ("**Wind Down**"), in any case in accordance with Law, by providing prior notice of such election to Solid.  The parties agree to cooperate in good faith to effectuate any Transfer or Wind Down in a commercially reasonable manner that minimizes the disruption or confusion to Accountholders, protects the names and reputations of the parties, and provides for a smooth and orderly Transfer or Wind Down.  For the avoidance of doubt, such cooperation will include Solid's continued provisioning of all services contemplated herein and maintenance of the Program until the Transfer or Wind Down is completed.

(b)    In the event that Client elects a Transfer to a Successor Bank, Solid's obligations will include:  (A) requiring the Bank to execute and deliver a mutually agreed upon transfer agreement; and (B) taking all other reasonable actions necessary to effectuate the Transfer to the Successor Bank, all in accordance with Law and Network Requirements.

(c)    As soon as reasonably practicable after giving notice to Solid of a Transfer or Wind Down, Client will provide to Solid, in writing, a proposed Transition Plan detailing: (i) which any designated Cards, Card Accounts, Financial Accounts and/or Program will be transferred to a Successor Bank or wound down; (ii) a proposed work plan; and (iii) a proposed timeline, which will designate the date of the Transfer or completion of the Wind Down.  The parties will meet promptly thereafter to review such proposed plan and work in good faith to promptly determine a mutually acceptable plan ("**Transition Plan**").  The parties will use reasonable efforts to



complete a Transfer or Wind Down within 180 days after Solid's receipt of Client's election. The period of time between such election and completion of a Transfer or Wind Down is referred to as the "**Transition Period**." Unless the Transition Plan provides otherwise, during the Transition Period, the Parties will continue to be bound by and comply with the terms of the Program Agreement and perform all of their obligations hereunder and will remain liable for their respective representations and warranties, covenants, agreements and indemnification obligations under the Program Agreement.

(d)        In no event will Solid make any public statement or customer communication regarding any Transfer or Wind Down without the express prior written approval of Client, which approval will not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, each party may communicate confidentially any Transfer or Wind Down to any subcontractor providing its affected services related to the Program, a Bank or Network.

(e)        In the event the Client elects to terminate this Fee Schedule or Program Agreement without cause at any time during the Initial Term pursuant to Section 13.3 of this Addendum 1, the Client is obligated to pay the monthly platform fees for the remainder of the Initial Term in addition to all other accrued fees in the Fee schedule as applicable through the Transition Period. In the event the termination is effected following the Initial Term, the Client will pay all the fees in the Fee schedule during the Transition Period, including the platform fees or other fees otherwise negotiated as part of the Transition Plan.

## 14.    Representations and Warranties.

Client represents and warrants to Solid that (a) Client will comply with, and will ensure that its third party service providers comply with, PCI-DSS and PA-DSS, as applicable; (b) Client will comply with the Network Requirements applicable to Client's use of the Banking Services; and (c) Client will not engage in activity that any Network identifies as damaging to its brand. Client must not make any representations or warranties to any third party concerning the Banking Services. Each party represents and warrants to the other party as follows: (a) that it is duly organized and validly existing in its state of organization, and the execution, delivery and performance of this Fee Schedule and Addendum 1 by such party will not violate any of its organizational documents or any agreement, judgment, order, decree or other obligation to which such party is subject or by which it is bound; (b) such party does not require consent or approval of any third party for the valid execution, delivery, and performance of this Fee Schedule and Addendum 1 by it; (c) such party has obtained and is in compliance with all licenses, permits, memberships, consents and authorizations required to perform all its obligations under this Fee Schedule and Addendum 1 or otherwise required under Law and other agreements which must be executed to effect the services provided by such party as expressly set forth herein, and which shall be maintained at all times during the term of this Fee Schedule and Addendum 1; (d) such party's agreement to provide the services and other obligations hereunder do not violate any agreement or obligation between such party and any third party; and (e) such party is not insolvent. Solid further represents and warrants to Client that: (i) it will perform all obligations hereunder in a timely, skillful, professional, and workmanlike manner by qualified personnel exercising reasonable care, skill, and diligence consistent with standard practices in the banking software industry, and will devote adequate resources to meet its obligations hereunder; (ii) it is and will remain in full compliance with Laws, Network Requirements and is and will remain in compliance with all material provisions of the Sponsor Bank Agreement; (iii) it is and will remain, and will ensure that its third party service providers comply with, PCI-DSS and PA-DSS, as applicable.

## 15.    Additional Indemnification.

Client will indemnify, defend and hold harmless Solid, its Affiliates, and the directors, employees and agents of each (the "**Solid Parties**") from and against any damages, awards, judgments, settlement amounts, fines, penalties, losses, costs and expenses (including reasonable legal fees and expenses and costs of investigation) and other liabilities (collectively, the "**Losses**") arising out of any third party lawsuit, action, claim, demand, administrative action, arbitration or other legal proceeding brought or asserted against any Solid Parties as a result of or in connection with: (a) Client's breach of this Addendum; (b) Client's, a Client Customer's or an Authorized User's use of the Banking Services in

# solid.

violation of the Accountholder Agreement or Program Agreement, as applicable; (c) inaccurate or incomplete information about Client provided, including through the UI, to Solid or the applicable Bank by or on behalf of Client; and (d) Client's failure to acquire binding acceptance of the Accountholder Agreement by the applicable Client Customer.

Solid will indemnify, defend and hold harmless Client, its Affiliates, and the directors, employees and agents of each (the "**Client Parties**") from and against any Losses arising out of any lawsuit, action, claim, demand, administrative action, arbitration or other legal proceeding brought or asserted against any Client Parties as a result of or in connection with: (a) Solid's breach of the Program Agreement or the Sponsor Bank Agreement; (b) Bank's or Solid's breach of Law or Network Requirements; (c) failure of the Banking Services, Card Services or Accountholder Agreement to comply with Law or Network Requirements; (d) any allegations that any intellectual property provided to Client by Solid violates or infringes on a third party's intellectual property; or (e) any unauthorized disclosure of Account Information.

**16.      Limitation of Liability.** NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE.

**17.      General**. The Program Agreement, represent the entire agreement between the parties pertaining to the Card Services and Banking Services. Any conflict between any Program Agreement will be resolved in favor of this Fee Schedule. Nothing in this Fee Schedule serves to establish a partnership, joint venture, or other agency relationship between Solid and Client, or with any Bank. Any modification to this Fee Schedule must be in a writing signed by both parties.

# EXHIBIT
# 3

**From:** "todd" <todd@solidfi.com>;
**Date:** Fri, Jan 20, 2023 06:59 AM
**To:** "刘嘉璇" <liujiaxuan@qbitnetwork.com>; "Sam Chan" <chenyuhua@qbitnetwork.com>;
**Cc:** "Raghav Lal" <raghav@solidfi.com>; "Abi John" <abi@solidfi.com>; "NateUrbassik" <nate@solidfi.com>;
**Subject:** Re: Solid / Qbit : Off-Boarding Customers - Communications and Timelines

Hi Jessie and Sam,

Our risk and compliance team has noticed unusual ACH activity in the Qbit Solid program.

This email confirms that Solid Financial Technologies, Inc. ("Solid") is hereby terminating, as of January 19, 2023, that certain Solid Banking and Card Services Fee Schedule (the "Agreement") between Solid and Bytechip, LLC ("Qbit") dated as of September 12, 2022, pursuant to Section 10(a) of the Fee Schedule of the Agreement (the "Fee Schedule") and Sections 13.2 and 13.3 of Addendum 1 of the Agreement (the "Addendum"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

To effect an orderly wind down consistent with applicable Law, all existing Financial Account balances will be distributed only to corresponding Qbit users who pass proper KYC review. Our team will reach out to you to discuss the details.

Except as expressly provided in this Letter, Solid expressly reserves all rights under the Agreement.

**Action items for termination :**

1. Qbit:

    1. Ensure all accounts have a $0 balance status for your program, including your cardholders/account holders, by February 17th, 2023.

        1. Accounts will be closed on February 17th, 2023. Funds left in accounts past this date will be returned to the approved KYC account holder's address via physical check.

    2. Pay any open invoices.

    1. Pay any pending transaction fees/dues/fraud losses/ACH returns, etc.
    2. Sign the Solid Termination DocuSign agreement. *(forthcoming)*

2. **Solid:**

    1. Provide a copy of open invoices, pending transaction fees/dues/fraud losses/ACH returns, etc.
    2. Solid will refund (if any) dues or reserves to Qbit.

Please let me know if you would like to discuss this further as soon as possible, given the deadline. A formal notice of termination is forthcoming via DocuSign.

Sincerely,
Todd


**Todd Boring**
Head of Customer Success at Solid
The Modern FinTech Platform

# EXHIBIT

# 4



**Yujun Wu <wyj0912@gmail.com>**

---

## Off-Boarding Customers - Communications
39 messages

---

**刘嘉旋 <liujiaxuan@qbitnetwork.com>**         Mon, Feb 13, 2023 at 12:16 PM
To: todd <todd@solidfi.com>, Raghav Lal <raghav@solidfi.com>, 吴羽君 <michael@qbitnetwork.com>, 宋雨柔
<yurou@qbitnetwork.com>, 陈宇华 <chenyuhua@qbitnetwork.com>

Hi Todd,

Sorry for bothering you. Since the last meeting, we discussed the details of the next steps, I also submitted the tickets
to ask for the bank letter. Unfortunately, I have not received the bank letter or any official documents showing that the
account is frozen by Evolve Bank and Trust yet, which means we could not provide evidence to our customer that this
is a helpless thing.

At the same time, our sales team suffered a lot of pressure from it. May we kindly ask for your help with the official
letter we could share with our customer? It is really necessary for us to better explain to our customers, hope you
could understand.

Any information or documents you may need, please let me know. We will try our best to cooperate with the
investigation!

Thanks a lot! Looking forward to your reply.

Kind regards,

---

**Todd Boring <todd@solidfi.com>**         Tue, Feb 14, 2023 at 2:36 AM
To: 刘嘉旋 <liujiaxuan@qbitnetwork.com>
Cc: Raghav Lal <raghav@solidfi.com>, 吴羽君 <michael@qbitnetwork.com>, 宋雨柔 <yurou@qbitnetwork.com>, 陈宇华
<chenyuhua@qbitnetwork.com>

Hi Jessie,

Thank you for reaching out, and I understand the importance of this letter for you and your customers. Unfortunately,
the bank is taking longer than expected to provide the letter. Abi, our Head of Banking Operations, has updated your
ticket.  He is the best person to handle your request , and we will update you as soon as we receive the letter.

I'll continue to monitor this ticket as well.

Please let me know if you need anything else.

Best,
Todd

### Todd Boring
Head of Customer Success at <u>Solid</u>
The Modern FinTech Platform

[Quoted text hidden]

---

**刘嘉旋 <liujiaxuan@qbitnetwork.com>**         Tue, Feb 14, 2023 at 12:13 PM
To: todd <todd@solidfi.com>
Cc: Raghav Lal <raghav@solidfi.com>, 吴羽君 <michael@qbitnetwork.com>, 宋雨柔 <yurou@qbitnetwork.com>, 陈宇华
<chenyuhua@qbitnetwork.com>

Hi Todd,

Thanks for your reply and understanding, hope this email finds you well.

As you may recall, the letter is vital for us to proceed with our current project, and we are eager to receive it as soon as possible.

I understand that there may be unforeseen circumstances that are causing the delay, but I would appreciate it if you could provide us with an update on the status of the letter. We want to make sure that we are aligned and can continue with our plans accordingly.

Thank you for your attention to this matter, and I look forward to hearing from you soon.

Best regards,

Jessie

------------------ Original ------------------
**From:** "todd"<todd@solidfi.com>;
**Date:** Tue, Feb 14, 2023 02:36 AM
**To:** "刘嘉旋"<liujiaxuan@qbitnetwork.com>;
**Cc:** "Raghav Lal"<raghav@solidfi.com>; "吴羽君"<michael@qbitnetwork.com>; "宋雨柔"<yurou@qbitnetwork.com>; "陈宇华"<chenyuhua@qbitnetwork.com>;
**Subject:** Re: Off-Boarding Customers - Communications

[Quoted text hidden]

---

**Michael Wu** <michael@qbitnetwork.com>                          Wed, Mar 15, 2023 at 10:32 PM
To: todd <todd@solidfi.com>, Raghav Lal <raghav@solidfi.com>
Cc: 宋雨柔 <yurou@qbitnetwork.com>, 陈宇华 <chenyuhua@qbitnetwork.com>, 刘嘉旋 <liujiaxuan@qbitnetwork.com>

Hi Todd and Raghav,

It has been **47 days (almost 7 weeks)** since our termination call. Still we got nothing from the bank. We actually haven't seen any official letter from the bank or from any official authority in the whole incident. We were just told by Solid and more than **5 millions** dollars of customers' funds are frozen in the account.

We don't think it is fair and legit. We partnered with other banks and financial institutions. We help them deal with several fraudulent wires so we know what the right way looks like. They will never freeze the whole account just because the fraudulent funds are transferred into. As we are regulated and hold the financial license in multiple jurisdictions, we process the customers' funds. It doesn't make any sense to freeze our whole account due to a couple of fraudulent transactions. The rest of the customers' funds are totally innocent.

Please see the attachment as how the other partner handled fraudulent transactions and communicated with us. They asked the information of the account holder and whether the remaining funds were enough to recover the loss due to the fraud. We helped them to send back the funds to the victim's account. I think that is the correct and more professional way to deal with fraudulent transactions.

The Silicon Valley Bank crash makes the customers no longer trust the banks. We cannot tell the customers that their funds are frozen without any official evidence. Therefore, after several legal consultations, we are seriously considering sue Solid or/and Evolve Bank & Trust to protect our customers' interest if next week neither of the items below happen:
- Funds not related to fraudulent transactions are released
- Official letter from the bank and have us direct conversation with the bank about this

Looking forward to your consideration.

Best

[Quoted text hidden]
--
Michael Wu | 吴羽君
Qbit CEO
LinkedIn | https://www.qbitnetwork.com
Hang Zhou | Silicon Valley | Singapore | Hong Kong

---

**Fraudent transaction example.pdf**
1862K



**Raghav Lal** <raghav@solidfi.com>                                    Thu, Mar 16, 2023 at 1:42 AM
To: Michael Wu <michael@qbitnetwork.com>
Cc: todd <todd@solidfi.com>, 宋雨柔 <yurou@qbitnetwork.com>, 陈宇华 <chenyuhua@qbitnetwork.com>, 刘嘉旋
<liujiaxuan@qbitnetwork.com>, Abi John <abi@solidfi.com>

Hi Michael,

I understand the predicament and are working diligently with our sponsor Bank Evolve - that is working on resolving
the fraud incidents/hold backs etc. No Bank is obligated to advise us on the details of any fraud investigation till it is
resolved. Having said that we are continually seeking a status/letter for you to ensure that the Bank is still investigating
this case.

Abi who you know is copied to provide any further information from the Bank.
Best,

**Raghav Lal**
Co-Founder and President at Solid.

[Quoted text hidden]
  [Quoted text hidden]
  [Quoted text hidden]
    [Quoted text hidden]


    [Quoted text hidden]
    [Quoted text hidden]

    **Todd Boring**
    Head of Customer Success at Solid
    The Modern FinTech Platform


    On Sun, Feb 12, 2023 at 8:16 PM, 刘嘉旋 <liujiaxuan@qbitnetwork.com> wrote:
      Hi Todd,

      Sorry for bothering you. Since the last meeting, we discussed the details of the next steps, I also submitted the
      tickets to ask for the bank letter. Unfortunately, I have not received the bank letter or any official documents
      showing that the account is frozen by Evolve Bank and Trust yet, which means we could not provide evidence
      to our customer that this is a helpless thing.

      At the same time, our sales team suffered a lot of pressure from it. May we kindly ask for your help with the
      official letter we could share with our customer? It is really necessary for us to better explain to our customers,
      hope you could understand.

      Any information or documents you may need, please let me know. We will try our best to cooperate with the
      investigation!

      Thanks a lot! Looking forward to your reply.

      Kind regards,

  [Quoted text hidden]

---

**Abi John** <abi@solidfi.com>                                         Thu, Mar 16, 2023 at 2:40 AM
To: Michael Wu <michael@qbitnetwork.com>
Cc: todd <todd@solidfi.com>, 宋雨柔 <yurou@qbitnetwork.com>, 陈宇华 <chenyuhua@qbitnetwork.com>, 刘嘉旋
<liujiaxuan@qbitnetwork.com>, Raghav Lal <raghav@solidfi.com>


Thanks Raghav!


Hi Michael,

Good day to you!

We understand you have expressed your standpoint regarding the freezing of the Bytechip account's (acc-6a5ff1ab-c2e2-4206-8e58-2aa74c5dd3cc & 2 others), and I want to assure you that we are constantly reminding the bank for documentation that can be shared.

To Give you the latest, the bank is currently in the process of investigating a high volume of transactions related to the 3 accounts of Qbit, and they are working in conjunction with the federal government. Please note that the Program will be notified of the outcome of the investigation via Solid as soon as the bank is able to provide us with the necessary documentation & the final instructions to Solid on the balances of these 3 accounts.

You must also know that it was just a couple of days back that the fraud department of the bank asked for further transactional details of various other accounts of your program and we have shared the information as requested by the bank. As and when IDs and transactional details are asked, it is being shared by Solid with the bank & therefore I know that this case is being worked on by them.

I understand that this is a difficult situation, and we are doing our best to move the investigation forward & closed at the earliest. We appreciate your ongoing patience while we work to resolve the issue with the bank. Having said the above, please understand, such investigations usually take time especially when the Feds are involved and therefore, I request that you kindly stay patient while we work through this. Thanks!

Regards,

**Abi John**

Head Ops @ Solid

[Quoted text hidden]

---

**Michael Wu** <michael@qbitnetwork.com>                                    Thu, Mar 16, 2023 at 11:27 PM
To: Abi John <abi@solidfi.com>
Cc: todd <todd@solidfi.com>, 宋雨柔 <yurou@qbitnetwork.com>, 陈宇华 <chenyuhua@qbitnetwork.com>, 刘嘉旋 <liujiaxuan@qbitnetwork.com>, Raghav Lal <raghav@solidfi.com>

Hi Abi and Raghav,

Thanks for the reply. However, after waiting for almost 7 weeks we don't really want to keep waiting in the darkness. What if we need to wait another 7 weeks or more? The customers don't trust the banks any more and we are facing enormous pressure and potential loss right now.

Firstly, could we or Solid request the bank release part of the funds in Bytechip that are not related to any fraudulent accounts.  It doesn't make any sense to hold all of the funds. If Solid does not want to request the bank for us, could you let us talk with the bank directly as we are also a licensed financial institution.

Secondly, please show us the official documents from the bank for freezing the accounts. I don't really understand why it takes so long to get the documents.  And question whether it is legit that even if there are no official documents, our millions of dollars can be frozen for such a long time.

Again if we cannot see any progress next week, I'm afraid we will take further action such as initiating the lawsuit. There are a couple of reputable firms in the bay area and NY willing to help us.

Best
[Quoted text hidden]

# EXHIBIT
# 5



Triad Centre I
6000 Poplar Avenue
Suite 300
Memphis, TN 38119

866.367.2611

June 20, 2023

Solid
c/o Abi John
2955 Campus Dr. #110
San Mateo, CA 94403

Evolve Bank & Trust has requested that the following accounts be frozen due to their involvement in unsatisfactory banking practices.

| Last 4 | User | Amount |
|--------|------|--------|
| 6238 | RINOTECH INC | $ 7,179.50 |
| 5672 | GATCHA PICTURES | $ 672,493.69 |
| 1162 | BYTECHIP | $ 4,336,961.74 |
| Total | | $ 5,016,634.93 |

If unauthorized misuse of the accounts is suspected, we would encourage reporting such misuse to the FBI's Internet Crime Complaint Center (IC3.gov) or to their local FBI Field office.

Sincerely,

*Becky Cox*

Becky Cox
Financial Crimes Manager, ID Theft Officer
Evolve Bank & Trust

cc: Robert Ducklo, General Counsel & Corporate Secretary, Evolve Bank & Trust



getevolved.com