Vijay J. Rajagopal, State Bar No. 290886
  *vijay@kurichetylaw.com*
**KURICHETY LAW PC**
179 McKnight Drive, Suite 6
Laguna Beach, California 92651
Tel:    217-390-2505

Michael Kozlowski (*pro hac vice*)
  Illinois State Bar No. 6320950
  *michael.kozlowski@esbrook.com*
**ESBROOK PC**
321 N. Clark Street Suite 1930
Chicago, Illinois 60654
Tel:    (312) 319-7682

Attorneys for Plaintiff
MICHAEL MASHKEVICH, on behalf of
himself and all others similarly situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated, | ) )  Case Number: 5:25-cv-02565-SVK |
| Plaintiff(s), | ) ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES IN SUPPORT TO** *EX* |
| | ) *PARTE* **MOTION FOR TEMPORARY** |
| vs. | ) **RESTRAINING ORDER** |
| | ) |
| UAB QBIT FINANCIAL SERVICE; BYTECHIP LLC d/b/a QBIT and QBITPAY; and YUJUN WU a/k/a MICHAEL WU, | ) ) ) |
| Defendant(s). | ) ) ) |

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ................................................................. 11

*Astrove v. Doe,*
  No. 22-CV-80614-RAR, 2022 WL 2805315 (S.D. Fla. Apr. 22, 2022) .................................. 12

*Avidor v. Sutter's Place, Inc.,*
  (2013) 212 Cal.App.4th 1439 ................................................................. 15

*Bandyopadhyay v. Defendant 1,*
  2022 WL 17176849 (S.D. Fla. Nov. 23, 2022)................................................. 22

*Barahona-Gomez v. Reno,*
  167 F.3d 1228 (9th Cir. 1999) ................................................................. 23

*Bent v. Barr,*
  445 F. Supp. 3d 408 (N.D. Cal. 2020) ....................................................... 10, 11

*Blum v. Defendant 1,*
  2023 WL 8880351 (N.D. Fla. Dec. 23, 2023) ............................................... 12, 21, 22

Bowen v. Li,
  No. 23-CV-20399, 2023 WL 2346292 (S.D. Fla. Mar. 3, 2023)............................ 22

*Bullock v. Doe,*
  No. 23-CV-3041 CJW-KEM, 2023 WL 9503380 (N.D. Iowa Nov. 3, 2023)......... 17

*Chow v. Defendant 1,*
  2024 WL 3225917 (E.D. La. Apr. 19, 2024)................................................ 22

*Fitzgerald v. Defendant 1,*
  2024 WL 3538245 (S.D. Fla. June 28, 2024)............................................... 22

*Gaponyuk v. Alferov,*
  No. 23-CV-01317, 2023 WL 4670043 (E.D. Cal. July 20, 2023)....................... 13, 23

*Ghirardo v. Antonioli,*
  (1996) 14 Cal.4th 39 ................................................................. 16

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 ................................................................................ 12

*Heissenberg v. Doe*,
   No. 21-CIV-80716, 2021 WL 8154531 (S.D. Fla. Apr. 23, 2021) .................................... 13, 17

*Hikmatullaev v. Villa*,
   No. 23-CV-22338, 2023 WL 4373225 (S.D. Fla. June 28, 2023) ........................................ 21

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ............................................................ 11, 14

*Hoggan v. Specialized Loan Servicing*, LLC,
   No. 2:21-CV-01862-TLN-CKD, 2021 WL 5180150 (E.D. Cal. Nov. 8, 2021) ...................... 10

*Jacobo v. Doe*,
   No. 22-CV-00672, 2022 WL 2079766 (E.D. Cal. June 9, 2022) .................................... *passim*

*Joe Hand Promotions, Inc. v. Albright*,
   2013 WL 2449500 (E.D. Cal. June 5, 2013) ........................................................ 14

*Joe Hand Promotions, Inc. v. Roseville Lodge No. 1293*,
   161 F. Supp.3d 910 (E.D. Cal. 2016)............................................................ 14

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) .................................................................. 23

*Jorgensen v. Cassiday*,
   320 F.3d 906 (9th Cir.2003) ................................................................... 23

*Reebok Int'd Ltd. v. Marnatech Enterprises, Inc.*,
   737 F. Supp. 1521 ............................................................................ 12

*Reno Air Racing Ass'n, Inc. v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) ............................................................... 11, 21

*Republic of the Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir.1988) ................................................................. 14

*Save Strawberry Canyon v. Dep't of Energy*,
   No. C 08-03494 WHA, 2009 WL 1098888 (N.D. Cal. Apr. 22, 2009).................................. 10

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 ................................................................................. 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ................................................................................................ 10

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) .................................................................................................... 11

Rules

Fed. R. Civ. P. 65(b) .................................................................................. 11, 18, 23

Other Authorities

Civil L.R. 65 .............................................................................................................. 23

# **TABLE OF CONTENTS**

I.   INTRODUCTION ……………………………………………………......4

II.  BACKGROUND………………………………………………………4 - 5

     A.  Pig Butchering Briefly Explained …………………….……………5 - 6

     B.  Mashkevich is "Pig Butchered"…………………………………… 6 - 9

     C.  Inca Confirms the Scheme and Traces Stolen Assets…………………9 – 11

          1.  Inca's Forward Tracing………………………………………10 - 11
          2.  Inca's Reverse Tracing………………………………………11

     D.  Mashkevich Files His Verified Complaint in Alabama
         and Obtains Injunctive Relief………………………….……………..11 – 12

     E.  Defendant Qbit Contents the Preliminary Injunction 12 - 13

III. LEGAL STANDARD …………………………………………………...13

     A.  Temporary Restraining Orders Evaluated on the Sliding Scale………...13 - 14
     B.  Notice is Not Required…………………………………………………14
     C.  Cryptocurrency is Especially Appropriate for Injunctive Relief
         Because it is Traceable………………………………………………14 - 15
     D.  Injunctive Relief Involving Non-Party Cryptocurrency
         Exchanges is Appropriate……………………………………………15 - 16

IV.  ARGUMENT………………………………………………………......16 - 17

     A.  The Sliding Scale Analysis Demonstrates that Plaintiff is
         Entitled to a TRO……………………………………………………17

          1.  Plaintiff is Likely to Succeed on the Merits……………………17 – 20
          2.  Plaintiff is Likely to Suffer Irreparable Harm
              in the Absence of Injunctive Relief…………………………20 – 21
          3.  The Balance of Equity Tips Sharply in
              Favor of Injunctive Relief………………………………21 – 22
          4.  The Injunction Serves the Public Interest……………………...22 - 24

     B.  No Further Notice is Required……………………………………24 - 26
     C.  No Bond Should be Required…………………………………....26 - 27

V.   CONCLUSION………………………………………………………...27

1

## I.    INTRODUCTION

2
3    The Court should grant the requested temporary restraining order ("TRO") in order to
4    maintain the status quo preserving Plaintiff and the Class' only feasible means of recovering the
5    millions of dollars belonging to Plaintiff and the Class that Defendants acquired through the
6    unlawful pig butchering scheme explained in detail in the Complaint.  Doing so secures meaningful
7    recovery for Plaintiff and the Class while presenting minimal burden on Defendants.  In stark
8    contrast, denying the request could result in millions of dollars of ill-gotten profits from the scheme
9    being "off ramped" by Defendants from the blockchain into fiat currency, resulting in a total loss
10   to Plaintiff and the Class without hope of recovery.
11        To be clear, the wallet that is the subject of this TRO–the THGTen Destination Wallet (as
12   defined in the Complaint) controlled by Defendants–is already frozen pursuant to the temporary
13   restraining order and preliminary injunction entered by the Honorable Christopher Abel in
14   Alabama. (Dkt. Nos. 1-1 and 1-2.)  Approximately seven months after the funds were frozen, Qbit
15   filed a "Nonparty Motion to Dissolve" the preliminary injunction issued in Alabama, claiming
16   ownership over the THGTen Destination Wallet. (Dkt. 1-10.)  While Qbit's motion is groundless
17   on the merits, it did raise the issue of personal jurisdiction, which may prevent the Alabama court
18   from maintaining the preliminary injunction over the THGTen Destination Wallet and thus give
19   Defendants the ability to evade accountability and forever put Plaintiff and Class Members' funds
20   out of reach.  Faced with this potentially catastrophic risk, Plaintiff filed this action against Qbit,
21   its affiliate Bytechip, and their common owner Yujun Wu out of an abundance of caution to ensure
22   proper jurisdiction over Defendants and maintenance of the status quo.  Plaintiff intends to proceed
23   against Defendants here–all of whom are located in California–and the defendants in the Alabama
24   Action (Olivia Ava, Emma Miller, F.B. Lee, and remaining fictitious defendants) in Alabama. In
25
26
27
28

the interim between Qbit's filing in Alabama and the filing of this action, Plaintiff–and his counsel–spent considerable time and effort to identify the specific Defendants, retain California counsel, and assemble the detailed factual allegations, which is the reason Plaintiff did not immediately file this action.  (Kozlowski Declaration dated March 17, 2025 ["Kozlowski Decl."], attached hereto as Exhibit A, ¶ 2.)

## II.    BACKGROUND

### A.    Pig Butchering Briefly Explained

"Pig butchering" is typically a scheme in which scammers promise victims returns and then fabricate evidence of positive performance on fake websites made to look like real websites of legitimate, well-known companies.  Scammers typically promise victims they will be paid for performing standardized online work or earn returns on unique investment opportunities. The initial stages of the scam involve convincing victims that they need to deposit or invest cryptocurrency to access the commissions they will be earning or to fund their investment accounts.  The websites on which the work is performed, or investments are made, and the corresponding performance metrics (including the supposed commissions or profits the victim is earning) are all fake.  The "butcherers" do this to make the work and investments look legitimate for the purpose of enticing victims to deposit or invest more cryptocurrency into wallets controlled by the butcherers.  When the victims have been sufficiently "fattened" with false commissions and/or profits, scammers steal the victims' cryptocurrency and cover their tracks by moving the stolen property through a maze of subsequent laundering transactions.  "Pig butchering" victims in the United States have lost billions of dollars and the scam remains active and unabated to this day, an alarming trend that has led to "pig butchering" schemes being the subject of numerous

state and federal government investigations and prosecutions[1], including an action which resulted in the forfeiture to the Department of Justice of more than a million dollars by Defendant Bytechip LLC, as discussed in the Complaint.

### B.    Mashkevich is "Pig Butchered"

Mashkevich owns a digital marketing agency that provides search engine optimization services for companies.  (Mashkevich Declaration dated March 17, 2025 ["Mashkevich Decl."], attached hereto as Exhibit B, ¶ 3.)  The agency is a single member LLC and Mashkevich has no employees.  (*Id*.)  Around March 20, 2024, a person representing himself as F.B. Lee ("Lee") contacted Mashkevich via WhatsApp regarding part-time online work.  (*Id*. at ¶ 5.)  Lee initially represented that the work involved a company called Grayphite, an international app marketing company where app developers publish their apps.  (*Id*.)  Lee represented that the work would be remote without any fixed time limits, and that all Mashkevich needed was a phone or computer to begin.  (*Id*.)  Mashkevich was led to believe he would be compensated based on a standardized commission schedule.  (*Id*.)  Lee explained that Mashkevich could withdraw money earned but would be required to replenish funds in order to "reset" any tasks to be performed in the future. (*Id*.)

After some training from Lee, Mashkevich began performing what he thought were tasks associated with optimizing applications for Grayphite.  (Mashkevich Decl. at ¶ 7.)  On March 29, 2024, Mashkevich sent an initial deposit of $110 of USDC, a cryptocurrency, from his Coinbase

---

[1] *See* FinCEN Alert of Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering," U.S. Treasury Financial Crimes Enforcement Network Sep. 8, 2023, https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf.

account to an account that Lee represented was part of the work platform.  (*Id*.)  Mashkevich subsequently performed tasks on this work platform and received payments for these tasks.  (*Id*.) Mashkevich was permitted to withdraw funds but was required to replenish funds to receive amounts from additional work.  (*Id*.)  Lee represented that Mashkevich could make larger commissions if he deposited larger amounts, which Mashkevich did.  (*Id*.) Mashkevich was shown an online cyberwallet balance that purportedly reflected his monetary balance in the system.  (*Id*. at ¶ 8.)  Lee told Mashkevich to withdraw cryptocurrency each day but then to put it back in because there must be 100 USDT[2] in Mashkevich's online "account" to authorize him to perform the optimization tasks.  (*Id*.)

After Lee persuaded Mashkevich he could withdraw his cryptocurrency at any time, Mashkevich began encountering so-called "combination tasks" during what Mashkevich thought was his legitimate app optimization work.  (Mashkevich Decl. at ¶ 9.).   These so-called "combination tasks" would cause Mashkevich's "balance" to show in the negative.  (*Id*.)  Lee would then convince Mashkevich that he needed to transfer greater amounts of cryptocurrency into the system to "free up" higher commissions.  (*Id*.)  Just over two weeks into this process, the system began increasing the amount Mashkevich must transfer into the system to earn his "commissions."  (*Id*. at ¶ 10.)

Ultimately, Mashkevich began transferring funds from bank accounts and converting them to cryptocurrency, borrowing funds from friends, and extending his financial commitment to what he believed to be a legitimate online enterprise.  (Mashkevich Decl. at ¶ 11.).  Mashkevich would

---

[2] "USDT" refers to that certain Virtual Currency commonly referred to as Tether, which is a stablecoin designed to maintain a stable value of approximately $1 per 1 USDT.  (Zarazinski Declaration dated March 17, 2025 ["Zarazinski Decl."], attached hereto as Exhibit C, ¶ 43.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

commit an additional large amount of funds, in part because Lee told him that he fronted some of the money Mashkevich needed to put into the system, and the system then displayed an amount that had purportedly been transferred into Mashkevich's account by Lee.  (*Id*.)

On April 9, 2024, after Mashkevich had transferred significant amounts of cryptocurrency and his "account" showed additional money placed in the account by Lee, Lee texted Mashkevich that "[m]y suggestion is that you can relax tonight and wait for the joy of withdrawing funds tomorrow."  (Mashkevich Decl. at ¶ 12.)  Mashkevich responded "[y]ea, i can't wait to see the funds back in Coinbase" and "I'm excited to pay you and my sister and Kevin back."  (*Id*.)

The following day on April 10, 2024, Mashkevich tried to withdraw his funds, was unable to do so, and reached out to Lee on WhatsApp.  (Mashkevich Decl. at ¶ 13.)  He was told his "credit score" on the platform had dropped to 80%, and he needed to restore the score to access his cryptocurrency.  (*Id*.)  Lee notified Mashkevich that he had two options to restore his credit score: (1) pay $20,000 ($1,000 per point he needed to restore) and reset his credit score immediately; or (2) wait 10 months for the score to return to 100%.  (*Id*. at ¶ 14.)  Mashkevich added additional cryptocurrency to his account, purportedly to correct his credit score so he could withdraw the "commissions" he thought he had earned. (*Id*. at ¶ 15.)

Lee told Mashkevich on April 17, 2024, that he could not withdraw his commissions because he owed taxes on them.  (Mashkevich Decl. at ¶ 15.).  Lee once again offered to assist Mashkevich, this time by supposedly transferring cryptocurrency into Mashkevich's account.  (*Id*.) Lee communicated with Mashkevich on April 19, 2024, to convince him that the FBI was involved because Lee unwittingly "helped" him with stolen funds.  (*Id*. at ¶ 16.)  Mashkevich asked Lee for a copy of the police report, but Lee failed to provide one.  (*Id*. at ¶ 17.)  WhatsApp conversations

between Lee and Mashkevich continued until April 27, 2024, which Mashkevich concluded by stating "[t]oo many bad people and liars stealing money that they don't deserve." (*Id*.).

On April 6, 2024, after Mashkevich had been interacting with Lee, someone representing herself as Emma Miller ("Miller") contacted Mashkevich about an additional related job opportunity that involved similar online work. (Mashkevich Decl. at ¶ 18.) The process with Miller was identical in all material respects to the one orchestrated by Lee. (*Id*. at ¶ 19.) The only notable distinction is that, whereas Lee convinced Mashkevich he was working on app optimization for Grayphite, Miller convinced Mashkevich she was working on app optimization for the online reservation platform Resy. (*Id*.) As with Lee, Miller trained Mashkevich and he had the opportunity to withdraw small amounts of cryptocurrency before encountering "combination tasks" that required additional investment. (*Id*.) This continued through April 24, 2024, when Mashkevich informed Miller "I'm done with all the optimization programs. Lost too much money." (*Id*.)

In all, Mashkevich lost approximately $90,000.

### C.    Inca Confirms the Scheme and Traces Stolen Assets

Inca Digital ("Inca") and Adam Zarazinski ("Zarazinski"), Chief Executive Officer of Inca, investigated the pig butchering scheme which lured Plaintiff and others similarly situated to deposit or "invest" their cryptocurrency. (Zarazinski Decl., ¶ 1.) Inca Digital is a digital asset intelligence company that provides data, analytics, and expertise to many of the world's leading exchanges, financial institutions, regulators, and government agencies. (*Id*. at ¶ 2.) Zarazinski and Inca have been investigating "pig butchering" schemes for over four years. (*Id*. at ¶ 4.) Inca's and Zarazinski's investigation led to their conclusion that Plaintiff was clearly a pig butchering scheme victim, as explained below and in Zarazinski's Declaration. (*Id*.)

Zarazinski explains in his Declaration how the Scammers attempted to conceal their conversion of the Class Members' cryptocurrency through a series of online transactions designed to hide their trail. Zarazinski and Inca were able to trace and connect the Scammers' transactions, follow the trail, and identify several of the cryptocurrency wallets that held and/or hold the cryptocurrency funds of Mr. Mashkevich and members of the Class, one of which is the THGTen Destination Wallet. (*Id.* at ¶ 8.)

Inca's investigation involved two phases, employing "rigorous blockchain forensic techniques." (*Id.* at ¶ 12.) Inca first "forward traces" funds from Plaintiff's wallet to the Deposit Wallets, through the Pivot Wallets, and ultimately to the Destination Wallets, including the THGTen Destination Wallet. Inca then "reverse traces" the flow of funds into the wallet addresses. (*Id.* at ¶ 13.) By performing this digital forensic tracing, Inca and Zarazinski were able to determine that additional cyberwallet addresses matched Plaintiff's flow of funds as part of a common scheme involving Class Members. (*Id.* at ¶ 25)

### 1.    Inca's Forward Tracing

Inca uses a three-step analysis for its forward tracing of the deposited funds. First, it identifies the "Deposit Wallet" addresses[3] that initially received Plaintiff's cryptocurrency. Second, it tracks the transfer of funds from those addresses to pivot[4] and "swap router and bridge" addresses. Next, it tracks those same funds through a series of wallet addresses to the "Destination Wallets" set forth in Appendix B to the Complaint, each categorized by exchange.

Zarazinski explained in his Declaration how this process works. To avoid repetition, Plaintiff refers to the Declaration and notes herein that Plaintiff provided screenshots to Inca that identified the Deposit Wallet addresses to which Plaintiff initially sent his cryptocurrency. From there, Zarazinski explains the function of swap router and bridge addresses, how those addresses

---

[3] Such Deposit Wallet addresses are set forth in Appendix A to the Complaint, which also includes additional Deposit Wallet addresses that received other Class Members' cryptocurrency.
[4] Such wallet addresses are referred to as "Pivot Wallets" in the Complaint.

were used to convert Plaintiff's funds to a different cryptocurrency, and how Defendants or their co-conspirators then routed the converted cryptocurrency to the TRON blockchain. (*Id.* at ¶ 23.) Inca can continue tracing Plaintiff's cryptocurrency on the TRON blockchain through transfers to a variety of intermediate wallets before final deposits are made into specific deposit wallets at a number of exchanges. (*Id.* at ¶ 24.) The conclusion of this forward tracing process is an identification of the precise crypto wallet addresses into which Plaintiff's funds were deposited (i.e., the Destination Wallets) and the cryptocurrency exchanges that host each such wallet.

### 2. Inca's Reverse Tracing

Once Inca has identified the Destination Wallets into which Plaintiff's funds were deposited and the cryptocurrency exchanges that host each such wallet, Inca can then reverse trace the funds. By doing so, Inca can determine which addresses were part of the common pattern of transactions that were involved in the three steps identified during Inca's forward tracing. This process enables Inca to identify the potential number of Class Members and to determine the approximate U.S. dollar value of the cryptocurrency the Class Members deposited into the Defendants or their co-conspirators' scheme. (*Id.* at ¶ 25.)

### D. Mashkevich Files His Verified Complaint in Alabama and Obtains Injunctive Relief

On June 4, 2024, Plaintiff filed an original action in the circuit court of Marshall County, Alabama against Defendants Ava, Miller, and Lee. (Dkt. 1-9.) He pled a cause of action for conversion and a request for injunctive relief. (*Id.*) He simultaneously filed an emergency motion for a temporary restraining order and for an order to show-cause why a preliminary injunction should not issue. That same day, the court granted Plaintiff's motion, ordering the freeze of the Destination Wallets set forth in Appendix B of the Complaint in this action, and scheduled the preliminary injunction hearing for June 14, 2024. (Dkt. 1-1.) On June 8, the crypto exchanges froze the Destination Wallets. (Declaration of R. Riley dated March 18, 2025 ["Riley Decl."],

attached ehreto as Exhibit D, ¶ 12.)    And that same day, Plaintiff completed service on the Destination Wallets through a special process approved in the June 4, 2024 TRO Order.  (*Id.*)

On June 14, 2024, the court in Alabama held its hearing and issued a Preliminary Injunction Order.  (*Id.* at ¶ 13.)   The order enjoined the Defendants and non-party exchanges at which Plaintiff's stolen funds were held from "withdrawing, transferring, selling, encumbering, or otherwise altering any of the cryptocurrency or assets held in the wallet addresses" of the Destination Wallets listed in Appendix B of the Complaint in this action.  (Dkt. 1-2.)   No defendants appeared at the hearing to contest the injunction.  (*Id.*)

### E.    Defendant Qbit Contests the Preliminary Injunction

On January 20, 2025, over seven months after the initial freeze, Qbit Financial Service filed a Motion to Vacate or Modify the Court's June 14, 2024 Order granting a Preliminary Injunction arguing *inter alia* that the Alabama court lacks jurisdiction.  (Dkt. 1-10.) Claiming ownership of the THGTen Destination Wallet, Qbit relied on a declaration from Qbit CEO Yujun Wu, who is a Defendant in this action, as its only evidence. A hearing for the motion was set for February 7, 2025.

On February 4, 2025, Plaintiff filed an Omnibus motion to strike Yujun Wu's declaration and response to Qbit's motion to dissolve, as well as a motion to continue the hearing on Qbit's motion to dissolve. (Dkt. 1-11.)  Qbit filed a response to the motion to continue the same day.  On February 6, 2025, the court granted Plaintiff's motion to continue the hearing on Qbit's motion to dissolve.

On Friday, February 14, 2025, the court held its continued hearing.  (Riley Decl., ¶ 14.) Any day, the Alabama court could dissolve the injunction, allowing Defendants to transfer the

assets within the THGTen Destination Wallet, rendering recovery essentially impossible. (*Id.* at ¶ 15.)

### III.    LEGAL STANDARD

Temporary restraining orders are properly issued to preserve the status quo pending a hearing on the request for a preliminary injunction. *Hoggan v. Specialized Loan Servicing*, LLC, No. 2:21-CV-01862-TLN-CKD, 2021 WL 5180150 at *6 (E.D. Cal. Nov. 8, 2021); see also *Save Strawberry Canyon v. Dep't of Energy*, No. C 08-03494 WHA, 2009 WL 1098888 at *2 (N.D. Cal. Apr. 22, 2009) (recognizing a district judge's "longstanding discretion . . . to preserve the *status quo* with provisional relief."). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Here, the preservation of the status quo freeze on Defendants' THGTen Destination Wallet is absolutely vital to give the Plaintiff and Class Members' a chance at recovering their stolen funds.

#### A.    Temporary Restraining Orders Evaluated on the Sliding Scale

"The legal standard governing TROs is 'substantially identical' to that governing preliminary injunctions." *Bent v. Barr,* 445 F. Supp. 3d 408, 415–16 (N.D. Cal. 2020) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001)). "A petitioner seeking either form of injunctive relief must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Bent,* 445 F.

Supp 3d at 415-16 (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

Courts in the Ninth Circuit use a "sliding scale" approach to evaluate these factors, according to which "a stronger showing of one element may offset a weaker showing of another." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). One permutation of the "sliding scale" approach sufficient to warrant the entry of a TRO and preliminary injunction is referred to as the "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under the "serious questions" test, injunctive relief is warranted where "serious questions going to the merits" are raised and "the balance of hardships tips sharply in plaintiff's favor." *Id.* Importantly, the "serious questions" test is but "one alternative on a continuum" of the sliding scale approach and is not only yardstick against which the propriety of injunctive relief is measured. *Id.*

## B.      Notice is Not Required

The Court may issue a TRO, without notice, if (1) it clearly appears that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (2) the movant's attorney certifies to the court in writing any efforts made to give notice and the reasons why it should not be required. *See* Fed. R. Civ. P. 65(b); *Reno Air Racing Ass'n, Inc. v. McCord,* 452 F.3d 1126, 1130-31 (9th Cir. 2006). Both requirements are satisfied here.

## C.      Cryptocurrency is Especially Appropriate for Injunctive Relief Because it is Traceable

1

2    Further, the cryptocurrency transferred to Defendants by Mr. Mashkevich and the other

3    members of the Class entails specific, identifiable property.  By its very nature, cryptocurrency

4    has a unique and specific identification within the blockchain; indeed, it is this attribute from which

5    cryptocurrency derives its value in being specific and identifiable.  It is for these reasons courts

6    regularly issue ex parte injunctive relief–like the TRO sought here–freezing assets in tainted

7    wallets, noting that "[t]he cryptocurrency assets at issue are specific, identifiable property and can

8    be traced in JOHN DOE's assets in the Destination Addresses or elsewhere." *Astrove v. Doe*, No.

9    22-CV-80614-RAR, 2022 WL 2805315 at *3 (S.D. Fla. Apr. 22, 2022) (granting *ex parte*

10   temporary restraining order in a cryptocurrency scheme, finding the "[p]laintiff has shown a strong

11   likelihood of success on the merits of his claims," including a claim for conversion); accord *Blum*

12   *v. Defendant 1*, No. 3:23-CV-24734-MCR-HTC, 2023 WL 8880351 at *3 (N.D. Fla. Dec. 23,

13   2023) (granting an *ex parte* temporary restraining order and holding, "Blum's cryptocurrency

14   assets are specific and identifiable property and have been traced to Defendants' Destination

15   Addresses.").

16       **D.    Injunctive Relief Involving Non-Party Cryptocurrency Exchanges Is**

17              **Appropriate.**

18

19       The Court's authority to issue injunctive relief is not limited to orders directed towards

20   Defendants; the authority extends to banks and other non-parties that have custody of Defendants'

21   assets or provide payment services to Defendants. *See Reebok Int'd Ltd. v. Marnatech Enterprises,*

22   *Inc.*, 737 F. Supp. 1521, 1527–28 (TRO and preliminary injunction order stating that "any banks,

23   savings and loan associations, or other financial institutions ... who receive actual notice of this

24   order by personal service or otherwise, are preliminarily enjoined from transferring, disposing of,

25   or secreting any money, stocks or other assets of these defendants, until further order of the court"

26   except in limited circumstances); *Gucci Am., Inc. v. Weixing Li,* 768 F.3d 122, 132-33 (rejecting

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

argument that plaintiff had to identify particular property derived from counterfeiting before obtaining TRO and preliminary injunction freezing all assets).  Accordingly, the Court has the power to direct injunctive relief towards non-party cryptocurrency exchanges that hold Defendants' wallets, including the OKX exchange where the THGTen Destination Wallet is held.

## IV.    ARGUMENT

As explained in more detail below, the Court should enter the requested temporary restraining order–immediately and without further notice to Defendants–because Plaintiff has demonstrated all necessary elements and doing so will only preserve the status quo and not subject Defendants to any additional burden or harm.

Other courts around the country regularly issue injunctive relief to protect potential recovery in similar circumstances.  (*See* Dkt. 1-11 at pp. 49-94.)  Cryptocurrency poses a heightened risk of asset dissipation as digital funds can be transferred instantly and irreversibly. *Jacobo v. Doe*, No. 22-CV-00672, 2022 WL 2079766 at *5 (E.D. Cal. June 9, 2022); *accord Heissenberg v. Doe*, No. 21-CIV-80716, 2021 WL 8154531 at *2 (S.D. Fla. Apr. 23, 2021).  As the Court reasoned in Jacobo, another pig butchering case, "if defendant were provided notice of this action, 'it would be a simple matter for [him] to transfer [the cryptocurrency] to unidentified recipients outside the traditional banking system, including contacts in foreign countries, and effectively put it beyond the reach of this [court].'" *Id.*, at *9. (Citation omitted).  This is in part because cryptocurrency's "independence from traditional custodians makes it difficult for law enforcement to trace or freeze cryptocurrencies in the event of fraud or theft[.]" *Id.*  It is for these reasons that courts have routinely "granted ex parte relief in situations like this one, noting the risks that cryptocurrencies may rapidly become lost and untraceable." *Gaponyuk v. Alferov*, No. 23-CV-01317, 2023 WL 4670043 (E.D. Cal. July 20, 2023) at *2 (citing *Jacobo, supra*).  It is for

this reason that the court in Alabama granted Plaintiff's June 4 ex parte application, without notice, for precisely the type of TRO and OSC that is requested in the present case. Likewise, it is for this reason that in June 27, 2024 Judge Berle of Los Angeles Superior Court granted an ex parte application, without notice, for precisely the type of TRO that is requested in the present case. (A true and correct copy of Judge Berle's Order is attached hereto as Exhibit E.)

A.    **The Sliding Scale Analysis Demonstrates that Plaintiff is Entitled to a TRO**

1.    **Plaintiff is Likely to Succeed on the Merits**

Plaintiff is likely to prevail on the merits of his claims. To establish a substantial likelihood of success on the merits, a Plaintiff must show 'a fair chance of success.' *In re Focus Media Inc.*, 387 F.3d at1086 (quoting *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir.1988) (en banc). However, "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only serious questions going to the merits." *hiQ Labs, Inc.,* 31 F.4th at 1188 (quotation omitted). Plaintiff is likely to prevail on his claims under either standard.

To establish conversion, Plaintiff need only establish that: (1) Plaintiff owned or had a right to possess the property at issue; (2) Defendants substantially interfered with Plaintiff's property by knowingly or intentionally taking possession of it, preventing Plaintiff from accessing it, or refusing to return the property to Plaintiff; (3) Plaintiff did not consent to the interference; (4) Plaintiff was harmed; and (5) Defendant's conduct was a substantial factor in causing Plaintiff's harm. *Judicial Council of California Civil Jury Instructions No. 2100* (2024). "Because conversion is a strict liability claim, a defendant's 'good faith, lack of knowledge, motive, or intent are not relevant' in establishing a claim for conversion." *Joe Hand Promotions, Inc. v. Roseville Lodge No. 1293*, 161 F. Supp.3d 910, 916 (E.D. Cal. 2016) (quoting *Joe Hand Promotions, Inc. v. Albright*, 2:11-cv-02260-WBS-CMK, 2013 WL 2449500, at *8 (E.D. Cal. June 5, 2013)).

Similarly, to establish a claim for money had and received, Plaintiff need only demonstrate Defendants received money that was intended to be used for the benefit of Plaintiff; that these funds were not used for Plaintiff's benefit; and that defendant has not given the money to Plaintiff. *Judicial Council of California Civil Jury Instructions No. 370* (2024).[5]

Here, Mr. Mashkevich's Declaration and the well-pled allegations of his Complaint clearly show that these elements are met. The Declaration and allegations establish that he transferred identifiable cryptocurrency under fraudulent pretenses that is not within wallets owned and/or or controlled by Defendants including the THGTen Destination Wallet. Defendants or their co-conspirators orchestrated all of this through fake websites and fake account balances that purported to show the "commissions" that Mashkevich had earned. Mashkevich made ever increasing cryptocurrency transfers because Defendants or their co-conspirators represented that the transfers were necessary to free-up the "commissions" Mashkevich was led to believe that he earned for online optimization work. Instead, Plaintiff suffered a total loss of his cryptocurrency and the funds with which he used to purchase it. Accordingly, Defendants converted Mashkevich's property.

Plaintiff is also likely to prevail on his claims of unjust enrichment and money had and received. For a claim of money had and received, a plaintiff must show that a defendant received money intended for plaintiff's benefit and neither used the money for plaintiff's benefit nor returned the money. *Judicial Council of California Civil Jury Instructions*, No. 370 (2024); see also *Avidor v. Sutter's Place, Inc.* (2013) 212 Cal.App.4th 1439, 1454. Similarly, to support a claim for unjust enrichment, a plaintiff must show that a defendant received a benefit from another

---

[5] Available at
https://courts.ca.gov/system/files/202408/judicial_council_of_california_civil_jury_instructions_2024.pdf

and retained it unjustly at the plaintiff's expense.  See *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51.

Here, Mr. Mashkevich's Declaration and the well-pled allegations of his Complaint again clearly show he is entitled to relief.  They establish that Defendants or their co-conspirators induced Mr. Mashkevich and other class members to send money on false promises of "earnings" through an entirely fraudulent work platform. These funds were never used for their stated purpose but were instead funneled through crypto wallets controlled by the Defendants or their co-conspirators before eventually reaching the frozen Destination Wallets, including Defendants' THGTen Destination Wallet.  Defendants neither returned nor intend to return the money that rightfully belongs to Mr. Mashkevich and the other Class Members, making both causes of action likely to succeed.

Finally, Plaintiff is likely to prevail on his claims of conspiracy and aiding and abetting. To prove conspiracy, a plaintiff must show: 1) that a defendant was aware their conspirators planned to convert plaintiff's funds; and 2) that the defendant agreed with their conspirators and intended the conversion be carried out.  *Judicial Council of California Civil Jury Instructions*, No. 3600 (2024).  To prove a claim of aiding and abetting, a plaintiff must show: 1) that a defendant knew conversion was being committed against plaintiff; 2) that the defendant gave substantial assistance or encouragement; and 3) that the defendant's conduct was a substantial factor in causing harm to the plaintiff. *Id.*, Rule 3610.

Here, the fraudulent work platform was a coordinated effort involving multiple actors, including individuals who induced Mr. Mashkevich to deposit funds, maintained the websites used to further the common scheme, and controlled the wallets used to hide the funds and to convert

them into usable fiat currency.  Defendants acted in concert to facilitate the theft and obfuscation of funds, making conspiracy and aiding and abetting likely to succeed.

Each of these reasons, and the well-pled allegations set forth in the Complaint in this action, clearly show that Mr. Mashkevich and the other similarly situated Class Members are entitled to their requested relief.

**2.    Plaintiff is Likely to Suffer Irreparable Harm in the Absence of Injunctive Relief**

Courts have repeatedly held that cryptocurrency theft schemes threaten imminent and irreparable loss absent injunctive relief in the manner sought by Plaintiff herein. "[C]ourts have found that the risk of irreparable harm to be likely in matters concerning fraudulent transfers of cryptocurrency due to the risk of anonymous and speedy asset dissipation." *Jacobo*, *supra* at *5, (citing *Heissenberg*, 2021 WL 8154531 at *2) .  This is in part because "it would be a simple matter for [defendant] to transfer... cryptocurrency to unidentified recipients outside the traditional banking system" and effectively place the assets at issue in this matter beyond the reach of the court[.]" *Id.* Courts have similarly held that a money judgment is an inadequate legal remedy based both on the anonymity of the defendants at the heart of the scheme, as well as the difficulty in having to trace transfer of cryptocurrency. As the Court reasoned in *Bullock*, "defendants will likely convert the crypto to a place where plaintiff can no longer find it or find defendants themselves." *Bullock v. Doe*, No. 23-CV-3041 CJW-KEM, 2023 WL 9503380 at *2 (N.D. Iowa Nov. 3, 2023). Thus, "plaintiff in fact likely does not have an adequate legal remedy, because a money damages judgment would be essentially meaningless." *Id.*

The same is true here.  Although the cryptocurrency in the THGTen Destination Wallet is already frozen in Alabama, that freeze is at risk of being lifted at any time due to issues of personal

17
Memorandum in Support of Ex Parte Motion for TRO  5:25-cv-02565-SVK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

jurisdiction over Defendants.  If it is, Defendants, with the simple click of a button, can instantaneously  transfer the funds forever beyond recovery.  It is for this reason that courts have held in similar schemes that, "[p]laintiff has good reason to believe the [d]efendant will hide or transfer his ill-gotten gains beyond the jurisdiction of this Court unless those assets are restrained." *Heissenberg, supra*, at *2. This case is no different.  Without an injunction, Plaintiff and the other Class Members will be left with no adequate legal remedy if the freeze in Alabama is lifted.

### 3.     The Balance of Equity Tips Sharply in Favor of Injunctive Relief

The TRO sought by Mr. Mashkevich is temporary and will expire within 14 days unless extended by the Court for good cause or by consent of the parties, with a hearing on a preliminary injunction to follow. *See* Fed. R. Civ. P. 65(b)(2). Even in the unlikely event Defendants could claim a legal right to the stolen cryptocurrency, the continued freeze of such assets would not subject Defendants to any additional burden or harm since the THGTen Destination Wallet is already frozen – at most it amounts to a mere temporary inconvenience. This temporary inconvenience is significantly outweighed by the potential harm to Plaintiff and the other Class Members if an injunction is not issued and the Alabama freeze is lifted: their cryptocurrency will be irretrievably lost, leaving them with no remedy.

As the Court in *Jacobo* held, balancing of these harms strongly favors Plaintiff:

A delay in defendant's ability to transfer the assets only minimally prejudices defendant, whereas withholding injunctive relief would severely prejudice plaintiff by providing defendant time to transfer the allegedly purloined assets into other accounts beyond the reach of this court.
*Jacobo*, supra, at *6.

Here, the cryptocurrency at issue has already been frozen in the Alabama proceeding, and the freeze has remained in place for months without any material prejudice to Defendants.  Any claim that Defendants are suffering economic harm is unsubstantiated and should be given little

weight, especially considering their more than six months-long delay in seeking to dissolve the freeze and the fact that the funds are not rightfully theirs anyway.  Thus, Defendants face, at most, a minor delay in accessing the funds, while Plaintiff and the other Class Members face the permanent loss of their stolen assets if the freeze is lifted.  In short, the balance of equities overwhelmingly supports the issuance of a TRO and preliminary injunction.

**4.    The Injunction Serves the Public Interest**

Pig butchering is rampant and its impacts on the public are devastating.  According to the Financial Crimes Enforcement Network (FinCEN), pig butchering scams–like those alleged in the Complaint–cost victims in the United States *billions of dollars.*[6]  In 2023 alone, the FBI reported more than 69,000 complaints from the public concerning crypto-related crime with more than $5.6 billion in reported losses.[7]

In February 2025, the FBI notified more than 4,300 victims of a pig butchering scheme that spanned all fifty states and involved nearly $10 billion in stolen cryptocurrency.[8]  According to the FBI, "pig butchering is one of the most prevalent and damaging fraud schemes today."[9]  The scams, like the scam alleged in the Complaint, ravage the lives of their victims and families, as was the case of a 71-year-old California man who lost approximately $2.7 million–his entire life

---

[6] https://www.fincen.gov/news/news-releases/fincen-issues-alert-prevalent-virtual-currency-investment-scam-commonly-known
[7] FBI Publishes 2023 Cryptocurrency Fraud Report — FBI
[8] https://www.nextgov.com/cybersecurity/2025/02/fbi-notified-over-4300-victims-pig-butchering-crypto-scams-past-year/402988/#:~:text=The%20accessibility%20of%20cryptocurrency%20investments,disappearing%20with%20all%20the%20money; *see also https://www.fbi.gov/how-we-can-help-you/victim-services/national-crimes-and-victim-resources/operation-level-up*
[9] https://www.fbi.gov/contact-us/field-offices/baltimore/news/cryptocurrency-investment-fraud-a-growing-problem-in-maryland

Memorandum in Support of Ex Parte Motion for TRO  5:25-cv-02565-SVK

savings–after falling to prey to someone claiming to be an attractive young woman named Emma.[10]

These scams have gone largely unchecked by authorities and are growing exponentially, as shown in the graph below from the FBI:

STATISTICS ON COMPLAINTS REPORTED TO IC3 OVER THE YEARS<sup>c</sup>



*See* Exhibit F for the FBI's full Cryptocurrency Fraud Report.

This case and the relief sought herein attempts to turn the tide and fight back against these pernicious pig butcherers and their cohorts. Put simply, the provisional relief sought by Mr. Mashkevich serves the public interest. As the Jacobo court held, "the public interest is properly served by promoting the objectives of . . . FinCEN and providing assurance to the public that courts will take action to promote protection of assets and recovery of stolen assets when they can be readily located and traced to specific locations." *Jacobo*, *supra*, at *6. Likewise, "entering a TRO favors the public interest because... [f]reezing cryptocurrency accounts reassures the public that even with transactions conducted in the cryptocurrency space, there is an adequate remedy at law

---

[10] https://www.reuters.com/investigates/special-report/fintech-crypto-fraud-thailand/

to prevent fraud or theft." *Blum*, *supra*, at \*5 (quoting *Hikmatullaev v. Villa*, No. 23-CV-22338, 2023 WL 4373225, at \*3 (S.D. Fla. June 28, 2023), report and recommendation adopted, No. 23-CV-22338, 2023 WL 4363566 (S.D. Fla. July 6, 2023)).

The same is true here.  Defendants and their co-conspirators have engaged in a sophisticated cryptocurrency fraud scheme, manipulating victims into transferring assets under false pretenses.  Without injunctive relief, public confidence in financial protections for cryptocurrency transactions would be undermined, and Defendants would be emboldened to continue their fraudulent conduct.  Maintaining the freeze on the wallet addresses to which Mr. Mashkevich and other Class Members' cryptocurrency has been traced serves the public interest by ensuring the possibility of an actual recovery, pending a hearing on the merits of the claims in this case.

### B.    No Further Notice is Required

This Court may issue a temporary restraining order *without notice* provided the TRO serves the underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing.  *See Reno Air Racing Ass'n, Inc. v. McCord,* 452 F.3d 1126, 1130-31 (9th Cir. 2006).  The TRO requested by Plaintiff does exactly that: it preserves the status quo by ensuring the freeze stays in place until a hearing can be had.  The time delay associated with providing formal notice and service to Defendants presents a serious risk that the funds will be unfrozen and lost.  Therefore, notice is not required, and the Court should enter the TRO on an *ex parte* basis.

Notwithstanding that, out of an abundance of caution, Plaintiff will provide notice of this action and the requested TRO to Defendants, and their Alabama counsel, via email upon filing (Kozlowski Decl., ¶¶ 3-5.)

Further, the proposed order requires that Plaintiff's counsel serve the owner(s) of the identified wallet (the THGTen Destination Wallet) through the Input Data Message field on the Tron blockchain. Under this method, a message with a link to a website containing documents is sent using the Input Data field on a transaction on the Tron blockchain. The message will contain a hyperlink (the "Service Hyperlink") to a website wherein all materials filed in this action as well as all standing orders will be included for download. The Service Hyperlink will also include a mechanism to track when a person clicks on the Service Hyperlink. This method effectively notifies Defendants of the pendency of this action and informs them how they may object to the TRO and/or requested preliminary injunction. (Zarazinski Decl., ¶ 41.) This type of alternative service, and those like it, have been approved in cryptocurrency cases in other jurisdictions. *See e.g., Fitzgerald v. Defendant 1*, No. 24-21925-CIV, 2024 WL 3538245, at *3 (S.D. Fla. June 28, 2024); *Stil Well v. Defendant "1,"* No. 23-21920-CIV, 2023 WL 5670722, at *3 (S.D. Fla. Sept. 1, 2023); *Bowen v. Li*, No. 23-CV-20399, 2023 WL 2346292, at *3 (S.D. Fla. Mar. 3, 2023); *Bandyopadhyay v. Defendant 1*, No. 22-CV-22907, 2022 WL 17176849, at *3 (S.D. Fla. Nov. 23, 2022); *Chow v. Defendant 1*, No. 24-CV-480, 2024 WL 3225917, at *1 (E.D. La. Apr. 19, 2024); *Blum*, 2023 WL 8880351, at *2–3 (approving service via non-fungible token).

Additionally, the Proposed Order directs that the exchange where the cryptocurrency wallet is held, OKX, provide separate notice of this Order to the customers of the identified cryptocurrency wallet. This comprehensive approach ensures compliance with Federal Rule of Civil Procedure 4(f)(3), which allows courts to authorize service through alternative means reasonably calculated to provide actual notice and not prohibited by international agreement. This is precisely the manner of service previously approved by both Judge Berle of Los Angeles Superior Court and by other courts and is reasonably calculated to lead to actual notice to the actual

owners of the affected cryptocurrency wallets, who may then appear at the preliminary injunction hearing if they wish.

### C.        No Bond Should be Required[11]

Posting of a bond is not required for issuance of a TRO, as Rule 65(c) "invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir.2003)); Fed. R. Civ. P. 65(c). Accordingly, the Ninth Circuit has held that district courts may dispense with the bond requirements in appropriate cases and may set a minimal or no bond where plaintiffs are unable to pay or where there is no risk of harm to the enjoined party. *Id.*; see also *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 2001). Further, even at the preliminary injunction stage, no bond–or only a minimal cash deposit with the Clerk–should be required, particularly since Mr. Mashkevich has already suffered the loss of nearly a hundred thousand dollars.

As courts have observed in other cryptocurrency theft cases, "courts may set the bond at zero if there is no evidence the party will suffer damages from the injunction." *Gaponyuk*, 2023 WL 4670043, at *3; accord, *Jacobo, supra*, at *6.  Such cases where a zero bond is appropriate include cryptocurrency schemes where "there is no evidence before the court demonstrating that defendant will suffer any damages as a result of the requested temporary restraining order." *Jacobo, supra*, at *6.

---

[11] Pursuant to Civil L.R. 65.1-1(a), the Court **may** require security "upon demand" and "where authorized by law and for good cause shown." (emphasis added).  Plaintiff maintains that no security is necessary and reserves the right to further articulate its position to the Court should a party demand such security.

Here, as articulated *supra*, the provisional relief sought aims to freeze a wallet where the stolen cryptocurrency was traced. Defendants have no right to this stolen property and, consequently, will sustain no damages if they are restrained from further transferring these assets. As in Jacobo, Plaintiff requests that no bond be required to enjoin the transfer of assets stolen from him.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the *Ex Parte* Motion for Temporary Restraining Order and the enter the proposed temporary restraining order and order to show cause contemporaneously submitted herewith and grant all other just and appropriate relief.

DATED: March 18, 2025                    **ESBROOK PC**


By:     /s/ Michael Kozlowski
        Michael Kozlowski


        Attorney for Plaintiff
        MICHAEL MASHKEVICH