ALBERT TONG (SBN 208439)
atong@maynardnexsen.com
JAMES J. HOCKEL (SBN 340612)
jhockel@maynardnexsen.com
MAYNARD NEXSEN LLP
Two Embarcadero Center, Ste. 1450
San Francisco, CA  94114
Telephone:    415.646.4670

Attorneys for Specially Appearing Defendant
UAB QBIT FINANCIAL SERVICE

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UAB QBIT FINANCIAL SERVICE, et al.,<br><br>Defendants.[1] | Case No. 5:25-cv-02565-PCP<br><br>**DEFENDANT UAB QBIT FINANCIAL SERVICE'S CONSOLIDATED OPPOSITION TO PLAINTIFF MICHAEL MASHKEVICH'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER (Doc. No. 8) AND MOTION FOR PROVISIONAL CLASS CERTIFICATION (Doc. No. 19)**<br><br>[*filed concurrently with* Declaration of John A. Smyth, III *and* Declaration of Yujun Wu]<br><br>Hearing Date:  March 24, 2025<br>Hearing Time: 1:00 p.m. |

COMES NOW Defendant UAB Qbit Financial Service ("Qbit Lithuania"), specially appearing for the purposes of opposing Plaintiff Michael Mashkevich's *ex parte* Motion for Temporary Restraining Order (Doc. No. 8) and Motion for Provisional Class Certification (Doc. No. 19), and respectfully urges this Honorable Court to deny the two respective motions for the following reasons:

---

[1] Defendant UAB Qbit Financial Service ("Qbit Lithuania") is specially appearing for the purposes of opposing Plaintiff Michael Mashkevich's *ex parte* Motion for Temporary Restraining Order (Doc. No. 8) and Motion for Provisional Class Certification (Doc. No. 19).  Qbit Lithuania's special appearance is not intended to waive and should not be construed as waiving any jurisdictional defense or any defense related to service of process.  Qbit Lithuania fully reserves the right to assert such objections at the appropriate time.

-1-

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................7

II. FACTUAL AND PROCEDURAL BACKGROUND ...............................................7

    A. Qbit Lithuania ...................................................................................................7

    B. The THGTen Wallet..........................................................................................8

    C. The Alabama State Court Action .......................................................................9

    D. The Alabama Preliminary Injunction................................................................10

    E. Qbit Lithuania's Motion to Dissolve or Modify the Injunction ......................12

    F. The Present Action .............................................................................................13

    G. The Pending Ex Parte Motion for a Temporary Restraining Order .................14

    H. The Pending Motion for Provisional Class Certification..................................15

III. ARGUMENT ...........................................................................................................16

    A. This Court Does Not Have Subject-Matter Jurisdiction to Issue Preliminary Injunctive Relief.........................................................................................................17

        1. Mashkevich Does Not Have Standing to Bring Claims Against Qbit Lithuania......17

        2. This Court Does Not Have Jurisdiction Under the Class Action Fairness Act. .......21

    B. This Court Does Not Have Personal Jurisdiction Over Qbit Lithuania. .........................24

    C. Mashkevich's Motion for Provisional Class Certification Should Be Rejected. ...........28

    D. If The Court Exercises Jurisdiction, It Should Nevertheless Deny the Ex Parte Motion for Temporary Restraining Order. .........................................................................32

        1. Mashkevich Has Not Demonstrated a Likelihood of Success on the Merits............33

        2. Mashkevich Has Not Demonstrated a Likelihood of Irreparable Harm. .................34

        3. The Balance of Equities Do Not Favor Mashkevich. .............................................35

        4. The Public Interest Favors Qbit Lithuania..............................................................36

        5. The Proposed Injunction Is Beyond the Limits of This Court's Equitable Power. ..36

        6. Mashkevich Should Be Required to Post a Bond. ...................................................38

IV. CONCLUSION...........................................................................................................38

1

## TABLE OF AUTHORITIES

2

Page(s)

3

Cases

4

555 U.S. 7 (2008) ............................................................................................................. 32

5

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ..................................................................................................... 30

6

7

*Augustine v. United States*,
   704 F.2d 1074 (9th Cir. 1983) ...................................................................................... 20

8

9

*Binns v. Am. Gen. Life Ins. Co.*,
   2024 WL 4843726 (C.D. Cal. Nov. 19, 2024) ............................................................. 21

10

*Bly-Magee v. California*,
   236 F.3d 1014 (9th Cir. 2001) ...................................................................................... 21

11

12

*Bullock v. Doe*,
   2023 WL 9503380 (N.D. Iowa Nov. 3, 2023) .............................................................. 33

13

14

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ..................................................................................................... 24

15

*Depot, Inc. v. Caring for Montanans, Inc.*,
   915 F.3d 643 (9th Cir. 2019) ........................................................................................ 36

16

17

*Fid. Nat. Title Ins. Co. v. Castle*, No. C,
   2011 WL 5882878 (N.D. Cal. Nov. 23, 2011) ............................................................. 17

18

19

*First Tech. Safety Sys., Inc. v. Depinet*,
   11 F.3d 641 (6th Cir. 1993) .......................................................................................... 31

20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ..................................................................................................... 24

21

22

*No. 70 of Alameda Cnty.*,
   415 U.S. 423 (1974) ..................................................................................................... 31

23

24

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ..................................................................................................... 36

25

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ..................................................................................................... 35

26

27

28

-2-

*Hendricks v. Bank of Am., N.A.*,
  408 F.3d 1127 (9th Cir. 2005) ........................................................................ 23

*IIG Wireless, Inc. v. Yi*,
  22 Cal. App. 5th 630 (2018) .......................................................................... 21

*In re Finjan Holdings, Inc.*,
  58 F.4th 1048 (9th Cir. 2023) ........................................................................ 22

*In re Focus Media Inc.*,
  387 F.3d 1077 (9th Cir. 2004) ....................................................................... 35

*Jacobo v. Doe*,
  2022 WL 2052637 (E.D. Cal. June 7, 2022) .................................................. 33

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ....................................................................... 19

*JustM2J LLC v. Brewer*,
  2025 WL 435827 (E.D. Cal. Feb. 7, 2025) ............................................... 33, 34

*Kidron v. Movie Acquisition Corp.*,
  40 Cal. App. 4th 1571 (1995) ........................................................................ 21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................... 16, 17, 19

*Mason v. Genisco Tech. Corp.*,
  960 F.2d 849 (9th Cir. 1992) ......................................................................... 23

*Meyer v. Portfolio Recovery Assocs., LLC*,
  707 F.3d 1036 (9th Cir. 2012) ....................................................................... 27

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
  926 F.3d 528 (9th Cir. 2019) ......................................................................... 16

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993) ........................................................................ 21, 22

*Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*,
  484 U.S. 97 (1987) ........................................................................................ 23

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ...................................................................................... 17

*Overturf v. Rocky Mountain Chocolate Factory, Inc.*,
  2008 WL 11337839 (C.D. Cal. Oct. 27, 2008) .............................................. 21

-3-

*Poslof v. Arce,*
   2025 WL 786356 (N.D. Cal. Mar. 12, 2025) ........................................................... 23

*Ranza v. Nike, Inc.,*
   793 F.3d 1059 (9th Cir. 2015) ................................................................... 25, 26

*Rattlesnake Coal. v. U.S. E.P.A.,*
   509 F.3d 1095 (9th Cir. 2007) ............................................................................ 20

*Reno Air Racing Ass'n., Inc. v. McCord,*
   452 F.3d 1126 (9th Cir. 2006) ............................................................................ 31

*Robinson v. United States,*
   586 F.3d 683 (9th Cir. 2009) .............................................................................. 20

*Schwarzenegger v. Fred Martin Motor Co.,*
   374 F.3d 797 (9th Cir. 2004) ....................................................................... 24, 25

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) .......................................................................................... 16

*Stormans, Inc. v. Selecky,*
   586 F.3d 1109 (9th Cir. 2009) ............................................................................ 34

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001) .............................................................................. 31

*Townley v. Miller,*
   722 F.3d 1128 (9th Cir. 2013) ............................................................................ 17

*United States v. Adefehinti,*
   510 F.3d 319 (D.C. Cir. 2007) ............................................................................ 28

*United States v. Hermanek,*
   289 F.3d 1076 (9th Cir. 2002) ............................................................................ 18

*United States v. Sumner,*
   226 F.3d 1005 (9th Cir. 2000) ............................................................................ 37

*United States v. Valencia-Lopez,*
   971 F.3d 891 (9th Cir. 2020) ....................................................................... 17, 18

*United States v. Wilkes,*
   662 F.3d 524 (9th Cir. 2011) .............................................................................. 28

-4-

*Van Loon v. Dep't of the Treasury*,
   122 F.4th 549 (5th Cir. 2024) .................................................................................. 18

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023) ........................................................................... 27, 30

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................................................. 22

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir.2006) .................................................................................. 24

*Zinser v. Accufix Rsch. Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ................................................................................. 30

Statutes

28 U.S.C. § 1332 ........................................................................................................... 22

28 U.S.C. § 1332(d) ...................................................................................................... 20

Article III of the United States Constitution .............................................................. 16

Cal. Civ. Code § 3439.04 ............................................................................................. 35

# I.  INTRODUCTION

Plaintiff Michael Mashkevich alleges that he was scammed by some unknown persons and lost $90,000 worth of cryptocurrency.  He claims that he has tracked that cryptocurrency through a convoluted series of transactions, with a fraction of it eventually ending up in an account owned by Defendant UAB Qbit Financial Service ("Qbit Lithuania").  He claims that other transactions from other wallets followed similar paths, resulting in a total of about $1 million being sent to Qbit Lithuania's wallet.  Based on these paltry facts, Mashkevich claims that this Court should issue sweeping injunctive relief, freezing more than $7 million of Qbit's assets on behalf of Mashkevich and his proposed class.

Mashkevich's proposed temporary restraining order should be denied.  As more fully explained below, this Court does not have the subject-matter or personal jurisdiction needed to issue the order.  Additionally, Mashkevich's proposed class action should be rejected as lacking predominance and superiority.  Even if this Court were to reach the merits of the injunctive request, Mashkevich fails on all four of the preliminary injunction factors, his proposed injunction exceeds this Court's equitable power, and he fails to provide sufficient basis for lifting the bond requirement.

# II.  FACTUAL AND PROCEDURAL BACKGROUND

## A.    Qbit Lithuania

Qbit Lithuania is a financial technology company organized under the laws of the Republic of Lithuania and headquartered in Lithuania.  It specializes in cross-border payment and banking solutions for global businesses.  Qbit Lithuania offers its customers, among other things, multi-currency business accounts, global payment processing, and supply chain financing.  Qbit Lithuania's customers may fund their accounts by transferring cryptocurrency, and they may direct Qbit Lithuania to use the deposited funds for payment purposes.  (*See* Declaration of Yujun "Michael" Wu ("Wu Decl.") at 1, ¶ 4.)

Qbit Lithuania is a regulated business.  It is licensed as a Virtual Asset Service Provider ("VASP") and regulated by Lithuania's comprehensive regulatory framework for cryptocurrency

companies.  These regulations require, among other things, robust Anti-Money Laundering ("AML") and Counter-Terrorism Financing ("CTF") protocols.  (*Id.* at 1, ¶ 5.)

As part of its compliance, Qbit Lithuania developed a comprehensive program for its AML and CTF policies, procedures, and controls.  Qbit Lithuania's policies are designed to prevent and mitigate possible risks of being involved in any kind of illegal activity.  Its policies outline procedures for customer onboarding, customer due diligence, and identity verification procedures to ensure the authenticity of documents and information provided by the prospective customer. Qbit Lithuania believes its policies, procedures, and controls comply with all regulatory requirements in the European Union, Hong Kong, and the United States.  (*Id.* at 1–2, ¶ 6.)

As part of its compliance, Qbit Lithuania's Chief Compliance and Money Laundering Reporting Officer, Huang "Jessica" Xiao, is responsible for overseeing all aspects of its AML and CTF protocols, including monitoring effectiveness, enhancing controls and procedures when necessary, and ensuring its AML and CTF staff training is adequate, appropriate, and effective. (*Id.* at 2, ¶ 7.)

As part of its procedures, Qbit Lithuania's services are only open to registered businesses and may be used for business purposes only.  To register an account, customers must provide various certifications and business documents, including certificates of incorporation, business licenses, governing documents, registries of directors and shares, ownership charts, and, for certain directors and account owners, personal identification documents.  (*Id.* at 2, ¶ 8.)

In the event Qbit Lithuania determines that one of its customers is involved in any kind of suspicious activity, it would have immediately investigated such issues and ceased any current or future business transactions with those customers pursuant to its AML and CTF policies.  (*Id.* at 2, ¶ 9.)

### B.    The THGTen Wallet

Qbit Lithuania uses the services of OKX Hong Kong FinTech Company Limited ("OKX"), a Hong Kong-based cryptocurrency exchange like Binance, Coinbase, or Kraken, to provide trading services related to it virtual assets.  Although OKX takes Qbit Lithuania's virtual assets

-7-

into its custody, Qbit Lithuania is the legal and beneficial owner of these assets and, until an injunction was issued by the Circuit Court of Marshall County, Alabama (the "Alabama Court"), was the only entity that could access them. One of these virtual assets is a cryptocurrency "wallet" identified as "THGTenLmvqWycGLGtgRvX4wURiHQeDvNps" (the "THGTen Wallet"). (*Id.* at 3, ¶ 16.)

On June 20, 2024, OKX informed Qbit Lithuania that, in compliance with preliminary injunction issued by Alabama Court, it had frozen the THGTen Wallet. (*Id.* at 3, ¶ 17.)

The THGTen Wallet contains approximately $7 million worth of cryptocurrency, all deposited by the account holders that have been screened through Qbit Lithuania's quality assurance procedures, and in compliance with its AML and CTF policies. (*Id.* at 3, ¶ 18.) Qbit Lithuania has no reason to believe that the funds in the THGTen Wallet were the proceeds of any alleged illegal activity. (*Id.* at 3, ¶ 19.)

### C.    The Alabama State Court Action

On June 4, 2024, Plaintiff Michael Mashkevich filed a putative class action in the Circuit Court of Marshall County, Alabama (the "Alabama Complaint"). The Alabama Complaint did not identify any defendants, and instead named 26 fictitious defendants. (Declaration of John A. Smyth, III ("Smyth Decl.") at 1, ¶ 2; Exh. A.) The Alabama Complaint gives fictitious names to Fictitious Defendants A-C. (Smyth Decl. Exh. A at ¶¶ 12–13.) The Complaint identifies Fictitious Defendant A as "Olivia Ava," Fictitious Defendant B as "Emma Miller," and Fictitious Defendant C as "F.B. Lee." However, the Alabama Complaint acknowledges that the "true identities" of these individuals "are currently unknown. (Smyth Decl. Exh. A at ¶ 12.)

In the Alabama Complaint, Mashkevich alleges that he was contacted by the unknown persons via WhatsApp, a messaging platform, and offered remote employment opportunities. (Smyth Decl. Exh. A at ¶¶ 20–27.) Mashkevich alleges that the fictitious defendants "trained" Mashkevich to perform "work" for which they told him he would receive commissions. (Smyth Decl. Exh. A at ¶¶ 20–30.) The Alabama Complaint further alleges that the fictitious defendants created fake websites that displayed fake totals for the "commissions" that Mashkevich had earned.

1   (Smyth Decl. Exh. A at ¶¶ 21–23.)   Through various deceptions and schemes, the fictitious
2   defendants convinced Mashkevich that he needed to deposit more and more of his own
3   cryptocurrency into these accounts so that he could access the commissions he thought he was
4   earning.   (Smyth Decl. Exh. A at ¶¶ 22, 31–37.)   Ultimately, Mashkevich transferred
5   approximately $90,000 to these accounts.  (Smyth Decl. Exh. A at ¶ 24.)

6          When Mashkevich learned that he could not access the cryptocurrency that he had
7   transferred, he contacted Inca Digital ("Inca"), a cryptocurrency investigation firm.  (Smyth Decl.
8   Exh. A at ¶ 8.)  Inca conducted an investigation that allegedly revealed that Fictitious Defendants
9   converted Mashkevich's assets and sent them through a web of transactions designed to "hide their
10  trail." (Smyth Decl. Exh. A at ¶¶ 40.)  Inca ultimately traced Mashkevich's cryptocurrency to 36
11  cryptocurrency wallets (the "Crypto Wallets") held by 5 cryptocurrency exchanges (the
12  "Exchanges"), including OKX.  (Smyth Decl. Exh. A at ¶ 41, Exh. A.)  OKX has custody of nine
13  of the Crypto Wallets.  (Smyth Decl. Exh. A at Exh A.)  The Alabama Complaint identifies one of
14  the nine Crypto Wallets maintained by OKX as the THGTen Wallet.  (Smyth Decl. Exh. A at Exh.
15  A.)

16          **D.      The Alabama Preliminary Injunction**

17          On the same day he filed the Alabama Complaint, Mashkevich moved for a temporary
18  restraining order and an order to show cause why a preliminary injunction should not issue.
19  (Smyth Decl. at 1–2, ¶ 3; Exh. B.)  Among other things, Mashkevich requested that the Alabama
20  state court enjoin the movement of any funds contained in the Crypto Wallets.  (Smyth Decl. Exh.
21  B at 2.)   In support of his motion, Mashkevich presented affidavit testimony describing the
22  WhatsApp conversations he had with the fictitious defendants and attesting that he lost $90,000 to
23  their scheme.  (Smyth Decl. at 2, ¶ 4; Exh. C at ¶¶ 5–20.)

24          Mashkevich also submitted the Declaration of Inca employee Charles Zach, executed in
25  Croatia.   (Smyth Decl. at 2, ¶ 5; Exh. D.)   According to Zach, Inca traced Mashkevich's
26  cryptocurrency by first using Mashkevich's screenshots to identify the addresses to which
27  Mashkevich sent his cryptocurrency.  (Smyth Decl. Exh. D at ¶ 8.)  Next, Inca "analyzed transfers

28

CONSOLIDATED OPPOSITION TO PLAINTIFF'S MOTIONS FOR TRO
AND PROVISIONAL CLASS CERTIFICATION
Case No. 5:25-cv-02565-PCP

from these addresses" and found that the fictitious defendants (whom Zach did not identify) combined funds from these addresses with other funds and converted them to different cryptocurrencies.  (Smyth Decl. Exh. D at ¶ 9.)  According to Zach, these combined funds were transferred yet again "through a series of wallet addresses, commingled, and then deposited" in the Crypto Wallets.  (Smyth Decl. Exh. D at ¶ 10.)  Finally, Inca "reversed traced" from the Crypto Wallets to identify a "common pattern of transactions."  (Smyth Decl. Exh. D at ¶ 11.)  Based only on this "reverse trace," Inca concluded that the Crypto Wallets contained "a minimum of $3.5 million" of funds stolen from "more than 125" putative class members.  (*Id.*)

Finally, in a proposed order submitted with his motion, Mashkevich proposed that "actual notice" of the TRO could be effected on the nonparty Exchanges "via a special-purpose token or equivalent blockchain currency or code," called a "Service Token," "delivered or airdropped into the" Crypto Wallets.  (Smyth Decl. at 2, ¶ 6; Exh. E at ¶ 3.)  He further proposed that that the Service Token would contain a "Service Hyperlink" to a website created by Mashkevich's counsel containing the TRO "and all papers upon which it is based" and that the Service Hyperlink would "include a mechanism to track when a person clicks on" it.  (*Id.*)  Mashkevich did not cite to any case law or rule of procedure authorizing notice by his proposed means.  Nor did he propose any mechanism for providing notice to the actual owners of the Crypto Wallets, such as Qbit Lithuania.

The Alabama state court adopted Mashkevich's proposed order in full, set a preliminary injunction hearing for June 14, 2024, and set an opposition deadline of June 7, 2024.  (Smyth Decl. at 2, ¶ 7; Exh. F.)

On June 12, 2024, Mashkevich submitted the Declaration of Inca contractor Albina Giuttari, executed in Switzerland, to show that he complied with the TRO's service requirements. (Smyth Decl. at 2, ¶ 8; Exh. G.)  Giuttari declared that on June 10, 2024, just four days before the scheduled preliminary injunction hearing and three days after the response deadline imposed by the Alabama state court, Inca delivered Service Tokens to the Crypto Wallets.  (Smyth Decl. Exh. G at ¶ 5.)  Giuttari declared that she subsequently "monitored the address for each [Crypto Wallet] as well as a unique transaction hash associated with the Service Tokens."  (*Id.*)  She provided a

"spreadsheet listing the addresses that have been served, along with the transaction hashes." (*Id.*) Neither Giuttari nor Mashkevich offered any information regarding who, if anyone, actually viewed the TRO papers.

On June 14, 2024, the Alabama state court held a preliminary injunction hearing and it issued the preliminary injunction the same day. (Smyth Decl. at 2, ¶ 9; Exh. H.) Not surprisingly—especially since no Defendant had been identified or served—"no defendants appeared to be heard in person or through counsel." (*Id.*) Nevertheless, the state court concluded that it was "satisfied," based on Giuttari's declaration, that Mashkevich's counsel provided the fictitious defendants and the nonparty exchanges with appropriate notice. (*Id.*)

### E.    Qbit Lithuania's Motion to Dissolve or Modify the Injunction

On June 20, 2024, OKX informed Qbit Lithuania that, in compliance with the injunction order, it had frozen the THGTen Wallet. (Wu Decl. at 3, ¶ 17.) After it became aware of the preliminary injunction, Qbit Lithuania commissioned a leading blockchain security and compliance company, Beosin, to conduct an in-depth analysis of the disputed OKX transactions listed in Mr. Zarazinski's declaration and determine their nature and identify potential sources of risk. Beosin determined the transactions were not attacks or malicious activities. (Wu Decl. at 3–4, ¶ 20.)

On July 8, 2024, Qbit Lithuania's Hong Kong-based counsel contacted Mashkevich's counsel in an effort to understand the nature of Mashkevich's claim and the amount of cryptocurrency that had been traced to the THGTen Wallet from Mashkevich himself. To date, Mashkevich has not provided Qbit Lithuania with that information. Instead, in contradiction to his own expert's calculations, Mashkvich's counsel represented to Qbit Lithuania on October 17, 2024, that the putative class's losses amount to "more than $40 million" and that the THGTen Wallet contains $3 million of stolen funds. Mashkevich's counsel demanded $3 million from Qbit Lithuania to unfreeze the THGTen Wallet.

Because the Injunction Order froze the THGTen Wallet, Qbit Lithuania must borrow money at high interest rates to pay back funds to its customers. As a result, the Injunction Order

has caused Qbit Lithuania to lose about $6,000 each day. (*Id.* at 4, ¶ 22.)

On January 20, 2025, Qbit Lithuania filed in the Alabama state court a Motion to Dissolve or, in the Alternative, Modify the Preliminary Injunction Order. Qbit Lithuania argued that: (1) the state court lacked subject-matter jurisdiction to enter the injunction order because Alabama law does not permit actions to be maintained solely against fictitious parties; (2) the state court's injunction order is void because the state court has not obtained personal jurisdiction over any defendant; (3) the issuance of the injunction violated the notice requirement and bond requirement of the Alabama Rules of Civil Procedure; (4) the injunction applies only to nonparties, in violation of Alabama law; (5) freezing assets to satisfy a future money judgment is unlawful; and (6) the evidence did not support a finding of likelihood of success on the merits. (Smyth Decl. at 2, ¶ 10; Exh. I.)

The Alabama state court held a hearing on Qbit Lithuania's motion on February 14, 2025. To date, the state court has not issued any ruling.

**F.    The Present Action**

On March 14, 2025, Mashkevich filed the instant action in the U.S. District Court for the Northern District of California against Qbit Lithuania, Bytechip LLC, and Michael Wu (the "California Complaint"). (Doc. No. 1.)

The California Complaint re-asserts the core allegations from the Alabama Complaint. In particular, the California Complaint alleges that Mashkevich sent a cryptocurrency known as "Ethereum" to the unidentified fraudsters, who sold the Ethereum for a different cryptocurrency known as "U.S. Dollar Token" ("USDT"). (Doc. No. 1 at 21, ¶¶ 81–82.)[2] Mashkevich then alleges that the USDT tokens were transferred between several different accounts. (Doc. No. 1 at 22–23, ¶¶ 83–88.) Mashkevich lists thirty-six "destination accounts," and alleges that the cryptocurrency purchased using funds from his allegedly converted cryptocurrency ended up in "some of the" destination wallets. (Doc. No. 1 at 19–20, 47–48, ¶ 75, Appx. B.) Mashkevich identifies the

---

[2] Citations to the record of this action utilize the pagination stamped on the PDF document by this Court's ECF system, rather than any pagination that might be marked within the document.

THGTen Wallet as one of the destination wallets, and alleges that a "significant portion of the stolen funds" can be traced to the THGTen Wallet. (Doc. No. 1 at 2, ¶ 1.) Mashkevich persists in his refusal to identify *how much* of the stolen funds were purportedly traced to the THGTen Wallet.

Mashkevich alleges that Inca was able to identify "an estimated $28 million" of cryptocurrency that followed similar routes to the cryptocurrency that was allegedly purchased using funds converted from Mashkevich. (Doc. No. 1 at 4, ¶ 9.) Mashkevich conclusorily asserts that all such cryptocurrency must have been purchased using stolen funds in the same way that his stolen funds were used to purchase cryptocurrency. (Doc. No. 1 at 20, ¶ 76.)

The web of cryptocurrency accounts that Inca deems suspicious includes over 280 accounts. (Doc. No. 1 at 20–26, 41–46, ¶¶ 80–92, Appx. A.) Without any explanation or particular factual allegations, Mashkevich alleges that every account that is part of this web must be owned and controlled by criminal money launderers: "it is highly likely that the owners of all the cryptocurrency wallets through which the Class Members' stolen cryptocurrency passed . . . were active participants in the Laundering Network." (Doc. No. 1 at 5, ¶ 10.) Mashkevich alleges that, of the $28 million that was allegedly laundered, "[a]t least $1 million" can be traced to the THGTen Wallet. (Doc. No. 1 at 20, ¶ 78.)

With regard to personal jurisdiction, the California Complaint alleges that this Court has jurisdiction over Qbit Lithuania because Bytechip, LLC—an entity distinct from Qbit Lithuania but which is also owned by Michael Wu—maintains an office in San Jose. (Doc. No. 1 at 6–7, ¶¶ 16–25.)

### G.    The Pending *Ex Parte* Motion for a Temporary Restraining Order

On March 18, 2025, Mashkevich filed the pending *Ex Parte* Motion for Temporary Restraining Order (the "TRO Motion"). (Doc. No. 8.) The TRO Motion is supported by a declaration from Mashkevich stating that he lost "approximately $90,000" in two different online scams. (Doc. No. 9-2 at 10, ¶ 20.)

The TRO Motion chiefly relies on a declaration from Adam Zarazinski, the Chief Executive Officer of Inca. Zarazinski claims that Inca's investigation has concluded that "it is

1    highly likely that [Qbit Lithuania, Bytechip, and Michael Wu] facilitate" the individuals who

2    scammed Mashkevich by serving as money launderers for the scammers.  (Doc. No. 9-3 at 3–4, ¶

3    4.)

4        Zarazinski claims that Mashkevich's assets were traced to 36 different destination accounts

5    via a complex web of transactions.  (Doc. No. 9-3 at 7–9, 27–28, ¶¶ 19–24, Appx. B.)  Zarazinski

6    asserts that the THGTen Wallet was one such destination account and that more than $1 million

7    "of traceable class funds" ended up in the THGTen Wallet.  (Doc. No. 9-3 at 11, ¶ 33.)  Zarazinski

8    does not state what amount of Mashkevich's funds ended up in the THGTen Wallet.

9        Zarazinski also claims, without any further elaboration, that Qbit Lithuania is likely to hide

10   its assets from the Court:  "Based on my expertise in blockchain forensics and my substantial

11   experience investigating pig butchering schemes similar to this one, if there is no injunction in

12   place freezing the assets contained in THGTen, it is highly likely that Defendants will transfer

13   cryptocurrency at issue beyond the reach of discovery or recovery."  (Doc. No. 9-3 at 15, ¶ 42.)

14   **H.    The Pending Motion for Provisional Class Certification**

15       On Friday, March 21, 2025 at 4:35 p.m., Mashkevich filed a Motion for Provisional Class

16   Certification, seeking to provisionally certify a class consisting of "all persons and entities who, at

17   the suggestion of the Scammers or individuals acting under the Scammers' instruction or control,

18   transferred cryptocurrency into one or more of the cryptocurrency wallets identified in Appendix

19   A [to the Complaint] and whose funds were deposited into the THGTen Destination Wallet."

20   (Doc. No. 19 at 6.)  Mashkevich's Motion for Provisional Class Certification is supported by only

21   one declaration, from Mashkevich's counsel, which solely focuses on the reasons why

22   Mashkevich's counsel believes he should be appointed as class counsel.  (Doc. No. 19-2.)

23       Mashkevich's Motion for Provisional Class Certification was noticed with a hearing date

24   and time of 1:00 p.m. on Monday, March 21, 2025—i.e., at the same time as the hearing on

25   Mashkevich's pending *Ex Parte* Motion for a Temporary Restraining Order, less than one court

26   day after the filing of the Motion for Provisional Class Certification.  (Doc. No. 19 at 1.)

27

28

-14-

## III. ARGUMENT

Mashkevich's *Ex Parte* Motion for a Temporary Restraining Order should be denied. There are numerous procedural obstacles that Mashkevich has failed to overcome, and the facts supporting his Motion are too paltry to merit the sweeping relief requested.

This Court lacks subject-matter jurisdiction for two reasons.  First, Mashkevich has failed to demonstrate standing.  The mere fact that a cryptocurrency token purchased using funds stolen from him allegedly ended up in the possession of Qbit Lithuania is not sufficient to demonstrate that his harm is traceable to the actions of Qbit Lithuania.  Second, Mashkevich has failed to demonstrate that the amount-in-controversy requirement is met.  Mashkevich's conspiracy claims should be disregarded as inadequately pleaded and unsupported by the evidence.  Absent the conspiracy claims, it is clear from the face of the Complaint and form the evidence, that the amount in controversy does not exceed the jurisdictional threshold.

This Court also lacks personal jurisdiction over Qbit Lithuania for two reasons.  First, Mashkevich has not served Qbit Lithuania.  Second, Qbit Lithuania is neither "at home" in the State of California, nor does it have sufficient case-related contacts to submit it to the specific personal jurisdiction of this Court.  Mashkevich's attempt to invoke alter ego jurisdiction is not supported by the evidence.

Even if this Court exercises jurisdiction, the Court should deny Mashkevich's Motion for Provisional Class Certification.  The class proposed by Mashkevich is so amorphous and unascertainable that the Court adjudicating such a class action would be overwhelmed by individual issues in determining who is a member of the class and whether each class member is entitled to relief—and all that is assuming that Mashkevich finds a way to deliver class notice, which is unlikely.  Additionally, the loss suffered by Mashkevich demonstrates that, if his claims are typical of the class, the class members would have sufficient incentive to bring individual actions such that the class action mechanism is unnecessary.

If this Court reaches the merits of the *Ex Parte* Motion for Temporary Restraining Order, this Court has numerous grounds for denying the request.  Under the four-prong *Winter* test,

-15-

1    Mashkevich has failed to demonstrate a reasonable likelihood of success on the merits, he has

2    failed to demonstrate that imminent and irreparable harm will result absent the preliminary

3    injunctive relief, he has failed to demonstrate that the balance of equities favors the injunction, and

4    he has failed to demonstrate that the public interest favors the injunction.  Additionally, the

5    proposed injunction violates the *Grupo Mexicano* rule set by the Supreme Court, which limits the

6    use of preliminary injunctive relief for freezing assets.  Mashkevich's sole avenue for complying

7    with *Grupo Mexicano* would be to identify specific assets in which he has a traceable equitable

8    interest.  Mashkevich has failed to do so.  Lastly, even if this Court does grant preliminary

9    injunctive relief, Mashkevich should be required to post a bond.

10        **A.    This Court Does Not Have Subject-Matter Jurisdiction to Issue Preliminary**
             **Injunctive Relief.**

11

12             *1.    Mashkevich Does Not Have Standing to Bring Claims Against Qbit*
                       *Lithuania.*

13

14        The standing doctrine serves to ensure that the authority of the federal courts extends only

15    to "cases" and "controversies" as mandated by Article III of the United States Constitution.  U.S.

16    Const. art. III, § 2; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).

17             Over the years, [the Supreme Court] ha[s] established that the irreducible
               constitutional minimum of standing contains three elements.  First, the plaintiff

18             must have suffered an injury in fact—an invasion of a legally protected interest
               which is (a) concrete and particularized, and (b) actual or imminent, not conjectural

19             or hypothetical.  Second, there must be a causal connection between the injury and
               the conduct complained of—the injury has to be fairly traceable to the challenged

20             action of the defendant, and not the result of the independent action of some third
               party not before the court.  Third, it must be likely, as opposed to merely

21             speculative, that the injury will be redressed by a favorable decision.

22    *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and quotation marks omitted,

23    alterations adopted).

24        Mashkevich himself must have standing, even if the motion for provisional class

25    certification is granted (which it should not be, for the reasons discussed below).  *See NEI*

26    *Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir. 2019)

27    ("If none of the named plaintiffs purporting to represent a class establishes the requisite of a case

28                                                    -16-

1  or controversy with the defendants, none may seek relief on behalf of himself or any other member

2  of the class.") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)) (internal quotation marks

3  omitted).

> The party invoking federal jurisdiction bears the burden of establishing these elements.  Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.  In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

11  *Lujan*, 504 U.S. at 561 (citations and quotation marks omitted, alterations adopted).

12      "At the preliminary injunction stage, plaintiffs must make a clear showing of each element

13  of standing."  *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).  And because "[a] motion

14  for preliminary injunction must be supported by evidence that goes beyond the unverified

15  allegations of the pleadings."  *Fid. Nat. Title Ins. Co. v. Castle*, No. C 11-00896 SI, 2011 WL

16  5882878, at *3 (N.D. Cal. Nov. 23, 2011) (quoting 9 Wright & Miller, Federal Practice &

17  Procedure § 2949 (2011)) (quotation marks omitted), accordingly, Mashkevich cannot meet his

18  burden of proving standing at the preliminary injunctive stage through the unverified allegations

19  of the California Complaint.

20      The primary issue here is the "traceability" element of Mashvevich's standing.

21  Mashkevich has not presented any evidence that his injuries are fairly traceable to the conduct of

22  Qbit Lithuania.

23      In his temporary restraining order papers, Mashkevich exclusively relies on a declaration

24  from his expert, Adam Zarazinski, to connect Qbit Lithuania to Mashkevich's loss.  A district court

25  cannot blindly accept the conclusions given by an expert without "a preliminary assessment of

26  whether the reasoning or methodology underlying the testimony is valid and of whether that

27  reasoning or methodology properly can be applied to the facts in issue."  *United States v. Valencia-*

28

-17-

*Lopez*, 971 F.3d 891, 900 (9th Cir. 2020) (quoting *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002) (quotation marks omitted, alteration adopted). In this process, "the court must assure that the methods are adequately explained." *Hermanek*, 289 F.3d at 1094. The Court cannot credit an expert's conclusion merely because of the expert's general qualifications; instead the Court must assure itself that the expert's conclusions reliably follow from the expert's methodology. *Valencia-Lopez*, 971 F.3d at 900.

Here, it is clear that Mashkevich's reliance on the Zarazinzki declaration is in vain. The Zarazinski declaration concludes that "it is highly likely that [Qbit Lithuania, Bytechip, and Michael Wu] facilitate" the individuals who scammed Mashkevich by serving as money launderers for the scammers. (Doc. No. 9-3 at 3–4, ¶ 4.) However, the Zarazinski declaration provides no evidence linking Qbit Lithuania to any scamming scheme.

Zarazinski claims that Mashkevich's assets were traced to 36 different destination accounts via a complex web of transactions. (Doc. No. 9-3 at 7–9, 27–28, ¶¶ 19–24, Appx. B.) Zarazinski does not explain the method by which he traced these transactions. Zarazinski claims that some of the accounts converted one type of cryptocurrency for another type of cryptocurrency, a process that he does not explain anywhere. Indeed, it appears that this conversion occurred while the funds were in customer wallets. Zarazinski does not explain by what method he was able to view transactions occurring within customer wallets or how an in-wallet transaction would take place.

Zarazinski asserts that the activities of some of these accounts appear to be suspicious, based on the transaction history of the account—however, the transaction history that Zarazinski relies on is the mere fact that some of the accounts spend the funds they receive within a few days of receipt and others don't (instead accumulating a large fund before spending it). (Doc. No. 9-3 at 7, ¶¶ 16–17.) Even if this were sufficient evidence to prove that a pre-established transaction mechanism existed, the U.S. Court of Appeals for the Fifth Circuit recently explained that such mechanisms have become popular, not just among criminals but among anyone who does not want their transaction history publically available on the cryptocurrency blockchain. *See Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 554–55 (5th Cir. 2024). This is extremely thin evidence for

1    branding hundreds of accounts as participants in a money laundering scheme.

2         Even if the Zarazinski declaration was sufficient to prove that a money laundering network

3    exists, his bald conclusion that every wallet that ever received a token that was once part of this

4    network must be controlled by criminals is completely unsupported.  Zarazinski claims that the

5    THGTen Wallet was one of the destination accounts, but he does not assert that the THGTen

6    Wallet exhibited any suspicious activity itself—nor, indeed, does he state the proportion of

7    cryptocurrency purchased using Mashkevich's funds that ended up in the THGTen Wallet.

8         In short, Zarazinski believes that Qbit Lithuania is associated with the scamming scheme

9    merely because, according to Zarazinski's tracing analysis, some cryptocurrency in Qbit

10   Lithuania's account was purchased using funds that Zarazinski believes he can trace back to

11   Mashkevich.  This connection is insufficient to support his conclusion.  Qbit Lithuania, as a

12   business model, provides banking services to clients, including clients who deal in

13   cryptocurrencies.  Zarazinski's claim that some of the cryptocurrency in Qbit Lithuania's

14   possession was purchased using stolen money is essentially equivalent to the claim that a Wells

15   Fargo ATM in Yreka, California holds a dollar once laundered by Al Capone: even if normal fiat

16   currency could be traced as readily as Zarazinski claims that cryptocurrency can be traced, it would

17   still be incredulous to claim that Wells Fargo was in cahoots with Capone.

18        Further, nowhere in Zarazinski's declaration does he assert how much of Mashkevich's

19   funds are presently in the THGTen Wallet.  Mashkevich has the burden of proving not only that

20   his injuries are traceable to defendants, but also "that the injury will be redressed by a favorable

21   decision." *Lujan*, 504 U.S. at 560–61.  As discussed further below, Mashkevich has no right to

22   freeze accounts merely to satisfy a future money judgment.  *See Johnson v. Couturier*, 572 F.3d

23   1067, 1084 (9th Cir. 2009).  So Mashkevich's redressability, for purposes of injunctive relief,

24   hinges on whether the property over which he claims an equitable interest is currently in the

25   possession of Qbit Lithuania.  Mashkevich has not offered any evidence to support this element.

26        Looking past the cryptocurrency jargon and unsupported conclusions, it is clear that

27   Zarazinski's analysis is suspect and incomplete.  It simply does not provide the evidence needed

28

1  to meet Mashkevich's burden on standing.

2          2.    *This Court Does Not Have Jurisdiction Under the Class Action Fairness*
3                *Act.*

4          The sole basis for jurisdiction invoked by Mashkovich's California Complaint is the Class

5  Action Fairness Act, 28 U.S.C. § 1332(d).  (*See* Doc. No. 1 at 7, ¶ 26 ("This Court has subject

6  matter jurisdiction over this entire action pursuant to the Class Action Fairness Act, 28 U.S.C. §

7  1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000,

8  exclusive of interest and costs, and any member of the Class is a citizen of state different from any

9  defendant.").)

10         "[T]he party asserting subject matter jurisdiction has the burden of proving its existence."

11  *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009) (quoting *Rattlesnake Coal. v. U.S.*

12  *E.P.A.*, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007).  Here too, allegations cannot suffice and

13  Mashkevich must affirmatively demonstrate through evidence that the jurisdictional requirements

14  are met.  *See Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009) ("[N]o presumptive

15  truthfulness attaches to plaintiff's allegations.") (quoting *Augustine v. United States*, 704 F.2d

16  1074, 1077 (9th Cir. 1983)).

17         The Class Action Fairness Act permits a federal court to hear a class action if "the matter

18  in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," and certain

19  minimal diversity requirements are met.  *See* 28 U.S.C. § 1332(d).  Mashkevich has not provided

20  evidence that this amount-in-controversy requirement is met.

21         Mashkevich's expert asserts that a total of $1,092,200 of cryptocurrency entered Qbit

22  Lithuania's possession from the alleged money laundering ring.  (Doc. No. 9-3 at 10, ¶ 32.)

23  Mashkevich does not dispute that this is the total amount that has entered Qbit Lithuania's

24  possession.  Instead, Mashkevich inflates the jurisdictional amount by invoking his civil

25  conspiracy claim and asserting that the money laundering scheme, in total, handled more than $28

26  million, which he argues should represent the amount in controversy for this action.  (Doc. No. 18

27  at 9.)

28
                                        -20-

When faced with similar claims, California courts have resolved the discrepancy by assessing whether the civil conspiracy claim is viable.  *See Binns v. Am. Gen. Life Ins. Co.*, No. 2:24-CV-08191-RGK-AGR, 2024 WL 4843726, at *2 (C.D. Cal. Nov. 19, 2024); *Overturf v. Rocky Mountain Chocolate Factory, Inc.*, No. SACV0800365AGRNBX, 2008 WL 11337839, at *4 (C.D. Cal. Oct. 27, 2008).  If the facts supporting the civil conspiracy claim are insufficient to meet the relevant pleading and evidentiary requirements, the civil conspiracy claim is disregarded and the amount in controversy is limited to the harm caused by the particular defendant, rather than the harm caused by the alleged conspiracy.  *See Binns*, 2024 WL 4843726, at *2; *Overturf*, 2008 WL 11337839, at *4.

> Conspiracy is not a separate tort, but a form of vicarious liability by which one defendant can be held liable for the acts of another.  . . .  A conspiracy requires evidence 'that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it.'  Thus, conspiracy provides a remedial measure for affixing liability to all who have 'agreed to a common design to commit a wrong' when damage to the plaintiff results.  The defendant in a conspiracy claim must be capable of committing the target tort.

*IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 652 (2018) (internal citations omitted).[3]  "The conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose."  *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995) (internal citations omitted).

When assessing whether Mashkevich has pleaded a viable claim for civil conspiracy, the Court must take into account Rule 9(b) of the Federal Rules of Civil Procedure.  Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "To comply with Rule 9(b), allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'"  *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)).  "The complaint must specify

---

[3] Qbit Lithuania reserves the right to brief choice of law issues at a later date.

such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Neubronner*, 6 F.3d at 672.

> Rule 9(b) applies where a claim is "grounded in fraud" or "sounds in fraud," even if fraud is not an essential element of the cause of action. In other words, if a plaintiff chooses to allege in the complaint that the defendant has engaged in fraudulent conduct, then the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

*In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1057 (9th Cir. 2023). "Rule 9(b)'s particularity requirement applies to state-law causes of action," in addition to federal causes of action. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).

Through the lens of Rule 9(b), it is clear that Mashkevich has not pleaded a viable claim for civil conspiracy. Nor, indeed, does Mashkevich's evidence submitted with his *ex parte* motion sufficiently support a claim for civil conspiracy. Again, the only factual allegation tying Qbit Lithuania to Mashkevich's loss is the fact that cryptocurrency tokens allegedly purchased using funds stolen from Mashkevich are, or once were, present in the THGTen Wallet. Mashkevich claims that a grand money laundering scheme was one of the steps taken along the way before the tokens reached the THGTen Wallet, but there is no connection alleged or proved between Qbit Lithuania and this conspiracy other than the fact that the tokens eventually reached the THGTen Wallet. Again, the factual allegations of Mashkevich's complaint amount to a claim that he found an Al Capone bill in a Wells Fargo ATM; these allegations simply do not meet the Rule 9(b) standard and are insufficient to demonstrate a viable civil conspiracy claim.

Because Mashkevich does not have a viable claim for civil conspiracy, the Court should ignore the inflated $28 million figure proffered by Mashkevich as the amount in controversy. Because the $28 million cannot serve as the amount in controversy, it is clear that Mashkevich's evidence cannot support a claim for more than $1,092,200 against Qbit Lithuania on behalf of the class. Thus, the amount-in-controversy requirement of the Class Action Fairness Act is not met.

Mashkevich's supplemental brief also invokes the normal diversity statute, 28 U.S.C. § 1332. (*See* Doc. No. 18 at 10–11.) This grounds for jurisdiction was never asserted in the California Complaint. In any event, Mashkevich's invocation of the normal diversity statute is

-22-

insufficient for the same reason:  the amount in controversy cannot include funds that are not connected to the THGTen Wallet because Mashkevich's claim for civil conspiracy is inadequately pleaded and unproven.  Although Mashkevich claims that he suffered a $90,000 loss, he never states the amount of that $90,000 that ended up in the THGTen Wallet as opposed to the other 35 wallets.  Mashkevich thus never provides any factual allegations or evidence to support for his claim that the amount in controversy, absent the civil conspiracy claim, exceeds $75,000.

It is Mashkevich's burden to prove that this court has subject-matter jurisdiction. Mashkevich has failed to meet that burden.  This Court should disregard the obviously faulty civil conspiracy claim and refuse to issue preliminary injunctive relief for lack of subject-matter jurisdiction.

### B.    This Court Does Not Have Personal Jurisdiction Over Qbit Lithuania.

Absent personal jurisdiction, the Court lacks the authority to issue any preliminary injunctive relief against Qbit Lithuania.  *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1135 (9th Cir. 2005).  Here, the Court lacks personal jurisdiction over Qbit Lithuania for a number of reasons.

First, Qbit Lithuania has not been served.  Service of process is an absolute prerequisite for any assertion of personal jurisdiction.  *See Mason v. Genisco Tech. Corp.*, 960 F.2d 849, 851 (9th Cir. 1992).  As this Court recently recognized, "[t]he Court cannot issue an injunction against any defendant until it has personal jurisdiction over that defendant, and it cannot exercise personal jurisdiction over a defendant until . . . the procedural requirement of service of summons [is] satisfied."  *Poslof v. Arce*, No. 24-CV-06004-PCP, 2025 WL 786356, at *14 (N.D. Cal. Mar. 12, 2025) (Pitts, J.) (quoting *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)) (citation and quotation marks omitted).  Mashkevich has not served Qbit Lithuania.  Indeed, the docket indicates that Mashkevich has not even requested the issuance of a summons.  Without service of process, there is no personal jurisdiction.  And without personal jurisdiction, the Court has no authority to issue preliminary injunctive relief.

Second, Qbit Lithuania does not have the requisite contacts with the State of California to subject it to the personal jurisdiction of this Court.  Under the Supreme Court's Due Process test,

-23-

there are two types of personal jurisdiction that a court can exercise: general personal jurisdiction and specific personal jurisdiction.

General personal jurisdiction permits a court to exercise jurisdiction over defendants whose "contacts with a forum are so substantial, continuous, and systematic that the defendant can be deemed to be 'present' in that forum for all purposes." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir.2006) (en banc). "With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction. Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (citations and quotation marks omitted, alterations adopted). Mashkevich does not provide any evidence that Qbit Lithuania is at home in the State of California. Indeed, it is undisputed that Qbit Lithuania is headquartered and organized under the laws of Lithuania. Accordingly, an exercise of general jurisdiction here would be improper.

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation and quotation marks omitted). The Ninth Circuit employs a three-prong test for deciding questions of specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). "The plaintiff bears the burden of satisfying the first two prongs of the test. If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state. If the plaintiff

-24-

1  succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to present

2  a compelling case that the exercise of jurisdiction would not be reasonable." *Id.*

3         Here, again, Mashkevich fails to make the requisite connection between Qbit Lithuania

4  and the State of California.  The THGTen Wallet—the only part of Mashkevich's grand tale of

5  conspiracy that is actually connected to Qbit Lithuania—is maintained at a Hong Kong

6  cryptocurrency exchange.  Mashkevich does not allege, much less provide proof, that any

7  California-based entity has ever sent money to or received money from Qbit Lithuania—nor has

8  he connected any such transaction with the facts of this case.  Indeed, even if the Court credits

9  Mashkevich's conspiracy allegations (which it should not), Mashkevich has not demonstrated that

10 the facts of his scam or the scams affecting any of the class members bears any relation to the State

11 of California.

12        Rather than connect Qbit Lithuania to the State of California, Mashkevich rests his

13 argument on the connections between the State of California and a completely different company,

14 Bytechip LLC, under the theory that Bytechip is an alter ego of Qbit Lithuania.  (Doc. No. 18 at

15 11–12.)  This claim is completely unsupported by the evidence.

16            The existence of a parent-subsidiary relationship is insufficient, on its own, to
              justify imputing one entity's contacts with a forum state to another for the purpose
17            of establishing personal jurisdiction.  A basic tenet of American corporate law is
              that the corporation and its shareholders are distinct entities.  As a general principle,
18            corporate separateness insulates a parent corporation from liability created by its
              subsidiary, notwithstanding the parent's ownership of the subsidiary.  However, in
19            certain limited circumstances, the veil separating affiliated entities may be pierced
              to impute liability from one entity to the other.  As in the context of corporate
20            liability, the veil separating affiliated corporations may also be pierced to exercise
              personal jurisdiction over a foreign defendant in certain limited circumstances.
21

22 *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070–71 (9th Cir. 2015).

23        Under the Ninth Circuit's alter ego test for personal jurisdiction, one corporate entity may

24 be deemed the alter ego of another if "the parent and subsidiary are 'not really separate entities,'

25 such that one entity's contacts with the forum state can be fairly attributed to the other."  *Id.* at

26 1071.

27            To satisfy the alter ego test, a plaintiff must make out a prima facie case (1) that
              there is such unity of interest and ownership that the separate personalities of the

28

                                                -25-

two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice.  The "unity of interest and ownership" prong of this test requires a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former.  This test envisions pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation."   Total ownership and shared management personnel are alone insufficient to establish the requisite level of control.

*Ranza*, 793 F.3d at 1073 (citations and quotation marks omitted, alterations adopted).

Mashkevich's California Complaint contains only threadbare allegations concerning alter ego.  Mashkevich alleges that Bytechip, LLC, occasionally used the mark "Qbit" in conducting business. (Doc. No. 1 at 6, ¶ 19.)  Mashkevich also alleges that Bytechip and Qbit Lithuania shared resources, such as computer facilities and a corporate office.  (Doc. No. 1 at 29–30, ¶¶ 103–07.)

In Mashkevich's *Ex Parte* Motion for a Temporary Retraining Order, Mashkevich did not submit evidence to support even these minimal allegations.  Instead, Mashkevich's entire evidence concerning alter ego consists of one paragraph in his counsel's declaration that states: "According to Bytechip LLC's July 24, 2024 Statement of Information filed with the California Secretary of State, Yujun 'Michael' Wu is the Manager or Member of Bytechip LLC, is its Chief Executive Officer, and is authorized to sign on behalf of Bytechip LLC."  (Doc. No. 9-1 at 3, ¶ 6.)  Even when this Court provided an opportunity for Mashkevich to file supplemental materials in support of his *Ex Parte* Motion, Mashkevich failed to file any additional evidence.

Mashkevich's evidence of shared ownership and shared resources is legally insufficient to demonstrate that Qbit Lithuania and Bytechip are alter egos.  *See Ranza*, 793 F.3d at 1073 ("Total ownership and shared management personnel are alone insufficient to establish the requisite level of control.").  Mashkevich failed to allege or provide any evidentiary support for the proposition that Qbit Lithuania or Bytechip "dictates every facet" of the other's business, or that Michael Wu "dictates every facet" of both Qbit Lithuania's and Bytechip's business.

Additionally, Mashkevich failed to allege specific facts or provide evidentiary support for the proposition that a separate treatment of Qbit Lithuania and Bytechip would result in fraud or injustice.  This is not a situation where one corporation uses a subsidiary to perpetrate injustices

1    and shield itself from liability. It is apparent that Bytechip's sole connection to the facts of this

2    case is the fact that it is mutually owned by Michael Wu. No injustice would result from requiring

3    Mashkevich to bring his claims in a forum where Qbit Lithuania is actually subject to jurisdiction,

4    such as in Lithuania.

5          To be clear: Michael Wu is not a resident of the State of California. (Wu Decl. at 2, ¶ 3.)

6    He is not subject to either general personal jurisdiction or specific personal jurisdiction in the State

7    of California. Bytechip is the only defendant that is subject to personal jurisdiction in California.

8    So Mashkevich must not only prove that Qbit Lithuania is an alter ego of Michael Wu, he must

9    prove that Qbit Lithuania is an alter ego *of Bytechip*.

10         The uncontroverted evidence before the court is straightforward and belies Mashkevich's

11   position: Bytechip is an entirely distinct business venture and operates independently of Qbit

12   Lithuania. (*Id.* at 2, ¶ 23.) Bytechip has separate financial accounts and maintains a distinct

13   corporate structure. (*Id.*) Under these circumstances, Bytechip cannot be treated as an alter ego

14   of Qbit Lithuania. Mashkevich has not met his burden of overcoming the usual presumption that

15   separate corporate entities are to be treated separately. His attempt to invoke alter ego jurisdiction

16   should be rejected and his request for a temporary restraining order should be rejected on the

17   grounds that this court lacks personal jurisdiction over Qbit Lithuania.

18       **C.**    **Mashkevich's Motion for Provisional Class Certification Should Be Rejected.**

19         A party seeking provisional class certification must meet the full class certification

20   requirements of Rule 23 of the Federal Rules of Civil Procedure. *See Meyer v. Portfolio Recovery*

21   *Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012). "Under Rule 23, a class action may be

22   maintained if the four prerequisites of Rule 23(a) are met, and the action meets one of the three

23   kinds of actions listed in Rule 23(b)." *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th Cir. 2023). It is

24   the plaintiff's burden to prove that class certification is justified. *Van*, 61 F.4th at 1066. Rule

25   23(a)'s requires that:

26       (1) the class is so numerous that joinder of all members is impracticable;

27       (2) there are questions of law or fact common to the class;

28

-27-

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Mashkevich here invokes Rule 23(b)(3), which permits a class action to be maintained where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The crucial problem with Mashkevich's proposed class action is that virtually nothing is known about the proposed class. Zarazinski claims, based on Inca's study of funds that were transferred through cryptocurrency wallets in transaction routes similar to the route taken by Mashkevich's funds, that "[t]he scheme affected approximately 2,000 victim wallets and involved the conversion of approximately $28 million of Class Member funds." (Doc. No. 9-3 at 5, ¶ 7.) However, Zarazinski is unable to determine who the owners of these 2,000 wallets are, how many owners there are, where the owners reside, or what the circumstances of the transactions between these wallets and the alleged money laundering mechanism were. Zarazinski also does not state the proportion of the funds originating from these 2,000 wallets that ended up in the THGTen Wallet.

This Court can take judicial notice of the basics of money laundering. "In its classic form, the money launderer folds ill-gotten funds into the receipts of a legitimate business." *United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (quoting *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007)). Given that money laundering, at its core, involves the comingling of legitimate and illegitimate funds, the mere fact that a cryptocurrency token followed a similar transaction path as the tokens purchased using Mashkevich's funds tells the Court very little about what happened in the original transaction. It is highly unlikely, given the known facts about money laundering, that every token from all 2,000 wallets was obtained illegally. It is more likely than not that at least some of the funds that wound their way through Zarazinski's money laundering

1    mechanism were in fact obtained by the alleged scammers or money launderers through perfectly

2    legitimate transactions.  The parties on the other side of these transactions of course would not

3    have any claim against Qbit Lithuania.

4           Mashkevich has not stated how he intends to effect class notice on this class.  Presumably,

5    he would propose that a "Service Token" be airdropped into each of the 2,000 wallets the same

6    way that he attempted to serve Qbit Lithuania.  This is a method of service not authorized under

7    the federal rules, never endorsed by any federal court, and which is demonstrably ineffective, as

8    evidenced by its failure to put Qbit Lithuania on notice of the Alabama injunction.

9           Even if Mashkevich could serve class notice on the owners of the 2,000 wallets,

10   determining which owners are class members would be functionally impossible.  The number and

11   scale of the individual issues at play with this proposed class are astounding.  Mashkevich defined

12   the class as "all persons and entities who, at the suggestion of the Scammers or individuals acting

13   under the Scammers' instruction or control, transferred cryptocurrency into one or more of the

14   cryptocurrency wallets . . . ."  (Doc. No. 19 at 2.)  To determine whether a class member

15   "transferred cryptocurrency" "at the suggestion of the Scammers or individuals acting under the

16   Scammers' instruction or control" would require the Court to assess each individual transaction to

17   determine whether the transaction was made "at the suggestion" of the scammers.  Every single

18   class member would have to respond to Mashkevich's "Service Token" and affirmatively provide

19   evidence that they meet the class definition.  Then, to prevail of the claims stated in the California

20   Complaint, each class member would have to provide evidence of what representations were made

21   to the class member, how did the class member rely on the representations, and what was the class

22   member's state of mind—and, of course, the finder of fact would have to determine the credibility

23   of each class member.  Proceeding to the merits on Mashkevich's proposed class action could

24   require up to 2,000 depositions and months of trial time.

25          The Ninth Circuit has repeatedly held that this kind of class-member-by-class-member

26   proceeding is inappropriate:

27          [T]he district court must assess the necessity and manageability of the potential
            class-member-by-class-member discovery process and trial.  On the one hand, if

28                                                      -29-

1
2
3
4
5

> the discovery and trial process must assess thousands of claims one claim at a time, then the individualized issue will weigh heavy in the predominance balancing. On the other hand, if the district court determines that the individualized issue is limited to a small number of class members or will otherwise be simple to investigate and present at trial, the district court might reasonably certify the class in the face of the individualized issue. When making this assessment, the district court should keep in mind that the plaintiff bears the burden of proving that class issues predominate over individualized issues.

6    *Van*, 61 F.4th at 1067 n.11. Mashkevich has not and cannot identify any source of common proof

7    for determining which of the 2,000 wallet owners are class members and which class members

8    should prevail on the merits.

9        The fact that many of the wallet owners may reside outside the United States complicates

10   the matter even further. Mashkevich does not explain how he intends to calculate class notice in

11   such a way that the service would be effective on any person who receives it, regardless of the

12   language spoken by that person. The depositions and evidentiary collection could involve many

13   hundreds of international lawyers. The trial in this matter could require the parties to employ

14   translators for dozens of different languages.

15       In addition to defeating predominance, the individual issues also defeat superiority. "If

16   each class member has to litigate numerous and substantial separate issues to establish his or her

17   right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Rsch. Inst., Inc.*,

18   253 F.3d 1180, 1192 (9th Cir. 2001).

19       The class action mechanism is intended to provide an avenue for aggregating claims—not

20   to punish defendants or inflate legal fees, but to provide a meaningful opportunity for justice where

21   many individuals with small claims would not have sufficient incentive to pursue those claims.

22   *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("While the text of Rule 23(b)(3)

23   does not exclude from certification cases in which individual damages run high, the Advisory

24   Committee had dominantly in mind vindication of the rights of groups of people who individually

25   would be without effective strength to bring their opponents into court at all." (quotation marks

26   omitted)). This is simply not the case where class certification would be appropriate. If

27   Mashkevich's claims are typical of the class's claims and his loss of $90,000 is typical of the losses

28
                                                    -30-

1    suffered by the class members, then the class members have more than enough incentive to pursue

2    justice outside the class mechanism.

3        Because individualized questions predominate over common questions, and because the

4    class action mechanism is not superior to other available mechanisms for adjudicating the claims

5    of the class members, the Court should deny class certification.

6        **D.    If The Court Exercises Jurisdiction, It Should Nevertheless Deny the *Ex***

7        ***Parte* Motion for Temporary Restraining Order.**

8        The issuance of a temporary restraining order is governed by Rule 65 of the Federal Rules

9    of Civil Procedure.  The standard for granting a temporary restraining order is highly demanding:

10       The stringent restrictions imposed . . . by Rule 65 on the availability of *ex parte*
         temporary restraining orders reflect the fact that our entire jurisprudence runs
11       counter to the notion of court action taken before reasonable notice and an
         opportunity to be heard has been granted both sides of a dispute.  *Ex parte*
12       temporary restraining orders are no doubt necessary in certain circumstances, but
         under federal law they should be restricted to serving their underlying purpose of
13       preserving the status quo and preventing irreparable harm just so long as is
         necessary to hold a hearing, and no longer.

14

15   *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda*

16   *Cnty.*, 415 U.S. 423, 438–39 (1974) (citation omitted).  Under this high standard, "courts have

17   recognized very few circumstances justifying the issuance of an ex parte TRO."  *Reno Air Racing*

18   *Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).  To justify an *ex parte* temporary

19   restraining order, "Plaintiffs must show that defendants would have disregarded a direct court

20   order and disposed of the goods within the time it would take for a hearing and must support such

21   assertions by showing that the adverse party has a history of disposing of evidence or violating

22   court orders or that persons similar to the adverse party have such a history."  *Id.* (quoting *First*

23   *Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650–1 (6th Cir. 1993)) (alterations adopted).

24       If the plaintiff can demonstrate that a temporary restraining order should issue on an *ex*

25   *parte* basis, the plaintiff must then demonstrate that the four *Winter* factors are met.  *See Stuhlbarg*

26   *Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 (9th Cir. 2001) (noting that the

27   preliminary injunction and temporary restraining order analyses are "substantially identical").

28

-31-

Under *Winter v. Natural Resources Defense Counsel, Inc.*, a party seeking preliminary injunctive relief must provide evidence proving that four factors are met: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. 7, 20 (2008).

   *1. Mashkevich Has Not Demonstrated a Likelihood of Success on the Merits.*

   Neither Mashkevich nor the class has any likelihood of success on the merits. To recap the various discussions above:

   (1) Zarazinski's conclusion that a money laundering network exists is not supported by sufficient evidence. The mere fact that some of the accounts spend the funds they receive within a few days of receipt and others don't is not sufficient evidence to claim that more than 280 cryptocurrency wallets are involved in a money laundering scheme.

   (2) Zarazinski's conclusion that Qbit Lithuania was involved in the purported money laundering scheme is not supported by the evidence. The mere fact that some cryptocurrency in Qbit Lithuania's account was purchased using funds that Zarazinski believes he can trace back to Mashkevich is not sufficient evidence to claim that Qbit Lithuania was a co-conspirator with the individuals who scammed Mashkevich or that Qbit Lithuania is liable for Mashkevich's loss. In essence, Zarazinski can at most claim that he found an innocuous Al Capone bill in a Wells Fargo ATM—not a smoking gun that Qbit Lithuania is engaged in a conspiracy to launder cryptocurrency.

   (3) Zarazinski's assertion that funds from 2,000 wallets originated funds that followed similar transaction routes to the route taken by Mashkevich's funds does not provide any meaningful information. It does not mean that there are 2,000 class members nor does it mean that all $28 million that was transacted is suspect.

   Mashkevich's evidence does not demonstrate that Qbit Lithuania was in any way responsible for his harm or that there is any merit to his claims against Qbit Lithuania. Mashkevich has not met his burden to prove that he has a reasonable likelihood of success on the merits. Indeed,

1    given that this action is subject to the requirements of Rule 9(b) of the Federal Rules of Civil

2    Procedure, as discussed above, it is unlikely that Mashkevich would even make it past the

3    pleadings stage, much less succeed on the merits, given the lack of particular factual allegations in

4    the California Complaint.

5                 2.     *Mashkevich Has Not Demonstrated a Likelihood of Irreparable Harm.*

6           The sole piece of evidence submitted by Mashkevich in support of a finding of irreparable

7    harm is Zarazinski's unexplained conclusion that Qbit Lithuania is likely to hide its assets from

8    the Court:  "Based on my expertise in blockchain forensics and my substantial experience

9    investigating pig butchering schemes similar to this one, if there is no injunction in place freezing

10   the assets contained in THGTen, it is highly likely that Defendants will transfer cryptocurrency at

11   issue beyond the reach of discovery or recovery."  (Doc. No. 9-3 at 15, ¶ 42.)

12          Mashkevich compares this case to two cases where scammed individuals located a portion

13   of the lost cryptocurrency and sought freeze orders against the unknown holders of the

14   cryptocurrency.  *See Bullock v. Doe*, No. 23-CV-3041 CJW-KEM, 2023 WL 9503380 (N.D. Iowa

15   Nov. 3, 2023); *Jacobo v. Doe*, No. 1:22-CV-00672-DAD-BAK (BAM), 2022 WL 2052637 (E.D.

16   Cal. June 7, 2022).

17          This case is very different from both *Bullock* and *Jacobo*.  In this case, Mashkevich knows

18   the holder of the cryptocurrency—Qbit Lithuania.  Mashkevich knows where the corporate offices

19   of Qbit Lithuania are and where it is incorporated.  Qbit Lithuania is not hiding.  This is simply

20   not a case where the cryptocurrency is the plaintiff's sole path to relief, which would vanish the

21   moment the cryptocurrency is transferred.  (Indeed, the claim that the cryptocurrency could be

22   hidden through a transfer is belied by Zarazinski's claim that the cryptocurrency at issue in this

23   case was trackable through even the most convoluted money laundering mechanisms.)

24          Qbit Lithuania, unlike the defendants in *Bullock* and *Jacobo*, is not anonymous.  That

25   crucial difference makes this case distinguishable from *Bullock* and *Jacobo* and draws this case

26   far closer to *JustM2J LLC v. Brewer*, No. 2:25-CV-00380-DAD-SCR, 2025 WL 435827 (E.D.

27   Cal. Feb. 7, 2025).  Indeed, *JustM2J* is strikingly similar to this case.  In *JustM2J*, the plaintiff lost

28

cryptocurrency in a cyberattack and was able to discover the names, locations, and occupations of many of the perpetrators.  The plaintiff brought suit against the non-anonymous individuals in the Eastern District of California and promptly moved for a temporary restraining order.  The plaintiff in *JustM2J* supported its *ex parte* motion for a temporary restraining order with a declaration from Adam Zarazinski (the same expert used by Mashkevich in this case).  Zarazinski's declaration in *JustM2J*, just like his declaration here, claimed that "the risk of further asset dissipation is imminent due to the typical behavior of cryptocurrency thieves."  *Id.* at *7.

The district court in *JustM2J* held that his kind of evidence is insufficient to demonstrate a likelihood of irreparable harm where the holders of the cryptocurrency are not anonymous.  The court noted that "the issuance of a temporary restraining order is generally inappropriate in cases involving the alleged theft of cryptocurrency where monetary damages were available and would suffice."  *Id.* at *8.  After analyzing multiple factors—"whether the defendants' identities are known, whether the fraudulent scheme is ongoing, and the defendants' conduct in the litigation," *id.* at *8—the district court concluded that money damages were available to compensate any harm and therefore there was no showing of imminent and irreparable harm.

This case is more comparable to *Brewer* than to *Bullock* or *Jacobo*.  There is not a significant likelihood of irreparable harm here.  In the unlikely event that Mashkevich obtains a judgment against Qbit Lithuania, the existing mechanisms for enforcing a judgment are more than sufficient for compensating his loss.

### 3. The Balance of Equities Do Not Favor Mashkevich.

With respect to the balance of equities, the Court "has a duty . . . to balance the interests of all parties and weigh the damage to each."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks omitted).

Qbit Lithuania's business, and the livelihood of every one of its employees, depends on its ability to access the funds needed for its cryptocurrency banking services.  For every day that the funds are frozen, Qbit Lithuania must pay about $6,000 in interest for the borrowed funds that it is using to make up for the lost funds.  Mashkevich claims that he lost $90,000 and seeks to recoup

-34-

that loss.  Qbit Lithuania is losing that same amount every fifteen days because of the overbroad, unjustified, and improper injunction entered by the Alabama court—the injunction that Mashkevich urges this Court to prolong.  The balance of equities favors Qbit Lithuania, not Mashkevich.

4.    *The Public Interest Favors Qbit Lithuania.*

In addition its own financial interest and the livelihood of its employees, Qbit Lithuania's business also supports the public interest.  Qbit Lithuania provides its cryptocurrency banking services to members of the public from across the world.  Qbit Lithuania is not able to effectively provide those services without access to the THGTen Wallet.  The injunction entered by the Alabama court has negatively impacted members of the public who use Qbit Lithuania's services.

Cryptocurrency is a growing area for speculation and online exchange of funds.  There are relatively few entities that provide cryptocurrency banking such as Qbit Lithuania.  The wholesale freeze of $7 million in Qbit Lithuania's assets harms a significant number of members of the public who rely on Qbit Lithuania's relatively niche services.

5.    *The Proposed Injunction Is Beyond the Limits of This Court's Equitable Power.*

In *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), the Supreme Court barred district courts from freezing assets to satisfy a future money judgment. *See id.* at 333 ("[W]e hold that the district court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending an adjudication of respondent's contract claim for money damages.").  The Supreme Court provided only limited exceptions to the rule: cases involving bankruptcy, claims for fraudulent conveyance, and cases where the plaintiff has an equitable interest over the property.  *See In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004).  This case does not involve bankruptcy, nor has plaintiff asserted a claim for fraudulent conveyance.[4]  Thus, the sole question is whether Mashkevich has an equitable interest in the

---

[4] A claim for fraudulent conveyance is a particular type of claim under state law that is necessarily predicated on a debtor-creditor relationship not present here.  *See* Cal. Civ. Code § 3439.04.

property that he is seeking to freeze.

For Mashkevich to have an equitable interest in the property, "the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002). "[A] plaintiff seeks restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff can clearly be traced to particular funds or property in the defendant's possession." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 661 (9th Cir. 2019) (citation and quotation marks omitted, alteration adopted). "[S]eeking recovery out of the defendant's general assets due to dissipation of the funds on nontraceable items (like food or travel) amounts to a legal remedy, not an equitable one." *Id.* (citation and quotation marks omitted).

Mashkevich's requested injunction violates the *Grupo Mexicano* rule. First, Mashkevich's injunction seeks to freeze the entire $7 million in the THGTen Wallet, despite the fact that nowhere near $7 million is traceable to his loss. Only a fraction of $90,000 is allegedly traceable to the funds stolen from Mashkevich. Even if class certification were granted (and it should not be), and even if every one of the 2,000 wallets belonged to class members (a proposition for which there is no evidence), that would nonetheless mean that only $1,092,200 of funds is traceable to the loss of the class members under Zarazinski's analysis. Thus, the vast majority of $7 million in the THGTen Wallet are not traceable to any loss suffered by Mashkevich or even by the class. The freezing of non-traceable funds would be a clear violation of *Grupo Mexicano*.

Even if Mashkevich's requested temporary restraining order were limited to only the traceable funds, Mashkevich has failed to provide the evidence or explanation needed to support the limited injunction. Mashkevich has not identified the type or amount of cryptocurrency in Qbit Lithuania's possession traceable to his loss, much less identified the particular serial numbers of the tokens that he has purportedly tracked through Zarazinski's money laundering machine. Given that the Court's equitable power is limited to freezing identifiable, traceable assets, Mashkevich's failure to specifically identify which tokens he wishes to freeze is fatal to his temporary restraining

-36-

1    order request.

2                    6.       *Mashkevich Should Be Required to Post a Bond.*

3          If this Court believes that a temporary restraining order is due to issue, it should require

4    Mashkevich to post a bond.  "The court may issue a preliminary injunction or a temporary

5    restraining order only if the movant gives security in an amount that the court considers proper to

6    pay the costs and damages sustained by any party found to have been wrongfully enjoined or

7    restrained."  Fed. R. Civ. P. 65(c).  Qbit Lithuania has submitted uncontroverted evidence that it

8    is losing about $6,000 per day due to its lack of access to the THGTen Wallet.  The Court must

9    require Mashkevich to post a bond in an amount sufficient to compensate Qbit Lithuania for the

10   losses suffered, as well as any other "costs and damages" that Qbit Lithuania may suffer.  For a

11   fourteen-day temporary restraining order, a bond of at least $100,000 should be required.

12                                    **IV.  CONCLUSION**

13         The law places limits on the power of a federal district court.  *See United States v. Sumner*,

14   226 F.3d 1005, 1009 (9th Cir. 2000).  Mashkevich asks this Honorable Court to ignore those limits

15   and, based on only threadbare allegations and scant evidence, impose a crushing financial burden

16   on Qbit Lithuania by freezing $7 million of Qbit Lithuania's assets.

17         The temporary restraining order requested by Mashkevich is beyond the limits of this

18   Court's subject-matter jurisdiction, targets a party beyond the limits of this Court's personal

19   jurisdiction, seeks relief beyond the limits of this Court's equitable powers, on behalf of a class

20   that cannot be certified, without a successful showing on *any* of the four *Winter* factors and without

21   posting a bond.  The *Ex Parte* Motion for Temporary Restraining Order is frankly outrageous—

22   and so too is the Motion for Provisional Class Certification.  The Court must deny both motions.

23         //

24         //

25         //

26         //

27         //

28
                                           -37-

1    Dated:  March 23, 2025                        MAYNARD NEXSEN LLP

2
                                        By:    */s/ James J. Hockel*
3                                              ALBERT TONG
                                              JAMES J. HOCKEL
4
                                              Attorneys for Specially Appearing
5                                              Defendant
                                              UAB QBIT FINANCIAL SERVICE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED OPPOSITION TO PLAINTIFF'S MOTIONS FOR TRO
AND PROVISIONAL CLASS CERTIFICATION
Case No. 5:25-cv-02565-PCP