ALBERT TONG (SBN 208439)
atong@maynardnexsen.com
JAMES J. HOCKEL (SBN 340612)
jhockel@maynardnexsen.com
MAYNARD NEXSEN LLP
Two Embarcadero Center, Ste. 1450
San Francisco, CA 94114
Telephone:    415.646.4670

Attorneys for Specially Appearing Defendant
UAB QBIT FINANCIAL SERVICE

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UAB QBIT FINANCIAL SERVICE, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-02565-PCP<br><br>**DECLARATION OF JOHN A. SMYTH, III IN SUPPORT OF DEFENDANT UAB QBIT FINANCIAL SERVICE'S CONSOLIDATED OPPOSITION TO PLAINTIFF MICHAEL MASHKEVICH'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER (Doc. No. 8) AND MOTION FOR PROVISIONAL CLASS CERTIFICATION (Doc. No. 19)**<br><br>Hearing Date:  March 24, 2025<br>Hearing Time: 1:00 p.m. |

I, John A. Smyth III, hereby declare as follows:

1.      I am an attorney licensed to practice law in Alabama, Arkansas, and Mississippi and I am a shareholder with the law firm Maynard Nexsen P.C.  I am counsel of record for non-party UAB Qbit Financial Service ("Qbit") in an action styled *Michael Mashkevich vs. Olivia Ava et al.*, in the Circuit Court of Marshall County, Alabama, CV-2024-900163.   ("the Alabama Action").

2.      Attached hereto as **Exhibit A** is a true and correct copy of the Complaint filed June 4, 2024, to commence the Alabama Action.

3.      Attached hereto as **Exhibit B** is a true and correct copy of Plaintiff's Emergency

-1-

DECLARATION OF JOHN A. SMYTH, III IN SUPPORT OF OPPOSITION
TO PLAINTIFF'S MOTIONS FOR TRO AND PROVISIONAL CLASS CERT
Case No. 5:25-cv-02565-PCP

1  Motion for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction

2  Should Not Enter filed June 4, 2024, in the Alabama Action.

3      4.      Attached hereto as **Exhibit C** is a true and correct copy of the Affidavit of Michael

4  Mashkevich filed June 4, 2024, in the Alabama Action.

5      5.      Attached hereto as **Exhibit D** is a true and correct copy of the Declaration of

6  Charles Zach filed June 4, 2024, in the Alabama Action.

7      6.      Attached hereto as **Exhibit E** is a true and correct copy of Plaintiff's Proposed

8  Order to Show Cause and Temporary Restraining Order filed June 4, 2024, in the Alabama Action.

9      7.      Attached hereto as **Exhibit F** is a true and correct copy of the Temporary

10 Restraining Order and Order to Show Cause entered by the Alabama court on June 4, 2024.

11     8.      Attached hereto as **Exhibit G** is a true and correct copy of Plaintiff's Notice of

12 Compliance With the Service Requirements Set Forth in the Temporary Restraining Order with

13 attached Declaration of Albina Giuttari filed on June 12, 2024, in the Alabama Action.

14     9.      Attached hereto as **Exhibit H** is a true and correct copy of the Preliminary

15 Injunction Order entered on June 14, 2024, in the Alabama Action.

16     10.     Attached hereto as **Exhibit I** is a true and correct copy of Non-Party UAB Qbit

17 Financial Service's Motion to Dissolve or, in the Alternative, Modify Preliminary Injunction Order

18 filed on January 20, 2025, in the Alabama Action.

19     I declare that the foregoing is true under penalty of perjury under the laws of the United

20 States of America.

21  Dated:  March 23, 2025

22

23                          By:  _____

24

25

26

27

28

-1-

# EXHIBIT A



AlaFile E-Notice

50-CV-2024-900163.00

To:  ROBERT R. RILEY JR.
     rob@rileyjacksonlaw.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA

MICHAEL MASHKEVICH V. OLIVIA AVA ET AL
50-CV-2024-900163.00

The following complaint was FILED on 6/4/2024 9:34:31 AM

Notice Date:      6/4/2024 9:34:31 AM

ANGIE JOHNSON
CIRCUIT COURT CLERK
MARSHALL COUNTY, ALABAMA
424 BLOUNT AVE.
SUITE 201
GUNTERSVILLE, AL, 35976

256-571-7785
angie.johnson@alacourt.gov

ELECTRONICALLY FILED
6/4/2024 9:34 AM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93    Rev. 9/18 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case<br>5(<br><br>Date of Filing:<br>06/04/2024 | Judge Code: |

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA
### MICHAEL MASHKEVICH v. OLIVIA AVA ET AL

**First Plaintiff:** ☐ Business  ☑ Individual  ☐ Government  ☐ Other

**First Defendant:** ☐ Business  ☑ Individual  ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Properly

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☑ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ EPFA - Elder Protection From Abuse
- ☐ QTLB - Quiet Title Land Bank
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☑ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**  F ☑ INITIAL FILING    A ☐ APPEAL FROM DISTRICT COURT    O ☐ OTHER

R ☐ REMANDED    T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?** ☐ YES ☑ NO    **Note:** Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**    ☑ MONETARY AWARD REQUESTED    ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**

RIL012    6/4/2024 9:34:29 AM    /s/ ROBERT R. RILEY JR.
_____    _____    _____
                Date                Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**    ☐ YES ☐ NO ☑ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:** ☐ YES ☐ NO

ELECTRONICALLY FILED
6/4/2024 9:34 AM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

# IN THE CIRCUIT COURT
## OF MARSHALL COUNTY, ALABAMA

_____

MICHAEL MASHKEVICH, on behalf of himself )
and all others similarly situated, )
  )  Civil Action No. _____
          Plaintiff, )
  )  <u>CLASS ACTION</u>
V. )
  )
OLIVIA AVA, EMMA MILLER, and F.B. LEE, )

FICTITIOUS DEFENDANT "A", being the true and correct identity of the individual identified herein as Defendant Olivia Ava; FICTITIOUS DEFENDANT "B", being the true and correct identity of the individual identified herein as Defendant Emma Miller; FICTITIOUS DEFENDANT "C", being the true and correct identity of the individual identified herein as Defendant F.B. Lee; FICTITIOUS DEFENDANTS "D" – "Z", being the true and correct identity of the business entities, individuals, and employees, agents, or servants of any of the named or fictitious defendants who participated in the conduct at issue in this case, including any defendants whose identities are currently unknown to Plaintiff who solicited Plaintiff using electronic means, who designed the fake work platforms Plaintiff utilized, who participated in receiving, forwarding, or otherwise disposing of Plaintiff's cryptocurrency, who initiated or opened any of the cyberwallets into which Plaintiff's cryptocurrency was deposited, who had or exercised control over any of the cyberwallets into which Plaintiff's cryptocurrency was deposited, or who otherwise participated in any way in the "pig butchering" schemes of which Plaintiff was a victim. The identities of Defendants "A"- "Z" are currently unknown to Plaintiff but will be added when Plaintiff ascertains their true identities through discovery.

  )
          Defendants. )
_____)|

## **COMPLAINT**

Class Plaintiff Michael Mashkevich ("Plaintiff"), by and through his undersigned counsel, Riley & Jackson, P.C., brings this Complaint for claims of conversion and related equitable remedies against Defendants, and alleges as follows:

## **INTRODUCTION**

1.    This case involves a cryptocurrency scam in which Defendants promise their victims they will be paid for performing standardized online work, and then steal their money.

2.      The cryptocurrency scam is centered around fake work platforms. Defendants solicit victims by sending boilerplate inquiries about part-time work. After a person responds to a message, one or more Defendants contact that person about a fake work platform and describe the purported work as involving activities such as clicking buttons, online data optimization, and performing tasks involving the use of various software applications.

3.      Defendants represent that the work involves real and legitimate online tasks, including tasks related to software applications at real companies (e.g., Grayphite, Resy, or inMobi) and that anyone can and should confirm the work platform's legitimacy by searching online for the official website of these companies. Defendants represent that other websites they control, which include the names of legitimate companies as part of the website link (e.g., https://www.appgrayphiteglobal.com or https://www.cozyrestaurant-du.com/en/home), are part of the work platform. Defendants further represent that, after training, a person working on a platform will earn commissions based on tasks performed. The commissions are purportedly based on a standardized income schedule with ranges of thousands of dollars per month. Defendants emphasize in standardized language the convenience of the remote work online, the absence of fixed time limits, the flexibility, and the preferred working hours.

4.      Defendants used these fake work platforms to lure a common class of victims ("Class Members," or the "Class") to transfer funds to cryptocurrency wallets controlled by Defendants. The Class in this matter is defined as all persons and entities whose funds were unlawfully taken by Defendants through the date of this Complaint, and whose stolen cryptocurrency is contained in the wallets set forth in Appendix A, or in other cryptocurrency accounts controlled by Defendants as set forth in Appendix A.

5.     Defendants followed a standardized roadmap to persuade Class Members to transfer cryptocurrency to wallets controlled by Defendants. First, Defendants requested that Class Members contribute a small amount of funds to set up their respective accounts. Then Defendants represented that Class Members had earned money for work performed and permitted Class Members to withdraw that money. Defendants then represented that Class Members were required to transfer additional funds to their accounts for standardized, boilerplate reasons, including when their credit score had dropped, their account balance had gone negative, they owed taxes, or due to a problem with loans from other work platform members. After Defendants persuaded Class Members to deposit additional funds, they stole the money and transferred it to wallets they control.

6.     Plaintiff is a resident of Albertville, Alabama. Like other similarly situated Class Members, Plaintiff was tricked by one or more individuals, including persons identifying themselves as Olivia Ava ("Ava"), Emma Miller ("Miller"), and F.B. Lee ("Lee") as part of a common scheme to transfer funds to cryptocurrency wallets controlled by Defendants using the fake work platforms.

7.     The scheme with Plaintiff began on or about March 20, 2024, when Defendants first contacted Plaintiff via WhatsApp. Defendants followed the standardized playbook set forth above, luring Plaintiff to transfer progressively greater amounts of money. Defendants represented that Plaintiff's funds were invested in cryptocurrency assets through the fake work platforms. Defendants subsequently blocked Plaintiff from accessing his accounts and transferring funds.

8.     After Plaintiff could not recover his funds, he contacted Inca Digital ("Inca"), a cryptocurrency investigation firm, which traced his transactions and confirmed that Defendants were orchestrating a fake work platform scheme. As described below, Inca investigated other

transactions involving the fake work platforms and found that these transactions were part of a common scheme to convert Class Member funds.

9.      Based on Inca's investigation to date, Defendants' conversion scheme involved transactions during the period from March 20, 2024 through at least the date of this Complaint, included more than 125 Class Member victims, and involved the conversion by Defendants of a minimum of $3.5 million of Class Member funds, with losses potentially higher.

10.     To date, the investigation initiated by Plaintiff has identified the wallet addresses set forth in Appendix A, categorized by cryptocurrency exchange, as part of the common allegations centered around the fake work platforms. Plaintiff requests that this Court issue an Order freezing these wallet addresses.

## JURISDICTION AND VENUE

11.     Plaintiff lives at 2895 Hustleville Road, Albertville, AL 35951. He works as an independent contractor in digital marketing with a specialization in search engine optimization.

12.     Defendants are persons who perpetrated the wrongdoing alleged herein. The true identities of Ava, Miller, and Lee are currently unknown and are subject to ongoing investigation. Miller contacted Plaintiff using U.S. phone number (213) 568-8512. Lee contacted Plaintiff using phone number +44 7706 295178. Lee referenced in his initial WhatsApp message to Plaintiff that Ava had suggested Plaintiff would be interested in online work.

13.     FICTITIOUS DEFENDANT "A", being the true and correct identity of the individual identified herein as Defendant Olivia Ava; FICTITIOUS DEFENDANT "B", being the true and correct identity of the individual identified herein as Defendant Emma Miller; FICTITIOUS DEFENDANT "C", being the true and correct identity of the individual identified

herein as Defendant F.B. Lee; FICTITIOUS DEFENDANTS "D" – "Z", being the true and correct identity of the business entities, individuals, and employees, agents, or servants of any of the named or fictitious defendants who participated in the conduct at issue in this case, including any defendants whose identities are currently unknown to Plaintiff who solicited Plaintiff using electronic means, who designed the fake work platforms Plaintiff utilized, who participated in receiving, forwarding, or otherwise disposing of Plaintiff's cryptocurrency, who initiated or opened any of the cyberwallets into which Plaintiff's cryptocurrency was deposited, who had or exercised control over any of the cyberwallets into which Plaintiff's cryptocurrency was deposited, or who otherwise participated in any way in the "pig butchering" schemes of which Plaintiff was a victim. Plaintiff avers that the identities of Defendants "A"- "Z" are currently unknown to Plaintiff but will be added when Plaintiff ascertains their true identities through discovery.

14.    This Court has personal jurisdiction over the defendants, including those fictitiously named, as the Defendants committed intentional torts directed at a resident citizen of Marshall County, Alabama, converted digital cryptocurrency belonging to a resident citizen of Marshall County, Alabama, solicited Plaintiff through electronic means, and otherwise committed tortious acts herein.

15.    Venue is proper in this Court because Defendants are neither citizens nor residents of Alabama and a substantial part of the events giving rise to the claims occurred in this county, where the Plaintiff resides and was primarily targeted by the Defendants' scheme.

16.    The Plaintiff reserves the right to amend this Complaint to include additional parties as Defendants, upon further investigation and discovery of their identities, roles, and residences.

## STATEMENT OF FACTS

17.    As detailed below, Defendants followed an especially pernicious version of the "pig butchering" roadmap for cryptocurrency theft. "Pig butchering" victims in the United States have lost billions of dollars and "pig butchering" schemes have been the subject of state and federal government investigation and prosecution.[1]

18.    In a typical "pig butchering" scheme, scammers promise victims returns and then fabricate evidence of positive performance on fake websites made to look like functioning cryptocurrency trading venues or investment companies to entice victims to "invest" more money. When the victims have been sufficiently "fattened" with false profits, scammers steal the victims' cryptocurrency, and cover their tracks by moving the stolen property through a maze of subsequent transactions.

19.    The Defendants' version of the "pig butchering" scheme involved promises of money in return for work by Class Members, who were enticed to spend time performing online tasks with the expectation of payment. Defendants further promised the Class Members that they could withdraw the money they had earned, but only after making additional payments.

## PLAINTIFF IS LURED TO DEPOSIT CRYPTOCURRENCY

20.    Plaintiff was contacted by Defendants on or about March 20, 2024 regarding part-time online work. Defendants initially represented that the work involved a company called Grayphite, an international app marketing company where app developers publish their apps.

---

[1] See FinCEN Alert of Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering," U.S. Treasury Financial Crimes Enforcement Network Sep. 8, 2023, https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf.

Defendants represented that the work would be remote without any fixed time limits, and that all Plaintiff needed was a phone or computer to begin.

21.    Defendants represented that Plaintiff would be compensated based on a standardized commission schedule. Defendants explained that Plaintiff could withdraw money earned, but would be required to replenish funds to "reset" any tasks to be performed in the future. On March 29, 2024, Plaintiff sent an initial deposit of $110 of USDC, a cryptocurrency, from his Coinbase account to an account that Defendants represented was part of the fake work platform.

22.    Plaintiff subsequently performed tasks on the fake work platform and received "payments" for these tasks in the sense that his account on the platform showed modest gains. He was permitted to withdraw funds, but was required to replenish funds to receive payments from additional work on the platform. Defendants represented that Plaintiff could make increasing commissions if he deposited increasing amounts, which he did, including deposits of USDC, as well as Bitcoin and Ethereum, two other cryptocurrencies.

23.    On April 6, 2024, Defendant Miller contacted Plaintiff about an additional related job opportunity that involved similar online work for a company called Resy. On April 7, 2024, Plaintiff began making additional deposits from his Kraken account related to this job opportunity, beginning with a $10 deposit and progressively increasing. Plaintiff made deposits from his Kraken account in both Bitcoin and Ethereum. As with Plaintiff's Coinbase deposits, Defendants permitted Plaintiff to withdraw small amounts of money he had "earned" and deposit those funds to his Kraken account, but Plaintiff was required to replenish funds to earn additional amounts. For example, on April 8, Plaintiff made a deposit of $100 from his Kraken account and subsequently withdrew and redeposited $95.14.

24.     During April 2024, Plaintiff made progressively increasing deposits and withdrawals. In aggregate, Plaintiff transferred approximately $90,000 to accounts controlled by Defendants.

25.     The online scheme that targeted Plaintiff is consistent with other online crypto theft schemes and reflects a methodologically and psychologically sophisticated approach of manipulation and theft.

26.     For example, Plaintiff was first solicited by Defendant Lee over the chat application WhatsApp. Defendant contacted Plaintiff to ask if Plaintiff was interested in a part time job. The following is taken from WhatsApp screenshots of the initial chat between Defendant Lee (identified as "Lee FB") and Plaintiff (identified as "Misha"):

> 3/20/24, 10:34 AM - Lee FB Job Interest: Hi I'm Lee and I heard from Olivia Ava that you are interested in a part time job I do. Have you time to learn more?
>
> 3/20/24, 10:53 AM - Misha: Yes please tell me more
>
> 3/20/24, 10:56 AM - Lee FB Job Interest: I'm glad to hear your response! let me introduce the profile of the company to you
>
> 3/20/24, 10:56 AM - Lee FB Job Interest: The name of the company is *Grayphite* This is an international app marketing company where app developers publish their apps on *Grayphite*.
>
> 3/20/24, 10:57 AM - Lee FB Job Interest: This job provides the convenience of remote work without any fixed time limits. It requires only 1-2 hours to complete and offers flexibility in choosing your preferred working hours.
>
> 3/20/24, 10:58 AM - Lee FB Job Interest: All you need is a phone or computer to begin. Workbench operates from 11:00 AM to 11:00 PM( EST Time )

```
3/20/24, 10:58 AM - Lee FB Job Interest: Is the
requirement manageable for you?

3/20/24, 11:17 AM - Misha: Yes.
```

27.    Plaintiff was later solicited by Defendant Miller, also over WhatsApp, and also to

ask if Plaintiff was interested in a part time job.  The following is taken from WhatsApp

screenshots of the initial chat between Defendant Miller (identified as "Emma") and Plaintiff

(identified as "Misha"):

```
4/6/24, 2:53 PM - ～Emma FB Job: Hello, I'm Emma Miller😀
Thanks so much Erica for providing me with your contact
information. I heard you were interested in a job
opportunity I'm working on. <This message was edited>

4/6/24, 2:55 PM - Misha: Hi, yes

4/6/24, 2:55 PM - Misha: See you also have an LA number.
Awesome

4/6/24, 3:02 PM - ～Emma FB Job: Haha, are you from Los
Angeles?

4/6/24, 3:04 PM - Misha: Lived in west Hollywood for a
few years and just kept my number. You still do?

4/6/24, 3:05 PM - ～Emma FB Job: Wow, this is a nice
place, nice environment

4/6/24, 3:05 PM - ～Emma FB Job: Since you're interested,
I'll walk you through every detail.

4/6/24, 3:07 PM - Misha: Great!

4/6/24, 3:07 PM - ～Emma FB Job: We provide back-end data
optimization services for Resy. This position provides
remote freelance/part-time/full-time work to complete
data optimization work for Resy platform merchants. It
only takes about 60 minutes a day to complete them all.
Have you ever done online part-time work before?
```

4/6/24, 3:10 PM - Misha: I know exactly what this is as I'm involved with something like that now. If my current system ends up working I'd like to start with you as well.

4/6/24, 3:11 PM - Misha: I know about the cryptocurrency, data optimization stuff and I'm guessing you have a similar pay structure where it's 800 after 5 days, then 1500 after 15, etc... Right?

4/6/24, 3:12 PM - ~Emma FB Job: No, we get paid $900 after completing five working days

4/6/24, 3:12 PM - ~Emma FB Job: Equivalent to our wages, the benefits will be much better

4/6/24, 3:13 PM - Misha: Awesome, but I can't commit to you until I see this one work.

4/6/24, 3:14 PM - Misha: If it does I'll be super excited as I understand the system pretty well now

4/6/24, 3:14 PM - Misha: So I'll get back to you in the next few days ok?

4/6/24, 3:15 PM - ~Emma FB Job: Okay, let me introduce what I do. Resy is an American online restaurant reservation service founded in 2014 by Gary Vaynerchuk, Ben Leventhal, and Michael Montero. As of 2024, 16,000 restaurants around the world can be booked through Resy. Resy was acquired by American Express in 2019. Our job is a workstation that provides comprehensive professional services such as restaurant evaluation, promotion, star rating, ranking, etc. The opening hours of the company's workstation are from 11Am to 11Pm every day. During this period, it can be completed in less than 1 hour. Finish your work for the day.

28.    The company Grayphite referenced by Defendant Lee and the company Resy referenced by Defendant Miller are legitimate businesses, consistent with the typical pattern in online crypto theft schemes of the type perpetrated by the Defendants against the Class. Defendants identify a legitimate business that the target can research and find online, but when the target is

engaged and "working", Defendants direct the target to a fake web site Defendants have created, which uses the name of the same legitimate business to deceive the target further.

29.     Defendants bait the target by explaining the online "work" the target will be doing is legitimate. For example, Defendants explained to Plaintiff over WhatsApp that Plaintiff would be helping optimize apps for data providers. Once the "work" is explained in a way that convinces the target the tasks are legitimate, Defendants then further bait the target with promises of earning revenue for completing simple online tasks, including an explanation of how spending more time on the platform will generate more revenue. Defendants Lee and Miller both followed this pattern in their communications with Plaintiff.

30.     From there, the Defendants "train" the target on how to use the online platform to complete the necessary tasks to earn revenue. Defendants Lee and Miller separately "trained" Plaintiff, who then began performing what Plaintiff thought were tasks associated with optimizing applications for Grayphite and Resy. In truth, Plaintiff was unknowingly interacting with sham websites designed by Defendants to further their crypto theft scheme. This is a technique consistent across several crypto theft schemes, whether they are couched as app optimization, investments, or otherwise.

31.     As Plaintiff began interacting with the sham online platform, Defendants began the next phase of their crypto theft scheme, which involves separating a target from his or her cryptocurrency. In the present case, Plaintiff was being shown online cryptocurrency wallet balances that purportedly reflected Plaintiff's monetary balance in the system. At the beginning of this stage of the scheme, the Defendants allow targets such as Plaintiff to transfer nominal amounts of cryptocurrency into their personal cryptocurrency wallets to advance the illusion that the target is performing real work for real cryptocurrency.

32.     After Defendants Lee and Miller separately persuaded Plaintiff that he could withdraw his cryptocurrency at any time, Plaintiff began encountering so-called "combination tasks" on the platforms. These new tasks were presented as legitimate app optimization work, but were nothing more than fake interactions designed to lure Plaintiff to deposit more cryptocurrency. These so-called combination tasks caused Plaintiff's "balance" to appear to be negative. Defendants Lee and Miller then convinced Plaintiff that he needed to transfer greater amounts of cryptocurrency into the system to "free up" his account and enable him to earn higher commissions from performing combination tasks.

33.     Over time, Defendants increased the amount of cryptocurrency a target is required to transfer into the system to earn his "commissions". When a target expressed skepticism, as Plaintiff did, Defendants assured the target all was in order and they just needed to continue participating in a work platform. Plaintiff transferred funds from bank accounts and converted them to cryptocurrency, borrowing funds from friends, and extending his financial commitment to what he believed to be legitimate online enterprises. Plaintiff committed additional large amounts, in part because Defendants Lee and Miller told Plaintiff that Defendants would help by lending him some of the cryptocurrency he was required to deposit. Defendants then displayed to Plaintiff a sham amount purportedly transferred into Plaintiff's accounts to convince Plaintiff that the individuals who were stealing from Plaintiff were trying to help.

34.     Defendants also implemented a "credit score" scheme to persuade a target to deposit additional funds. For example, when Plaintiff tried to withdraw funds from the sham Grayphite platform, but was unable to do so, he reached out to Defendant Lee on WhatsApp. Defendant Lee told Plaintiff his "credit score" on the platform had dropped to 80%, and he needed to restore his score to access his cryptocurrency. Defendants notified Plaintiff that he had two

options to restore his credit score. Option 1 was to pay $20,000 ($1,000 per point to restore) and

reset his credit score immediately. Option 2 was he could wait 10 months for his score to return to

100%. Defendant Lee offered to "help," as follows:

```
4/10/24, 10:20 AM - Lee FB Job Interest: If you choose 1 I will
help you and I will go raise money for you. Because I
understand now you don't need comfort, but funds

4/10/24, 10:21 AM - Lee FB Job Interest: If you choose 2, I
will wait with you

4/10/24, 10:21 AM - Lee FB Job Interest: I respect your
decision
```

35.    Plaintiff added additional cryptocurrency to his account, purportedly to correct his

credit score so he could withdraw the "commissions" he thought he had earned.

36.    Another aspect of Defendants' crypto theft scheme involved purported "taxes." For

example, Defendants told Plaintiff on April 17, 2024 that he could not withdraw his commissions

because he owed "taxes" on them. Defendant Lee once again offered to assist Plaintiff, this time

by supposedly transferring cryptocurrency into Plaintiff's account.

37.    Finally, Defendants' crypto theft scheme involved threats related to alleged law

enforcement involvement. For example, Defendant Lee communicated with Plaintiff via

WhatsApp on April 19, 2024 to convince Plaintiff the FBI was involved because Lee had

unwittingly "helped" Plaintiff with funds Defendant Lee had borrowed from a friend, only to find

out Defendant Lee used stolen funds in Plaintiff's account.

38.    Plaintiff asked Defendant Lee for a copy of the police report, which Lee failed to

provide. WhatsApp conversations between Plaintiff and Defendant Lee continued until April 27,

2024, when Plaintiff concluded that there were "[t]oo many bad people and liars stealing money

that they don't deserve." Plaintiff also ceased interacting with Defendant Miller, informing her,

"I'm done with all the optimization programs. Lost too much money."

39.     In sum, Defendants used a systematic multi-stage crypto theft scheme to target Class Members, including Plaintiff, and lured them to transfer increasing amounts of cryptocurrency as part of fake work platforms. The final step in this scheme, as described below, was identical for Class Members: Defendants stole the funds.

**DEFENDANTS CONVERT CLASS MEMBERS' ASSETS**

40.     Inca's investigation revealed that Defendants used the fake work platforms to convert Class Members' assets, including Plaintiff's assets, and then sent those assets through a web of transactions designed to hide their trail. Inca traced and connected Defendants' transactions, found and followed a trail of transactions, and identified the cryptocurrency wallets that held Class Members' funds.

41.     Inca's investigation involved two phases, each of which is precise, reliable, and replicable. In phase one, Inca "forward traced" the flow of funds from Plaintiff's investment to other cryptocurrency wallets. Inca traced Plaintiff's transactions forward to the wallets set forth in Exhibit A, each of which were involved in transactions originating with Class Member wallets.

42.     In phase two, Inca "reverse traced" the flow of funds to the above addresses and determined that additional addresses matched Plaintiff's flow of funds as part of a common scheme involving other Class Members. Through this tracing, Inca was able to confirm the identity of wallets involved in cryptocurrency transactions that were part of the common scheme, including the identity of Defendants' wallets that received Class Member funds and accordingly should be frozen. Those wallets are set forth in Appendix A, categorized by exchange.

43.     The bottom line of Inca's analysis is that Class Members' funds converted by Defendants were sent to the cryptocurrency wallets listed in Appendix A. It is these wallets that Plaintiff seeks to freeze.

## CLASS ALLEGATIONS

44.    This action may be properly maintained as a class action under state law.

45.    The proposed Class is defined as follows: all persons and entities whose funds were unlawfully taken by Defendants through the date of this Complaint, and whose stolen cryptocurrency is contained in the wallets set forth in Appendix A, or in other cryptocurrency accounts controlled by Defendants at the exchanges set forth in Appendix A.

46.    Excluded from the Class are individual Defendants and their families; corporate Defendants and their officers, directors and affiliates, if any, at all relevant times; Defendants' legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest. Plaintiff reserves the right to amend or modify the Class in connection with a motion for class certification or as the result of discovery.

47.    Based on Inca's investigation, the Class Members are so numerous, and are potentially scattered throughout the world, as to make joinder of all members impracticable, if not impossible. Plaintiff will attempt to ascertain Class Member identities through notice to the original owners of assets contained in the accounts listed in Appendix A to this Complaint, as well as through discovery, including into account records at relevant institutions.

48.    The same "pig butchering" scheme, involving the same fake work platforms, was used to victimize all Class Members, so that commonality of the claims predominates. Nearly all factual and legal issues raised in this Complaint are common to each Class Member and will apply uniformly to every Class Member.

49.    Plaintiff's claims are typical of those of other Class Members, arise from the same practice or course of conduct as the claims of other Class Members, and are based on the same legal theory. Defendants used the same platforms to perpetrate their scheme and use the same

ecosystem of cryptocurrency wallets to hide their tracks. By pursuing his own interests, Plaintiff will advance the interest of the absent class members. Plaintiff, like all other Class Members, sustained damages arising from Defendants' scheme and subsequent transactions to convert stolen property and hide the locations of victims' cryptocurrency assets. Plaintiff and Class Members were, and are, similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct. Plaintiff is entitled to the same declaratory, injunctive, and other relief as other Class Members.

50.    Plaintiff will fairly and adequately represent the Class and protect the interests of the class. By proving his claim, Plaintiff will prove the Class's claims and Plaintiff's interests are thus fully aligned with those of Class Members. There are no material conflicts between Plaintiff's claims and those of other Class Members, including absent Class Members, that would make class certification inappropriate. Plaintiff has retained qualified counsel with relevant experience and will actively monitor this litigation. Counsel selected to represent the Class will fairly and adequately protect the interests of the Class, have relevant experience in complex and class litigation, and are competent counsel for class action litigation. Counsel for the Class will vigorously assert the claims of all Class Members.

51.    Class certification is warranted because litigating these claims on a classwide basis is superior to other ways of adjudicating the claims at issue. For each Class Member to pursue their claim individually would require resource-intensive and time-consuming cryptocurrency tracing, analysis, and investigation through a maze of transactions. This action is properly maintained as a class action in that common questions of law and fact exist as to Class Members and predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration

of: the interests of Class Members in individually controlling the prosecution or defense of separate actions and/or proceedings; the impracticability or inefficiency of prosecuting or defending separate actions and/or proceedings; the extent and nature of any litigation concerning the controversy already commenced Class Members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

52.     Among the numerous questions of law and fact common to the Class are: whether Defendants have acted or refused to act on grounds generally applicable to the Plaintiff and the Class; whether Defendants have a pattern, practice and scheme of "pig butchering" and subsequent digital transactions to convert stolen property and hide the locations of victims' cryptocurrency assets; to what extent Plaintiff and Class Members are entitled to damages; and to what extent Plaintiff and Class Members are entitled to declaratory and injunctive relief. Defendants have consistently acted and refused to act in ways generally applicable to the Class. Thus, final declaratory and injunctive relief with respect to the entire Class is appropriate.

53.     Finally, Plaintiff and Class Members have suffered or are at imminent, severe, and unacceptably high risk of suffering, irreparable harm because of Defendants' ability to move funds at any time, without notice. If Defendants withdraw funds from the wallets set forth in Appendix A, Plaintiff and Class Members will not be able to recover their funds, and will lose their property forever.

## FIRST CAUSE OF ACTION
### CONVERSION

54. Plaintiff realleges and incorporates by reference all preceding paragraphs.

55. Defendants intentionally and unlawfully took possession of the Plaintiff's and other Class Members' cryptocurrency funds, converting them for their own use.

56. The funds of Plaintiff and all Class Members are or will be specifically identifiable, in that Defendants' wrongful actions alleged herein involve cryptocurrency, which is traceable digital currency.

57. This act of conversion has caused significant financial harm to the Plaintiff and other Class Members.

## SECOND CAUSE OF ACTION
### REQUEST FOR INJUNCTIVE RELIEF

58. Plaintiff realleges and incorporates by reference all preceding paragraphs.

59. Plaintiff requests a freeze of all accounts that have transacted through the fake work platforms, including all cryptocurrency wallets set forth in Appendix A. Such a freeze is necessary to preserve the possibility of restitution for the Plaintiff and other victims.

**Wherefore,** Plaintiff respectfully requests that this Court enter a temporary restraining order and freeze the cryptocurrency addresses set forth in Appendix A, and an order awarding: (1) damages in the amount of the value of Plaintiff's and other Class Members' stolen assets at the time of the theft; (2) pre-judgment interest; (3) an injunction ordering the return of any remaining stolen assets or the proceeds derived from the same; (4) attorneys' fees and costs incurred in prosecuting this action; and (5) any other relief that the Court finds just and proper.

Dated: June 3, 2024

Respectfully submitted,

*/s/ Robert R. Riley, Jr.*
Robert R. Riley, Jr. (ASB-8310-Y75R)

*/s/ Keith Jackson*
Keith Jackson (ASB-7519-J66B)

*/s/ James E. Murrill*
James E. Murrill (ASB-4329-A57M)
Attorneys for Plaintiff

**OF COUNSEL:**

RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Telephone: (205) 879-5000
rob@rileyjacksonlaw.com
kj@rileyjacksonlaw.com
jay@rileyjacksonlaw.com

Appendix A

**Binance**

THm7R5wHvqx8gZkCX9KS9hjhvUv5TrXU4y
TTTkoMc9VuVKTGFQJPxF5pS2f1XV5u5QHJ
TLB95AHgDtns5cohFKicTsE2zpFqcbzMM7
TBeUKtZxjcR6HmeVXV4TFeFWN3nvDDAqTw
TXMA8WaXdWa5EYkBhAMuCwjHjSdHGvyV2y
TCzHEWKCgo17CVwbkPFmZorDi9kWkpMbnd
TKJ77SjyQGAX4u711tneGXpgZLTVwRZ8Uk
TFsZ9UvNYS4tLPWLUzKsGviHsPsWFuKsH8
TPJV9ayW6YqPK9yddvaMzKwm424ySeJriK
TNRzzzCZ5x1HPS6LSca2MCamDLoJNQLTdW
TDuJLcreNwBzDp3RHrpsoTbhnw9s3QmPb9
TBJh9brKQp8ZvTq6vi5BvU9epdwEP63ysj
TWUeDMvPrY88cpX2EmFxHdd2xtWfm9cPDK
TLvFAMp7qZ7iF8fqqewM7AMjJtzZwjSWve
TGqjuFc8jxfjZBpUuFGnRLAXqzbHzYB4Wm
TLN6ayhvQqzFK1KweyNDfMiqMfgrZ2rMg3
TUjGaqLmBnYythnN5hPNELyJPBBmEcjXdW
TTv4AqmaKwMt2SagrSyRyqE7XB6dpLUHyd
THEJ47jWuKmwssvvo7hrmw1wyjFbxDR54p
TP9uatVfbAcZe4qAqANZ6Hjc7JrzGGYhro
TJphKU7t3aW1WoJ3ur9YW4zxNwE9cc6e2H

**OKX**

TSLj5S3KAfvK8mDtDBisZvWDGUbKUDR16v
TCeLkTvsCb6Tz2ik7xng1YoT9BYdcVxHnr
TJGebBJfUAgs4NUManaRFGQRpoLEwYPj2o
TLXtzgg2Axd7ThhhZRq5LoBLgsUYnx8TpZ
THGTenLmvqWycGLGtgRvX4wURiHQeDvNps
TFwi8cW7CUZ3mVY92hYaQiEoAYr5z1E2Kh
TUxrJsf1ZcRgXpfX9L2VLUCEJ5DUs2mWC7
TKuKfiyMCV65AK4A5YGLP3sgDnzkMc6fdp
TA8C3BnEyVvyPGTTEhcsNZz9jNNm6j8tbi

**Gate.io**

TXV4pAhJSk9BxetRLh2BvTEnyC8xc7VZM8

**KuCoin**

TDGGk3yNwo9uEmL69zmdwJwUYaCozZMQuD
TUijurbvTKwCpYzEi3TnC62gRLGCxn7q6T

**LBank**

TUNN5XDrQg6fkfUEdWcYDHgvPwXyxS1k2C
TGUSM4zJ6XrJ5xaD9pnB5eLrKy2GqjG3pC
TVXe59tPrQmFVrP4no59t1Vp3aDSfs8m2t

20

# EXHIBIT B

ELECTRONICALLY FILED
6/4/2024 10:01 AM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

**IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA**

MICHAEL MASHKEVICH, on behalf of himself )
and all others similarly situated, )
    )    Civil Action No. 2024-900163
    Plaintiff, )
    )    **CLASS ACTION**
V. )
    )
OLIVIA AVA, EMMA MILLER, and F.B. LEE, )
    )
    Defendants. )

**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE WHY A
PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Plaintiff Michael Mashkevich ("Mashkevich"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, moves for entry of a temporary restraining order and order to show cause why a preliminary injunction should not issue pursuant to Ala. R. Civ. P. 65 to preserve the *status quo* and enjoin the withdrawal, transfer, disposition, sale, or encumbering of cryptocurrency stored in specific wallets and procured by Defendants through a "pig butchering" scheme as set forth in Plaintiff's Complaint and the attached Brief in Support. In support of this motion, Mashkevich relies on the facts and law discussed in the attached Brief in Support and exhibits thereto.

In accordance with Ala. R. Civ. P. 65(b) and the attached Affidavit of Robert R. Riley, Jr., Mashkevich moves for a temporary restraining order without notice to Defendants. Notice is highly likely to precipitate the Defendants involved in the scheme to transfer or sell the cryptocurrency held in the specific wallets identified to date, thereby thwarting the purpose for which injunctive relief is sought.

1

WHEREFORE, Mashkevich requests this Court grant its motion and enter the Temporary Restraining Order and Order to Show Cause why a Preliminary Injunction Should Not Issue attached as Exhibit D (the "Proposed Order"), providing:

A. That Defendants Olivia Ava, Emma Miller, F.B. Lee and non-parties Binance Holdings Ltd., OKX, Gate.io, KuCoin, and LBank, and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any other persons through which they act, or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, (collectively, the "Enjoined Parties") are hereby temporarily restrained from withdrawing, transferring, disposing, selling, encumbering or altering any of the cryptocurrency or assets contained in the wallets listed in Appendix A of the Proposed Order;

B. That service of the Court's Order be effectuated through the use of a Service Token caused by Plaintiff's counsel to be airdropped into the cryptocurrency wallet addresses identified in Appendix A of the Proposed Order;

C. That the Court issue an Order to Show Cause why a preliminary injunction should not be issued, and set a hearing at a date and time to be determined by the Court within 14 days of its Order; and

D. Grant any additional relief this Court deems just, fair, or appropriate.

Respectfully submitted,

*/s/ Robert R. Riley, Jr.*
Robert R. Riley, Jr. (ASB-8310-Y75R)
Keith Jackson (ASB-7519-J66B)
James E. Murrill (ASB-4329-A57M)
Attorneys for Plaintiff

**OF COUNSEL:**

RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Telephone: (205) 879-5000
rob@rileyjacksonlaw.com
kj@rileyjacksonlaw.com
jay@rileyjacksonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2024, a copy of the foregoing was electronically filed with the Clerk of the Court using the AlaFile system. Counsel acknowledges that, given the nature of the Petition for which this Brief is provided as support, notice will not be provided to the named Defendants and implicated non-parties until after the entry of a Temporary Restraining Order.

*/s/ Robert R. Riley, Jr.*
OF COUNSEL

# EXHIBIT C

ELECTRONICALLY FILED
6/4/2024 10:05 AM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

**IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA**

| | | |
|---|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 2024-900163 |
| V. | ) ) | **CLASS ACTION** |
| OLIVIA AVA, EMMA MILLER, and F.B. LEE, | ) ) ) | |
| Defendants. | ) ) )\| | |

**AFFIDAVIT OF MICHAEL MASHKEVICH**

COMES now the undersigned Affiant and after having been duly sworn, states under oath as follows:

1.    My name is Michael Mashkevich.  I am over nineteen (19) years of age and I am competent to testify to the matters stated herein.  The evidence set forth in the foregoing affidavit is based on my personal knowledge unless expressly stated otherwise.  This affidavit is made in support of Plaintiff's Motion for Temporary Restraining Order and for Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Motion").

2.    I live and reside in Albertville, Alabama.

3.    I own a digital marketing agency that provides search engine optimization services for companies.  The name of my agency is We Are Quality, LLC, which is licensed to do business in Alabama.  I am the only member of the LLC and I have no employees.

4.    A true and correct copy of my WhatsApp chat with the Defendants is attached.  As explained below, the respective chats are separated into Exhibit A and Exhibit B.

5.    On or about March 20, 2024, a person representing himself as F.B. Lee ("Lee") contacted me via WhatsApp regarding part-time online work.  A true and correct copy of my

WhatsApp chat with Lee is attached as Exhibit A. Lee initially represented that the work involved a company called Grayphite, an international app marketing company where app developers publish their apps. He represented that the work would be remote without any fixed time limits, and that all I needed was a phone or computer to begin. I was led to believe I would be compensated based on a standardized commission schedule. Lee explained that I could withdraw money earned, but would be required to replenish funds in order to "reset" any tasks to be performed in the future.

6.      The following is taken from my initial chat with Lee on March 20, 2024 (I am referred to as "Misha"):

```
3/20/24, 10:34 AM - Lee FB Job Interest: Hi I'm Lee and I heard
from Olivia Ava that you are interested in a part time job I do.
Have you time to learn more?

3/20/24, 10:53 AM - Misha: Yes please tell me more

3/20/24, 10:56 AM - Lee FB Job Interest: I'm glad to hear your
response! let me introduce the profile of the company to you

3/20/24, 10:56 AM - Lee FB Job Interest: The name of the company
is *Grayphite* This is an international app marketing company
where app developers publish their apps on *Grayphite*.

3/20/24, 10:57 AM - Lee FB Job Interest: This job provides the
convenience of remote work without any fixed time limits. It
requires only 1-2 hours to complete and offers flexibility in
choosing your preferred working hours.

3/20/24, 10:58 AM - Lee FB Job Interest: All you need is a phone
or computer to begin. Workbench operates from 11:00 AM to 11:00
PM( EST Time )

3/20/24, 10:58 AM - Lee FB Job Interest: Is the requirement
manageable for you?

3/20/24, 11:17 AM - Misha: Yes.

                              ***

3/20/24, 11:21 AM - Lee FB Job Interest: Okay, let me tell you
what our work consists of and what exactly you need to do every
day first. I'll answer it directly one by one

3/20/24, 11:22 AM - Misha: Great

3/20/24, 11:24 AM - Lee FB Job Interest: So our actual roles are
helping optimize apps for data providers to publish their apps
```

to get more ratings, ranking, and publish traffic to make things
even smoother. Our role performance is very easy to process we
just have to click the button to optimize the applications.

3/20/24, 11:25 AM - Lee FB Job Interest: To make it even clearer
for you to understand, take popular apps like Facebook and
YouTube, for example. Their ranking in the App Store or Play
Store depends on factors such as popularity, download rate, and
positive reviews.

3/20/24, 11:29 AM - Lee FB Job Interest: This job is not require
investment or any fees and you don't need to spend any penny.
There is no risk involved

3/20/24, 11:32 AM - Misha: Wonderful, that makes sense. I do have
experience from having a published app previously in the Google
Play store and would enjoy learning and optimizing applications.

* * *

3/20/24, 11:33 AM - Misha: How will the role compensate me?

3/20/24, 11:35 AM - Lee FB Job Interest: I'm glad to hear that
you have similar experience; this job is non-technical and no
experience needed. So you can freely work at your comfortable
level.

3/20/24, 11:37 AM - Lee FB Job Interest: So here salaries are
expected to be receive during work consecutive for: 5 days *800
USDT*, 15 days *1500 USDT*, 30 days *3800 USDT* So total our
salaries will be paid 3 times a month, our total will be
*6100USDT*.

3/20/24, 11:38 AM - Lee FB Job Interest: And everyday you'll be
earning daily commission depends on the apps you optimized. If
you have questions about the job requirements and salary package
you can ask me ? if you not i will explain you about training
course !

3/20/24, 11:40 AM - Misha: What do you mean by 'work consecutive'?

3/20/24, 11:41 AM - Lee FB Job Interest: It means that if you
work for 5 days company will pay you one time, and you
continuously work for more 15 days you'll receive another
transaction, and when you can continuously work for 30 days 3800
USDT more. So the total is 6100 USDT

7.    Over the following week, Lee "trained" me and I began performing what I thought

were tasks associated with optimizing applications for Grayphite.  On March 29, 2024, I sent an

initial deposit of $110 of USDC, a cryptocurrency, from my Coinbase account to an account that

3

Lee represented was part of the work platform.  I subsequently performed tasks on this work

platform and received payments for these tasks. I was permitted to withdraw funds, but I was

required to replenish funds in order to receive amounts from additional work.  Lee represented that

I could make increasing commissions if I deposited increasing amounts, which I did, including

deposits of USDC, as well as Bitcoin and Ethereum, two other cryptocurrencies.

      8.     I was shown an online cyberwallet balance that purportedly reflected my monetary

balance in the system.  Lee told me to withdraw cryptocurrency each day but then to put it back in

because there must be 100 USDT (the cryptocurrency Tether) in my online "account" to authorize

me to perform the optimization tasks.   The following is taken from my chat with Lee on March

28, 2024 (I am referred to as "Misha"):

> 3/28/24, 2:32 PM - Misha: I can withdraw this now?
>
> 3/28/24, 2:33 PM - Lee FB Job Interest: Yes, you can withdraw money, or you can continue to reset the task and punch in today's working day.
>
> 3/28/24, 2:34 PM - Misha: Can I withdraw and continue to do tasks?
>
> 3/28/24, 2:34 PM - Misha: I want to see if withdrawal would actually work
>
> 3/28/24, 2:34 PM - Lee FB Job Interest: You can exit at any time
>
> 3/28/24, 2:35 PM - Misha: Can I withdraw and still do the tasks to get my eventual $800USDT?
>
> 3/28/24, 2:36 PM - Misha: When will I see the optimization counter reset?
>
> 3/28/24, 2:36 PM - Lee FB Job Interest: You need to reset the task. A minimum of 100 USDT is required to reset the task.
>
> 3/28/24, 2:37 PM - Misha: IMG-20240328-WA0041.jpg (file attached)
>
> 3/28/24, 2:37 PM - Misha: I don't understand
>
> 3/28/24, 2:37 PM - Lee FB Job Interest: Your balance is not enough to carry out the reset task. If you want to reset the

```
task, you need to replenish 38USDT. You can withdraw it at
any time after completing the optimization task, or you can
reuse it.

3/28/24, 2:37 PM - Lee FB Job Interest: Yes, the reset task
requires contacting cs for reset. The minimum reset is 100
USDT
```

9.    After Lee persuaded me that I could withdraw my cryptocurrency at any time, I began encountering so-called "combination tasks" during what I thought was my legitimate app optimization work. These so-called "combination tasks" would cause my "balance" to show in the negative. Lee would then convince me that I needed to transfer greater amounts of cryptocurrency into the system to "free up" higher commissions.

10.    Just over two weeks into this process, the system begin increasing the amount I must transfer into the system to earn my "commissions."  The following is taken from my chat with Lee on April 5, 2024 (I am referred to as "Misha"):

```
4/5/24, 8:07 PM - Lee FB Job Interest: You did not encounter
multiple combined tasks. This is the second negative number
in a combined task just like the one you encountered before.

4/5/24, 8:07 PM - Misha: What can I do?!

4/5/24, 8:08 PM - Lee FB Job Interest: You have already
completed a negative number. You only need to complete the
second negative number to complete the task and withdraw
funds.

4/5/24, 8:08 PM - Misha: I can only take 2600 more from
robinhood

4/5/24, 8:09 PM - Lee FB Job Interest: Your combined task is
composed of 3 tasks, so there are two negative numbers.

4/5/24, 8:09 PM - Misha: That still leaves 2445

4/5/24, 8:09 PM - Misha: How do I handle it

4/5/24, 8:09 PM - Lee FB Job Interest: Is there no way to make
up for all negative numbers?

4/5/24, 8:10 PM - Misha: How do I get 2445

4/5/24, 8:10 PM - Misha: And what if I get another combination
```

```
4/5/24, 8:10 PM - Misha: This system is rigged it seems

4/5/24, 8:10 PM - Lee FB Job Interest: Do you still have funds
in other accounts? Can you top up using PayPal or Google Pay?

4/5/24, 8:11 PM - Misha: How do I do it with PayPal?

4/5/24, 8:12 PM - Lee FB Job Interest: There's no way this is
going to happen, I've been working here for almost a year and
it's fair and safe. Otherwise I wouldn't have been working
here for so long.
```

11.     Ultimately, I began transferring funds from bank accounts and converting them to cryptocurrency, borrowing funds from friends, and extending my financial commitment to what I believed to be a legitimate online enterprise.  I would commit an additional large amount, in part because Lee told me that he fronted some of the money I needed to put into the system.  The system then displayed an amount that had purportedly been transferred into my account by Lee.

12.     On April 9, 2024, after I had transferred significant amounts of cryptocurrency and my "account" showed additional money placed in the account by Lee, Lee texted me that "[m]y suggestion is that you can relax tonight and wait for the joy of withdrawing funds tomorrow." I responded "[y]ea, i can't wait to see the funds back in Coinbase" and "I'm excited to pay you and my sister and Kevin back."

13.     The following day on April 10, 2024, I tried to withdraw my funds, was unable to do so, and reached out to Lee on WhatsApp. I was told my "credit score" on the platform had dropped to 80%, and I needed to restore the score to access my cryptocurrency.  The following is taken from my chat with Lee on April 10, 2024 (I am referred to as "Misha"):

```
4/10/24, 9:58 AM - Lee FB Job Interest: So what should we
do now to restore our credit score?

4/10/24, 9:58 AM - Misha: They said they'll let me know in
30 min

4/10/24, 9:59 AM - Misha: It's such a rigged game really
```

```
4/10/24, 10:00 AM - Lee FB Job Interest: Don't rush, let's
figure out the situation and solutions first

4/10/24, 10:01 AM - Lee FB Job Interest: I've never had a
problem with my credit score, so I can't give you any
advice.

4/10/24, 10:01 AM - Misha: IMG-20240410-WA0013.jpg (file
attached)
They responded (attachment not included in Complaint):

4/10/24, 10:06 AM - Lee FB Job Interest: So the current
reply is that because we have received complaints from
merchants, our credit score has been reduced. Now we need
to restore these 20 credit scores?

4/10/24, 10:08 AM - Misha: Yes exactly
```

14.    Lee notified me that I had two options to restore my credit score. Option 1 was to

pay $20,000 ($1,000 per point I needed to restore) and reset my credit score immediately.  Option

2 was I could wait 10 months for my score to return to 100%.  The following is taken from my

chat with Lee on April 10, 2024 (I am referred to as "Misha"):

```
4/10/24, 10:20 AM - Lee FB Job Interest: If you choose 1 I
will help you and I will go raise money for you. Because
I understand now you don't need comfort, but funds

4/10/24, 10:21 AM - Lee FB Job Interest: If you choose 2,
I will wait with you

4/10/24, 10:21 AM - Lee FB Job Interest: I respect your decision
```

15.    I added additional cryptocurrency to my account, purportedly to correct my credit

score so I could withdraw the "commissions" I thought I had earned.  Lee told me on April 17,

2024 that I could not withdraw my commissions because I owed taxes on them. Lee once again

offered to assist me, this time by supposedly transferring cryptocurrency into my account.

16.    Lee communicated with me on April 19, 2024 to convince me the FBI was involved

because Lee unwittingly "helped" me with stolen funds.  The following is taken from my chat with

Lee on April 19, 2024 (I am referred to as "Misha"):

4/19/24, 10:06 AM - Lee FB Job Interest: My bank called me and there was a problem with my account. After I arrived at the bank, the FBI took me to the interrogation room and interrogated me, suspecting me of money laundering.

4/19/24, 10:07 AM - Lee FB Job Interest: Many fund transactions in my account are with my friends. I can't contact my friends now. No one can prove that I don't know about his account status.

4/19/24, 10:08 AM - Lee FB Job Interest: He lent me some funds, which I used to complete the task for you

4/19/24, 10:11 AM - Misha: So why did they let you go?

4/19/24, 10:12 AM - Lee FB Job Interest: I had no idea, my girlfriend paid a bail amount

4/19/24, 10:12 AM - Lee FB Job Interest: I don't know anything about my friend's account

4/19/24, 10:14 AM - Misha: So you have a trial date now? What specific proof do they have of anything?

4/19/24, 10:14 AM - Lee FB Job Interest: My head is so messed up now, I can't think, I need to wait for them to find my friends

4/19/24, 10:15 AM - Lee FB Job Interest: I collapsed. I was just trying to help you out of kindness, but this happened.

4/19/24, 10:37 AM - Misha: Grayphite didn't even let me withdraw the money, they want you to contact them. It's frankly just a scam

17.    I asked Lee for a copy of the police report, and Lee failed to provide one. WhatsApp conversations between Lee and me continued until April 27, 2024, which I concluded with "[t]oo many bad people and liars stealing money that they don't deserve."

18.    On April 6, 2024, someone representing herself as Emma Miller ("Miller") contacted me about an additional related job opportunity that involved similar online work. A true and correct copy of my WhatsApp chat with Miller is attached as Exhibit B. Miller contacted me via WhatsApp about a purported job opportunity and used a Los Angeles telephone number for her communication with me. On April 7, 2024, I began making additional deposits from my

Kraken account related to this job opportunity, beginning with a $10 deposit and progressively increasing. I made deposits from my Kraken account in both Bitcoin and Ethereum. As with my Coinbase deposits, they let me withdraw money I had earned and deposit those funds to my Kraken account, but I was required to replenish funds in order to earn additional amounts. For example, on April 8, I made a deposit of $100 from my Kraken account and subsequently withdrew and redeposited $95.14.

19.    The process with Miller was identical in all material respects to the one orchestrated by Lee. The only notable distinction is that, whereas Lee convinced me he was working on app optimization for Grayphite, Miller convinced me she was working on app optimization for the online reservation platform Resy.  As with Lee, Miller trained me and I had the opportunity to withdraw small amounts of cryptocurrency. I then encountered "combination tasks" that required additional investment. This continued through April 24, 2024, when I informed Miller "I'm done with all the optimization programs. Lost too much money."

20.    In all, I transferred approximately $90,000 to accounts controlled by Defendants.

21.    Before the investigation by my counsel, I was not aware of transactions undertaken to hide and steal my cryptocurrency assets. I would be severely harmed if I am unable to recover those assets. I submit this affidavit in support of my request for emergency relief by order to show cause for a preliminary injunction, and a temporary restraining order pending the hearing on the preliminary injunction.

22.    I declare under penalty of perjury that the foregoing is true and correct.

Further Affiant saith not.

unable to recover those assets. I submit this affidavit in support of my request for emergency relief by order to show cause for a preliminary injunction, and a temporary restraining order pending the hearing on the preliminary injunction.

22.    I declare under penalty of perjury that the foregoing is true and correct.

Further Affiant saith not.

_____

Michael Mashkevich

**STATE OF ALABAMA**              )
**COUNTY OF JEFFERSON**           )

I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that Michael Mashkevich, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being duly informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date and that the matters contained therein are true.

Given under my hand and seal on this 3rd day of June, 2024.

_____
Notary Public
My Commission Expires Feb 6, 2027

10

# EXHIBIT D

ELECTRONICALLY FILED
6/4/2024 10:05 AM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

## IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA

|  |  |  |
|---|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 2024-900163 |
| V. | ) ) | **CLASS ACTION** |
| OLIVIA AVA, EMMA MILLER, and F.B. LEE, | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF CHARLES ZACH

I, Charles Zach, declare under penalty of perjury as follows:

1.      My name is Charles Zach.  I am an employee at Inca Digital, a company that investigates cryptocurrency schemes, including "pig butchering." As part of my employment at Inca Digital, I have investigated matters related to the complaint by Michael Mashkevich ("Plaintiff") in the above-captioned action. I am over 18 years of age, of sound mind, and am competent to testify to the matters stated herein.  The evidence set forth in the foregoing declaration is based on my personal knowledge unless expressly stated otherwise.

2.      Inca Digital is a digital asset intelligence company that provides data, analytics, and expertise to many of the world's leading exchanges, financial institutions, regulators, and government agencies. Inca Digital's clients use its unique and comprehensive intelligence to surveil digital asset markets, fight crime, generate alpha, and more. For more information about Inca Digital and our work, please visit: https://inca.digital/.

3.      Inca Digital has been investigating 'pig butchering' cases for over two years. "Pig butchering" victims in the United States have lost billions of dollars and "pig butchering" schemes

have been the subject of state and federal government investigation and prosecution.[1] Based on my expertise and experience, this is a clear case of "pig butchering."

4.    I understand that this Class Action is brought to freeze wallets containing Class Member funds that Defendants converted, and return these funds to Class Member victims. Based on Inca's investigation to date, Defendants' conversion scheme involved transactions during the period from March 20, 2024 through at least the date of this Complaint, included more than 125 Class Member victims, and involved the conversion by Defendants of a minimum of $3.5 million of Class Member funds, with losses potentially higher.

5.    Defendants attempted to conceal their conversion of the cryptocurrency of the members of the Class through a series of online transactions designed to hide their trail. However, to date, an investigation by Inca has been able to trace and connect Defendants' transactions, follow the trail, and identify several of the cryptocurrency wallets that held and/or hold the cryptocurrency funds of Mr. Mashkevich and members of the Class.

6.    Inca's investigation involved two phases, each of which is precise, reliable and replicable, as set forth below. First, in phase one, Inca "forward traced" funds from Plaintiff's deposit of cryptocurrency with Defendants to other wallets. Subsequently, in phase two, Inca "reverse traced" the flow of funds into the above addresses and determined that additional addresses matched Plaintiff's flow of funds as part of a common scheme involving Class Members.

7.    Inca's "forward tracing" was based on a three-step analysis: (1) identifying the addresses that initially received Plaintiff's cryptocurrency; (2) tracking the transfer of funds from

---

[1] See FinCEN Alert of Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering," U.S. Treasury Financial Crimes Enforcement Network Sep. 8, 2023, https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf.

those addresses to "swap router and bridge" addresses and then through a series of blockchain transactions, and (3) tracking those funds through a series of wallet addresses to the "Deposit Addresses" set forth in Appendix A to the Complaint, each categorized by exchange. (A "blockchain" is a system used to record cryptocurrency transactions.)

8.      First, Inca analyzed screenshots provided by the victim and identified the addresses to which Plaintiff initially sent cryptocurrency. These addresses are:

0xD4698477E65C7be219094aC71F65F40582EF5dbe (Ethereum Blockchain)

0x588cc7b481dDd82c7AF67cEdA460d8a11c27d850 (Ethereum Blockchain)

0xFBee5baBA85C839e3E6aBD11b7eF4D8001357f82 (Ethereum Blockchain)

0x5e8221fbC4AB02DE192861B8a74EE42a1725E08A (Polygon Blockchain)

0xFF4418Ea020fB448E30D98E71c1848Fe99E63cB6 (Polygon Blockchain)

0x7Fe9C0e0d151f52BEe23187Ef08D88D65a489C2d (Polygon Blockchain)

0x0663122B58AbCbEDCF49d0f5BFCe419CCFf03E1b (Polygon Blockchain)

0x8a25Db9a90612f5fB81E5082A6390a3BC1350422 (Polygon Blockchain)

0x85C0CE7f188873bC814aCC90f59cB9BB0e8E6299 (Polygon Blockchain)

0x69981239714Ca2Fe84f39e0CC429FDf81Dc61977 (Polygon Blockchain)

0x91f613192485F775C59b1399de598B6e693Dc51B (Polygon Blockchain)

0x188A38A4B38843cAa1E211359803D26D5FC5463A (Polygon Blockchain)

9.      Second, Inca analyzed transfers from these addresses and found that funds were routed to "swap router and bridge" addresses. A "swap router and bridge" address is a kind of aggregator that is used to combine funds and convert them to a different cryptocurrency. In this case, the "swap router and bridge" addresses were called "SWFT.PRO" and "BitGet Wallet: Swap

Bridge" and they were used to convert funds to a different cryptocurrency (known as "USDT"), and sent to the TRON blockchain. These addresses are:

> 0x92e929d8B2c8430BcAF4cD87654789578BB2b786 (SWFT.PRO)
>
> 0x22cE84A7F86662b78E49C6ec9E51D60FddE7b70A (BitGet Wallet: Swap Bridge)
>
> TH8tNBq1NJPfDdDksEaeQPjYsL9KCW713M (BitGet Wallet: Swap Bridge)

10.    Third, Inca analyzed the subsequent transfer of funds on the TRON blockchain and determined they were routed through a series of wallet addresses, commingled, and then deposited at the "Deposit Addresses" set forth herein, along with each cryptocurrency exchange:

Binance
THm7R5wHvqx8gZkCX9KS9hjhvUv5TrXU4y
TTTkoMc9VuVKTGFQJPxF5pS2f1XV5u5QHJ
TLB95AHgDtns5cohFKicTsE2zpFqcbzMM7
TBeUKtZxjcR6HmeVXV4TFeFWN3nvDDAqTw
TXMA8WaXdWa5EYkBhAMuCwjHjSdHGvyV2y
TCzHEWKCgo17CVwbkPFmZorDi9kWkpMbnd
TKJ77SjyQGAX4u711tneGXpgZLTVwRZ8Uk
TFsZ9UvNYS4tLPWLUzKsGviHsPsWFuKsH8
TPJV9ayW6YqPK9yddvaMzKwm424ySeJriK
TNRzzzCZ5x1HPS6LSca2MCamDLoJNQLTdW
TDuJLcreNwBzDp3RHrpsoTbhnw9s3QmPb9
TBJh9brKQp8ZvTq6vi5BvU9epdwEP63ysj
TWUeDMvPrY88cpX2EmFxHdd2xtWfm9cPDK
TLvFAMp7qZ7iF8fqqewM7AMjJtzZwjSWve
TGqjuFc8jxfjZBpUuFGnRLAXqzbHzYB4Wm
TLN6ayhvQqzFK1KweyNDfMiqMfgrZ2rMg3
TUjGaqLmBnYythnN5hPNELyJPBBmEcjXdW
TTv4AqmaKwMt2SagrSyRyqE7XB6dpLUHyd
THEJ47jWuKmwssvvo7hrmw1wyjFbxDR54p
TP9uatVfbAcZe4qAqANZ6Hjc7JrzGGYhro
TJphKU7t3aW1WoJ3ur9YW4zxNwE9cc6e2H

OKX
TSLj5S3KAfvK8mDtDBisZvWDGUbKUDR16v
TCeLkTvsCb6Tz2ik7xng1YoT9BYdcVxHnr
TJGebBJfUAgs4NUManaRFGQRpoLEwYPj2o

4

TLXtzgg2Axd7ThhhZRq5LoBLgsUYnx8TpZ
THGTenLmvqWycGLGtgRvX4wURiHQeDvNps
TFwi8cW7CUZ3mVY92hYaQiEoAYr5z1E2Kh
TUxrJsf1ZcRgXpfX9L2VLUCEJ5DUs2mWC7
TKuKfiyMCV65AK4A5YGLP3sgDnzkMc6fdp
TA8C3BnEyVvyPGTTEhcsNZz9jNNm6j8tbi

Gate.io
TXV4pAhJSk9BxetRLh2BvTEnyC8xc7VZM8

KuCoin
TDGGk3yNwo9uEmL69zmdwJwUYaCozZMQuD
TUijurbvTKwCpYzEi3TnC62gRLGCxn7q6T

LBank
TUNN5XDrQg6fkfUEdWcYDHgvPwXyxS1k2C
TGUSM4zJ6XrJ5xaD9pnB5eLrKy2GqjG3pC
TVXe59tPrQmFVrP4no59t1Vp3aDSfs8m2t

11.    Next, Inca "reverse traced" from the Deposit Addresses to determine which addresses were part of the common pattern of transactions that were involved in the three steps above. Inca concluded based on this analysis that the Class Members include more than 125 victims, and involved the conversion by Defendants of a minimum of $3.5 million of Class Member funds, with losses potentially higher.

12.    I declare under penalty of perjury under the law of the State of Alabama that the foregoing is true and correct, and that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States.

_____
Charles B. Zach

Executed on the 3RD day of June, 2024, at    Sinj, Croatia_____
                                             City and Country

# EXHIBIT E

ELECTRONICALLY FILED
6/4/2024 10:05 AM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

**IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA**

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated, )<br><br>Plaintiff, )<br><br>V. )<br><br>OLIVIA AVA, EMMA MILLER, and F.B. LEE, )<br><br>Defendants. ) | Civil Action No. 2024-900163<br><br>**CLASS ACTION** |

(PROPOSED)

**ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

This matter is before the Court on Plaintiff's Emergency Motion for Temporary Restraining Order and for Order to Show Cause Why a Preliminary Injunction Should Not Issue. The Court has reviewed the Motion and Brief in Support of the same, as well as the Affidavit of Michael Mashkevich, the Declaration of Charles Zach, and the Affidavit of Robert R. Riley, Jr. The Court is satisfied that pursuant to Alabama Rule of Civil Procedure 65(b), the issuance of this Order to Show Cause and Temporary Restraining Order is warranted without written or oral notice to the Defendants based on Plaintiff's setting forth specific facts of the likelihood of immediate and irreparable injury if time were afforded to allow Defendants to be heard in opposition to Plaintiff's Motion before ruling, and because notice prior to the issuance of this Order should not be required for the reasons set forth in Plaintiff's Motion and Brief in Support. Based on the foregoing, and for the reasons explained below, the Court GRANTS Plaintiff's Motion for a Temporary Restraining Order in its entirety this _____ day of _____, 2024 at _____ AM/PM.

It is hereby ORDERED THAT:

1.       Plaintiff's motion for a temporary restraining order is GRANTED.

2.       Defendants Olivia Ava, Emma Miller, F.B. Lee, and non-parties Binance Holdings Ltd., OKX, Gate.io, KuCoin, LBank, and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any other persons through which they act, or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, (collectively, the "Enjoined Parties") are hereby temporarily restrained from withdrawing, transferring, selling, encumbering, or otherwise altering any of the cryptocurrency or assets held in the wallet addresses listed in Appendix A of this Order, whether such property is located inside or outside of the United States of America.

3.       Plaintiff's attorneys shall cause a copy of this Order, together with a copy of the papers upon which it is based, to be served on or before _____, upon the person or persons controlling the wallets identified in Appendix A to this Order via a special-purpose token or equivalent blockchain currency or code (the "Service Token"), delivered or airdropped into the wallets identified in Appendix A to this Order. The Service Token will contain a hyperlink (the "Service Hyperlink") to a website Plaintiff's counsel will cause to be created, wherein Plaintiff's counsel shall cause to be published this Order and all papers upon which it is based. The Service Hyperlink will include a mechanism to track when a person clicks on the Service Hyperlink. Such service shall constitute actual notice of this Order and sufficient service on the person or persons controlling the corresponding wallet addresses identified in Appendix A of this Order.

4.       Binance Holdings Ltd., OKX, Gate.io, KuCoin, LBank, and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any other persons through which they act, or who act in active concert or participation with any of them, who receive

2

actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, are hereby directed, within twenty-four (24) hours of receiving actual notice of this Order to provide notice of the same to any of their customers associated with the wallet addresses identified in Appendix A of this Order, including Defendants, and provide counsel for Plaintiff copy of such notice.

5.     Pursuant to Ala. R. Civ. P. 65(b), the Defendants, Enjoined Parties and anyone else wishing to be heard, shall appear on _____, 2024 at _____ AM/PM for a hearing at _____ where they may show good cause for why this Court should not enter a preliminary injunction further enjoining the withdraw, transfer, sale, encumbrance, or alteration of the cryptocurrency or assets held in the wallet addressed listed in Appendix A of this Order during the pendency of this action, whether such property is located inside or outside of the United States of America, and imposing such additional relief as the Court deems just and proper.

6.     The Defendants, the Enjoined Parties, and anyone else wishing to be heard, shall file with the Court and serve on Plaintiff's counsel any response, opposition, affidavits or declarations no later than seven (7) days prior to the hearing for preliminary injunction. If such documents are filed and served, Plaintiff may file a reply brief in support of its request for preliminary injunctive relief no later than two (2) days prior to the preliminary injunction hearing.

7.     Defendants and the Enjoined Parties are hereby on notice that failure to timely serve and file an opposition, or failure to appear at the hearing, may result in the imposition of a preliminary injunction against them pursuant to Rule 65 of the Alabama Rules of Civil Procedure.

8.     The temporary restraining order set forth in this Order will expire _____ days from its entry unless, for good cause shown, this Order is extended or Defendants consent

that it should be extended for a longer period. However, the Court may, upon demonstration of good cause by any party-in-interest, shorten or lift this Order.

9.      Defendants and the Enjoined Parties are further notified of their right to apply to the Court for modification or dissolution of this Temporary Restraining Order, if appropriate and supported by a showing of good cause, on notice or such shorter notice as the Court may allow.

10.     Notice was not provided to Defendants prior to issuance of this Order either because their identities have not yet been ascertained or because the Court has determined that providing such notice would cause a likelihood of immediate, irreparable injury or loss, particularly through the dissipation of the assets listed in Appendix A of this Order.

11.     Pursuant to Ala. R. Civ. P. 65(c), the Court in its discretion determines that no bond is required.

12.     This Order was Issued _____, 2024, at ____:____ AM/PM.


_____
Circuit Court Judge

Appendix A

**Binance Holdings**
THm7R5wHvqx8gZkCX9KS9hjhvUv5TrXU4y
TTTkoMc9VuVKTGFQJPxF5pS2f1XV5u5QHJ
TLB95AHgDtns5cohFKicTsE2zpFqcbzMM7
TBeUKtZxjcR6HmeVXV4TFeFWN3nvDDAqTw
TXMA8WaXdWa5EYkBhAMuCwjHjSdHGvyV2y
TCzHEWKCgo17CVwbkPFmZorDi9kWkpMbnd
TKJ77SjyQGAX4u711tneGXpgZLTVwRZ8Uk
TFsZ9UvNYS4tLPWLUzKsGviHsPsWFuKsH8
TPJV9ayW6YqPK9yddvaMzKwm424ySeJriK
TNRzzzCZ5x1HPS6LSca2MCamDLoJNQLTdW
TDuJLcreNwBzDp3RHrpsoTbhnw9s3QmPb9
TBJh9brKQp8ZvTq6vi5BvU9epdwEP63ysj
TWUeDMvPrY88cpX2EmFxHdd2xtWfm9cPDK
TLvFAMp7qZ7iF8fqqewM7AMjJtzZwjSWve
TGqjuFc8jxfjZBpUuFGnRLAXqzbHzYB4Wm
TLN6ayhvQqzFK1KweyNDfMiqMfgrZ2rMg3
TUjGaqLmBnYythnN5hPNELyJPBBmEcjXdW
TTv4AqmaKwMt2SagrSyRyqE7XB6dpLUHyd
THEJ47jWuKmwssvvo7hrmw1wyjFbxDR54p
TP9uatVfbAcZe4qAqANZ6Hjc7JrzGGYhro
TJphKU7t3aW1WoJ3ur9YW4zxNwE9cc6e2H

**OKX**
TSLj5S3KAfvK8mDtDBisZvWDGUbKUDR16v
TCeLkTvsCb6Tz2ik7xng1YoT9BYdcVxHnr
TJGebBJfUAgs4NUManaRFGQRpoLEwYPj2o
TLXtzgg2Axd7ThhhZRq5LoBLgsUYnx8TpZ
THGTenLmvqWycGLGtgRvX4wURiHQeDvNps
TFwi8cW7CUZ3mVY92hYaQiEoAYr5z1E2Kh
TUxrJsf1ZcRgXpfX9L2VLUCEJ5DUs2mWC7
TKuKfiyMCV65AK4A5YGLP3sgDnzkMc6fdp
TA8C3BnEyVvyPGTTEhcsNZz9jNNm6j8tbi

**Gate.io**
TXV4pAhJSk9BxetRLh2BvTEnyC8xc7VZM8

**KuCoin**
TDGGk3yNwo9uEmL69zmdwJwUYaCozZMQuD
TUijurbvTKwCpYzEi3TnC62gRLGCxn7q6T

**LBank**
TUNN5XDrQg6fkfUEdWcYDHgvPwXyxS1k2C
TGUSM4zJ6XrJ5xaD9pnB5eLrKy2GqjG3pC
TVXe59tPrQmFVrP4no59t1Vp3aDSfs8m2t

5

# EXHIBIT F

ELECTRONICALLY FILED
6/4/2024 1:47 PM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

## IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA

MICHAEL MASHKEVICH,

                    Plaintiff,

V.                                              Civil Action No. CV 2024-900163

OLIVIA AVA, EMMA MILLER,
and F.B. LEE, et al.,

                    Defendants.

## ORDER FOR TEMPORARY RESTRAINING ORDER AND TO SHOW CAUSE

This matter is before the Court on Plaintiff's Emergency Motion for Temporary Restraining Order and for Order to Show Cause why a preliminary injunction should not issue.

The Court has reviewed the Motion and Brief in Support of the same, as well as the Affidavit of Michael Mashkevich, the Declaration of Charles Zach, and the Affidavit of Robert R. Riley, Jr. The Court is satisfied that pursuant to Alabama Rule of Civil Procedure 65(b), the issuance of this Order to Show Cause and Temporary Restraining Order is warranted without written or oral notice to the Defendants based on Plaintiff's setting forth specific facts of the likelihood of immediate and irreparable injury if time were afforded to allow Defendants to be heard in opposition to Plaintiff's Motion before ruling, and because notice prior to the issuance of this Order should not be required for the reasons set forth in Plaintiff's Motion and Brief in Support. Based on the foregoing, and for the reasons explained below, the Court GRANTS Plaintiff's Motion for a Temporary Restraining Order in its entirety this 4TH DAY OF JUNE, 2024.

It is hereby **ORDERED** that:

1.     Plaintiff's motion for a temporary restraining order is GRANTED.

2.     Defendants Olivia Ava, Emma Miller, F.B. Lee, and non-parties Binance Holdings Ltd., OKX, Gate.io, KuCoin, LBank, and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any

other persons through which they act, or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, (collectively, the "Enjoined Parties") are hereby temporarily restrained from withdrawing, transferring, selling, encumbering, or otherwise altering any of the cryptocurrency or assets held in the wallet addresses listed in Appendix A of this Order, whether such property is located inside or outside of the United States of America.

3.    Plaintiff's attorneys shall cause a copy of this Order, together with a copy of the papers upon which it is based, to be served upon the person or persons controlling the wallets identified in Appendix A to this Order via a special-purpose token or equivalent blockchain currency or code (the "Service Token"), delivered or airdropped into the wallets identified in Appendix A to this Order. The Service Token will contain a hyperlink (the "Service Hyperlink") to a website Plaintiff's counsel will cause to be created, wherein Plaintiff's counsel shall cause to be published this Order and all papers upon which it is based. The Service Hyperlink will include a mechanism to track when a person clicks on the Service Hyperlink. Such service shall constitute actual notice of this Order and sufficient service on the person or persons controlling the corresponding wallet addresses identified in Appendix A of this Order.

4.    Binance Holdings Ltd., OKX, Gate.io, KuCoin, LBank, and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any other persons through which they act, or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, are hereby directed, within twenty-four (24) hours of receiving actual notice of this Order to provide notice of the same to any of their customers associated with the wallet addresses identified in Appendix A of this Order, including Defendants, and provide counsel for Plaintiff copy of such notice.

5.    Pursuant to Ala. R. Civ. P. 65(b), the Defendants, Enjoined Parties and anyone else wishing to be heard, shall appear on **14TH DAY OF JUNE, 2024 AT 9:00 A.M. at the Marshall County Courthouse located in GUNTERSVILLE, Second Floor, Courtroom #1** for a hearing where they may show good cause for why this Court should not enter a preliminary injunction further enjoining the withdraw, transfer, sale, encumbrance, or alteration of the cryptocurrency or assets held in the wallet addressed listed in Appendix A of this Order during the pendency of this action, whether such property is located inside or outside of the

United States of America, and imposing such additional relief as the Court deems just and proper.

6.     The Defendants, the Enjoined Parties, and anyone else wishing to be heard, shall file with the Court and serve on Plaintiff's counsel any response, opposition, affidavits or declarations no later than seven (7) days prior to the hearing for preliminary injunction. If such documents are filed and served, Plaintiff may file a reply brief in support of its request for preliminary injunctive relief no later than two (2) days prior to the preliminary injunction hearing.

7.     Defendants and the Enjoined Parties are hereby on notice that failure to timely serve and file an opposition, or failure to appear at the hearing, may result in the imposition of a preliminary injunction against them pursuant to Rule 65 of the Alabama Rules of Civil Procedure.

8.     The temporary restraining order set forth in this Order will expire **TEN DAYS (10 DAYS)** from its entry unless, for good cause shown, this Order is extended or Defendants consent that it should be extended for a longer period. However, the Court may, upon demonstration of good cause by any party-in-interest, shorten or lift this Order.

9.     Defendants and the Enjoined Parties are further notified of their right to apply to the Court for modification or dissolution of this Temporary Restraining Order, if appropriate and supported by a showing of good cause, on notice or such shorter notice as the Court may allow.

10.     Notice was not provided to Defendants prior to issuance of this Order either because their identities have not yet been ascertained or because the Court has determined that providing such notice would cause a likelihood of immediate, irreparable injury or loss, particularly through the dissipation of the assets listed in Appendix A of this Order.

11.     Pursuant to Ala. R. Civ. P. 65(c), the Court in its discretion determines that no bond is required.

ORDERED this 4th day of JUNE, 2024.

*/s/ Christopher F. Abel*
CHRISTOPHER F. ABEL
CIRCUIT JUDGE

3

# APPENDIX A

**Binance Holdings**
THm7R5wHvqx8gZkCX9KS9hjhvUv5TrXU4y
TTTkoMc9VuVKTGFQJPxF5pS2f1XV5u5QHJ
TLB95AHgDtns5cohFKicTsE2zpFqcbzMM7
TBeUKtZxjcR6HmeVXV4TFeFWN3nvDDAqTw
TXMA8WaXdWa5EYkBhAMuCwjHjSdHGvyV2y
TCzHEWKCgo17CVwbkPFmZorDi9kWkpMbnd
TKJ77SjyQGAX4u711tneGXpgZLTVwRZ8Uk
TFsZ9UvNYS4tLPWLUzKsGviHsPsWFuKsH8
TPJV9ayW6YqPK9yddvaMzKwm424ySeJriK
TNRzzzCZ5x1HPS6LSca2MCamDLoJNQLTdW
TDuJLcreNwBzDp3RHrpsoTbhnw9s3QmPb9
TBJh9brKQp8ZvTq6vi5BvU9epdwEP63ysj
TWUeDMvPrY88cpX2EmFxHdd2xtWfm9cPDK
TLvFAMp7qZ7iF8fqqewM7AMjJtzZwjSWve
TGqjuFc8jxfjZBpUuFGnRLAXqzbHzYB4Wm
TLN6ayhvQqzFK1KweyNDfMiqMfgrZ2rMg3
TUjGaqLmBnYythnN5hPNELyJPBBmEcjXdW
TTv4AqmaKwMt2SagrSyRyqE7XB6dpLUHyd
THEJ47jWuKmwssvvo7hrmw1wyjFbxDR54p
TP9uatVfbAcZe4qAqANZ6Hjc7JrzGGYhro
TJphKU7t3aW1WoJ3ur9YW4zxNwE9cc6e2H

**OKX**
TSLj5S3KAfvK8mDtDBisZvWDGUbKUDR16v
TCeLkTvsCb6Tz2ik7xng1YoT9BYdcVxHnr
TJGebBJfUAgs4NUManaRFGQRpoLEwYPj2o
TLXtzgg2Axd7ThhhZRq5LoBLgsUYnx8TpZ
THGTenLmvqWycGLGtgRvX4wURiHQeDvNps
TFwi8cW7CUZ3mVY92hYaQiEoAYr5z1E2Kh
TUxrJsf1ZcRgXpfX9L2VLUCEJ5DUs2mWC7
TKuKfiyMCV65AK4A5YGLP3sgDnzkMc6fdp
TA8C3BnEyVvyPGTTEhcsNZz9jNNm6j8tbi

**Gate.io**
TXV4pAhJSk9BxetRLh2BvTEnyC8xc7VZM8

**KuCoin**
TDGGk3yNwo9uEmL69zmdwJwUYaCozZMQuD
TUijurbvTKwCpYzEi3TnC62gRLGCxn7q6T

**LBank**
TUNN5XDrQg6fkfUEdWcYDHgvPwXyxS1k2C
TGUSM4zJ6XrJ5xaD9pnB5eLrKy2GqjG3pC
TVXe59tPrQmFVrP4no59t1Vp3aDSfs8m2t

# EXHIBIT G

ELECTRONICALLY FILED
6/12/2024 3:50 PM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

**IN THE CIRCUIT COURT OF MARSHALL COUNTY**

|  |  |  |
|---|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated, | ) ) | |
| | ) | Civil Action No. 2024-900163 |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| OLIVIA AVA, EMMA MILLER, and F.B. LEE, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S NOTICE OF COMPLIANCE
WITH THE SERVICE REQUIREMENTS SET FORTH IN THE
TEMPORARY RESTRAINING ORDER**

Plaintiff Michael Mashkevich hereby gives notice that his counsel has complied with the service requirements set forth in the Court's June 4, 2024 Order for Temporary Restraining Order and to Show Cause. The Declaration of Albina Giuttari is attached hereto and is submitted to evidence said compliance.

Respectfully submitted,

*/s/ Robert R. Riley, Jr.*
Robert R. Riley, Jr. (ASB-8310-Y75R)
Keith Jackson (ASB-7519-J66B)
James E. Murrill (ASB-4329-A57M)
Attorneys for Plaintiff

**OF COUNSEL:**

RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Telephone: (205) 879-5000
rob@rileyjacksonlaw.com
kj@rileyjacksonlaw.com
jay@rileyjacksonlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 12, 2024, a copy of the foregoing was electronically filed with the Clerk of the Court using the AlaFile system.

<u>*/s/ Robert R. Riley, Jr.*</u>
OF COUNSEL

## IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated, )<br>)<br>) | |
| Plaintiff, ) | Civil Action No. 2024-900163 |
| ) | |
| V. ) | **CLASS ACTION** |
| ) | |
| OLIVIA AVA, EMMA MILLER, and F.B. LEE, )<br>) | |
| Defendants. ) | |

### DECLARATION OF **ALBINA GIUTTARI**

I, Albina Giuttari, declare under penalty of perjury as follows:

1.  My name is Albina Giuttari.  I am over 18 years of age, of sound mind, and am competent to testify to the matters stated herein.  The evidence set forth in the foregoing declaration is based on my personal knowledge unless expressly stated otherwise.

1.  I am an contractor at Inca Digital, a company that investigates cryptocurrency schemes and has been involved in the delivery of special purpose tokens or equivalent blockchain currency or code ("Service Tokens") in litigation in various venues, including in state courts in New York and Florida and federal court in Michigan. Inca Digital is a digital asset intelligence company that provides data, analytics, and expertise to many of the world's leading exchanges, financial institutions, regulators, and government agencies. Inca Digital's clients use its unique and comprehensive intelligence to surveil digital asset markets, fight crime, generate alpha, and more. For more information about Inca Digital and our work, please visit: https://inca.digital/.

2.      As part of my employment, I have taken certain actions to assist Plaintiff's attorneys to serve various pleadings filed in, and the Temporary Restraining Order issued in, this case (the "TRO").

3.      The TRO contained the following instructions:

> Plaintiff's attorneys shall cause a copy of this Order, together with a copy of the papers upon which it is based, to be served upon the person or persons controlling the wallets identified in Appendix A to this Order via a special-purpose token or equivalent blockchain currency or code (the "Service Token"), delivered or airdropped into the wallets identified in Appendix A to this Order. The Service Token will contain a hyperlink (the "Service Hyperlink") to a website Plaintiff's counsel will cause to be created, wherein Plaintiff's counsel shall cause to be published this Order and all papers upon which it is based. The Service Hyperlink will include a mechanism to track when a person clicks on the Service Hyperlink. Such service shall constitute actual notice of this Order and sufficient service on the person or persons controlling the corresponding wallet addresses identified in Appendix A of this Order.

4.      I was part of the team at Inca Digital that created the Service Tokens and delivered them into the wallets identified in Appendix A to the TRO. Each Service token contained a hyperlink to a website created by Inca, https://order17wk8.com/, which included links to four documents: (1) the Complaint, (2) the TRO motion, (3) the TRO Order, and (4) the TRO Brief & Exhibits A-D. A printout of this website is attached as Exhibit 1.

5.      I have confirmed that Service Tokens were delivered into each of the wallets listed in Appendix A of the TRO. The service process at Inca Digital began immediately after the issuance of the TRO and was completed for all of the wallets as of 4:45pm Eastern Daylight Time on Monday, June 10, 2024. I subsequently monitored the address for each wallet as well as a unique transaction hash associated with the Service Tokens. A printout of the spreadsheet listing the addresses that have been served, along with the transaction hashes, is attached as Exhibit 2.

6.       The process Inca Digital followed to create the Service Tokens and website in this case were substantially similar to the process followed in other cases involving cryptocurrency, including in the courts referenced above.

7.       I declare under penalty of perjury under the law of the State of Alabama that the foregoing is true and correct, and that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States.

*Albina Giuttari*
_____
Albina Giuttari

Executed on the __11__ day of June, 2024, at ___Lamone, Switzerland_____

City and Country

**Exhibit 1 - a printout of the website served**

Screenshot of https://order17wk8.com/

ORDER17WK8

MICHAEL MASHKEVICH V. OLIVIA AVA ET AL

50-CV-2024-900163.00

Documents

1 - Complaint (pdf)                    Download
1 - TRO - Motion (pdf)                 Download
4 - Order for TRO (pdf)                Download

3 – TRO – Brief & Exhibits A-D

Download PDF



Prev    Next

order17wk8

**Exhibit 2 - a printout of the spreadsheet listing the addresses that have been served, along with the transaction hashes**

Case 5:25-cv-02565-PCP    Document 21-1    Filed 03/23/25    Page 66 of 107

| # | Wallet address | Transaction hash for transfer for LINK |
|---|---|---|
| 1 | THm7R5wHvqx8gZkCX9KS9hjhvUv5TrXU4y | 63b34b6728fadc3decfee07d481e9b13bdbc11828ff101a2d439a2d96e818795 |
| 2 | TTTkoMc9VuVKTGFQJPxF5pS2f1XVu5QHJ | 1d0735b4fc009f8c3b925ef51823ac024dce900daf28cd79ea4c6017b11455a6 |
| 3 | TLB95AHgDtns5cohFKicTsE2zpFqcbzMM7 | b24b0c29fa6f7b04b1b624313ff0ce1e67afb94d66dd0f269fbfe723f7afb142 |
| 4 | TBeUKtZxjcR6HmeVXV4TFeFWN3nvDDAqTw | 8fc580d24dcd019fd9d6846c210b811c7e8157dd4c3211285d53ea9612f75557 |
| 5 | TXMA8WaXdWa5EYkBhAMuCwjHjSdHGvyV2y | 621057a9be79584dc7b8efe9dc22fcda0bcd98fe3e3436d030ce81ac1519d43c |
| 6 | TCzHEWKCgo17CVwbkPFmZorDi9kWkpMbnd | c99669b75750c34df818df330e302ff3e99d78fec4bbb0b7bcb9e3e784ba7229 |
| 7 | TKJ77SjyQGAX4u711tneGXpgZLTVwRZ8Uk | 303f607ffe32b5d17ce29391716e17bad2c55263ceee0b764afaded36be7e94d |
| 8 | TFsZ9UvNYS4tLPWLUzKsGviHsPsWFuKsH8 | 4de92fcab73f0ee95b0273763573ce95cdbab74c0defd6dd74b197dada2c8565 |
| 9 | TPJV9ayW6YqPK9yddvaMzKwm424ySeJriK | 8ad17997d46f9593dbc9aa726db7e8e55fd1d52635ea359ef5dcbd7ef8f6fc1f |
| 10 | TNRzzzCZ5x1HPS6LSca2MCamDLoJNQLTdW | f6aab798e40f4d798b3451dd16b108a95f50ce00e8b85618ab4bbe3e6365dbb6 |
| 11 | TDuJLcreNwBzDp3RHrpsoTbhnw9s3QmPb9 | ab7919ed34f5d7d48c40f8c5fa23a088e9deb55a6190dfc5978179760f67d228 |
| 12 | TBJh9brKQp8ZvTq6vi5BvU9epdwEP63ysj | 61be52cce3dbb4e1b4641541fa38b1efe58e61eb7a07fb03368ef941ca32ae41 |
| 13 | TWUeDMvPrY88cpX2EmFxHdd2xtWfm9cPDK | cf4aba634d0de3aa171e2e4c9cf308af6384712d6dbc398aa68e2c43a441a8d5 |
| 14 | TLvFAMp7qZ7iF8fqqewM7AMjJtzZwjSWve | db2f7793f326a0f8488c6d8e33204f4be88dfaea764b29ea4636c4b221fa8cc9 |
| 15 | TGqjuFc8jxfjZBpUuFGnRLAXqzbHzYB4Wm | 94b28924aa3a47cbfeed7010dc785a6554d88e8c91eaea188672835e5a1592b4 |
| 16 | TLN6ayhvQqzFK1KweyNDfMiqMfgrZ2rMg3 | e3100b0d94a5dab7e2ea5a730048cbc39b64a7b32e12f944905046b862734033 |
| 17 | TUjGaqLmBnYythnN5hPNELyJPBBmEcjXdW | 2b64f032088959ae727503e2aca644ddc783f7e1f358da6aef304908db1fb19f |
| 18 | TTv4AqmaKwMt2SagrSyRyqE7XB6dpLUHyd | fbf427ffbf3c05db92e5ec07698d33ef30557317348db48e125ed34131375373 |
| 19 | THEJ47jWuKmwssvvo7hrmw1wyjFbxDR54p | 94fccdbe629128fe8b879c531b69119a933fa12bc47abd6dfc1c3689d5941d32 |
| 20 | TP9uatVfbAcZe4qAqANZ6Hjc7JrzGGYhro | 236b95b0bc533c1480f3a2f4dadca06f5c6e57383e2fc8371cced8c61775d474 |
| 21 | TJphKU7t3aW1WoJ3ur9YW4zxNwE9cc6e2H | 353a6b250a8362723a7a3f5fbb71b49c5e0d34eb635350c6dd00dfc888558c82 |
| 22 | TSLj5S3KAfvK8mDtDBisZvWDGUbKUDR16v | 61ce68c81d1b98136f9b7546e7f28f5e87ede30e60bbc0929e84cc8a7b681459 |
| 23 | TCeLkTvsCb6Tz2ik7xng1YoT9BYdcVxHnr | 15e46bf26f5986d218ad19e92c5e405198d5e4509bfc88e9772165cc3e2132fa |
| 24 | TJGebBJfUAgs4NUManaRFGQRpoLEwYPj2o | 16c8d7a69000c7e55475c883e241233dd98f7ef7557569fbdfc0bc5e11c3e609 |
| 25 | TLXtzgg2Axd7ThhhZRq5LoBLgsUYnx8TpZ | 64eb0240cbc784bcebd805704ff56b38dfb5672efed54dced4e8f20232b0dc95 |
| 26 | THGTenLmvqWycGLGtgRvX4wURiHQeDvNps | e76a644842bccafb9ede61c97610e019ed41a8880e1027a034876316aa2996b7 |
| 27 | TFwi8cW7CUZ3mVY92hYaQiEoAYr5z1E2Kh | 2621277fbed820900871fd3546a0ffe2003dc45dad9ef98e29129eb1ea3e137a |
| 28 | TUxrJsf1ZcRgXpfX9L2VLUCEJ5DUs2mWC7 | 8934ff3c5182146c07520ebb7dc7a37a24b0f8b204aef05e839b17735e5d25be |
| 29 | TKuKfiyMCV65AK4A5YGLP3sgDnzkMc6fdp | d1a282ba7373322eb1a2e0cc1fd45fac158f169bd3675fed2e0f594307bd90dd |
| 30 | TA8C3BnEyVvyPGTTEhcsNZz9jNNm6j8tbi | 5b3d39352745ce410415999e7a085894a6af13fec21b3c030d02f5e2b502b5e5 |
| 31 | TXV4pAhJSk9BxetRLh2BvTEnyC8xc7VZM8 | bfe1077d4299547f47d75c851a7981d5cf60e06970bbe5e4ec19be9994981d7e |
| 32 | TDGGk3yNwo9uEmL69zmdwJwUYaCozZMQuD | 25df6f60357793be242ab6b3ac803ab12d5356dfdc4224c8c16f95a04c58a3f0 |
| 33 | TUijurbvTKwCpYzEi3TnC62gRLGCxn7q6T | e55fe3215c424f76412904e1d2e4323c1e521f8236ebc423d4d7ac501d980a4f |
| 34 | TUNN5XDrQg6fkfUEdWcYDHgvPwXyxS1k2C | af0fc818cd6aaa4cd826078bb7e55be8c3292c73d611486d61215d4b7371c623 |
| 35 | TGUSM4zJ6XrJ5xaD9pnB5eLrKy2GqjG3pC | 80178b146ccceeb23ed485f0ee333d3389cd63ba536423cee9460e048286e23c |
| 36 | TVXe59tPrQmFVrP4no59t1Vp3aDSfs8m2t | 5cb6486af68bd1b1f83a9dc3712dc6203378181a3b942b823478cc2f80609c4d |

# EXHIBIT H

DOCUMENT 17

ELECTRONICALLY FILED
6/14/2024 9:39 AM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

**IN THE CIRCUIT COURT OF MARSHALL COUNTY**

|  |  |
|---|---|
| _____ ) | |
| MICHAEL MASHKEVICH, on behalf of himself ) | |
| and all others similarly situated, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| V. ) | CASE NO.: CV-2024-900163 |
| ) | |
| OLIVIA AVA, EMMA MILLER, and F.B. LEE, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## PRELIMINARY INJUNCTION ORDER

The Court has previously considered Plaintiff's Emergency Motion for Temporary Restraining Order and for Order to Show Cause Why a Preliminary Injunction Should Not Issue. On June 4, 2024, the Court issued an Order for Temporary Restraining Order and to Show Cause (the "TRO").

Now pending before the Court is whether to grant Plaintiff a preliminary injunction. This matter was scheduled for hearing on June 14, 2024. Based on the arguments of Plaintiff's counsel and the related Declaration of Albina Giuttari, the Court is satisfied that Plaintiff's counsel has met the service requirements set forth in the TRO. Consequently, Defendants and the entities enjoined by the TRO were provided with notice of this hearing, informed of the nature of this hearing, and informed of their right to be heard. At said hearing, no defendants appeared to be heard in person or through counsel.

The Court has reviewed and considered the evidence, which includes the Affidavit of Plaintiff Michael Mashkevich and the attached WhatsApp chats with Defendants F.B. Lee and Emma Miller, the Declaration of Charles Zach, and the Affidavit of Robert R. Riley, Jr. The Court has also heard and considered the arguments of counsel.

1

This case involves the alleged theft of cryptocurrency using a scheme known as "pig butchering." Using fake identities, fake websites, offshore bank accounts, and legitimate and illegitimate cryptocurrency exchanges, Defendants perpetrated a scheme to convert and fraudulently obtain large sums from Plaintiff and similarly situated individuals.  After the victims have been lured to transfer large amounts of money – the "fattening" – the perpetrators and the victims' assets disappear – the "butchering."  The scheme has many variations, but it always results – as it did in this case – with the proceeds of the scheme being transferred beyond reach through cryptocurrency channels.

The version of the scheme that ensnared Plaintiff involved Defendants promising Plaintiff he would be paid for performing standardized online work. Defendants represented that the work involved real and legitimate online tasks, including tasks related to software applications at real companies.    The websites on which the work was performed are fake, though Plaintiff did not know that while he was performing the work and while the scheme was unfolding.   Early on, Defendants requested that Plaintiff contribute a small amount of funds – converted to cryptocurrency – to set up the respective accounts that were supposedly part of the work that Plaintiff would be performing.  Eventually, Defendants represented that Plaintiff was required to transfer additional funds to the accounts for standardized, boilerplate reasons, including when Plaintiff's credit score had dropped, Plaintiff's account balance had gone negative, Plaintiff owed taxes, or due to a problem with loans from other work platform members. After Defendants persuaded Plaintiff to deposit additional funds, they stole the money and transferred it to cryptocurrency wallets they control.  Defendants then attempted to conceal their conversion of the Plaintiff's cryptocurrency through a series of online transactions designed to hide their trail.  Charles Zach and his company were able to trace and connect Defendants' transactions, follow the trail, and identify several of the cryptocurrency wallets that held and/or hold the cryptocurrency funds of Plaintiff and others who were likely victims of similar "pig butchering" schemes.

The TRO froze the digital wallets which held and/or hold the cryptocurrency funds of Plaintiff and others who were likely victims of similar "pig butchering" schemes.  Plaintiff now seeks a preliminary injunction that would serve to continue the freeze of those wallets.

"'In order for a trial court to grant a preliminary injunction, the plaintiff must show <u>all</u> of the following: 1) that without the injunction the plaintiff would suffer immediate and irreparable injury; (2) that the plaintiff has no

adequate remedy at law; (3) that the plaintiff has at least a reasonable chance of success on the ultimate merits of his case; and (4) that the hardship imposed on the defendant by the injunction would not unreasonably outweigh the benefit accruing to the plaintiff.'" *Stephens v. Colley*, 160 So.3d 278, 282 (Ala. 2014) (internal citations omitted, emphasis in the original).

The Court is satisfied that without the injunction Plaintiff would suffer immediate and irreparable injury. Cryptocurrency theft schemes threaten imminent and irreparable loss absent injunctive relief due to the risk of anonymous and speedy asset dissipation. It would be a simple matter for Defendants to transfer cryptocurrency to unidentified recipients outside the traditional banking system and effectively place the assets at issue in this matter beyond the reach of the Court. Here, through substantial effort, the current location of the cryptocurrency has been established. But that location can change quickly because Defendants can quickly and easily move the cryptocurrency to other digital wallets, continuing to put those assets outside the reach of victims and this Court. The only way to prevent that irreparable harm is to freeze the digital wallets that currently hold the cryptocurrency, thereby preventing Defendants – until this Court decides otherwise – from transferring the cryptocurrency to parts unknown.

The Court is satisfied that Plaintiff has no adequate remedy at law. A money judgment is an inadequate legal remedy based both on the anonymity of the Defendants at the heart of the scheme, as well as the difficulty in having to trace transfer of cryptocurrency. Defendants can convert the cryptocurrency to a place where Plaintiff can no longer find it or find Defendants themselves. Defendants' identities are either unknown or fake and a money judgment against them is meaningless. Absent an injunction, Defendants can be expected to continue to transfer Plaintiff and others' cryptocurrency beyond the reach of discovery and this Court. Thus, the only remedy is to enjoin the transfer of the cryptocurrency at issue.

The Court is satisfied that Plaintiff has at least a reasonable chance of success on the ultimate merits of his case. Under Alabama law, "[c]onversion occurs upon a wrongful taking, an interference, or a detention of the property of another." *Yarbrough v. Williams*, 533 So.2d 565, 567 (Ala. 1988). "Generally, an action will not lie for the conversion of money. However, if the money at issue is capable of identification, then a claim of conversion may be appropriate." *Greene County Bd. of Educ. v. Bailey*, 586 So.2d 893, 898 (Ala. 1991). Here, Plaintiff has made a strong showing that Defendants converted his

cryptocurrency deposits and investments through a series of unauthorized and unlawful transfers. Defendants used fake work platforms to lure Plaintiff to transfer funds to cryptocurrency wallets controlled by Defendants. Defendants orchestrated all of this through fake websites and fake balances that purported to show the "commissions" that Plaintiff had earned. Plaintiff made ever increasing transfers because Defendants said the transfers were necessary to free-up the "commissions" Plaintiff was led to believe that he earned for online optimization work. In doing so, Defendants converted Plaintiff's property. Plaintiff's transfers were made with cryptocurrency, and that cryptocurrency is specific, identifiable property subject to conversion. By its very nature, cryptocurrency has a unique and specific identification within the blockchain. Indeed, it is this attribute from which cryptocurrency derives its value in being specific and identifiable.

Finally, the Court is satisfied that the hardship imposed on the Defendants by the injunction would not unreasonably outweigh the benefit accruing to the Plaintiff. Even if Defendants could claim a legal right to the stolen cryptocurrency, the freeze of such assets is but a temporary inconvenience. Counterbalanced against this inconvenience is the harm to Plaintiff and the other potential class members if an injunction does not issue. Namely, that Plaintiff and other potential victims' cryptocurrency will be forever gone and leave them with no adequate remedy for their loss. A delay in Defendants' ability to transfer the assets only minimally prejudices Defendants, whereas withholding injunctive relief would severely prejudice Plaintiff by providing Defendants time to transfer the allegedly purloined assets into other accounts beyond the reach of this Court. Consequently, the balancing of the harm to Plaintiff and the "pig butchering" Defendants favors injunctive relief.

Based on the foregoing, it is **ORDERED** that:

1.    Plaintiff's request for a preliminary injunction is **GRANTED** pursuant to *Alabama Rule of Civil Procedure* 65(d).

2.    Defendants Olivia Ava, Emma Miller, F.B. Lee, and non-parties Binance Holdings Ltd., OKX, Gate.io, KuCoin, LBank, and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any other persons through which they act, or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, (collectively,

the "Enjoined Parties") are hereby enjoined  from withdrawing, transferring, selling, encumbering, or otherwise altering any of the cryptocurrency or assets held in the wallet addresses listed in Appendix A of this Order, whether such property is located inside or outside of the United States of America.

3.     Plaintiff's attorneys shall cause a copy of this Order to be served upon the person or persons controlling the wallets identified in Appendix A to this Order via a special-purpose token or equivalent blockchain currency or code (the "Service Token"), delivered into the wallets identified in Appendix A to this Order. The Service Token will contain a hyperlink (the "Service Hyperlink") to the website Plaintiff's counsel has caused to be created, wherein Plaintiff's counsel shall cause to be published this Order. The Service Hyperlink will include a mechanism to track when a person clicks on the Service Hyperlink. Such service shall constitute actual notice of this Order and sufficient service on the person or persons controlling the corresponding wallet addresses identified in Appendix A of this Order.

4.     Binance Holdings Ltd., OKX, Gate.io, KuCoin, LBank, and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any other persons through which they act, or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, are hereby directed, within twenty-four (24) hours of receiving actual notice of this Order to provide notice of the same to any of their customers associated with the wallet addresses identified in Appendix A of this Order, including Defendants, and provide counsel for Plaintiff copy of such notice.

5.     Binance Holdings Ltd., OKX, Gate.io, KuCoin, LBank, and any of their agents, servants, employees, attorneys, partners, successors, assigns, subsidiaries, or any other persons through which they act, or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, are hereby directed, within ten (10) days of receiving actual notice of this Order, to provide Plaintiff's attorneys with the type and total amount of cryptocurrency and assets contained within each wallet address identified in Appendix A of this Order as of the date of this Order.

5

6.    Pursuant to *Ala. R. Civ. P.* 65(c), the Court in its discretion determines that no bond or security is required. *Ala. R. Civ. P.* 65(c) provides "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs, damages, and reasonable attorney fees as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained[.]"  There are exceptions to the security requirement, including when the issue addressed by the preliminary injunction "'is one of overriding public concern.'" *Spinks v. Automation Pers. Servs., Inc.*, 49 So.3d 186, 190 (Ala. 2010) (internal citations omitted).  The overriding public concern is providing assurance to the public that courts will take action to promote protection of assets and recovery of stolen assets when they can be readily located and traced to specific locations.  Freezing cryptocurrency accounts reassures the public that even with transactions conducted in the cryptocurrency space, there is an adequate remedy to prevent fraud or theft. Conversely, no public interest would be served by continuing to permit Defendants to transfer and dissipate stolen assets in furtherance of their scheme.  Defendants have no right to this stolen property and, consequently, will sustain no damages if they are restrained from further transfer of these assets.

7.    Until such time as the Court issues an order that either terminates, modifies, or converts it into permanent injunction, the preliminary injunction set forth in this Order shall remain in full force and effect.

**ORDERED** this **14ᵀᴴ** day of **JUNE, 2024**.

_____

**CIRCUIT JUDGE**

## Appendix A

**Binance Holdings**
THm7R5wHvqx8gZkCX9KS9hjhvUv5TrXU4y
TTTkoMc9VuVKTGFQJPxF5pS2f1XV5u5QHJ
TLB95AHgDtns5cohFKicTsE2zpFqcbzMM7
TBeUKtZxjcR6HmcVXV4TFcFWN3nvDDAqTw
TXMA8WaXdWa5EYkBhAMuCwjHjSdHGvyV2y
TCzHEWKCgo17CVwbkPFmZorDi9kWkpMbnd
TKJ77SjyQGAX4u711tneGXpgZLTVwRZ8Uk
TFsZ9UvNYS4tLPWLUzKsGviHsPsWFuKsH8
TPJV9ayW6YqPK9yddvaMzKwm424ySeJriK
TNRzzzCZ5x1HPS6LSca2MCamDLoJNQLTdW
TDuJLcreNwBzDp3RHrpsoTbhnw9s3QmPb9
TBJh9brKQp8ZvTq6vi5BvU9epdwEP63ysj
TWUeDMvPrY88cpX2EmFxHdd2xtWfm9cPDK
TLvFAMp7qZ7iF8fqqewM7AMjJtzZwjSWve
TGqjuFc8jxfjZBpUuFGnRLAXqzbHzYB4Wm
TLN6ayhvQqzFK1KweyNDfMiqMfgrZ2rMg3
TUjGaqLmBnYythnN5hPNELyJPBBmEcjXdW
TTv4AqmaKwMt2SagrSyRyqE7XB6dpLUHyd
THEJ47jWuKmwssvvo7hrmw1wyjFbxDR54p
TP9uatVfbAcZe4qAqANZ6Hjc7JrzGGYhro
TJphKU7t3aW1WoJ3ur9YW4zxNwE9cc6e2H


## OKX
TSLj5S3KAfvK8mDtDBisZvWDGUbKUDR16v
TCeLkTvsCb6Tz2ik7xng1YoT9BYdcVxHnr
TJGebBJfUAgs4NUManaRFGQRpoLEwYPj2o
TLXtzgg2Axd7ThhhZRq5LoBLgsUYnx8TpZ
THGTenLmvqWycGLGtgRvX4wURiI1QeDvNps
TFwi8cW7CUZ3mVY92hYaQiEoAYr5z1E2Kh
TUxrJsf1ZcRgXpfX9L2VLUCEJ5DUs2mWC7
TKuKfiyMCV65AK4A5YGLP3sgDnzkMc6fdp
TA8C3BnEyVvyPGTTEhcsNZz9jNNm6j8tbi


## Gate.io
TXV4pAhJSk9BxetRLh2BvTEnyC8xc7VZM8


## KuCoin
TDGGk3yNwo9uEmL69zmdwJwUYaCozZMQuD
TUijurbvTKwCpYzEi3TnC62gRLGCxn7q6T


## LBank
TUNN5XDrQg6fkfUEdWcYDHgvPwXyxS1k2C
TGUSM4zJ6XrJ5xaD9pnB5eLrKy2GqjG3pC
TVXe59tPrQmFVrP4no59t1Vp3aDSfs8m2t

# EXHIBIT I

ELECTRONICALLY FILED
1/20/2025 1:57 PM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

**IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA**

| | | |
|---|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all others similarly situated | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NUMBER: CV-2024-900163 |
| OLIVIA AVA, et al. | ) ) | |
| Defendants. | ) | |

## NONPARTY UAB QBIT FINANCIAL SERVICE'S MOTION TO DISSOLVE OR, IN THE ALTERNATIVE, MODIFY PRELIMINARY INJUNCTION ORDER

On June 14, 2024, this Court issued a preliminary injunction order (Doc. 17, the "Injunction Order") that, among other things, ordered nonparty OKX Hong Kong FinTech Company Limited ("OKX"), a Honk Kong-based cryptocurrency exchange, to freeze nine of its customers' cryptocurrency accounts. One of those accounts belonged to nonparty UAB Qbit Financial Service ("Qbit"),[1] a Lithuanian financial technology company specializing in cross-border payment and banking solutions for global businesses. The frozen account contains funds belonging to these businesses, which are Qbit customers. To pay back its customers' funds from the frozen account, Qbit has been borrowing money at high interest rates and, as a result, is losing about $6,000 each day. The Injunction Order directly and adversely affects Qbit, and Qbit now moves for its dissolution.

This Court should dissolve the Injunction Order for several reasons. Perhaps the most glaring reason is the fact that Plaintiff Michael Mashkevich brought this case against fictitious parties only. Such actions are void *ab initio*, and courts lack authority to take any action upon them

---

[1] "UAB" stands for "Uzdaroji Akcine Bendrove," which is Lithuania's designation for a Lithuanian Private Limited Company. Translated literally, "Uzdaroji Akcine Bendrove" means "Closed Joint Stock Company."

except to dismiss them. The Injunction Order, like this lawsuit, is therefore void.

The Injunction Order is also void because this Court issued it before obtaining personal jurisdiction over any defendant. Courts cannot obtain personal jurisdiction over a defendant until that defendant is served with process. Mashkevich cannot serve process, however, because his lawsuit does not identify a defendant.

Jurisdictional issues aside, the Injunction Order violates Rule 65 in several respects. First, it violates Rule 65(a)(1)'s requirement that notice be provided to "the adverse party." Obviously, Mashkevich could not have provided notice to an "adverse party" because he has not identified an "adverse party." Even if it was possible to provide notice to fictitious parties, the "notice" purportedly provided by Mashkevich was provided not to any fictitious parties, but to cryptocurrency exchanges who all agree are *nonparties*. Furthermore, such "notice"—delivered by what this Court described as "Service Tokens" airdropped into digital wallets—does not constitute a valid form of notice under Rule 5. And even if it did, Mashkevich deprived any notice recipients of due process by failing to deliver those "Service Tokens" until three days *after* this Court's deadline for filing opposition to his preliminary injunction request.

Second, the Injunction Order violates Rule 65(b)(2) because it does not bind any parties to this case. Courts may enjoin certain nonparties, such as persons acting in concert with enjoined defendants, only when doing so is necessary to give effect to an injunction against a *party*. The Injunction Order does not bind any identifiable party. Indeed, the harm Qbit is suffering results directly from the Injunction Order's enjoinment of *nonparty* OKX.

Third, even if the Injunction Order actually bound parties, it would still violate Rule 65(c)'s security requirement. This Court did not require Mashkevich to post security because, in its view, his private conversion claim presented an issue of "overriding public concern." Although the

Alabama Supreme Court has recognized that an "overriding public concern" may warrant an exception to the bond requirement in an appropriate case, it appears that no Alabama appellate court has ever affirmed a trial court's decision to make such an exception. Indeed, the Alabama Supreme Court recently held that the "overriding public concern" exception did not apply to an injunction order that opened a roadway to the public. *Milton v. Haywood*, 393 So. 3d 1156 (Ala. 2023). If public access to a roadway does not present an issue of "overriding public concern," Mashkevich's private conversion claim certainly does not.

In addition to its other legal defects, the Injunction Order creates an unlawful remedy by freezing assets before judgment. Alabama has long recognized that, absent an equitable interest asserted by the plaintiff, courts lack the authority to freeze a defendant's assets before judgment. *See Norman v. Occupational Safety Ass'n of Ala. Workmen's Comp. Fund*, 811 So. 2d 492 (Ala. 2001). This rule should apply with extra force when, as here, the frozen assets do not even belong to a defendant, but rather to nonparties.

Notwithstanding these numerous legal deficiencies, the evidence supports, at the very least, a modification of the Injunction Order to unfreeze Qbit's account. Unfreezing Qbit's account will not cause Mashkevich to suffer any irremediable harm before judgment. Mashkevich's conversion claim for money damages provides him an adequate remedy at law. Furthermore, Mashkevich cannot show a likelihood of success on the merits because he cannot even identify who is supposedly responsible for his loss. And because Mashkevich cannot identify a defendant, there is neither evidence to warrant an injunction against nonparties for acting in concert with a defendant nor evidence from which this Court could assess the hardship against any particular defendant.

The hardships to nonparty Qbit, however, are undeniable. Without being provided notice, process, or any opportunity to defend itself, Qbit lost access to millions of dollars in its customer's

funds. Not only is the Injunction Order causing Qbit to lose $6,000 per day, but it is has also empowered Mashkevich to demand exorbitant sums of money from Qbit without ever naming Qbit as a party. After becoming aware of the Injunction Order, Qbit contacted Mashkevich's counsel. Taking advantage of Qbit's precarious position as a nonparty, Mashkevich's counsel offered to unfreeze Qbit's account in exchange for a ransom payment of more than 30 times what Mashkevich claims to have lost.[2] By leveraging the *ultra vires* Injunction Order, Mashkevich has effectively drawn Qbit into this litigation without having to worry about due process or rules of procedure. Such concerns, of course, go to the very heart of why injunctions like the one imposed by the Injunction Order are invalid. The Injunction Order is unlawful and this Court should dissolve it.

## BACKGROUND AND PROCEDURAL HISTORY

### A.    Qbit

Qbit is a financial technology company headquartered in Lithuania. Declaration of Yujun Wu ("Ex. A") at ¶ 2. It specializes in cross-border payment and banking solutions for global businesses. *Id.* Qbit offers its customers, among other things, multi-currency business accounts, global payment processing, and supply chain financing. *Id.* at ¶ 3. Qbit's customers may fund their accounts by transferring cryptocurrency, and they may direct Qbit to use the deposited funds for payment purposes. *Id.*

Qbit services cryptocurrency accounts on a platform called "Interlace," which is only open to registered businesses and may be used for business purposes only. *Id.* at ¶ 4. To register an Interlace account, customers must provide various certifications and business documents,

---

[2] To the extent Mashkevich's ransom demand can be characterized as a settlement offer, it does not fall within the protections of Alabama Rule of Evidence 408. That Rule prohibits "any party" from offering settlement offers into evidence. Qbit is not a "party" to this action.

including certificates of incorporation, business licenses, governing documents, registries of directors and shares, ownership charts, and, for certain directors and account owners, personal identification documents. *Id.*

Qbit uses OKX to provide trading services related to it virtual assets. *Id.* at ¶ 5. OKX takes these virtual assets into its custody, but Qbit is the legal and beneficial owner of these assets and, until the events giving rise to this motion, was the only entity that could access them. *Id.* One of these virtual assets, and the asset at issue here, is a cryptocurrency "wallet" identified as "THGTenLmvqWycGLGtgRvX4wURiHQeDvNps" (the "Qbit Wallet"). *Id.*.

## B.    Procedural Background

### 1.    Mashkevich files a complaint naming only fictitious parties as defendants

Mashkevich filed this putative class action on June 4, 2024. Doc. 2 ("Compl."). The Complaint does not identify a single defendant, but instead names 26 Fictitious Defendants. *Id.* at ¶ 13. According to the Complaint, Fictitious Defendants used fake work platforms to convince Mashkevich and putative class members to transfer funds from cryptocurrency wallets into wallets that Fictitious Defendants control. *See id.* at ¶¶ 2–5.

The Complaint gives fictitious names to Fictitious Defendants A-C. *See id.* at ¶¶ 12–13. The Complaint identifies Fictitious Defendant A as "Olivia Ava," Fictitious Defendant B as "Emma Miller," and Fictitious Defendant C as "F.B. Lee." Mashkevich acknowledges that the "true identities" of these individuals "are currently unknown. *Id.* at ¶ 12.

According to the Complaint, between March 20, 2024 and April 6, 2024, "Lee," at "Ava's" behest, and "Miller" contacted Mashkevich via WhatsApp under the auspices of offering remote online employment opportunities.  *See id.* at ¶¶ 20–27. "Lee" and "Miller" directed Mashkevich to fake web sites that they created, and they "trained" Mashkevich to perform "work" for which

they told him he would receive commissions. *Id.* at ¶¶ 20–30. "Lee" and "Miller" instructed Mashkevich to create cryptocurrency accounts on these fake work platforms. *Id.* at ¶¶ 21–23. They led Mashkevich to believe that he would be able to withdraw his commissions from these accounts. *Id.* Through various deceptions and schemes, "Lee" and "Miller" convinced Mashkevich that he needed to deposit more and more of his own cryptocurrency into these accounts so that he could access the commissions he thought he was earning. *See id.* at ¶¶ 22, 31–37. Ultimately, Mashkevich transferred approximately $90,000 to these accounts. *Id.* at ¶ 24.

When Mashkevich learned that he could not access the cryptocurrency that he had transferred, he contacted Inca Digital ("Inca"), a cryptocurrency investigation firm. *Id.* at ¶ 8. Inca conducted an investigation that allegedly revealed that Fictitious Defendants converted Mashkevich's assets and sent them through a web of transactions designed to "hide their trail." *Id.* at ¶ 40. Inca ultimately traced Mashkevich's cryptocurrency to 36 cryptocurrency wallets (the "Crypto Wallets") held by 5 cryptocurrency exchanges (the "Exchanges"), including OKX. *Id.* at ¶ 41, Ex. A. OKX has custody of nine of the Crypto Wallets. *Id.* at Ex. A. The Complaint identifies one of the nine Crypto Wallets maintained by OKX as the Qbit Wallet. *Id.*

Maskevich also brings class allegations. *See id.* at ¶¶ 44–53. He alleges that once Inca identified the 36 Crypto Wallets, it "reversed traced" the funds contained in the Crypto Wallets and determined through the "flow of funds" that Fictitious Defendants used the same scheme used against Mashkevich to convert the cryptocurrency of other putative class members and that the Crytpo Wallets also hold putative class members' funds. *Id.* at ¶¶ 42–43, Ex. A.

Based on these allegations, Mashkevich brings only one substantive count: conversion. *Id.* at ¶¶ 54–57.[3] According to the Complaint, the cryptocurrency allegedly converted by Fictitious

---

[3] The Complaint purports to list two "causes of action": "conversion" and "request for injunctive relief." Compl. ¶¶ 54–59. But an "injunction is a remedy, not a cause of action." *Davis v. Bank of Am., N.A.*, No. 2:12-CV-01632, 2014

6

Defendants is "specifically identifiable." *Id.* at ¶ 56. Despite this allegation—and despite Mashkevich's assertion that Inca traced his specific cryptocurrency to the Crypto Wallets— the Complaint does not identify the specific cryptocurrency that Fictitious Defendants supposedly converted. Nor does Mashkevich allege that the Crypto Wallets hold *only* stolen cryptocurrency. Indeed, Mashkevich does not allege how much cryptocurrency each of the Crypto Wallets holds. Nevertheless, as part of his remedy, Mashkevich requested injunctive relief freezing all cryptocurrency—not just his own—held in the Crypto Wallets. *Id.* at ¶¶ 58–59.

### 2.    Mashkevich requests injunctive relief and this Court issues a TRO

On the same day he filed the Complaint, Mashkevich moved for a temporary restraining order and an order to show cause why a preliminary injunction should not issue. Doc. 5. Among other things, Mashkevich requested that this Court enjoin the movement of any funds contained in the Crypto Wallets. *Id.* at 2. In support of his motion, Mashkevich presented affidavit testimony describing the WhatsApp conversations he had with "Lee" and "Miller" and attesting that he lost $90,000 to their scheme. *See generally* Doc. 8 at ¶¶ 5–20.

Mashkevich also submitted the Declaration of Inca employee Charles Zach, executed in Croatia. Doc. 7. According to Zach, Inca traced Mashkevich's cryptocurrency by first using Mashkevich's screenshots to identify the addresses to which Mashkevich sent his cryptocurrency. *Id.* at ¶ 8. Next, Inca "analyzed transfers from these addresses" and found that Fictitious Defendants (whom Zach did not identify) combined funds from these addresses with other funds and converted them to different cryptocurrencies. *Id.* at ¶ 9. According to Zach, these combined funds were transferred yet again "through a series of wallet addresses, commingled, and then

WL 5090692, at *14 (N.D. Ala. Oct. 9, 2014). Therefore, "[i]njunctive relief is not properly pled as a separate cause of action, but is available only as part of the relief granted if plaintiff prevails on a substantive cause of action." *Id.* (citing *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004)).

deposited" in the Crypto Wallets. *Id.* at ¶ 10. Finally, Inca "reversed traced" from the Crypto Wallets to identify a "common pattern of transactions." *Id.* at ¶ 11. Based only on this "reverse trace," Inca concluded that the Crypto Wallets contained "a minimum of $3.5 million" of funds stolen from "more than 125" putative class members. *Id.* Although Zach claimed he had identified the location of Mashkevich's cryptocurrency, he did not state, as the Complaint alleges, that such cryptocurrency is specifically identifiable. Nor did he attempt to identify the cryptocurrency taken from Mashkevich or any putative class member.

Finally, in a proposed order submitted with his motion, Mashkevich proposed that "actual notice" of the TRO could be effected on the nonparty Exchanges "via a special-purpose token or equivalent blockchain currency or code," called a "Service Token," "delivered or airdropped into the" Crypto Wallets. Doc. 11 at ¶ 3. He further proposed that that the Service Token would contain a "Service Hyperlink" to a website created by Mashkevich's counsel containing the TRO "and all papers upon which it is based" and that the Service Hyperlink would "include a mechanism to track when a person clicks on" it. *Id.* Mashkevich did not cite to any case law or rule of procedure authorizing notice by his proposed means. Nor did he propose any mechanism for providing notice to the *actual owners* of the Crypto Wallets, such as Qbit.

Shortly afterwards, this Court granted Mashkevich's motion in full, including his proposal for effecting "actual notice" using "Service Tokens." Doc. 13 (the "TRO"). The TRO did not require Mashkevich to provide any notice whatsoever to the actual owners of the Crypto Wallets, such as Qbit. It set a preliminary injunction hearing for June 14, 2024, and it gave Fictitious Defendants, the nonparty Exchanges, and "anyone else wishing to be heard" until June 7, 2024— 3 days from the date of the TRO—to provide responses and evidence in opposition to Mashkevich's preliminary injunction request. *Id.* at ¶¶ 5–6.

3.    **Mashkevich delivers the "Service Tokens" to the Crypto Wallets after the time to respond had elapsed**

On June 12, 2024, Mashkevich submitted the Declaration of Inca contractor Albina Giuttari, executed in Switzerland, to show that he complied with the TRO's service requirements. Doc. 15. Guittari declared that on June 10, 2024, just four days before the scheduled preliminary-injunction hearing and three days <u>after</u> the response deadline imposed by this Court, Inca delivered Service Tokens to the Crypto Wallets. *Id.* at ¶ 5. Giuttari declared that she subsequently "monitored the address for each [Crypto Wallet] as well as a unique transaction hash associated with the Service Tokens." *Id.* She provided a "spreadsheet listing the addresses that have been served, along with the transaction hashes." *Id.* Neither Giuttari nor Mashkevich offered any information regarding who, if anyone, actually viewed the TRO.

4.    **This Court grants a preliminary injunction against nonparties and does not require Mashkevich to post security**

On June 14, 2024, this Court held a preliminary injunction hearing, and it issued a preliminary injunction the same day. Injunction Order 1. Not surprisingly—especially since no Defendant had been identified—"no defendants appeared to be heard in person or through counsel." *Id.* Nevertheless, this Court was "satisfied," based on Giuttari's declaration, that Mashkevich's counsel provided Fictitious Defendants and the nonparty Exchanges with appropriate notice. *Id.*

This Court found, based on affidavits and declarations submitted, that Mashkevich satisfied all requirements for a preliminary injunction. *See id.* at 2–3. First, it found that Mashkevich met the "immediate and irreparable loss" requirement because, if the Crypto Wallets were not frozen, Fictitious Defendants would be able to "transfer cryptocurrency to unidentified recipients outside the traditional banking system and effectively place the assets at issue . . . beyond the reach of the

Court." *Id.* at 3. This Court did not explain how such transfers would irreparably harm Mashkevich in light of his claim for money damages.

Second—and for essentially the same reasons—this Court found that Mashkevich had no adequate remedy at law. *Id.* at 3. Even though Mashkevich's conversion claims seeks money damages, *see* Compl. 18, this Court determined that a "money judgment" against Fictitious Defendants would be "meaningless" because no one knows who the Fictitious Defendants are and they could be "expected to continue to transfer [Maskevich's] and others' cryptocurrency beyond the reach of discovery and this Court." Injunction Order 3.

Third, even though Mashkevich has not identified a single defendant, this Court found that Mashkevich had "at least a reasonable chance of success" against Fictitious Defendants "on the ultimate merits" of his conversion claim. *Id.* While acknowledging that conversion actions will not generally "lie for the conversion of money," this Court noted that exceptions may be made when the "money at issue is capable of identification." Doc. 17 at 3 (quoting *Greene Cnty. Bd. of Educ. v. Bailey*, 586 So. 2d 893, 898 (Ala. 1991)). This Court, apparently relying only on Mashkevich's allegations, explained that "cryptocurrency is specific, identifiable property subject to conversion" because "[b]y its very nature [it] has a unique and specific identification within the blockchain." *Id.* at 3-4. Despite this explanation, this Court did not limit the Injunction Order to apply only to specific, identifiable cryptocurrency supposedly contained in the Crypto Wallets. Instead, the Injunction Order applies to all currency contained in the Crypto Wallets. Nor did this Court address the fact that Mashkevich's expert did not identify the specific cryptocurrency that he claims Fictitious Defendants converted.

Fourth, this Court found that the hardship imposed on Fictitious Defendants "would not unreasonably outweigh the benefit accruing to" Mashkevich. *Id.* at 4. Even though Mashkevich

has not identified any defendants, this Court nevertheless found sufficient evidence to conclude that freezing the assets of all Fictitious Defendants would "only minimally prejudice[]" them. *Id.* This was because, according to this Court, the Injunction's Order freeze of the Crypto Wallets was only a "temporary inconvenience." *Id.* On the other hand, this Court found that if it did not freeze the Crypto Wallets, Mashkevich and "other potential victims" would have no "adequate remedy for their loss" because the specific cryptocurrency at issue—which, again, has not been identified—would be "forever gone." *Id.* This Court did not address potential hardships that the Injunction Order would impose upon the nonparty Exchanges it enjoined or any particular Crypto Wallet owner, such as Qbit.

Finally, while acknowledging that Alabama Rule of Civil Procedure 65(c) generally prohibits a preliminary injunction order to be issued without a bond, this Court concluded that the Injunction Order fell within an exception to the bond requirement because "the issue addressed" was one of "overriding public concern." *Id.* at 6. According to this Court, even though this case is only a private conversion action, there is an "overriding public concern" to "promote protection of assets and recovery of stolen assets when they can be readily located and traced to specific locations." *Id.* By "[f]reezing cryptocurrency accounts," this Court said, it could "reassure[] the public that even with transactions conducted in the cryptocurrency, there is an adequate remedy to prevent fraud or theft." *Id.*

**C.    Qbit Learns of the Injunction Order, and Mashkevich Demands a $3 Million Ransom Payment to Unfreeze the Qbit Wallet**

On June 20, 2024, OKX informed Qbit that, in compliance with the Injunction Order, it had frozen the Qbit Wallet. Ex. A at ¶ 6. On July 8, 2024, Qbit's Hong Kong-based counsel contacted Mashkevich's counsel in an effort to understand the nature of Mashkevich's claim and the amount of cryptocurrency that had been traced to the Qbit Wallet. To date, Mashkevich has

not provided Qbit with that information. Instead, even though his own expert estimated the amount of funds stolen from the putative class as $3.5 million, *see* Doc. 9 at ¶ 11, Mashkvich's counsel represented to Qbit on October 17, 2024, that the putative class's losses amount to "more than $40 million" and that the Qbit Wallet contains $3 million of stolen funds. Mashkevich's counsel demanded $3 million from Qbit to unfreeze the Qbit Wallet.[4]

The Qbit Wallet contains approximately $7 million worth of cryptocurrency, all deposited by Interlace account holders that have been screened through Interlace's quality assurance procedures. Ex. A at ¶ 7. *See also supra* at 4–5 (describing Interlace verification procedures). Because the Injunction Order froze the Qbit Wallet, Qbit must borrow money at high interest rates to pay back funds to its customers. Ex. A at ¶ 8. As a result, the Injunction Order has caused Qbit to lose about $6,000 each day. *Id.*

## STANDARD OF REVIEW

Whether to dissolve a preliminary injunction "rests within the wide discretion of the circuit court." *Petroleum Equip. Tool Co. v. State Bd. of Health*, 575 So. 2d 587, 589 (Ala. Civ. App. 1991). However, a court "exceeds its discretion when its ruling is based on an erroneous conclusion of law . . . or has so far ignored recognized principles of law or practice as to cause substantial injustice." *Corner Stone Funeral Chapel, Inc. v. MVMG, LLC*, 170 So. 3d 626, 630 (Ala. 2014).

## ARGUMENT

This Court issued the Injunction Order without jurisdiction to do so and in violation of several provisions contained in Rule 65. Qbit, being adversely affected by the Injunction Order, has standing to challenge it. Mashkevich's decision to file a complaint against solely fictitious parties not only failed to trigger this Court's subject-matter jurisdiction, but also made it impossible

---

[4] *See supra* note 2.

for this Court to obtain the personal jurisdiction necessary to enter an injunction. The Injunction Order violates Rule 65(a)(1)'s notice requirements because no notice was provided to an adverse party, and, even it had been, such notice did not comply with Rule 5 and was, regardless, untimely. It violates Rule 65(b) because it binds nonparties only. And even if the Injunction Order *did* bind identifiable parties, it would still violate Rule 65(c) because it unlawfully excused Mashkevich from posting a bond.

The remedy fashioned by the Injunction Order is also unlawful. Absent a lien or equitable claim to funds, Alabama law prohibits freezing assets to preserve funds for a money judgment that has yet to be obtained. And it certainly prohibits such relief when, as here, the enjoined entities are not even parties to the case.

Finally, even if Mashkevich could overcome all of these legal deficiencies, the evidence does not support the continued freeze of the Qbit Wallet. Unfreezing the Qbit Wallet will neither irreparably harm Mashkevich nor leave him without an adequate remedy at law. If Mashkevich ever identifies a defendant who has stolen his funds and placed them in the Qbit Wallet, he may pursue a conversion claim for money damages against such a defendant. For all these reasons, this Court should dissolve the Injunction Order or, in the alternative, modify the Injunction Order to unfreeze the Qbit Wallet.

## I.      Qbit Has Standing to Challenge the Injunction Order

Qbit has standing to challenge the Injunction Order even though it is not a party to this case. This is because "[n]on-parties who are bound by a court's equitable decrees have a right to move to have the order dissolved." *Ex parte State Personnel Board*, 45 So. 3d 751, 754 (Ala. 2010) (citing *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998)). *See also id.* ("A nonparty normally has standing to appeal when it is adversely affected by an injunction." (quoting

*In re Piper Funds, Inc., Institutional Income Portfolio Litig.*, 71 F.3d 298, 301 (8th Cir. 1995)). The Injunction Order adversely affects Qbit because it prevents Qbit from accessing its cryptocurrency account. Ex. A at ¶¶ 5–8. As a result of the Injunction Order, Qbit is losing approximately $6,000 each day and is borrowing money at high interest rates to pay back funds to customers. *Id.* at ¶ 8. Because the Injunction Order directly and adversely prevents Qbit from accessing its cryptocurrency account, Qbit has standing as a nonparty to challenge the Injunction Order.

## II.    This Court Lacked Subject-Matter Jurisdiction to Enter the Injunction Order

A complaint that does not identify any defendants "fail[s] to commence a valid action." *Ex parte Bd. of Trustees of Univ. of Ala.*, -- So. 3d --, No. SC-2024-0210, 2024 WL 3997908, at *4 (Ala. Aug. 30, 2024). Because Mashkevich brought his Complaint against fictitious parties only, this Court lacked jurisdiction to enter the Injunction Order. Indeed, the "only action" this Court was permitted to take was "to dismiss" the Complaint. *Id.*

In *Board of Trustees*, a University of Alabama-Birmingham ("UAB") professor brought negligence and breach-of-contract claims against UAB and eight fictitious defendants. *Id.* at *1. He twice amended his complaint to add new claims and new parties, including substituting several UAB employees for fictitious defendants. *Id.* UAB's board and the individual defendants moved to dismiss on absolute-immunity grounds. *Id.* After the trial court denied their motion, the defendants petitioned the Alabama Supreme Court for a writ of mandamus. *Id.* A unanimous Supreme Court held that the original complaint "was both void <u>ab initio</u> and failed to trigger the subject-matter jurisdiction of the trial court." *Id.* at *3. This was because the original complaint named only UAB and fictitious parties as defendants. UAB, as a State institution of higher learning, enjoyed absolute immunity under the Alabama Constitution and was "not subject to suit

under any theory." *Id.* (internal quotations omitted). Because UAB—the only named defendant—was immune from suit, the Court reasoned that "essentially, what occurred in [the] case" was that the plaintiff had filed "an unservable complaint with <u>only</u> fictitiously named defendants" and thus had not "commence[d] an action." *Id.* at *4 (quoting *Weaver v. Firestone*, 155 So. 3d 952, 963 (Ala. 2013) (emphasis in original)). Because the plaintiff's original complaint was "a nullity under Alabama law" and "failed to commence a valid action," the trial court "lacked jurisdiction to allow [the plaintiff] to later substitute named defendants for fictitiously named defendants identified in the original complaint." *Id.* Under these circumstances, "the only action the trial court could have taken was to dismiss it." *Id.*

Under *Board of Trustees*, Mashkevich's Complaint is a nullity warranting dismissal. Indeed, whereas the *Board of Trustees* plaintiff at least *identified* one defendant—albeit one that was immune from suit—Mashkevich has identified none. In other words, Mashkevich *unequivocally* did what the Supreme Court found the *Board of Trustees* plaintiff "essentially" did. *Id.* He filed an "unservable complaint with <u>only</u> fictitiously named defendants." *Id.* at *4 (quoting *Weaver*, 155 So. 3d at 963 (emphasis in original)). *See also Johnson v. Reddoch*, 198 So. 3d 497, 505 (Ala. 2015) (plurality) (describing *Weaver* as "expressly reject[ing] the arguments that" Rule 9 permits a plaintiff to file "a complaint naming as defendants *only* fictitious parties" and "that a complaint naming only fictitious part[i]es" could "commence an action against the alleged tortfeasors" (internal quotation marks omitted)). Mashkevich has therefore failed to "commence an action," and "the only action" this Court was permitted to take under Alabama law was to dismiss Mashkevich's Complaint. *Id.* This Court therefore lacked jurisdiction to issue the Injunction Order.

### III.    The Injunction Order is Void Because this Court Has Not Obtained Jurisdiction Over Any Defendant

The Injunction Order should also be dissolved because this Court has not and cannot obtain personal jurisdiction over any Defendant in this case. When a court enters a preliminary injunction against a defendant over which it has not yet obtained personal jurisdiction, that injunction is void. *Facebook, Inc. v. K.G.S.*, 294 So. 3d 122, 141 (Ala. 2019). And it is well-settled that a court cannot obtain personal jurisdiction over a defendant until that defendant is served with process. *See Crowder v. Blevins*, -- So.3d --, No. SC-2023-0445, 2024 WL 1223798, at *8 (Ala. Mar. 22, 2024) ("[F]ailure of proper service under Rule 4[, Ala. R. Civ. P.,] deprives a court of jurisdiction and renders its judgment void." (quoting *Ex parte Pate*, 673 So. 2d 427, 428–29 (Ala. 1995)); *Ex parte Sawyer*, 984 So. 2d 1100, 1111 (Ala. 2007) (noting that the trial court did not "obtain[] personal jurisdiction over" a defendant until "process was properly served").

Mashkevich has not and cannot serve process upon any Defendant to this case. A complaint brought against fictitious parties only is "unservable." *Board of Trustees*, 2024 WL 3997908, at *4 (internal quotations omitted). Because Mashkevich has not and cannot serve process upon any Defendant in this case, this Court, accordingly, has not and cannot obtain personal jurisdiction over any Defendant in this case. And because a court must obtain personal jurisdiction over a defendant prior to entering a preliminary injunction, the Injunction Order is void.

### IV.    The Injunction Order Violates Rule 65

The Injunction Order is also due to be dissolved because it violates Alabama Rule of Civil Procedure 65 in several respects. Specifically, this Court issued the Injunction Order in violation of Rule 65's notice requirement, and the Injunction Order unlawfully binds nonparties only. And even if it were otherwise lawful, the Injunction Order violates Rule 65's security requirement.

### A.    The Injunction Order violates Rule 65(a)(1)

The Injunction Order violates Rule 65(a)(1)'s notice requirement because it was issued without notice to an adverse party, and the notice purportedly provided neither comported with Rule 5 nor afforded due process to those affected by the injunction.

### 1.    No notice was provided to an adverse party

Alabama Rule of Civil Procedure 65(a)(1) prohibits courts from issuing preliminary injunctions "without notice to the adverse party." *See also Ingenuity Int'l, LLC v. Smith*, 386 So. 3d 450, 457 (Ala. 2023) ("[N]otice to the adverse party before a preliminary injunction is issued is mandatory." (internal quotations omitted)). In this case, Mashkevich has not identified an "adverse party." Instead, he has named only fictitious parties as defendants. Obviously, Mashkevich cannot give notice to an adverse party if he does not know the adverse party's identity. This Court's Injunction Order therefore violates Rule 65(a)(1)'s threshold requirement.

This Court misconstrued Rule 65(a)(1)'s notice requirements when it required Mashkevich to provide notice of the preliminary injunction hearing to nonparties only. The TRO ordered Mashkevich's attorneys to serve notice via "Service Tokens" upon five <u>nonparty</u> Exchanges, including OKX, the custodian of the Qbit Wallet. *See* Doc. 13 at ¶ 3. *See also id.* at ¶ 2 (expressly identifying the Exchanges as "non-parties"). Even assuming that these "Service Tokens" otherwise constitute sufficient notice, notice to *nonparties* does not satisfy Rule 65(a)(1)'s requirement that notice be given to adverse *parties*.

Even if it were possible to provide notice to a fictitious party, Mashkevich has not done so. This Court did not order Mashkevich to provide notice to "Ava," "Miller," "Lee," or any of the 23 other Fictitious Defendants. Instead, prior to holding its preliminary injunction hearing, this Court required Mashkevich to give notice to the *non-party Exchanges only*. *See id.* at ¶¶ 3–4. This Court

based its finding that Mashkevich satisfied service requirements entirely on Guittari's declaration that Inca delivered Service Tokens into the Crypto Wallets controlled by the nonparty Exchanges. *See* Doc. 15 at ¶ 5; Injunction Order 1. There is no evidence that Mashkevich provided notice to any party to this case. Because no adverse party was provided notice, the Injunction Order is due to be dissolved.

### 2.    The "Service Tokens" issued by Mashkevish did not provide sufficient notice

Even if the "Service Tokens" had been served upon an "adverse party," they did not constitute a valid method of service under Rule 5. Under Rule 5, "every order required by its terms to be served" must be served "by delivering a copy to the attorney or the party or by mailing it to the attorney or party at the attorney's or party's last known address, or, if no address is known, by leaving it with the clerk of the court." Ala. R. Civ. P. 5(a)-(b). "Delivery of a copy" means

> handing it to the attorney or party; or leaving it at the attorney's or party's office with a clerk or other person in charge thereof; or, if no one is in charge, leaving it in a conspicuous place therein; or, if the office is closed or the person to be served has no office, leaving it at the person's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein.

Ala. R. Civ. P. 5(b). Here, this Court directed Mashkevich to serve the TRO by delivering "Service Tokens" containing "hyperlink[s]" into the Crypto Wallets. Rule 5 does not permit service of court orders via "Service Tokens."

Furthermore, the record does not establish who, if anyone, actually received notice of this Court's order. Although Giuttari stated in her declaration that Inca delivered "Service Tokens" into the Crypto Wallets and "monitored the address for each wallet as well as a unique transaction hash associated with the Service Token," Doc. 15 at ¶ 5, she does not purport to have any knowledge concerning *who*, if anyone, actually accessed and viewed the TRO.

### 3. Even if "Service Tokens" provided to unknown individuals constitute a valid method of service, the timing of such service failed to comport with due process

Notwithstanding other defects discussed herein, the notice purportedly provided by Mashkevich did not provide any potential recipient a meaningful opportunity to be heard. Notice of a preliminary injunction hearing does not comport with due process unless it provides a defendant with "a fair opportunity to oppose the [injunction] application and to prepare for such opposition." *Southern Homes, AL, Inc. v. Bermuda Lakes, LLC*, 57 So. 3d 100, 104 (Ala. 2010) (quoting *Granny Goose Foods, Inc. v. B'hood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 434 n.7 (1974)). The TRO set a preliminary injunction hearing for June 14, 2024, and required anyone wishing to file an opposition to do so by June 7, 2024. Doc. 13 at ¶¶ 5–6. Guittari stated that the "service process . . . was completed for all the [Cyber Wallets] as of 4:45pm Eastern Daylight Time on Monday, June 10, 2024." Doc. 15 at ¶ 5. Thus, to extent the "Service Tokens" constituted valid notice, no one received such notice until *after* the time to file an opposition and, at the earliest, less than four days before the hearing. This did not give the purported notice recipients a fair opportunity to oppose the injunction or prepare for the preliminary injunction hearing. The Injunction Order therefore violated the due process rights of every entity or person it was entered against.

### B. The Injunction Order violates Rule 65(d)(2)

The Injunction Order is also void because it does not bind any parties. Indeed, it binds nonparties only. Under Alabama Rule of Civil Procedure 65(d)(2), an injunction "is binding only upon the parties to the action; the "officers, agents, servants, employees, and attorneys" of those bound parties; and "persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Thus, although Rule 65(d)(2) contemplates that the

enjoinment of certain nonparties may be necessary to give effect to the injunction *against a party*, the enjoinment of a *party* is a prerequisite—and indeed the reason for—any such nonparty being enjoined. *See Chunchula Energy Corp. v. Ciba-Geigy Corp.*, 503 So. 2d 1211, 1216 (Ala. 1987) (holding that injunction could not bind stockholders and purported alter egos of defendant corporation when those stockholders and purported alter egos were not named as parties to the action).

Rule 65(c) underscores this limitation on a court's injunction power. With exceptions not applicable here, it prohibits courts from issuing a preliminary injunction "except upon the giving of security by the applicant . . . for the payment of such costs, damages, and reasonable attorney fees as may be incurred or suffered by *any party* who is found to have been wrongfully enjoined or restrained" (emphasis added). Rule 65(c) makes no mention of damages incurred by *nonparties* because nonparties cannot be preliminary enjoined unless they are in "active concert or participation" with a bound defendant.

Because Mashkevich has brought this action against fictitious parties only, the Injunction Order does not identify any party that it binds. Although it purports to bind "Defendants," those "Defendants"—"Ava," "Miller," and "Lee"——are fictitious and therefore not identifiable. Furthermore, Qbit's interest in this case arose not out of any injunction against these "Defendants," but rather out of this Court's injunction against *nonparty* OKX. Finally, even if an injunction could be properly issued against a fictitious party such as "Ava," "Miller," or "Lee," no injunction could be issued against Qbit until this Court "determined" that Qbit was "shown to be in concert or participation" with the enjoined party. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969). No such showing has been made. For all these reasons, the Injunction Order violates Rule 65(b)(2) and should be dissolved.

### C.    The Injunction Order violates Rule 65(c)

Even if the Injunction Order was otherwise lawful, its failure to require security violates Rule 65(c). As discussed above, Rule 65(c) generally prohibits courts from issuing a preliminary injunction "except upon the giving of security by the applicant . . . for the payment of such costs, damages, and reasonable attorney fees as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." It expressly recognizes only two exceptions. First, courts may not require the State of Alabama and its "officers and agents" to provide security. Second, courts may not require security in "domestic relations cases." Unless a court makes a "specific finding" that "one or more of the[se] exceptions" exist, "[i]t is mandatory that security be given under Rule 65(c)." *Milton v. Haywood*, 393 So. 3d 1156, 1157–58 (Ala. 2023). Neither of these exceptions applies here, and this Court did not determine otherwise.

Instead, relying on dicta from *Spinks v. Automation Personnel Services*, this Court excused the bond requirement because the "issue addressed by the preliminary injunction 'is one of overriding public concern.'" Injunction Order 6 (quoting 49 So. 3d 186, 190 (Ala. 2010)). Notably, although *Spinks* recognized that an "overriding public concern" may excuse Rule 65(c)'s bond requirement, it did not apply that exception. Neither did the two cases that *Spinks* cited for that proposition: *Anders v. Fowler*, 423 So. 2d 838 (Ala. 1982) and *Lightsey v. Kensington Mortgage and Finance Corp.*, 315 So. 2d 431, 434 (Ala. 1975). Indeed, it appears that no appellate court in this State has ever approved a trial court's decision to forego the bond requirement based on an "overriding public concern."

The Supreme Court, however, recently reverse a preliminary injunction order that used the "overriding public concern" exception to excuse the bond requirement. In *Milton*, the trial court entered a preliminary injunction requiring defendant landowners to open gates erected by the

landowners that the plaintiffs claimed were blocking public access to a county road and trails in Talladega National Forest. 393 So. 3d at 1157. The trial court did not require the plaintiffs to post security because it determined that the "case [was] of great public concern." *Id.* at 1158 (internal quotations omitted). On appeal, the Supreme Court recognized that "members of the public" may have "used the disputed portions of the road," but nevertheless concluded that the public's "inability to access" those portions did not "constitute[] an issue of overriding public concern." *Id.* at 1158. It therefore reversed the preliminary injunction. *Id.*

*Milton* is instructive because even though the Court recognized that the dispute at issue could directly affect members of the public, it still concluded that the public's "inability to access the disputed portion of" the road presented no "overriding public concern" that would warrant an exception from Rule 65(c)'s security requirement. Here, *nothing* about Maskevich's private conversion claim affects the general public, and this Court did not find otherwise.

Rather than focus on whether Mashkevich's conversion claim presented an "overriding public concern," this Court instead focused on how the public would perceive its *treatment* of Mashkevich's injunction request. By "[f]reezing cryptocurrency accounts," this Court said, it could "reassure[] the public that even with transactions conducted in the cryptocurrency space, there is an adequate remedy to prevent fraud or theft." Injunction Order 6. In other words, this Court determined that its ability to fashion an adequate equitable remedy in the purported absence of an adequate legal remedy was an "overriding public concern."

Applying this Court's rationale, Rule 65(c) would be a dead letter because *every* preliminary injunction attempts to preserve an adequate remedy in equity when an adequate remedy at law does not exist. *See Stephens v. Colley*, 160 So. 3d 278, 282 (Ala. 2014) (requiring a plaintiff seeking a preliminary injunction to show, among other things, that it "has no adequate

remedy at law" (internal quotations omitted)). Thus, under this Court's reasoning, a plaintiff who meets the requirements for preliminary injunctive relief *necessarily* makes a showing that the "issue addressed by the preliminary injunction is one of overriding public concern" because the mere issuance of the injunction "reassures the public" that an adequate remedy exists to address any injuries they may someday incur. *Milton*, 393 So. 3d at 1158 (internal quotations omitted); Injunction Order 6.

In any event, the "issue" that must constitute an "overriding public concern" must be tied to the plaintiff's claims, not a court's *treatment* of those claims. In *Milton*, the Court identified the pertinent "issue" as the public's "inability to access the disputed portion of" the road, and determined that this was not an issue of "overriding public concern." 393 So. 3d at 1158. The only "issue" addressed by the Injunction Order is whether Mashkevich (and perhaps unidentified putative class members) may recover cryptocurrency. If the general public's inability to access a road did not qualify as an issue of "overriding public concern," certainly Maskevich's loss of his own cryptocurrency does not qualify either. Therefore, even if the Injunction Order was otherwise properly entered (it was not), the failure of this Court to require security requires its dissolution.

## IV.    The Injunction Order's Freezing of Assets is Improper

Besides exceeding the jurisdiction of this Court and not comporting with Rule 65, the Injunction Order should also be dissolved because the remedy it provides—the freezing of assets to secure the satisfaction of a future money judgment—is unlawful. In *Norman v. Occupational Safety Association of Alabama Workmen's Compensation Fund*, a workers' compensation fund sued an owner of the fund's administrator alleging that he breached his fiduciary duties to the fund by recommending that the fund transfer its insurance contracts to an insurance company with which the owner was in merger negotiations. 811 So. 2d 492, 493–94 (Ala. 2001). At the fund's

request, the trial court entered a preliminary injunction enjoining the insurance company from disbursing payments to the owner related to the merger transaction, enjoining the owner from making any effort to obtain such funds from the insurance company, and requiring the insurance company to pay into the court all proceeds due as a result of the merger transactions. *Id.* at 496, 499. The plaintiff fund argued that any money obtained by the defendant owner as a result of the owner's breach of fiduciary duty rightfully belonged to the fund, and it "fear[ed] that if [the owner] obtain[ed] cash from [the insurance company], there [was] a risk that [the owner would] conceal, transfer, spend or otherwise dispose of this money and that the [f]und [would] not be able to get it from [him] at the conclusion of [the] case." *Id.* at 499 (internal quotation marks omitted).

The Alabama Supreme Court rejected the fund's position and reversed the preliminary injunction. It found persuasive and "consistent with Alabama law" the U.S. Supreme Court's holding that "in cases where a creditor plaintiff has no lien or equitable interest in a debtor defendant's assets, a federal district court has no authority to issue a preliminary injunction preventing the defendant from transferring its assets." *Id.* at 500–01 (citing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)). The Court explained that the "common-law rule in Alabama has long been that, '[o]rdinarily, the property of the defendant, in an action at law, is not subjected to the payment of the demand against him, until that demand is sanctioned and established by the verdict of a jury, and the judgment of a court.'" *Id.* at 501 (quoting *Millard's Adm'rs v. Hall*, 24 Ala. 209, 226–27 (Ala. 1854) (emphasis omitted)). Because the fund's action sought "money damages rather than equitable relief," the court "lacked the authority . . . to enjoin [the insurance company] from disbursing the proceeds or to enjoin [the owner] from making efforts to obtain the proceeds." *Id.*

Like the trial court in *Norman*, this Court issued the Injunction Order out of concern that

someone may transfer or dispose of the funds at issue before final judgment. *See* Injunction Order 3–4. And like the plaintiff in *Norman*, Mashkevich has brought a claim for money damages. The Complaint's only substantive count is an action at law for conversion, and he seeks "damages in the amount of the value of" his assets and "proceeds derived from the same." Compl. 18. Although Maskevich nominally requests "the return of any remaining stolen assets" and asserts that his "cryptocurrency is specific [and] identifiable," he has not provided this Court with any information by which it could specifically identify the cryptocurrency that belongs to him. *Id.*; Doc. 7 at 14. Indeed, his expert admits that Mashkevich's funds have been commingled with other funds. Doc. 9 at ¶¶ 9–10.

Furthermore, the assets frozen by the Injunction Order far exceed the assets that Mashkevich claims were stolen. Mashkevich presented affidavit testimony that he lost $90,000 to Fictitious Defendants' scheme. Doc. 8 at ¶ 20. He also submitted testimony from his expert that all 36 Crypto Wallets combined contain "a minimum of $3.5 million" taken from putative class members. Doc. 9 at ¶ 11. This Court received no evidence concerning the amount of cryptocurrency held in each of the frozen Crypto Wallets. With this motion, Qbit now presents affidavit testimony that the Qbit Wallet alone holds approximately $7 million worth of cryptocurrency. Ex. A at ¶ 7. Even if this Court could excuse Mashkevich's failure to specifically identify the cryptocurrency that he claims is specifically identifiable, it would still have no evidentiary basis to freeze more than the amount of cryptocurrency that Mashkevich claims was stolen.

Regardless, absent a claim for the return of specific, identifiable cryptocurrency, Mashkevich's action is one for money damages. This Court lacks the authority to freeze accounts on the chance that one day Mashkevich will obtain a money judgment. This is especially true

when, as here, Mashkevich has not even brought a claim against any of the account owners. Because it orders an unlawful remedy, the Injunction Order should be dissolved.

**V.      There is no Evidentiary Basis to Freeze the Qbit Wallet**

Even if this Court determines that the Injunction Order survives the several legal challenges posed by this motion, the evidence before this Court supports modifying the Injunction Order to unfreeze the Qbit Wallet.

***First,*** neither Mashkevich nor any putative class member would be likely to suffer immediate and irreparable harm if the Qbit Wallet is unfrozen. In its Injunction Order, this Court reasoned that Mashkevich would suffer immediate and irreparable injury absent a freeze because it "would be a simple matter for [Fictitious] Defendants to transfer cryptocurrency to unidentified recipients outside the banking system and effectively place the assets at issue in this matter beyond the reach of the Court." Doc. 17 at 3. Such reasoning makes sense, however, only if the source of the irreparable harm is the loss of *specific, identifiable* cryptocurrency. This is because, regardless of whether Fictitious Defendants "transfer cryptocurrency to unidentified recipients," they will still be obligated to make Mashkevich whole with money damages if they are ultimately found liable. But Mashkevich has not presented any evidence that he will suffer irreparable harm if the specific cryptocurrency he lost is not returned. Indeed, Mashkevich has not even identified the specific cryptocurrency at issue.

***Second,*** Mashkevich has an adequate remedy for any harm he suffers: money damages. Indeed, "an action for conversion"—the only substantive cause of action brought by Mashkevich[5]—"is a suit for *money damages* for the personal property converted." *Taylor v. Powertel, Inc.*, 551 S.E.2d 765, 769 (Ga. Ct. App. 2001) (emphasis added). This Court nevertheless

---

[5] *See* supra note 3.

found that, for two reasons, a "money judgment" would be an "inadequate legal remedy." Injunction Order 3. This Court first determined that the "anonymity of the Defendants at the heart of the scheme" made a "money judgment against them . . . meaningless." *Id.* But the absence of a defendant makes *any* judgment —not just a "money judgment"—meaningless, because it cannot be enforced against anyone. The absence of *any* meaningful remedy does not give this Court authority to fashion a remedy against entities that are not parties to this case. Next, this Court determined that "the difficulty in having to trace the cryptocurrency" also rendered any money judgment "inadequate." *Id.* Whether Mashkevich locates his specific, identifiable cryptocurrency, however, does not affect his legal remedy for conversion. If Mashkevich can prove that Fictitious Defendants converted his property, he will have a legal remedy against them for conversion even if the specific converted property is never located.

**Third,** Mashkevich has not established a reasonable chance of success on the merits of his case because he has not identified a defendant. As discussed earlier, *supra* at 13–14, this lawsuit is a nullity under Alabama law because Mashkevich instituted it by filing an unservable complaint against only fictitious parties. This defect alone prevents him from prevailing. But regardless of whether this Court has subject-matter jurisdiction, Mashkevich cannot prevail on his conversion claim without identifying a defendant. To prove conversion, a plaintiff must establish, among other things, "that *the defendant* destroyed or exercised dominion over [his] property." *Schaeffer v. Poellnitz*, 154 So. 3d 979, 988 (Ala. 2014) (emphasis added). Mashkevich cannot establish a likelihood of success on the merits if he has not even identified who is allegedly responsible for converting his property.

**Finally,** because Mashkevich has not identified any defendants, this Court did not—and does not currently have—have any evidence before it to weigh the hardship that the Injunction

Order would have on Fictitious Defendants. For reasons discussed herein, however, the hardship the Injunction Order has placed on nonparty Qbit is substantial. *See supra* at 3–4.

## **CONCLUSION**

For the foregoing reasons, this Court should dissolve the Injunction Order. In the alternative, this Court should modify the Injunction Order to unfreeze the Qbit Wallet.

Respectfully submitted,

*/s/ Thomas W.H. Buck, Jr.*
Thomas W.H. Buck, Jr.
*One of the Attorneys for Nonparty UAB Qbit Financial Service*

OF COUNSEL:

John A. Smyth, III
Helen Kathryn Downs
Thomas W.H. Buck, Jr.
MAYNARD NEXSEN PC
1901 6th Avenue North
Suite 1700
Birmingham, Alabama 35203
(205) 254-1000
jsmyth@maynardnexsen.com
hkdowns@maynardnexsen.com
tbuck@maynardnexsen.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court via Alafile, which will send notification of such filing to all counsel of record on this the 20th day of January, 2025**.**

/s/ Thomas W. H. Buck, Jr.
Of Counsel

ELECTRONICALLY FILED
1/20/2025 1:57 PM
50-CV-2024-900163.00
CIRCUIT COURT OF
MARSHALL COUNTY, ALABAMA
ANGIE JOHNSON, CLERK

# EXHIBIT A

**IN THE CIRCUIT COURT OF MARSHALL COUNTY, ALABAMA**

| | |
|---|---|
| **MICHAEL MASHKEVICH, on behalf** | ) |
| **of himself and all others similarly** | ) |
| **situated** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )     **CASE NUMBER: CV-2024-900163** |
| | ) |
| **OLIVIA AVA, et al.** | ) |
| | ) |
|     **Defendants.** | ) |

**DECLARATION OF YUJUN WU**

I, Yujun Wu, declare under penalty of perjury as follows:

1.       My name is Yujun Wu. I am the chief executive officer for UAB Qbit Financial Service ("Qbit"). I am over 19 years of age, of sound mind, and am competent to testify to the matters herein. The evidence set forth in the foregoing declaration is based on my personal knowledge.

2.       Qbit is a financial technology company headquartered in Lithuania. It specializes in cross-border payment and banking solutions for global businesses.

3.       Qbit offers its customers, among other things, multi-currency business accounts, global payment processing, and supply chain financing. Qbit's customers may fund their accounts by transferring cryptocurrency, and they may direct Qbit to use the deposited funds for payment purposes.

4.       Qbit services cryptocurrency accounts on a platform called "Interlace," which is only open to registered businesses and may be used for business purposes only. To register an Interlace account, customers must provide various certifications and business documents, including certificates of incorporation, business licenses, governing documents, registries of

directors and shares, ownership charts, and, for certain directors and account owners, personal identification documents.

5.      Qbit uses OKX Hong Kong FinTech Company Limited ("OKX") to provide trading services related to it virtual assets. OKX takes these virtual assets into its custody, but Qbit is the legal and beneficial owner of these assets and, until an injunction was issued in this case, was the only entity that could access them. One of these virtual assets is a cryptocurrency "wallet" identified as "THGTenLmvqWycGLGtgRvX4wURiHQeDvNps" (the "Qbit Wallet").

6.      On June 20, 2024, OKX informed Qbit that, in compliance with this Court's order, it had frozen the Qbit Wallet.

7.      The Qbit Wallet contains approximately $7 million worth of cryptocurrency, all deposited by Interlace account holders that have been screened through Interlace's quality assurance procedures.

8.      Because this Court ordered OKX to freeze the Qbit Wallet, Qbit must borrow money at high interest rates to pay back funds to its customers. As a result, the injunction has caused Qbit to lose about $6,000 each day.

9.      I declare under penalty of perjury under the law of the State of Alabama that the foregoing is true and correct, and that I am physically located outside the geographic boundaries of the United States, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States.

_____
Yujun Wu

Executed on the __15__ day of __Jan__, at

__Hong Kong_____China_____
City and Country