ALBERT TONG (SBN 208439)
atong@maynardnexsen.com
JAMES J. HOCKEL (SBN 340612)
jhockel@maynardnexsen.com
MAYNARD NEXSEN LLP
Two Embarcadero Center, Ste. 1450
San Francisco, CA  94114
Telephone:     415.646.4670

JOHN A. SMYTH, III (*pro hac vice pending*)
jsmyth@maynardnexsen.com
THOMAS W.H. BUCK, JR. (*pro hac vice pending*)
tbuck@maynardnexsen.com
MAYNARD NEXSEN P.C.
1901 Sixth Avenue North
Suite 1700
Birmingham, AL  35203
Telephone:     205.254.1000

Attorneys for Specially Appearing Defendant
UAB QBIT FINANCIAL SERVICE

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MASHKEVICH, on behalf of himself and all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UAB QBIT FINANCIAL SERVICE, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-02565-PCP<br><br>**DECLARATION OF YUJUN WU IN SUPPORT OF DEFENDANT UAB QBIT FINANCIAL SERVICE'S CONSOLIDATED OPPOSITION TO PLAINTIFF MICHAEL MASHKEVICH'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER (Doc. No. 8) AND MOTION FOR PROVISIONAL CLASS CERTIFICATION (Doc. No. 19)**<br><br>Hearing Date:  March 24, 2025<br>Hearing Time: 1:00 p.m. |

I, YUJUN "MICHAEL" WU, declare as follows:

1.      I submit this declaration pursuant to 28 U.S.C. § 1746 in connection with specially appearing defendant UAB QBIT FINANCIAL SERVICE's ("Qbit Lithuania") Consolidated Opposition to Plaintiff Michael Mashkevich's *Ex Parte* Motion for Temporary Restraining Order and Motion for Provisional Class Certification.

2.      I am over 18 years of age and have personal knowledge of the matters set forth herein.  If placed under oath as a witness, I would testify in accordance with this declaration.

3.      I am a resident of Hong Kong.  By submitting this declaration, I do not consent to service or jurisdiction in this Court.

## BACKGROUND ON QBIT LITHUANIA

4.      At all times relevant to the allegations in this case, I was the Chief Executive Officer at Qbit Lithuania.  Qbit Lithuania is a financial technology company registered in Lithuania.  It specializes in cross-border payment and banking solutions for global businesses.  Qbit Lithuania offers its customers, among other things, multi-currency business accounts, global payment processing, and supply chain financing.  Qbit Lithuania's customers may fund their accounts by transferring cryptocurrency, and they may direct Qbit Lithuania to use the deposited funds for payment purposes.

5.      Qbit Lithuania is a regulated business.  It is licensed as a Virtual Asset Service Provider ("VASP") and regulated by Lithuania's comprehensive regulatory framework for cryptocurrency companies.  These regulations require, among other things, robust Anti-Money Laundering ("AML") and Counter-Terrorism Financing ("CTF") protocols.

6.      As part of its compliance, Qbit Lithuania developed a comprehensive program for its AML and CTF policies, procedures, and controls.  Qbit Lithuania's policies are designed to prevent and mitigate possible risks of being involved in any kind of illegal activity.  Its policies outline procedures for customer onboarding, customer due diligence, and identity verification procedures to ensure the authenticity of documents and information provided by the prospective customer.  Qbit Lithuania believes its policies, procedures, and controls comply with all

-1-

regulatory requirements in the European Union, Hong Kong, and the United States.  Attached as **Exhibit A** is a true and correct copy of Qbit Lithuania's AML and CTF policies and procedures. Attached as **Exhibit B** is a true and correct copy of Qbit Lithuania's Transaction Monitoring rules.

7.      As part of its compliance, Qbit Lithuania's Chief Compliance and Money Laundering Reporting Officer, Huang "Jessica" Xiao, is responsible for overseeing all aspects of its AML and CTF protocols, including monitoring effectiveness, enhancing controls and procedures when necessary, and ensuring its AML and CTF staff training is adequate, appropriate, and effective.

8.      As part of its procedures, Qbit Lithuania's services are only open to registered businesses and may be used for business purposes only.  To register an account, customers must provide various certifications and business documents, including certificates of incorporation, business licenses, governing documents, registries of directors and shares, ownership charts, and, for certain directors and account owners, personal identification documents.

9.      In the event Qbit Lithuania determines that one of its customers is involved in any kind of suspicious activity, it would have immediately investigated such issues and ceased any current or future business transactions with those customers pursuant to its AML and CTF policies.

## KNOWLEDGE OF THE ALLEGED SCHEME

10.      Qbit Lithuania first became aware of the alleged scheme set forth in Mr. Mashkevich's Complaint on or about June 20, 2024, when it learned that one of its wallets with OKX Hong Kong FinTech Company Limited ("OKX") was frozen.

11.      Qbit Lithuania was not part of, nor a knowing participant, in the alleged scheme set forth in Mr. Mashkevich's Complaint.

12.      Qbit Lithuania did not know, and does not know, Mr. Mashkevich, "Misha," "F.B. Lee," "Emma Miller," or any of the other parties identified in the alleged scheme, or anyone purporting to be these persons.

-2-

13.     Qbit Lithuania has never directly or indirectly communicated with Mr. Mashkevich, "Misha," "F.B. Lee," "Emma Miller," or any of the other parties identified in the alleged scheme, or anyone purporting to be these persons.

14.     Qbit Lithuania has never directly or indirectly worked with "Grayphite," "Resy," or any other "international app marketing company."

15.     If Qbit Lithuania was aware that any customer was engaged in any scheme like what Mr. Mashkevich alleged in his Complaint, it would not have onboarded the customer, or it would have immediately ceased business transactions with the customer, pursuant to its AML and CTF policies.

### THE THGTEN WALLET

16.     OKX is a cryptocurrency exchange like Binance, Coinbase, and Kraken.  Qbit Lithuania uses OKX to provide trading services related to it virtual assets.  Although OKX takes Qbit Lithuania's virtual assets into its custody, Qbit Lithuania is the legal and beneficial owner of these assets and, until an injunction was issued by the Circuit Court of Marshall County, Alabama (the "Alabama Court"), was the only entity that could access them.  One of these virtual assets is a cryptocurrency "wallet" identified as "THGTenLmvqWycGLGtgRvX4wURiHQeDvNps" (the "THGTen Wallet").

17.     On June 20, 2024, OKX informed Qbit Lithuania that, in compliance with preliminary injunction issued by Alabama Court, it had frozen the THGTen Wallet.

18.     The THGTen Wallet contains approximately $7 million worth of cryptocurrency, all deposited by the account holders that have been screened through Qbit Lithuania's quality assurance procedures, and in compliance with its AML and CTF policies.

19.     Qbit Lithuania has no reason to believe that the funds in the THGTen Wallet were the proceeds of any alleged illegal activity.

20.     After it became aware of the preliminary injunction, Qbit Lithuania commissioned a leading blockchain security and compliance company, Beosin, to conduct an in-depth analysis of the disputed OKX transactions listed in Mr. Zarazinski's declaration and

determine their nature and identify potential soures of risk.  Beosin determined the transactions were not attacks or malicious activities.  Attached hereto as **Exhibit C** is a true and correct copy of Beosin's report.

21.     According to paragraph 37 of Mr. Zarasinki's declaration, "$251 million in USDT flowed into THGTen [and] [n]early all incoming deposits of USDT came from the wallet address TydJv1."  Based on Qbit Lithuania's records, TydJv1 is the account for the wallet that it maintained with Cregis.  Cregis is a financial technology company with offices in Hong Kong and Dubai, specializing in enterprise level crypto asset management solutions.  Qbit Lithuania has no relationship with Cregis, aside from being one of its customers.  Cregis satisfied all of Qbit Lithuania's onboarding protocols.  Qbit Lithuania has no knowledge that Cregis was involved in the scheme alleged by Mr. Mashkevich.

22.     Because the Alabama Court ordered OKX to freeze the THGTen Wallet, Qbit Lithuania must borrow money at high interest rates to pay back funds to its customers. As a result, the injunction has caused Qbit Lithuania to lose about $6,000 each day.

23.     Qbit Lithuania has no relationship with Bytechip LLC ("Bytechip").  Bytechip is an entirely distinct business venture and operates independently of Qbit Lithuania; has separate financial accounts; and maintains a distinct corporate structure.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March _____23_____, 2025 in Hong Kong.

_____
YUJUN "MICHAEL" WU

-4-

# EXHIBIT A

# Qbit Financial Service AML&CTF Policy

**Issue Department:** Compliance

**Version:** V2.2

**Issue Date:** 2024.03.08

**Effective Date:** 2024.03. 11

# Contents

1. Introduction................................................................................................................................ 4

1.1   Objective and Legislation ......................................................................................................... 4

1.2   Scope......................................................................................................................................... 4

1.3   Business Model ......................................................................................................................... 4

1.3.1     Business Definition............................................................................................................ 5

1.3.2     Target Customers .............................................................................................................. 5

1.4   Definition of Money Laundering and Terrorist Financing.......................................................... 5

1.4.1     Money Laundering ............................................................................................................ 5

1.4.2     Terrorist Financing............................................................................................................ 6

1.4.3     Proliferation Financing...................................................................................................... 6

1.5   Roles and Responsibilities ........................................................................................................ 6

1.5.1     The Board and Senior Management.................................................................................. 7

1.5.2     Compliance Officer and Money Laundering Reporting Officer.......................................... 8

2.   Compliance Risk Management .................................................................................................... 9

3.   Risk Assessment.......................................................................................................................... 9

3.1   Institutional Risk Assessment ................................................................................................... 9

3.2   Customer Risk Assessment ..................................................................................................... 10

4.   Customer Due Diligence ........................................................................................................... 11

4.1 Timing of CDD............................................................................................................................ 11

4.2   Identification of Customer ..................................................................................................... 12

4.2.1. Natural Persons .................................................................................................................... 12

4.2.2.  Companies .......................................................................................................................... 12

4.2.3.  Trust or other similar Legal Arrangements.......................................................................... 13

4.3   CDD Procedure ...................................................................................................................... 13

4.4 Review Requirements ................................................................................................................ 14

4.5   Non-Compliance with CDD Measures .................................................................................... 16

5 Enhanced Due Diligence ............................................................................................................... 16

6.   Simplified Due Diligence .......................................................................................................... 20

7.   Watch Lists Screening............................................................................................................... 20

8.   Ongoing Monitoring ................................................................................................................. 23

8.1 Ongoing Customer Due Diligence.............................................................................................. 23

8.2 Transaction Monitoring ............................................................................................................. 23

8.2.1.  Signal of Suspicious Transaction......................................................................................... 24

8.2.2. Monitoring of Terrorist Financing Activities.......................................................................... 24

8.3.3. Investigate Risk Alert ........................................................................................................... 24

8.3.4. Transaction Block ................................................................................................................. 25

9.   Suspicious Activity Reporting ........................................................................................... 25

9.1 Internal Reporting ............................................................................................................. 25

9.2 External Reporting ............................................................................................................ 26

9.3 Request for Further Information (RFI) ............................................................................. 27

9.4 Post SAR Management ...................................................................................................... 27

10. Record Keeping ................................................................................................................... 27

11. Training ............................................................................................................................... 28

12. Cooperation with Requests from Law Enforcement Agencies ........................................... 29

13. Policy Administration ......................................................................................................... 29

Glossary ................................................................................................................................... 32

      Beneficial owner ............................................................................................................... 32

      Connected party ................................................................................................................ 32

      Dormant customer ............................................................................................................. 32

      PEP .................................................................................................................................... 33

      Source of Wealth ............................................................................................................... 33

      Source of Funds ................................................................................................................ 33

Appendix A: Prohibited Countries .......................................................................................... 33

Appendix B: Prohibited Industries .......................................................................................... 34

# 1. Introduction

## 1.1 Objective and Legislation

Qbit Financial Service  (herein after referring to as "Qbit Financial Service " or "Company") registered in Lithuania and is a licensed VASP. Qbit Financial Service  is committed to the implementation of robust measures to effectively counter the threats of money laundering (ML) and terrorist financing (TF) while ensuring compliance with all relevant legislative requirements in EU, Hong Kong and USA, collectively referred to as "Regulations."

- FFIEC Manual from FinCEN
- FATF Recommendations
- Anti-Money Laundering and Counter-Terrorist Financing Ordinance ("AMLO"), Cap. 615

https://www.elegislation.gov.hk/hk/cap615!en

- Guideline on Anti-Money Laundering and Counter-Financing of Terrorism (For Money Service Operators)

https://eservices.customs.gov.hk/MSOS/download/guideline/AMLO_Guideline_en.pdf

- Drug Trafficking (Recovery of Proceeds) Ordinance ("DTROPO"), Cap. 405

https://www.elegislation.gov.hk/hk/cap405!en?INDEX_CS=N

- Organized and Serious Crimes Ordinance ("OSCO"), Cap. 455

https://www.elegislation.gov.hk/hk/cap455!en?INDEX_CS=N

- United Nations (Anti-Terrorism Measures) Ordinance ("UNATMO"), Cap. 575

https://www.elegislation.gov.hk/hk/cap575!en?INDEX_CS=N

- United Nations Sanctions Ordinance ("UNSO"), Cap. 537

https://www.elegislation.gov.hk/hk/cap537!en?INDEX_CS=N

- Weapons of Mass Destruction (Control of Provision of Services) Ordinance, ("WMDO"), Cap. 526

https://www.elegislation.gov.hk/hk/cap526

The Regulations require Qbit Financial Service  to adopt and maintain an Anti-Money Laundering and Counter -Terrorist Financing program covering its approach to, amongst other things, customer due diligence, record-keeping  and compliance reporting, the details of which are set out in this Policy.

This Anti-Money Laundering (AML) and Counter-Terrorist Financing (CTF) Policy ("Policy") ensures that Qbit Financial Service  adopts sufficient measures and procedures in order to meet its obligations under the Regulations.

## 1.2 Scope

This Policy applies to Qbit Financial Service  and its board members, senior managements and all employees (direct and indirect parent companies, subsidiaries, all directors, officers, full-time/part-time and seconded employees, anyone working in the company). In particular, it contains information which all members of staff need to be aware of in order to prevent the business being used to launder the proceeds of crime or for terrorist financing and any activity that facilitates money laundering or the funding of terrorist or criminal activities and to comply with all applicable requirements under the EU, U.S. and HK AML/CTF framework.

## 1.3 Business Model

### 1.3.1 Business Definition

As a Money Service Operator, based on the demand for funds settlement from international trade in goods and services and cross-border remittances, Qbit Financial Service utilizes its relationships with other financial institutions and its technology research and development capabilities to provide customized currency exchange and remittance services, which includes the following:

- Currency exchange service based on the real transaction background, excluding foreign exchange derivatives and leveraged foreign exchange trading;

- Remittance service based on the real transaction background.

### 1.3.2 Target Customers

Qbit Financial Service provides services to foreign merchants that sell goods and service oversea marketplaces to manage expenses and to collect and transmit funds. The Company's target customers include e-Commerce merchants, B2B merchants, service providers (especially for advertising and logistic service), and small and medium enterprises in DTC (Directo To Business) business, which includes industries such as information technologies, education, and digital marketing, etc.

## 1.4 Definition of Money Laundering and Terrorist Financing

### 1.4.1 Money Laundering

Money Laundering is defined as:

- the conversion or transfer of property, knowing that such property is derived from criminal activity or from an act of participation in such activity, for the purpose of concealing or disguising the illicit origin of the property or of assisting any person who is involved in the commission of such an activity to evade the legal consequences of that person's action;

- the concealment or disguise of the true nature, source, location, disposition, movement, rights with respect to, or ownership of, property, knowing that such property is derived from criminal activity or from an act of participation in such an activity;

- the acquisition, possession or use of property, knowing, at the time of receipt, that such property was derived from criminal activity or from an act of participation in such an activity;

- participation in, association to commit, attempts to commit and aiding, abetting, facilitating and counselling the commission of any of the actions referred to in points (1), (2) and (3).

There are three common stages in the laundering of money, and they frequently involve numerous transactions. These stages and typical signs are:

- Placement - the physical disposal of cash proceeds derived from illegal activities;

- Layering - separating illicit proceeds from their source by creating complex layers of financial transactions designed to disguise the source of the money, subvert the audit trail and provide anonymity; and

- Integration - creating the impression of apparent legitimacy to criminally derived wealth. In situations where the layering process succeeds, integration schemes effectively return the laundered proceeds back into the general financial system and the proceeds appear to be the result of, or connected to, legitimate business activities.

### 1.4.2 Terrorist Financing

Terrorist Financing is defined as:

- The provision or collection, by any means, directly or indirectly, of any property :

    ▪ With the intention that the property be used; or

    ▪ Knowing that the property will be used, in whole or in part, to commit one or more terrorist acts (whether or not the property is actually so used).

- The making available of any property or financial (or related) services, by any means, directly or indirectly, to or for the benefit of a person knowing that, or being reckless as to whether, the person is a terrorist or terrorist associate; or

- The collection of property or solicitation of financial (or related) services, by any means, directly or indirectly, for the benefit of a person knowing that, or being reckless as to whether, the person is a terrorist or terrorist associate.

Terrorists or terrorist organizations require funds to carryout acts of terrorism and terrorist financing provides the funds needed. Sources of terrorist financing maybe legitimate or illegitimate. It maybe derived from criminal activities such as kidnapping, extortion, fraud or drug trafficking. It may also be derived from legitimate income such as membership dues, sale of publications, donations from persons or entities sympathetic to their cause, and sometimes income from legitimate business operations belonging to terrorist organizations.

### 1.4.3 Proliferation Financing

Proliferation Financing (PF) is the provision of services that will or may assist the development, production, acquisition or stockpiling of weapons capable of causing mass destruction or that will or may assist the means of delivery of such weapons. The provision of services is widely defined and includes the lending of money or other provision of financial assistance.

## 1.5  Roles and Responsibilities

Money laundering, fraud and market abuse threats are dynamic, and criminals constantly devise new techniques to exploit targets in the financial services sector.

The Board and Senior Managements of Qbit Financial Service  are committed to identifying and effectively managing all risks to the business and ensuring appropriate action is taken to prevent the company being used for money laundering or terrorist financing.

Appropriate procedures and processes to identify and verify customers have been implemented, and due diligence is carried out prior to entering into a business relationship, as well as ongoing monitoring throughout the business relationship.

All staff must undergo training to ensure they are aware of the legislation and their own obligations, particularly to promptly report their suspicions internally. All staff will be subject to annual assessment of AML and CTF knowledge and should familiarize themselves with the content of the AML program.

Ultimate responsibility for this approach lies with the Qbit Financial Service 's senior management but all staff bear a responsibility to maintain the effectiveness of systems and controls.

Qbit Financial Service  ensures at all times that:

• Customers' identities are satisfactorily verified before Qbit Financial Service  establish business relationship with them;

• Qbit Financial Service  knows its customers and their beneficial owners. Understands their purposes for entering business relationship before and throughout the duration of the business relationship;

• Staff are trained and made aware of both their personal legal obligations and the legal obligations of Qbit Financial Service ;

• Staff are trained to be vigilant of money laundering and terrorist financing and to report any suspicions to the MLRO;

• Sufficient records are kept for required period.

Appropriate procedures to achieve these objectives are established and maintained. The Compliance Officer/MLRO and the compliance team will provide further guidance on any area of and are committed to supporting Company's efforts to combat ML/TF.

This Policy is signed off by the board of directors and updated in annual basis as a minimum requirement. Qbit Financial Service  shall also update the Policy and any other procedures from time to time to ensure that Qbit Financial Service  fulfill all applicable laws and regulations.

Qbit Financial Service  adopts a risk-based approach (RBA) in design and implementation of the AML and CTF Policy, procedures and controls with a view to managing and mitigating ML/TF risks.

### 1.5.1 The Board and Senior Management

The board of directors and senior management play a crucial role in establishing and overseeing the implementation of effective AML measures. They are responsible for ensuring that the organization adheres to relevant laws, regulations, and industry standards, and that appropriate internal controls are in place to detect and prevent money laundering and terrorist financing activities.

Here are key aspects of the role and responsibilities that the board and senior management of Qbit Financial Service consider when developing and implementing the AML/CTF policy:

• Establishing an AML framework: The board should create a comprehensive AML framework that outlines the organization's AML objectives, defines roles and responsibilities, and sets forth the necessary policies, procedures, and controls.

• Appointing an AML compliance officer: Senior management should designate a qualified individual or team to be responsible for the day-to-day implementation and oversight of the AML program. This individual or team will be tasked with ensuring ongoing compliance and coordinating AML-related activities across the organization.

• Developing a risk-based approach: The board and senior management should adopt a risk-based approach to AML compliance, which involves identifying, assessing, and managing the risks posed by different aspects of the organization's business operations. This includes understanding the nature of the products and services offered, the jurisdictions in which the organization operates, and the inherent risks associated with each aspect of the business.

• Oversight and monitoring: The board and senior management should regularly review and assess the effectiveness

of the AML program, ensuring that controls are functioning properly and identifying any areas for improvement.

- Auditing and internal controls: Senior management should establish an internal audit function to review the AML program's effectiveness and ensure ongoing compliance with relevant regulations.

- Collaboration with external stakeholders: The board and senior management should foster relationships with law enforcement, regulatory authorities, and industry peers to share information and best practices related to AML and CTF.

- Continuous improvement: The board and senior management should remain informed about the lasted AML and CTF regulations, trends, and best practices, and continuously evolve the organization's AML program to address emerging risks and stay ahead of potential threats.

The Appointed President for managing staff and operation of Qbit Financial Service 's AML/CTF program is:

> Name: Yujun Wu
> Email:  Michael@qbitnetwork.com

## 1.5.2 Compliance Officer and Money Laundering Reporting Officer

Qbit Financial Service  appoints a Compliance Officer (CO) as the focal point within Qbit Financial Service  for the oversight of activities relating to the prevention and detection of ML/TF and providing support and guidance to senior management to ensure that ML/TF risks are adequately managed. The CO should assume responsibility for:

- Developing and/or continuously reviewing the AML/CTF Systems;

- Overseeing all aspects of the AML/CTF Systems which include monitoring effectiveness  and enhancing the controls and procedures where necessary;

- Communicating key AML/CTF  issues with  senior management, including, where  appropriate, significant compliance deficiencies; and

- Ensuring AML/CTF staff training is adequate, appropriate and effective.

The Appointed Compliance Officer of Qbit Financial Service  is：

> Name: Huang Xiao (Jessica)
> Email:jessicahuang@qbitnetwork.com

Qbit Financial Service  appoints a Money Laundering Reporting Officer (MLRO) as a central reference point for reporting suspicious transactions and also as the main point of contact with the Joint Financial Intelligence Unit (JFIU) and law enforcement agencies. The MLRO should play an active role in the identification and reporting of suspicious transactions.Principal functions of the MLRO should include having oversight of:

- Review of internal disclosures and exception reports and, in light of all available relevant information, determination of whether or not it is necessary to make a report to the JFIU;

- Maintenance of all records related to such internal reviews; and

- Provision of guidance on how to avoid tipping off.

The Appointed MLRO of Qbit Financial Service  is：

> Name: Huang Xiao (Jessica)
> Email: jessicahuang@qbitnetwork.com

Compliance Officer/MLRO shall report management information to the senior management every 6 months as a minimum requirement. Risk events shall be reported to senior management in a timely, complete, understandable and accurate manner.

# 2. Compliance Risk Management

Qbit Financial Service  will remain vigilant on the need to establish its own three lines of defense:

First Line of Defense

The employees in Business Development Team, Sales Team and Operations Team are at the frontlines of business and are responsible for identifying and escalating any potential ML/TF risks of the business.

Second Line of Defense

The Compliance Team and Compliance Officer/MLRO form the second line of defense. Collectively, they are responsible for identifying, assessing and safeguarding Qbit Financial Service 's business from ML/TF risks.

Third Line of Defense

The Internal Audit function plays an important role in independently evaluating the AML/CTF and Sanctions Risk Management framework and controls. The Internal Auditor, when necessary, may engage external auditors to assess and evaluate the effectiveness of AILINGAL's compliance with prevailing AML/CTF and Sanctions regulations, and policies and procedures. At present, Qbit Financial Service  is mainly engaged in external audits, and the frequency of audits is at least once every two years, depends on the company's risk assessment.

# 3. Risk Assessment

## 3.1 Institutional Risk Assessment

The institutional risk assessment forms the basis of the RBA. Enabling Qbit Financial Service  to understand how and to what extent Qbit Financial Service  is vulnerable to ML/TF. Qbit Financial Service  shall conduct institutional risk assessment to identify, assess and understand its ML/TF risks in relation to:

1.  Customer risk factors, for example:
- target market and customer segments;
- the number and proportion of customers identified as high risk

2.  Country risk factors, for example:
- the countries or jurisdictions it is exposed to, either through its own activities or the activities of customers, especially countries or jurisdictions identified by credible sources, with relatively higher level of corruption or

organized crime, and/or not having effective AML/CTF regimes.

3.  Product, service, transaction or delivery channel risk factors, for example:
•   the nature, scale, diversity and complexity of its business;
•   the characteristics of products and services offered, and the extent to which they are vulnerable to ML/TF abuse;
•   the volume and size of its transactions;

•   the delivery channels, including the extent to which we deals directly with the customer, the extent to which we relies on (or is allowed to rely on) third party to conduct CDD, the extent to which we uses technology, and the extent to which these channels are vulnerable to ML/TF abuse.

4.  Other risk factors, for example:
•   the nature, scale and quality of available ML/TF risk management resources, including appropriately qualified staff with access to ongoing AML/CFT training and development;
•   compliance and regulatory findings;
•   results of internal or external audits

The appropriate steps to conduct the institutional ML/TF risk assessment should include:
•   documenting the risk assessment process which includeshow risk factors are identified from internal and external sources, and how the risk factors are evaluated by way of qualitative and quantitative analysis;
•   considering all the relevant risk factors before determining what the level of overall risk is, and the appropriate level and type of mitigation to be applied;
•   obtaining the approval of senior management on the risk assessment results;
•   determining how to maintain the risk assessment result being relevant.

The Compliance Officer assign an inherent risk of Qbit Financial Service based on the assessment and assess adequacy and
effectiveness of the design and performance the control and provides a residual risk rating. The result of the assessment shall be reported to the board and senior management. Qbit Financial Service conducts institutional risk assessment in annual
basis as a minimum requirement.

## 3.2 Customer Risk Assessment

Qbit Financial Service shall conduct dynamic Customer Risk Assessment (CRA) to assess ML/TF risk posed by its customers in order to implement an effective Risk Based Approach on its AML/CTF program with appropriate Customer Due Diligence and ongoing monitor standard.

Customers will be categorized into three levels of ML/TF risks by various factors including customer risk, country risk, product, transaction and deliver channel. Initial CRA for new customers shall be completed when establishing business relationship. CRA for existing customers will be reviewed and adjustments when:
•   Ongoing Customer Due Diligence;
•   Existing CRA is believed to be inaccurate to reflect the customer's ML/TF risk;
•   Suspicion of ML/TF is detected.

The following factors that will be considered in conducting CRA：

- Qbit Financial Service  establishes business relations with any customer;

- Qbit Financial Service  effects any occasional transaction:

  ▪ A transaction (other than a wire transfer) equal to or exceeding an aggregate value of HK$120,000, whether carried out in a single operation or several operations that appear to Qbit Financial Service  to be linked; or

  ▪ A wire transfer equal to or exceeding an aggregate value of HK$8,000, whether carried out in a single operation or several operations that appear to Qbit Financial Service  to be linked;

  ▪ There is asuspicion of money laundering or terrorism financing;

  ▪ Qbit Financial Service  has doubts about the veracity or adequacy of any information previously obtained.

The beneficial owner of the customer is subject to the same requirement and procedure as CRA mentioned above. In particular, the following scenario will lead the customer to be high risk and applied with EDD:

- The nature of a particular situation presents a risk of money laundering or terrorist financing;

- The customer is a Politically Exposed Person ("PEP") or has any relationship or transaction involving one.

High risk customers will be subject to the more restrict measures including but not limited to:

- Enhanced Customer Due Diligence;

- More frequent and strength Ongoing Customer Due Diligence;

- More restrict Transaction monitoring;

- Obtain approval from the senior management to establish/maintain the business relationship;

- Take reasonable measures to establish the relevant customer's or beneficial owner's source of wealth and the source of the funds that are involved in the business relationship.

# 4. Customer Due Diligence

## 4.1 Timing of CDD

Qbit Financial Service  shall carry out and complete the CDD process before establishing any business relationship or before facilitating any transaction. CDD will also be conducted when:

- before establishing a business relationship with the customer;

- before carrying out for the customer an occasional transaction :

  (i) A transaction (other than a wire transfer) equal to or exceeding an aggregate value of HK$120,000, whether carried out in a single operation or several operations that appear to Qbit Financial Service  to be linked; or

  (ii) a wire transfer equal to or exceeding an aggregate value of HK$8,000, whether carried out in a single operation or several operations that appear to Qbit Financial Service  to be linked;

- when the Company suspects that the customer or the customer's account is involved in ML/TF; or;

- when the Company doubts the veracity or adequacy of any information previously obtained for the purpose of

identifying the customer or for the purpose of verifying the customer's identity..

## 4.2  Identification of Customer

Qbit Financial Service  executes  following  CDD  measures:  Identify  the  customer  and  verify  the  customer's identity  using documents, data or information provided by a reliable and independent source.

### 4.2.1. Natural Persons

•    Full Name, including any aliases;

•    Unique identification number and document type;

•    Date ofBirth;

•    Nationality;

•    Residential Address.


Examples of which include:

•    Identity card or other national identity card;

•    valid travel document (e.g. unexpired passport); or

•    other relevant documents, data or information provided by a reliable and independent source (e.g. document issued by a government body).


### 4.2.2.  Companies

•    Full Name, including any aliases/trading names;

•    Business Registration Number;

•    Registered or business address, and if different, principal place of business;

•    Date of Incorporation;

•    Country of Incorporation/Registration;

•    The bushiness description;

•    History operation proof;

Examples of which include:

•    certificate of incorporation;

•    record in an independent company registry;

•    certificate of incumbency;

•    certificate of good standing;

•    record of registration;

•    partnership agreement or deed;

•    constitutional document; or

•    other relevant documents, data or information provided by a reliable and independent source (e.g. document issued by a government body).

### 4.2.3. Trust or other similar Legal Arrangements

- Full Name, including any aliases/trading names;

- Business Registration Number;

- Registered or business address, and if different, principal place of business;

- Date of establishment or settlement;

- Jurisdiction whose laws govern the trust or legal arrangement.

Examples of which include:

- trust deed or similar instrument;

- record of an appropriate register in the relevant country of establishment;

- written confirmation from a trustee acting in a professional capacity;

- written confirmation from a lawyer who has reviewed the relevant instrument; or

- written confirmation from a trust company which is within the same financial group as Qbit Financial Service , if the trust concerned is managed by that trust company.

- Where there is a beneficial owner in relation to the customer, identify and take reasonable measures to verify the beneficial owner's identity so that the company is satisfied that it knows who the beneficial owner is, measures to enable the Company to understand the ownership and control structure of the legal person;

- Obtain information on the purpose and intended nature of the business relationship; and

- If a person purports to act on behalf of the customer:

  - Identify the person and take reasonable measures to verify the person's identity using documents, data or information provided by a reliable and independent source; and

  - Verify the person's authority to act on behalf of the customer.

## 4.3 CDD Procedure

Qbit Financial Service  will adopt appropriate controls and oversight and accordingly to determine the extent of due diligence  to be performed in RBA manner. The Company only service entity customers, and the basic required information and documents include:

| Category | Element |
|---|---|
| Basic Information and documents | Name |
| | Type of Entity |
| | Registration No. |
| | Certificate of Incorporation |
| | Business Registration Certificate |
| | NNC1/ NAR1 |
| | Articles of Association (optional) |
| | Registration Date |

| | Registration Address |
|---|---|
| | Operation Address |
| Director and Other Officeholders | Name |
| | Nationality |
| | ID/Passport No. |
| | Valid Date of ID/Passport |
| | Date ofBirth |
| | Address |
| | Copy of ID/Passport |
| | Selfie with ID (optional) |
| | Proof of Residency (optional) |
| | Phone No. and Email address |
| Beneficial Owner<br><br>*A natural person owning more than 25% of the legal person or legal arrangement, taking into account any aggregated ownership for companies with cross-shareholdings. A natural person who does not meet the shareholding threshold stated above but who controls the customer (e.g. through exercising significant influence) is abeneficial owner. | Name |
| | Nationality |
| | ID/Passport No. |
| | Valid Date of ID/Passport |
| | Date ofBirth |
| | Address |
| | Copy of ID/Passport |
| | Proof of Ownership |
| | Share Information (Share Structure, Total shares issued, Member's shares held) |

Compliance staff will verify the completeness and authentication of these information and documents by:

- Checking through the relevant authority;
- Searching the third party database;
- Other applicable approaches.

Qbit Financial Service  shall obtain the information on the purpose and intended nature of the business relationship of the customers, including but not limited:

- The bushiness description;
- History operation proof

## 4.4 Review Requirements

Complete Validity

- All submitted materials should be integrated and complete; The document must be photo of the original certificate or stamped copy;

- The documents must be clear and legible; if they have been artificially painted because they are not clear, they must be stamped on the painted area;

- All documents should be within the validity period.

<u>Authenticity</u>

Based on risk control principles, we should ensure that the identification documents provided by the customer are authentic. Operations staff should use appropriate methods to check the information provided by the customer for authenticity and accuracy.

For company-related personal identity information, we will automatically verify the authenticity through the face recognition system, which contains mainly the following two parts:

1) The authenticity of identity documents, including whether the identity information matches, and whether the documents are real and effective.

2) The verification of the face and the photo of the ID document. If the verified face does not match, or if the face provided is a photo or video, it will not be accepted.

Besides, we also use the citizen identity authentication service of the "National Citizen Identity Card Number Inquiry Service Center, whereby the system will automatically transmit name and personal ID number to the Ministry of Public Security's "National Citizenship Information Database for authentication, which returns a result of "match" or "not match".

Face recognition is the first step of the CDD process. If the face recognition result fails, the operation staff will not do further review of the information submitted. If the face recognition passes, another manual review will also be required to ensure that there are no automated identification errors.

All face recognition records and results will be retained in the system, and more detailed feedback is available in the back-office system of the service provider. We also regularly monitor the acceptance and failure rates of the facial recognition system to ensure that it is working properly and efficiently.

Regarding to the business information, official websites include but not limited to:

1) National Enterprise Credit Information Publicity System Log on to the website http://www.gsxt.gov.cn/ to verify the registration information, legal person information and shareholder information of mainland enterprises.

2) The Cyber Search Centre of the Integrated Companies Registry Information System (ICRIS) Log on to the website to verify the registration status of enterprises, information of directors and

shareholder.

<u>Consistency</u>

1) The information of the registered subject and the contracted subject are consistent;

2) The company name shown in all the provided documents must be completely consistent;

3)   The permitted business scope is consistent with the current business operation;

4)   The information filled in is consistent with the submitted certification information.

If can be confirmed that the identity information and certification documents provided by the customer are true and valid, the corporate information and shareholder information are consistent with information obtained from reliable channels or official sources, a business relationship can be established with the customer. If it is suspected or confirmed that the customer provides false identification documents, or if the reviewed corporate information, shareholder information is inconsistent with information obtained from reliable channels or official sources, or if the identity of the customer cannot be verified, Qbit Financial Service shall refuse to establish a business relationship with the customer.

## 4.5  Non-Compliance with CDD Measures

Qbit Financial Service must not undertake any transactions for, establish or maintain business relationship with any customer or beneficiary, when any of them

- is subject to prohibition of establishing business relationship or providing service sanctioned by OFAC, UN, and/or other authorities and organization;

- is anonymous or using fiction names;

- use shell bank account;

- meet other scenarios cause Qbit Financial Service unable to comply with the required AML/CTF measures.

# 5 Enhanced Due Diligence

## 5.1 Introduction to EDD

When customer or beneficiary owner falls under high risk after RCA, identified as a PEP for instance, or any suspicious/high risk indicator detected,Qbit Financial Service shall carryout enhanced due diligence (EDD) process to verify the high-risk customers' identity and expected behavior.

The objectives of the EDD Procedures are as follows:
- To identify and assess the risks associated with customers, partners, and other relevant parties;
- To ensure compliance with anti-money laundering (AML) and counter-terrorism financing (CTF) regulations;
- To prevent involvement in illicit activities and safeguard the reputation of the Company;
- To maintain accurate and up-to-date records of due diligence activities.

EDD includes one of more process below:
- Obtaining additional information on the customer and updating more regularly the customer profile including the identification data;
- Obtaining additional information on the intended nature of the business relationship (e.g. anticipated account activity), the source of wealth and source of funds;
- Verifying the customer and information with various channels, including:
    - Public Information search;

- On-site visit;
- Telephone Interview;
- Inquire for the applicable regulators.

Acceptable sources that validate Source of Wealth includes but not limited:

- Proof of property sale
- Records of external investment;
- Commercial loan agreement letter;
- Intra-Group Financing - Audited Financial Statements;
- Bank Statements;
- Written confirmation from a qualified accountant/lawyer;
- Records documenting shareholder capital contribution.
- Articles of Association (or equivalent) or an extract of the Articles of Association signed by the company secretary or another senior officer which confirms all details relating to the authorized and issued share capital.

Acceptable sources that validate Initial Source of Funds includes but not limited:

- Documents of underlying transactions/the activity which generates the funds
- Identity of the payer and operating background.

## 5.2 Timing of EDD

### Onboarding New Customers or Establishing New Business Relationships

When initiating a relationship with a new customer or business partner, organizations should assess the risk profile and determine whether EDD measures are necessary. If the customer or relationship falls within predefined high-risk categories, EDD should be performed before commencing the business relationship.

### Trigger Events

Certain events or triggers may necessitate the application of EDD. These triggers could include changes in a customer's behavior, unusual transaction patterns, complex or large-value transactions, or the identification of red flags during regular monitoring. Triggers should prompt Company to conduct additional due diligence to mitigate emerging risks promptly.

### Periodic or Trigger-Based Reviews

The Company should establish a process for conducting periodic reviews of high-risk customers or business relationships. These reviews maybe conducted annually, biannually, or at intervals defined by internal policies. Additionally, Company may conduct reviews triggered by significant changes in the customer's circumstances, such as changes in beneficial ownership, geographical location, or nature of business.

### Compliance with Regulatory Requirements

EDD must also be conducted in any situation specified by a relevant authority by written notice. It is essential for the Company to stay updated with relevant regulations and ensure compliance by conducting EDD within the specified

timelines.

## 5.3 EDD Procedures

EDD should be performed on a risk-based approach and should focus on obtaining information that can demonstrate or support the type of transactions or volume that the customers are carrying out.

A non-exhaustive list of additional information includes:

| | Individual | Entity |
|---|---|---|
| Additional information shall be obtained | ✓ Types of goods sold/service offering;<br>✓ Occupation; and<br>✓ Proof of address | ✓ Types of goods sold/service offering;<br>✓ Industry;<br>✓ Proof of business location;<br>✓ Full list of UBOs owning 10% or more, along with identity documents for each UBO;<br>✓ Ownership structure;<br>✓ Annual report and/or financial statement or tax return if applicable. |
| Additional verification on information obtained | ✓ The expected types of goods sold/service offering is consistent with the occupation.<br>✓ The expected transaction volume is consistent with the expected types of goods sold/service offering and the occupation.<br>✓ The proof of address is consistent with the resident address. | ✓ The expected types of goods sold/service offering are consistent with the industry.<br>✓ The expected transaction volume is consistent with the expected types of goods sold/service offering, the industry and the financial statement.<br>✓ The proof of business location to be consistent with the primary place of business or domicile.<br>✓ Visit and review the company website (if applicable) of the merchant to identify any inconsistency with the expected types of goods sold/service offering and industry. |

The following procedures outline the detailed process for performing EDD：

| Step | Process | Detailed Description |
|---|---|---|
| 01 | Confirming EDD Trigger | Before initiating the EDD process, ensure that the risk rating was correctly calculated.<br><br>EDD is required when<br>• Customer Risk Assessment rating is calculated as high risk; or<br>• Suspicions are identified over the course of screenings and transaction monitoring |

| 02 | Collect EDD related information | Collect EDD related information and documents from the customer through queries or interviews. L1 reviewer from CDD Team must perform, including but not limited to the following:<br>• Obtain additional customer information;<br>• Obtain additional information on the intended nature of the business relationship/reason for intended or performed transaction;<br>• Conduct enhanced ongoing monitoring of the business relationship |
|---|---|---|
| 03 | Verify information | Additional information obtained shall be verified against existing knowledge of customer and with independent source of verification.<br>Additional verification measures for Entity:<br>• Verify the identity of each UBO, and PEP check results for all new UBOs; and<br>• Obtain company search report from independent third party if needed. |
| 04 | Escalation for investigation | Review the case and may request additional documents/information/procedures to validate the risks.<br><br>L2 reviewer from Compliance Team would then revisit the case, based on the additional information provided and assess additional ML/Sanctions risks if any. |
| 05 | Approving or rejecting application | MLRO in conjunction with approval from senior management (a member from Board of Directors) could approve or reject the application and consider declining/exiting the relationship if the risk posed by a customer is beyond the Company's risk appetite.<br><br>In case an application is rejected, Sales Team and CDD Team will be informed of the decision.<br><br>If application is rejected/relationship is exited because of sanctions or ML/TF related reason, name shall be added to internal blacklist and consideration to file SAR should be made. |
| 06 | Acceptance of relationship and account opening | Notify CDD Team when the customer account opening request has been approved. |
| 07 | Update customer profile | All additional information collected should be updated in the customer profile. |

The approval of senior management to establish or continue the relationship is required for a business relationship that presents a high ML/TF risk.

All the records of investigation, together with all EDD records, will be documented electronically.

# 6. Simplified Due Diligence

To improve efficiency, we may streamline due diligence for low-risk customers, which include:

• Companies listed on any stock market.

• Governments in the FATF member area or agencies that perform similar functions as public institutions.

• Other institutional (or individual) customer whose funds come from a proven legal source and for which control persons and beneficial owner can be independently verified.

Simplified due diligence measures:

For listed companies, it is only necessary to obtain the customer's listing status on the stock exchange, that is to say, there is no need to identify the beneficial owner of the listed company. However, other procedural aspects of due diligence must be implemented and continuous monitoring of business relations is still necessary.

All the records of investigation, together with all SDD records, will be documented electronically.

# 7. Watch Lists Screening

## 7.1 Introduction to List Screening

Qbit Financial Service  is required to observe and maintain appropriate systems to conduct checks against the PEP list, Terrorists lists, Sanctions Lists and other blacklists for screening purposes to prevent the Company involving into the TF, sanction and PF activities, and to identify the risks to take applicable actions in time.

Qbit Financial Service  has an in-house automated system that utilizes data provided by Refinitive World- Check to screen on subjects:

1) customers, beneficiary owners and/or relevant parties, counterparties, banks, countries, etc.

2) employees (senior executives, etc.)

3) transaction details

against the lists when establishing business relationship and executing a transaction for customers. Screening shall also be conducted in a timely manner upon update to the lists.  Qbit Financial Service  automatically requests update data from World- Check and insert to local system. The alerts will be triggered if the name of the subject hit the list(s).

## 7.2 Screening Procedures

The Qbit Financial Service  list screening process involves three stages: before, during and after the event.

Pre-screening: refers to scanning the screening objects before customer onboarding or transaction processing. If it is an individual customer, it should be checked whether the name of the customer is on the monitoring list; if it is an enterprise customer, it should be checked whether the name of the enterprise, legal representative / director, and beneficial owner are on the monitoring list. If suspicious circumstances cannot be excluded, no business relationship/transaction can be completed.

The screening in the event refers to the screening conducted during the transaction; the main screening targets are the counterparty and the country/region of the transaction. If there is a potential hit, the transaction processing should be suspended;

Post-incident screening means that the system performs a retrospective scan after the customer onboards or after the transaction ends, when the customer information is updated or the list content is updated. The Compliance Department regularly reviews the use of the list screening system at least every two years, checks the effectiveness of the system, and updates the system and processes based on past conditions, to ensure the screening system is improved in light of changes in the domestic and international anti-money laundering situation.

## 7.3 Database Vendor

Qbit Financial Service uses the "list screening" service provided by World-check, a third-party data service provider.

Introduction

World-check provides lists of Sanction, Regulatory Enforcement, Legal Enforcement, Politically Exposed Persons and Other Body, matching algorithms, and case management systems. Examples of Sanction List:

- European Union Sanctions
- Canadian Sanctions
- Hong Kong Gazetted Sanctions List
- OFAC SDN List
- UK HM Treasury Sanction List
- United Nations Sanctions

Matching algorithm

World-check's matching logic is fuzzy matching.

## 7.4  Case Management System

Role Definition

The case processing role is called "investigator" and is divided into two levels, namely the first-level investigator and the second-level investigator. Complex cases can be reported to the second-level investigator for review. At the sametime, the company sets up quality control procedures, and the quality control specialist reviews the cases closed by the investigator to ensure the quality of the investigation.

- First-Level Investigator
  - The first-level investigator is responsible for the first-level review of the cases generated in the system in World-check. The role can make three kinds of judgments on the case: false positives, true hits, and report to the second-level investigator.

- Second-Level Investigator
  - The second-level investigator is mainly responsible for processing the cases reported by the first-level investigator, and can also directly handle the cases of the first-level investigator. The role can make two judgments about the case: false positives and true hits.

Case Handling

When investigating the case, the investigator compares the customer's information with the information of the hit list source.

Give priority to the potential true hit. For example, if the name field "Zhang San" hits the subject information in the database, it is first necessary to pay attention to whether the name field of the subject in the database is also "Zhang San": if not, it can be immediately determined that the case is false positive.

If the hit field matches the field in the database, continue to match other fields and elements, such as birthday, nationality, photos and other elements.

If the first-level investigator still fails to judge whether it is a true hit after a series of information comparison and verification, then it needs to be reported to the second-level investigator, and the review opinion cannot be empty.

The second-level investigator's review at this level must ensure that the L1 review provided sound rationale and judication for the case disposition. In the event, the L2 reviewer does not agree with the L1's conclusion, the case needs to be referred to MLRO for final decision.

Require Additional Information

When the existing customer information collected is insufficient and the investigator cannot be assisted in making a correct judgment, the investigator needs to contact the customer to obtain more additional information from the customer, but pay attention to the wording when contacting the customer to avoid disclosing sensitive information to customers. The customer must reply within the prescribed deadline. The customer's reply mail and other information must be uploaded to the system.

## 7.5  Emergency Response Mechanism

When the anti-money laundering system or data screening function occurs breakdown, sudden communication failure or improper database update, the anti-money laundering staff should immediately report to the MLRO, on the one hand actively contact the company's technical support department for maintenance, on the other hand contact the database supplier. It is required to provide immediate measures such as manual verification on the webpage, or download the latest sanction list for emergency use directly from the official website of the United Nations, OFAC website, EU website, etc. After the system is restored, we should retrospect the transactions have been processed or the customers have been onboarded when the problem occurred, and retain the relevant traces and instructions.

Through the investigation, if Qbit Financial Service  know that a (existing) customer or a beneficial owner of a (existing) customer is a PEP, the Company must not establish a business relationship/ continue its business relationship with the customer before

- Obtain approval from the senior management; and

- Take reasonable measures to establish the customer's or beneficial owner's source of wealth and the source of the funds that will be involved in the proposed business relationship.

All the records of investigation, together with all screening records, will be documented electronically.

# 8. Ongoing Monitoring

Qbit Financial Service continuously monitors its business relationship with a customer in two aspects, Ongoing Customer Due Diligence and Transaction Monitoring.

## 8.1 Ongoing Customer Due Diligence

Qbit Financial Service adopts RBA ongoing Customer Due Diligence, on whose information is re-reviewed with different

frequency. Customers of higher risk shall be re-reviewed with higher frequency. Qbit Financial Service ensures all

high-risk customers must be subject to a minimum of an annual review, and more frequently if deemed necessary.

| High Risk | Medium Risk | Low Risk |
|---|---|---|
| Every 6 months | Every 12 months | Every 24 months |

A customer information re-review shall be also triggered on certain scenarios, such as:

- Customer require to update his information that may cause change of his risk;

- Unusual or inconsistent transaction is to take place;

- Resume active of a dormant customer;

- Qbit Financial Service is aware that the customer, its associated parties, beneficiary owners, and/or agents posed adverse media news or events such as penalties or fines;

- The customer, its associated parties, beneficiary owners, and/or agents is believed to be sanctioned subject (sanctions not related to the business relationship), PEPs and/or special interested person/entity;

- Qbit Financial Service is aware that the customer's information is suspicious or lacks sufficient information;

- Other suspicious is detected.

## 8.2 Transaction Monitoring

Qbit Financial Service provides sufficient guidance to staff to enable them to form suspicion or to recognize the signs when ML/TF is taking place, which emphasize the nature of the transactions and customer instructions that staff is likely to encounter, the type of product or service and the means of delivery, are the key elements to identify the risks. And the guidance should also make sure all staff are made aware of the identity of the MLRO and of the procedures to follow when making an internal report; and all internal reports must reach the MLRO without undue delay.

Qbit Financial Service established and maintains an automated monitoring system to monitors all transactions with Risk Based Approach. This helps the Company identify any unusual/suspicious activity or changes in transaction patterns. Monitoring thresholds are adjusted on customer risk basis. The higher customer risk poses, the more restrict thresholds are applied. The following factors should be taken into account in the monitoring of suspicious transactions:

- Anti-money laundering regulations and guidelines, risk tips, analysis reports on types of money laundering and risk

assessment reports issued by regulatory bodies and the International Anti-Money Laundering Organization;

• Analysis of the criminal situation, risk warnings, reports on types of crimes and work reports issued by the judicial organizations;

• Anti-money laundering regulatory opinions issued by regulatory bodies;

• Other factors of concern to be issued by regulators.

### 8.2.1. Signal of Suspicious Transaction

The following is a (non-exhaustive) list of examples of situations that might give rise to suspicion in certain circumstances:

• transactions or instructions which have no apparent lawful purpose or appear not to have a commercial rationale;

• transactions, instructions or activity that involve apparently unnecessary complexity or which do not constitute the most logical, convenient or secure way to do business;

• where the transaction being requested by the customer, without reasonable explanation;

• where without reasonable explanation, the size or pattern of transactions is out of line with any pattern that has previously emerged;

• where the customer refuses to provide the information requested without reasonable explanation or who otherwise refuses to cooperate with the CDD and/or ongoing monitoring process;

• where a customer who has entered into a business relationship uses the relationship for a single transaction or for only a very short period without a reasonable explanation.

### 8.2.2. Monitoring of Terrorist Financing or other Illegal Activities

The Company has applied World-Check database to scan the name of customers and counterparties in real time. If the following lists of terrorist organizations and persons are monitored, and if there are reasonable grounds to suspect that the client or their counterparties, funds or other assets are related to the list, the compliance staff shall immediately submit a suspicious transaction report to the regulatory authority and take measures in accordance with the requirements of the relevant competent departments.

• Lists of terrorist organizations and persons required by regulatory authorities to carryout terrorist activities;

• Lists of terrorist organizations and persons of terrorist activities issued by the United Nations Security Council;

• The list of other organizations and personnel suspected of terrorist activities or illegal entities that the Government has requested to be concerned about;

• Where the list of terrorist organizations and persons of terrorist activities is adjusted,    the Company shall immediately  conduct a retrospective investigation and submit a suspicious transaction report in accordance with the provisions of the preceding paragraph;

• Where laws, administrative regulations and regulations provide otherwise for the monitoring of the above-mentioned lists.

### 8.3.3. Investigate Risk Alert

The compliance staff would investigate any transaction flagged by a risk alert to attempt to determine whether the transaction is a legitimate commercial transaction, the result of an inadvertent mistake, or a suspicious transaction.

In the course of investigation, our compliance staff may use any one, or a combination, of the following methods:

- Review the Customer's transaction history;
- Visit the Customer's Marketplace store;
- Open sources research for negative news;
- Contact the customer for further inquiries regarding the specific transaction.

**8.3.4. Transaction Block**

Qbit Financial Service  will block the transaction in the following scenarios:

- The customer account status is unnormal;
- The customer or counterparty hit the blacklist or high risk watchlist, such as PEP, Sanction, etc;
- The payment processing IP is unnormal;
- The amount is above the risk management threshold;
- Other high risk scenarios.

Qbit Financial Service  reviews the adequacy and effectiveness of the transaction monitoring systems and processes at least every two years. The parameters and thresholds shall be properly documented and independently validated to ensure that they are appropriate to its operations and context.

# 9. Suspicious Activity Reporting

## 9.1 Internal Reporting

When the compliance staff suspects that property is related to money laundering or terrorist financing activities, they should take the following measures:

- Investigate the transaction by collecting all relevant information;
- Prepare an internal investigation report (SAR Referral) which must include the full details of the customer and as full a statement as possible of the information giving rise to the suspicion;
- Submit investigation report to MLRO and he/she will decide whether to report to JFIU;
- Disclosures should be made either before a suspicious transaction or activity occurs (whether the intended transaction ultimately takes place or not), or after a transaction or activity has been completed.

The internal report shall be submitted to the compliance team directly once the staff recognize the signs of risks. The compliance team shall reply an acknowledgement of receipt and remind the reporting staff that this matter must not be discussed with any third party unless MLRO expresses consent. Any discussion or disclosure without consent may be considered "tipping-off₂" within the Regulations. The internal report could be submitted by email or paper documents, and must includes the following elements:

- The information of the customer;
- Date;
- Product;
- Narrative of suspicious scenario, such as the suspicious point, transaction details and related documents.

The Timeline of submitting SAR is as follows：

1) The compliance staff should issue due diligence requirement to customers within 2 working days (T+1) after the monitoring and analysis of suspicious transactions;

2) The client shall be required to give feedback on the relevant due diligence information within 3 working days after receiving the due diligence request (T+2);

3) If the client fails to give feedback about the due diligence within 3 working days, the compliance staff shall initiate a reminder, and shall cut down the customer's account function if still no answer without valid reasons within 2 working days after the reminder;

4) The compliance staff shall adopt "SAFE" approach to perform the investigation and submit an analysis result to the MLRO within 2 working days after receiving feedback on due diligence materials;

5) The MLRO shall review the result and decide whether to submits the judgment of the suspicious transaction to regulator within 5 working days;

6) Continuous monitoring of the customers and transactions involved in the suspicious transaction reports should be conducted. If suspicious transaction activity continues to occur and the suspicious characteristics do not change significantly, a follow-up report shall be submitted within three months from the date of the last suspicious transaction report; if a significant change in suspicious characteristics occurs, a new suspicious transaction report shall be submitted in accordance with the provisions;

7) The MLRO would review the documented disposition of risk alerts on a periodic basis to ensure that proper procedures are followed on the investigation and disposition of risk alerts. The MLRO has authority to remand for further investigation or reverse the determination reached by any other investigating compliance staff.

## 9.2 External Reporting

If Qbit Financial Service knows or suspects that any property:

- In whole or in part directly or indirectly represents any person's proceeds of;

- Was used in connection with, or;

- Is intended to be used in connection with terrorist financing, drug trafficking, money laundering, or other types of illegal activities.

Company shall file an SAR with the JFIU. Process by which suspicion is escalated externally (if applicable), by the MLRO. The MLRO will:

- Receive the internal investigation report.

- Document the evaluation process followed and the rationale for the decision to report or not to report to the appropriate authorities, the process and decision making should be done in 5 working days after received the internal report;

- Where a reportable suspicion has been formed, complete and transmit an SAR to JFIU with proper approach;

- Maintain a log of all SARs together with associated supporting documentation, including any further material information that becomes available from time to time;

- Ensure any person/entity subject to a SAR is considered as High risk and subjected to enhanced monitoring and review.

Records of SARs and supporting documentation are retained by the compliance team indefinitely. The number of SARs submitted to external investigating authorities is reported to the Board of Directors on a monthly basis. If SAR is lodged

prior to the transaction actually occur, the transaction must not be processed unless a Consent is acquired from JFIU. SAR against the same customer may cause the termination of the business relationship.

### 9.3 Request for Further Information (RFI)

Qbit Financial Service  may receive inquiries from Competent Authorities on certain customer relationship or transactions. Compliance Team should respond tothe RFI in an effective and timely manner.

Qbit Financial Service  should respond to such RFI within the required time limit by providing information or material that fall within the scope of the request. Where the Company encounters difficulties in complying with the timeframes stipulated, officer-in-charge of the investigation should be contacted at the earliest opportunity for further guidance. During a law- enforcement investigation, should freeze the relevant accounts and transactions related to the investigation.

### 9.4 Post SAR Management

After SAR reporting, a review of the concerned customer relationship should be considered irrespective of the feedback provided by the JFIU; appropriate risk mitigating measures should be applied,e.g. exiting customer relationship or raising customer risk rating.

**Continue Customer Relationship with Enhanced monitoring**

If MLRO determines that the risk of maintaining a concerned customer relationship despite internal/external SAR reporting is tolerable, the concerned customer relationship can be continued with enhanced monitoring and/or pre-approval of transaction.

Enhanced Monitoring

 Customer risk rating of concerned customer should be updated to high risk and the customer relationship should be subjected to enhanced monitoring. CDD Team should perform trigger eventCDD review as a result of the SAR reporting, and regular periodic review and customer risk rating should be reviewed at least every 6 months (in line with customers with high customer risk rating).

Pre-approval of Transaction

If SAR is submitted due to suspicious transactions, Compliance Team should assess if pre- approval on all or certain transactions should be obtained prior to executing such transactions.

**Exit Customer Relationship**

If MLRO determines that the risk of maintaining a concerned customer relationship despite internal/external SAR reporting is beyond Qbit Financial Service 's risk appetite, MLRO should notify Sales Team and CDD Team of the decision to terminate the customer relationship and add the customer to the Internal Blacklist.

# 10.  Record Keeping

The objective of record keeping is to ensure that the Company are able to provide the basic information about customer and to reconstruct the individual transactions undertaken at the request of the relevant authorities at any given time.

Qbit Financial Service  retains its customer, transaction, CRA and AML/CTF monitoring and investigation records electronically. Qbit Financial Service  complies with the regulations and proactively keeps records created or generated through the business relationship.

Qbit Financial Service  will comply with the regulations and maintain customer/transaction records for no less than 5 years after the end of the business relationship/the completion of transaction.

All correspondence/reports, both internal and with the appropriate authority, in connection with suspicious transactions will be retained by Qbit Financial Service  for a minimum period of 5 years after the relevant authority has closed the case.

The system can access all the records anytime, and can extract records no longer than 3 working days, which is mainly according to the data size.

# 11. Training

Staff training is an important element of an effective system to prevent and detect ML/TF activities. Staff should be trained in what they need to do to carry out their particular roles with respect to AML/CTF.

Qbit Financial Service  provides training to all staff at the start of employment, and on an annual basis thereafter. The training enables employees to recognize suspicious transactions, and ensures they are aware of their responsibilities to report suspicious activity to the MLRO and apply customer due diligence. As a minimum, the training covers:

- Money laundering and terrorist financing risks faced by Qbit Financial Service ;
- Policies and procedures in place to manage the risks;
- Customer due diligence;
- Suspicious Activity reporting, internal and external procedures;
- The identity and responsibilities of the MLRO;
- Possible consequences for failure to report suspicious transactions under AMLO, DTROP, the OSCO and the UNATMO;
- Changing trends and money laundering practices.

The training shall be provided to the certain groups of staff to ensure they aware their responsibility in related to AML/CTF:

- All new staff, irrespective of seniority;
- Members of staff who are dealing directly with the public (e.g. Customer Service Dep);
- Back-office staff (e.g. Risk Dep), depending on their roles;
- Managerial staff including internal audit officers and CO/MLRO.

No matter which training approach is adopted, Qbit Financial Service  shall monitor and maintain records of who have been trained, when the staff received the training and the type of the training provided. Training records will be retained for a minimum  of 5 years. Training records include:

- a copy of the training materials;
- completion of the training;
- a list of staff who have completed training, with dates, with their signatures, or electronic training records.

Qbit Financial Service monitors the effectiveness of the training, which be achieved by:

- Testing staff's understanding of the policies and procedures to combat ML/TF, the understanding of their statutory and regulatory obligations, and also their ability to recognize suspicious transactions;

- Monitoring the compliance of staff with the AML/CTF Systems as well as the quality and quantity of internal reports so that further training needs maybe identified and appropriate action can betaken; and

- Monitoring attendance and following up with staff who miss such training without reasonable cause.

# 12. Cooperation with Requests from Law Enforcement Agencies

Qbit Financial Service established and maintains procedures to handle requests from law enforcement agencies, the MLRO will be the main point of contact with law enforcement agencies. After receiving the requests, the MLRO will report to the senior management to acquire the sufficient resources.

Qbit Financial Service shall respond to any search warrant and production order within the required time limit by providing all the information or material that fall within the scope of the request. At the same time, Qbit Financial Service must assess the risks involved and the need to conduct an review on the customer or the business relationship to determine whether there is any suspicion and should also be aware that the customer subject to the request can be a victim of crime.

During a law-enforcement investigation, Qbit Financial Service maybe served with a restraint order, which prohibits the dealing with particular funds or property pending the outcome of an investigation. Qbit Financial Service shall ensure that it is able to freeze the relevant property that is the subject of the order.

Qbit Financial Service shall strictly follow the confiscation order in the event that it holds funds or other property belonging to that defendant that are deemed by the court to represent his benefit from the crime.

# 13. Policy Administration

Qbit Financial Service reviews this policy at least annually.

| Revision Number | Reason for Change | Policy Owner | Review Authority | Director Signature | Approval Date |
|---|---|---|---|---|---|
| 1.0 | Policy Establish | Wu Yujun | Director | | 2019.8.19 |
| 1.1 | Policy | Wu | Director | | 2020.6.30 |

|  | Update | Yujun |  |  |  |
|---|---|---|---|---|---|
| 1.2 | Policy Update | Wu Yujun | Director |  | 2021.04.12 |
| 1.3 | Policy Update | Wu Yujun | Director |  | 2022.07.15 |
| 1.4 | Policy Update | Wu Yujun | Director |  | 2023.07.25 |
| 2.0 | Policy Update | Wu Yujun | Director |  | 2023.11.10 |
| 2.1 | Policy Update | Wu Yujun | Director |  | 2024.01.05 |
| 2.2 | Policy Update | Wu Yujun | Jessica Huang *Jessica Huang* |  | 2024.03.08 |

# Glossary

**Beneficial owner**

A beneficial owner is normally a natural person who ultimately owns or controls the customer or on whose behalf a transaction or activity is being conducted.

Defines beneficial owner in relation to a corporation as:

(i) an individual who -

(a) owns or controls, directly or indirectly, including through a trust or bearer shareholding, more than 25% of the issued share capital of the corporation;

(b) is, directly or indirectly, entitled to exercise or control the exercise of more than 25% of the voting rights at general meetings of the corporation; or

(c) exercises ultimate control over the management of the corporation; or

(ii) if the corporation is acting on behalf of another person, means the other person.

Defines beneficial owner, in relation to a partnership as:

(i) an individual who

(a) is entitled to or controls, directly or indirectly, more than a 25% share of the capital or profits of the partnership;

(b) is, directly or indirectly, entitled to exercise or control the exercise of more than 25% of the voting rights in the partnership; or

(c) exercises ultimate control over the management of the partnership; or

(ii) if the partnership is acting on behalf of another person, means the other person.

**Connected party**

A connected party of a customer that is a legal person, a trust or other similar legal arrangement:

(a) in relation to a corporation, means a director of the customer;

(b) in relation to a partnership, means a partner of the customer;

(c) in relation to a trust or other similar legal arrangement, means a trustee (or equivalent) of the customer; and

(d) in other cases not falling within subsection (a), (b) or (c), means a natural person holding a senior management position or having executive authority in the customer.

**Dormant customer**

Qbit Financial Service defines a dormant customer as an active customer that raise no activity, operation or service request with Qbit Financial Service for 90 days

**PEP**

Definition of PEP and close associate is accordance with that provided by AMLO: A (foreign) PEP is:

(a) an individual who is or has been entrusted with a prominent public function in place outside U.S. and EU and

    (i) includes a head of state, head of government, senior politician, senior government, judicial or military official, senior executive of a state-owned corporation and an important political party official;

    (ii) but does not include a middle-ranking or more junior official of any of the categories mentioned in subparagraph (i);

(b) a spouse, a partner, a child or a parent of an individual falling within paragraph (a) above, or a spouse or a partner of a child of such an individual; or

(c) a close associate of an individual falling within paragraph (a).


**Source of Wealth**

Source of wealth refers to the origin of an individual's entire body of wealth (i.e. total assets). This information will usually give an indication as to the size of wealth the customer would be expected to have, and a picture of how the individual acquired such wealth. Although an MSO may not have specific information about assets not deposited with or processed by it, it maybe possible to gather general information from the individual, commercial databases or other open sources.

**Source of Funds**

Source of funds refers to the origin of the particular funds or other assets which are the subject of the business relationship between an individual and the MSO (e.g. the amounts being invested, deposited, or wired as part of the business relationship). Source of funds information should not simply be limited to knowing from which the funds may have been transferred, but also the activity that generates the funds. The information obtained should be substantive and establish a provenance or reason for the funds having been acquired.

## Appendix A: Prohibited Countries/Regions

| Countries |
|---|
| Iran |
| Sudan, South |
| Syria |
| Democratic People's Republic of Korea (DPRK) |
| Cuba |
| Crimea |
| Sudan |
| Libya |
| Russia |
| Belarus |
| Venezuela |
| Myanmar |
| Ukraine |
| Somalia |
| Luhansk |
| Donetsk |
| Central African Republic |

## Appendix B: Prohibited Industries

| Industries |
| --- |
| Explosives, Weapons, and Related Items |
| Replica weapons |
| Prescription |
| Narcotic drugs |
| Human Organs |
| Illegal tool |
| Animals, wildlife products |
| Gambling & Lottery |
| Jewelry & Precious Gems |
| Pesticides and Pesticide Devices |
| Tobacco & Tobacco-Related Products |
| Currency, Coins, and Cryptoassets and Cash Equivalents |
| Counterfeit goods, replicas, and other Intellectual Property Violations |
| Radioactive Materials |
| Luxury Artwork |
| Pornographic, violent, obscene books and audio-visual products |
| Adult Erotica Products |
| Cultural Relic |
| Coupons and Prepaid Cards |
| Government documents, Personal Identity Cards and permits |
| Offense Products |
| Real Estate |
| Stocks and other securities |
| Products related to Personal Privacy and Security |
| Other Illegal Products |

# EXHIBIT B

| Rules Name | Rules ID | Description | Cycle (Day) | Remark |
|---|---|---|---|---|
| Large Amount Transaction | LAT01 | Per User (based on UID)<br><br>Single payment transaction amount<br>≥10,000 USD (if the user's risk level is high)<br>≥30,000 USD (if the user's risk level is medium)<br>≥50,000 USD (if the user's risk level is low) | 1 | Trigger manual review and RFI |
| | LAT02 | Per User (based on UID)<br>Per beneficiary account (based on bank account/BIC code)<br>Cumulative amount of payment per day<br>≥15,000 USD (if the user's risk level is high)<br>≥35,000 USD (if the user's risk level is medium)<br>≥55,000 USD (if the user's risk level is low) | 1 | Trigger alert with transaction approved |
| | LAT03 | Per User (based on UID)<br>Per beneficiary account (based on bank account/BIC code)<br>Cumulative amount of payment per month<br>≥70,000 USD (if the user's risk level is high)<br>≥210,000 USD (if the user's risk level is medium)<br>≥350,000 USD (if the user's risk level is low) | 30 | |
| | LAT04 | Per User (based on UID)<br><br>Cumulative amount of payment per day<br>≥50,000 USD (if the user's risk level is high)<br>≥80,000 USD (if the user's risk level is medium)<br>≥100,000 USD (if the user's risk level is low) | 1 | Trigger alert with transaction approved |
| | LAT05 | Per User (based on UID)<br><br>Cumulative number of payment per month<br>≥100,000 USD (if the user's risk level is high)<br>≥300,000 USD (if the user's risk level is medium)<br>≥500,000 USD (if the user's risk level is low) | 30 | |
| High Frequency Transaction | HFT01 | Per User (based on UID)<br>Cumulative number of payment ≥4<br>Cumulative amount of payment ≥1000 USD | 1 | Trigger alert with transaction approved |
| | HFT02 | Per User (based on UID)<br>Cumulative number of payment ≥9<br>Cumulative amount of payment ≥2000 USD | 3 | |
| | HFT03 | Per User (based on UID)<br>Per beneficiary account (based on bank account/BIC code)<br>Beneficiary account with different name<br>Cumulative number of payment≥3 | 1 | |
| | HFT04 | Per User (based on UID)<br>Per beneficiary account (based on bank account/BIC code)<br>Beneficiary account with different name<br>Cumulative number of payment≥8 | 3 | |
| | AFT01 | Per User (based on UID)<br>The total amount of payment T+0≥10000 USD<br>(The total amount of payment T+0 - The daily average amount of payment T-8~T-1) / (The daily average amount of payment on T-8~T-1)≥50%<br>The daily average amount of payment on T-8~T-1>0 | 7 | Trigger alert with transaction approved |
| | AFT02 | Per User (based on UID)<br>The total amount of payment T+0≥10000 USD<br>(The total number of payment on T+0 - The average number of payment on T-31~T-1) / (The average number of payment on T-31~T-1) ≥40% | 30 | Trigger alert with transaction approved |

| | | | | |
|---|---|---|---|---|
| Abnormal Transaction | | The daily average amount of payment T-31~T-1>0 | | |
| | AFT03 | Per User（based on UID） | 7 | Trigger alert with transaction approved |
| | | The total number of payment on T+0≥3 | | |
| | | (The total number of payment on T+0 - The average number of payment on  T-8~T-1) / (The average number of payment on T-8~T-1) ≥50% | | |
| | | The daily average amount of payment on T-8~T-1>0 | | |
| | AFT04 | Per User（based on UID） | 30 | Trigger alert with transanction approved |
| | | The total number of payment on T+0≥3 | | |
| | | (The total number of payment on T+0 - The average number of payment on  T-31~T-1) / (The average number of payment on T-31~T-1) ≥40% | | |
| | | The daily average amount of payment on T-31~T-1>0 | | |
| | AFT05 | Per User（based on UID） | N/A | Trigger  manual review and RFI |
| | | The counterpary is a personal account | | |
| | | Single payment transaction amount ≥10000 USD | | |
| | AFT06 | Per beneficiary account (based on bank account/BIC code) | 3 | Trigger alert with transanction approved |
| | | Received payments from ≥5 users（based on UID） | | |
| | AFT07 | Per User（based on UID） | 3 | Trigger alert with transanction approved |
| | | The counterpary is a personal account | | |
| | | Cumulative number of payments≥5 | | |
| | AFT08 | Per User（based on UID） | 3 | Trigger alert with transanction approved |
| | | Complete the payment to ≧5 external bank accounts | | |
| High Risk Country Transaction | HRC01 | The country where the payer or bank is located is high risk | N/A | Trigger manual review and RFI |
| | | The country where the receiver or bank is located is high risk | | |

# EXHIBIT C



# Analysis Report

# of TRX Transactions

No. 202410101130

Oct 10th, 2024



**SECURING BLOCKCHAIN ECOSYSTEM**

**WWW.BEOSIN.COM**

# Contents

1 Overview.........................................................................................................................................4

2 Analysis Process.........................................................................................................................5

3 Summary....................................................................................................................................14

4 About Beosin.............................................................................................................................15

## ● **Analysis Description**

Commissioned by Qbit, Beosin conducted an in-depth analysis of the disputed TRX transactions to determine their nature and identify potential sources of risk. Based on Beosin's thorough investigation, all relevant facts will be clearly presented in this report, which provides only factual interpretations and statements regarding the transactions.

Transaction Analysis

# 1 Overview

| Platform | Tron |
|---|---|
| Related Addresses | TPpcsyzfjnJKbmBFdfYNbDKmdnpXBqtjVf<br>TQ5H5A48RqgeCEjJJRipgvzx5QATKVx6HK<br>TYdJv19WaC992rhseXA4j27R5FM2dKVDqk<br><br>TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW<br>TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z<br>TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm |

# 2 Analysis Process

Using the TRON blockchain explorer website (https://tronscan.io/), we queried the wallet address TYdJv19WaC992rhseXA4j27R5FM2dKVDqk. This address received a transfer of 0.000003 TRX from address TQ5H5A48RqgeCEjJJRipgvzx5QATKVx6HK and another transfer of 0.000005 TRX from address TPpcsyzfjnJKbmBFdfYNbDKmdnpXBqtjVf, as shown in Figures 1 and 2.

By querying the addresses TQ5H5A48RqgeCEjJJRipgvzx5QATKVx6HK and TPpcsyzfjnJKbmBFdfYNbDKmdnpXBqtjVf on the blockchain explorer, we found that these two addresses, in addition to transferring small amounts of TRX to address TYdJv19WaC992rhseXA4j27R5FM2dKVDqk, also sent small TRX transfers to several other different addresses.

Figure 1: Partial screenshot of the transaction history for address TYdJv19WaC992rhseXA4j27R5FM2dKVDqk.



Figure 2: Partial screenshot of the transaction history for address TYdJv19WaC992rhseXA4j27R5FM2dKVDqk.

tronscan.org/#/address/TYdJv19WaC992rhseXA4j27R5FM2dKVDqk

A total of 3,768 transaction(s). Track this account's activities

| Txn Hash | Block | Time (UTC) | Transaction Type | From | To | Token | Result |
|---|---|---|---|---|---|---|---|
| 5ce154994...8e9d2 | 61676063 | 2024-05-14 07:20:27 | Transfer TRX | TAVfMrYGZdYSPDY... ihnYu9a | TYdJv19WaC992r...2dKVDqk | 0.000005 TRX | ✓ |
| f1fae1aee7...470d1 | 61676061 | 2024-05-14 07:20:21 | Transfer TRX | TUZrmRDU1tF3nS...kUSUw5C | TYdJv19WaC992r...2dKVDqk | 0.000003 TRX | ✓ |
| 79d56458... 18013 | 61676049 | 2024-05-14 07:19:45 | Transfer TRX | TQ5mCVWEN6W... 3MSTP9C | TYdJv19WaC992r...2dKVDqk | 0.000005 TRX | ✓ |
| 40a693163...4f8b5 | 61655470 | 2024-05-13 14:10:30 | Transfer TRX | THbvnvqfUttx6WP... KGfCCsb | TYdJv19WaC992r...2dKVDqk | 0.00052 TRX | ✓ |
| bb20ccf37... 79287 | 61651196 | 2024-05-13 10:36:42 | Reclaim Resources | TBj8BrNjqS4MCa... QUQPbV5 | TYdJv19WaC992r...2dKVDqk | 0 TRX | ✓ |
| 8de78aa29... cd80f | 61650518 | 2024-05-13 10:02:48 | Transfer | TYdJv19WaC992rh...2dKVDqk | SC USDT Token | 0 TRX | ✓ |
| 45e179f36... e3a9b | 61650516 | 2024-05-13 10:02:42 | Delegate Resources | TBj8BrNjqS4MCa... QUQPbV5 | TYdJv19WaC992r...2dKVDqk | 0 TRX | ✓ |
| 2de0b06f9...5295e | 61650192 | 2024-05-13 09:46:30 | Transfer TRX | TTKL5R2deNLcYk...ZmNzM76 | TYdJv19WaC992r...2dKVDqk | 0.000004 TRX | ✓ |
| ed465af53f... a73cf | 61650179 | 2024-05-13 09:45:51 | Transfer TRX | TXGNDwj8UAMGW...nt6K7bF | TYdJv19WaC992r...2dKVDqk | 0.000003 TRX | ✓ |
| 29e35aeb2...531a6 | 61650177 | 2024-05-13 09:45:45 | Transfer TRX | TSSotegpUnx1J28... HT5FCUJ | TYdJv19WaC992r...2dKVDqk | 0.000001 TRX | ✓ |
| 9174be0b... 7664a | 61650172 | 2024-05-13 09:45:30 | Transfer TRX | TPpcsyzfjnJKbmBFdf... XBqtjVf | TYdJv19WaC992r...2dKVDqk | 0.000005 TRX | ✓ |
| 1490fa057...84270 | 61648696 | 2024-05-13 08:31:42 | Reclaim Resources | TBj8BrNjqS4MCa... QUQPbV5 | TYdJv19WaC992r...2dKVDqk | 0 TRX | ✓ |
| e202bba7c...14683 | 61648079 | 2024-05-13 08:00:51 | Transfer TRX | TGvjigcUEPvjCrBR3... 8eBSTk6 | TYdJv19WaC992r...2dKVDqk | 0.000353 TRX | ✓ |
| 063c2e0c7...b0d63 | 61648063 | 2024-05-13 08:00:03 | Transfer | TYdJv19WaC992rh...2dKVDqk | SC USDT Token | 0 TRX | ✓ |

By using the TRON blockchain browser website (https://tronscan.io/) to query the wallet addresses TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z and TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm, we identified several transactions related to the address TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW. From the transaction records, the following two transaction snapshots were selected as examples:

Figure 3: Screenshot of the transaction list for address TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z

tronscan.io/#/address/TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z

| Group | Txn Hash | Block | Time (UTC) | Transaction Type | From | To | Token | Result |
|---|---|---|---|---|---|---|---|---|
| 1 | 1f46c48a4... c27ce | 65190482 | 2024-09-13 09:24:12 | Reclaim Resources | TRnaLNahtEUeZ4... cJwAmH9 | TJoB6F1UQvReV2...XwGbv4z | 0 TRX | ✓ |
| | 28312783... 292d2 | 65189870 | 2024-09-13 08:53:36 | Transfer | TJoB6F1UQvReV2... XwGbv4z | SC USDT Token | 0 TRX | ✓ |
| | 52d9fc918... 55e33 | 65189868 | 2024-09-13 08:53:30 | Transfer TRX | TGn4LVcWSPtnFe... La9zBQW | TJoB6F1UQvReV2...XwGbv4z | 0.345 TRX | ✓ |
| | 5d620c8ff... be430 | 65189868 | 2024-09-13 08:53:30 | Delegate Resources | TRnaLNahtEUeZ4... cJwAmH9 | TJoB6F1UQvReV2...XwGbv4z | 0 TRX | ✓ |
| | da836eec7... bfde9 | 65189426 | 2024-09-13 08:31:24 | Transfer TRX | TU2ywFuzWuyMWa... F7xsq5i | TJoB6F1UQvReV2...XwGbv4z | 0.000001 TRX | ✓ |
| 2 | 08b0f8957... 476f6 | 65188082 | 2024-09-13 07:24:12 | Reclaim Resources | TRnaLNahtEUeZ4... cJwAmH9 | TJoB6F1UQvReV2...XwGbv4z | 0 TRX | ✓ |
| | 7b12e73e0...34a0c | 65187443 | 2024-09-13 06:52:15 | Transfer | TJoB6F1UQvReV2... XwGbv4z | SC USDT Token | 0 TRX | ✓ |
| | 769da15fa9...9ef9f | 65187441 | 2024-09-13 06:52:09 | Transfer TRX | TGn4LVcWSPtnFe... La9zBQW | TJoB6F1UQvReV2...XwGbv4z | 0.345 TRX | ✓ |
| | ab8fddd7b... 2b01f | 65187441 | 2024-09-13 06:52:09 | Delegate Resources | TRnaLNahtEUeZ4... cJwAmH9 | TJoB6F1UQvReV2...XwGbv4z | 0 TRX | ✓ |
| 3 | 6b0fb60c4... 44ab1 | 65187182 | 2024-09-13 06:39:12 | Reclaim Resources | TRnaLNahtEUeZ4... cJwAmH9 | TJoB6F1UQvReV2...XwGbv4z | 0 TRX | ✓ |
| | 18ee2bcbb... f33a8 | 65186810 | 2024-09-13 06:20:36 | Transfer TRX | TVijH5MZ7iE5ejfJdi...odwvj4A | TJoB6F1UQvReV2...XwGbv4z | 0.000007 TRX | ✓ |
| | 14103ed16...12ced | 65186571 | 2024-09-13 06:08:39 | Transfer | TJoB6F1UQvReV2... XwGbv4z | SC USDT Token | 0 TRX | ✓ |
| | 28df86913e...f447f | 65186569 | 2024-09-13 06:08:33 | Delegate Resources | TRnaLNahtEUeZ4... cJwAmH9 | TJoB6F1UQvReV2...XwGbv4z | 0 TRX | ✓ |
| | 4df16fcca4...d17a2 | 65186569 | 2024-09-13 06:08:33 | Transfer TRX | TGn4LVcWSPtnFe... La9zBQW | TJoB6F1UQvReV2...XwGbv4z | 0.345 TRX | ✓ |



Transaction Analysis

Figure 4:Screenshot of the transaction list for address TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm



Based on the data shown in Figures 3 and 4, the following pattern has been identified: every time address TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW transfers TRX to addresses TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z and TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm, a transaction of type "Delegated Resource" initiated by address TRnaLNahtEUeZ4L63mM9euS3wndcJwAmH9 is received both before and after the TRX transfer. Subsequently, a USDT transfer is initiated by the TRX transfer and the delegated resource address, consuming 0 TRX (the energy required for the transfer is provided by the delegated resource address). Finally, the address that initiated the proxy resource transfer will initiate another transaction of type "Reclaim Resource".

Figure 5: Screenshot of permissions for address TRnaLNahtEUeZ4L63mM9euS3wndcJwAmH9



As shown in Figure 5, upon querying the delegated resource address TRnaLNahtEUeZ4L63mM9euS3wndcJwAmH9, it is found that this address has other permissioned addresses. It has granted "delegated resource" and "reclaim resource" permissions to the address TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW.

Figure 6: Screenshot of the transaction list for address TRnaLNahtEUeZ4L63mM9euS3wndcJwAmH9

Transaction Analysis



As shown in Figure 6, the analysis of the transaction records for address TRnaLNahtEUeZ4L63mM9euS3wndcJwAmH9 reveals that this address primarily serves to provide the energy resources required for transfers to other addresses.

Figure 7: Screenshot of the outgoing TRX address analysis for TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW



Figure 8: Screenshot of the outgoing TRX address analysis for TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW (2)

Transaction Analysis



As shown in Figures 7 and 8, by querying multiple outgoing TRX records for the address TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW, it can be observed that after this address transfers TRX to a certain address, there is always a subsequent delegated resource authorization transaction. Following that, the authorized address initiates a USDT transfer, and after the transfer is completed, a resource reclamation transaction is executed.

Figure 9: Screenshot of address TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z receiving a TRX transfer from address TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW



Figure 10: Screenshot of address TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm receiving a TRX transfer from address TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW



Through the TRON blockchain explorer website (https://tronscan.io/), we queried wallet addresses TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z and TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm. As shown in Figures 9 and 10, as of September 19, 2024, the statistics reveal that address

TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z received a total of 288 transfers amounting to 99.2 TRX (approximately 15.13 USDT) from address TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW. Similarly, address TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm received 259 transfers totaling 89.01 TRX (approximately 13.6 USDT) from the same address. Notably, aside from the first TRX transfer of 0.000001 TRX, all subsequent transfers were of 0.345 TRX each.

Figure 11: Screenshot of the transaction details for one of the USDT transfers from address TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm



When transferring USDT on the TRON blockchain, the address needs to consume approximately 345 bandwidth and over 30,000 energy. According to the bandwidth rules on the TRON chain, there is free bandwidth available daily. However, if the number of transactions is excessive and the bandwidth is insufficient, TRX must be consumed to acquire additional bandwidth, where 1 TRX equals 1,000 bandwidth. As shown in Figure 11, transferring USDT consumes 0.345 TRX for bandwidth use.

(For information on energy, bandwidth, and delegated resources, you can visit the following links:

1. https://support.tronscan.org/hc/en-us/articles/360041445672-What-are-Bandwidth-and-Energy

Transaction Analysis

2. https://support.tronscan.org/hc/en-us/articles/17212356517785-How-to-delegate
-my-resources-to-others）

# 3 Summary

The energy required for USDT transfers from addresses
TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z and
TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm is mainly provided by a resource
delegation address. Prior to receiving a resource delegation transaction, a TRX transfer from
address TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW is observed, with an amount of 0.345
TRX. The purpose of this transfer is to ensure that the USDT transfer proceeds smoothly,
without failing due to insufficient bandwidth. In addition to providing TRX to
TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z and
TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm, this address also provides TRX to other
addresses, followed by delegated resource-related transactions. Therefore,
TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW is a dedicated address providing energy
leasing services.

As of September 19, 2024, the 288 transfers totaling 99.2 TRX (approximately 15.13 USDT)
to TJoB6F1UQvReV29FsjXD65ox8RDXwGbv4z and 89.01 TRX (approximately 13.6 USDT)
to TCs5sYLboUpHKWqBW3HF9nfVByEPViBWPm from
TGn4LVcWSPtnFev44viMNnwDfxnLa9zBQW are not attack or malicious activities. These
are normal transactions for energy leasing services.

(Note: TRX energy leasing service refers to a feature on the TRON blockchain network that
allows users to rent energy from other accounts to execute smart contract operations or
transactions without needing to hold sufficient energy themselves. This also helps reduce
transaction fees. In the TRON network, energy and bandwidth are the two basic resources
for transactions, similar to gas fees on Ethereum.)

# 4 About Beosin

Beosin is a leading global blockchain security company co-founded by professors from world-renowned universities and there are 40+ PhDs in the team. It has offices in Singapore, Hong Kong, Japan and other 10+ countries and regions. With the mission of "Securing Blockchain Ecosystem", Beosin provides "All-in-One" blockchain security solution covering Smart Contract Audit, On-chain Risk Monitoring & Alert, KYT AML, and Crypto Tracing. Beosin has already audited more than 3000 smart contracts including famous Web3 projects PancakeSwap, DODO, DeBox and Ankr. The KYT AML are serving 100+ institutions including Hashkey, Cobo, OpenBlock, Aegis and Celer.





**Official Website**
https://www.beosin.com



**Telegram**
https://t.me/beosin



**Twitter**
https://twitter.com/Beosin_com



**Email**
service@beosin.com